# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

## MOTION INFORMATION STATEMENT

**Docket Number(s):** _____    _____ Caption [use short title] _____

**Motion for:** _____

_____

_____

Set forth below precise, complete statement of relief sought:

_____

_____

_____

_____

_____

_____

**MOVING PARTY:** _____    **OPPOSING PARTY:** _____
- ☐ Plaintiff    ☐ Defendant
- ☐ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** _____    **OPPOSING ATTORNEY:** _____
[name of attorney, with firm, address, phone number and e-mail]

_____    _____

_____    _____

_____    _____

Court-Judge/Agency appealed from: _____

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
- ☐ Yes  ☐ No (explain):_____

_____

Opposing counsel's position on motion:
- ☐ Unopposed  ☐ Opposed  ☐ Don't Know

Does opposing counsel intend to file a response:
- ☐ Yes  ☐ No  ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below?    ☐ Yes  ☐ No

Has this relief been previously sought in this Court?    ☐ Yes  ☐ No

Requested return date and explanation of emergency:_____

_____

_____

_____

_____

Is oral argument on motion requested?    ☐ Yes  ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes  ☐ No  If yes, enter date:_____

**Signature of Moving Attorney:**

_____**Date:** _____    Service by:  ☐ CM/ECF    ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# 14-2902-cr

## In the United States Court of Appeals for the Second Circuit

---

UNITED STATES OF AMERICA,
APPELLEE

*v.*

JESSE C. LITVAK,
DEFENDANT-APPELLANT

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (CRIM. NO. 13-19)
(THE HONORABLE JANET C. HALL, C.J.)*

---

**MOTION FOR RELEASE PENDING APPEAL**

---

KANNON K. SHANMUGAM
DANE H. BUTSWINKAS
ALLISON B. JONES
MASHA G. HANSFORD
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000*

# TABLE OF CONTENTS

Page

Introduction ...................................................................................................1

Statement .......................................................................................................2

Argument .......................................................................................................6

I.  It is undisputed that Mr. Litvak poses no risk of flight or danger to the community ..............................................................................................7

II. Mr. Litvak's appeal raises substantial questions likely to result in reversal or a new trial ...........................................................................7

    A.  The appeal raises substantial questions ...............................................8

        1.  Materiality ...................................................................................8

        2.  Evidentiary rulings ....................................................................11

        3.  Scienter .....................................................................................14

    B.  A favorable ruling would lead to reversal or a new trial ...................18

Conclusion ..................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Appert* v. *Morgan Stanley Dean Witter, Inc.*,
   673 F.3d 609 (7th Cir. 2012) ...............................................................9

*Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) .........................................18

*Feinman* v. *Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996)...........9, 10, 19

*Gupta* v. *United States*, No. 12-4448 (2d Cir.)......................................20

*Marx & Co.* v. *Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977)................13

*McCaw* v. *O'Malley*, 249 S.W. 41 (Mo. 1923) ....................................10

*Neder* v. *United States*, 527 U.S. 1 (1999) ...........................................18

*Steiner* v. *Hughes*, 44 P.2d 857 (Okla. 1935) .........................................10

*United States* v. *Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ........................6

*United States* v. *Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ......................17

Cases—continued:

*United States* v. *Certified Environmental Services, Inc.*,
753 F.3d 72 (2d Cir. 2014) ................................................13, 14, 18, 19

*United States* v. *English*, 629 F.3d 311 (2d Cir. 2011)............................6

*United States* v. *Garcia*, 340 F.3d 1013 (9th Cir. 2003) ......................20

*United States* v. *Gaudin*, 515 U.S. 506 (1995) ......................................17

*United States* v. *Mandanici*, 205 F.3d 519 (2d Cir. 2000)......................18

*United States* v. *Mucciante*, 21 F.3d 1228 (2d Cir. 1994)......................17

*United States* v. *Randell*, 761 F.2d 122 (2d Cir. 1985) ........................8, 18

*United States* v. *Regent Office Supply Co.*,
421 F.2d 1174 (2d Cir. 1970) ..................................................*passim*

*United States* v. *Starr*, 816 F.2d 94 (2d Cir. 1987)............................15, 16, 17, 19

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013)............................8, 11, 14, 15

*United States* v. *Viloski*, No. 12-265,
2014 WL 401074 (2d Cir. Feb. 4, 2014) (summary order) ................17

## STATUTES AND RULES

15 U.S.C. § 78ff .................................................................................2

15 U.S.C. § 78j(b) ...............................................................................2

18 U.S.C. § 1001 ...........................................................................2, 3, 18

18 U.S.C. § 1031 ...........................................................................2, 3, 18

18 U.S.C. § 3143(b) .........................................................................1, 6

Fed. R. App. P. 9(b) ...........................................................................1

Fed. R. Crim. P. 29.............................................................................6

Fed. R. Evid. 401 ...............................................................................14

## MISCELLANEOUS

Administrative Office of the U.S. Courts,
*Judicial Business of the United States Courts* (2013) ........................19

Pursuant to Federal Rule of Appellate Procedure 9(b) and 18 U.S.C. § 3143(b), defendant-appellant Jesse Litvak moves for an order granting continued release pending appeal.[1]

## INTRODUCTION

In this case—the first of its kind—the government prosecuted Jesse Litvak, a bond trader, for statements he made in the course of negotiations with professional investment fund managers. In some transactions, Mr. Litvak concededly misrepresented the amount of profit his employer would make; in others, he misrepresented the reason he was unwilling to accept a less favorable price. In neither case, however, did Mr. Litvak make any misrepresentations concerning the nature or quality of the securities transacted. Consequently, the counterparties to the transactions paid a price they were willing to pay for precisely the securities they expected to, and did, receive. On the theory that the counterparties were nevertheless the victims of a fraud, the government prosecuted Mr. Litvak for securities fraud, TARP fraud, and making false statements, and a jury convicted him of those charges. The district court sentenced Mr. Litvak to 24 months of imprisonment, and Mr. Litvak filed a timely notice of appeal on August 5, 2014.

The district court forged new ground in approving the use of federal fraud

---

[1] If this motion cannot be decided before November 5, the date set for Mr. Litvak's surrender, *see* A206, Mr. Litvak respectfully requests that the Court issue an order temporarily staying the surrender date pending its decision on the motion.

statutes to police negotiations between sophisticated parties. This Court has previously expressed its reluctance to "give approval or disapproval to the myriad of sales pitches used for various purposes in the diversified world of commerce." *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1178-1179 (2d Cir. 1970). The government's theory of this case, however, not only expresses disapproval of Mr. Litvak's sales tactics; it criminalizes them. And the district court's rulings on materiality, which was an element of every charge, and intent to defraud fly in the face of circuit precedent. Compounding those errors, the district court excluded as irrelevant testimony bearing on materiality and good faith—disputed issues that were central to this case. Each of the district court's rulings raises a substantial question likely to result in reversal or a new trial. Because Mr. Litvak's eligibility for continued release is otherwise undisputed, and because Mr. Litvak would otherwise serve a substantial portion, if not all, of his sentence before his appeal is decided, the Court should grant Mr. Litvak continued release pending its review of his conviction.

## STATEMENT

The government charged Mr. Litvak with ten counts of securities fraud, *see* 15 U.S.C. §§ 78j(b), 78ff, one count of fraud against the Troubled Asset Relief Program (TARP), *see* 18 U.S.C. § 1031, and four counts of making false statements on a matter within the jurisdiction of the government, *see* 18 U.S.C. § 1001.

Specifically, the government alleged that, while transacting residential mortgage-based securities as a bond trader at Jefferies and Co., Mr. Litvak lied to the investment professionals with whom he traded about the portion of the transaction price that would represent a profit to Jefferies.[2]

Take, for example, the trade charged in Count 3. While negotiating the sale of the security at issue with an investment fund manager, Mr. Litvak said that he acquired it at a price of $67.66 (based on a $100 face value). The fund manager then offered to buy the security at $67.78, which would represent a profit of approximately 0.12% of the transaction price for Jefferies, and the trade occurred at that price. In reality, Mr. Litvak had acquired the security for $67.47, so when he sold it, Jefferies actually earned a profit of approximately 0.31% of the transaction price. *See* A78.

In other trades, Mr. Litvak referred in negotiations to a nonexistent seller with whom he pretended to negotiate in order to obtain the security for the counterparty buyer, telling the buyer that he thought a certain price was nearly as low as the seller would go, and that Mr. Litvak had to "beat [the seller] up pretty good," when in reality no third party was participating in the negotiation and the bond was one that Jefferies already owned. *See* A127-129.

---

[2] The government justified the Section 1031 and Section 1001 charges on the ground that the counterparties for some of the charged trades managed funds in which the Department of the Treasury invested as part of TARP.

Critically, in each instance, the counterparty knew the total price at which it would purchase the security and agreed to transact at that price. At trial, several counterparties—who testified as the government's own witnesses—explained that they had relied on sophisticated models to value the securities. *See, e.g.*, A99 (Norris) (stating that "we were fairly dependent, almost exclusively dependent on what the output of our research team gave us"); A109 (Wollman) (similarly testifying about reliance on his own fundamentals and analytics). The size of Jefferies' profit or fees did not factor into the analysis. *See, e.g.*, A83 (Canter) (stating that "there's no model input for the dealer's cost"); A98 (Norris) (testifying that "[t]here's no separate input for any fees"); A91 (Canter) (stating that it was not necessary to know Jefferies' profit in order to conduct "investment analysis in deciding how much to pay for a bond"). Accordingly, as the counterparties testified, Mr. Litvak's statements did not affect the value of the securities. *See, e.g.*, A106-107 (Norris) (asserting that "nothing about Jesse's tactics or what he said . . . changed the economics of buying that bond at 79-30[32nds] on that day" or "affected the nature or quality of the bond"); A94 (Vlajinac) (stating that "misrepresentations concerning the existence of a third-party seller and the acquisition cost did not affect my thinking about the bond itself").

The counterparties also testified that they exercised due diligence and determined that no better total price was then available in the market for the bond at

issue. *See, e.g.*, A97 (Vlajinac). The counterparties added that their decision to transact at the final price was based on a "judgment that that's the price that was in the best interest of the fund." A85 (Canter); *see also, e.g.*, A134, A137-138 (Corso) (contending that the total price for the transaction "was a perfectly acceptable price for York Capital based upon [its] analytics that day," or else the counterparty "would have passed"). Despite being the alleged victims of a fraud, the counterparties repeatedly testified that they "would do th[e] trade again at [the same] price." A87 (Canter); *see also* A101-102 (Norris) (stating that, "[b]ased on our analytics," buying the security at the actual transaction price "was a smart investment decision").

The counterparties also acknowledged their understanding of the basic "negotiating dynamic" in which "the traders are typically trying to get you [to] pay more for a bond." A82 (Canter). They testified that everyone knows that the information given by the trader, especially information that is "volunteer[ed]," is "take[n] . . . with a grain of salt." A108 (Norris); *see also*, *e.g.*, A121 (Wollman) (stating that "[I] understand in those negotiations that sometimes that kind of information that's volunteered . . . may not be 100 percent truthful"); A93 (Vlajinac) (asserting that "I'm always going to be skeptical"); A131 (Lemin) (recognizing that "skepticism is appropriate" because the trader is "saying things . . . that are designed to make you bid higher"); A122 (Wollman) (conveying

5

Mr. Litvak's representation about the trading price for a certain bond to another trader with the comment, "believe as much of that as you will").

Despite all of the foregoing evidence, the district court denied the defense's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, holding, first, that there was sufficient evidence of materiality because the misstatements could have affected the parties' negotiations, and second, that there was sufficient evidence of intent to defraud because Mr. Litvak intended to deceive the counterparties.

## ARGUMENT

A court "shall order the release" of a convicted defendant if the court finds (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and (2) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact" that is "likely to result" in reversal or a new trial. 18 U.S.C. § 3143(b). Once the defendant makes the requisite showing, "the statute establishes a right to liberty that is not simply discretionary but mandatory." *United States* v. *Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

This Court reviews the district court's assessment of flight risk and danger for clear error. But it reviews de novo a district court's determination as to the existence of a substantial question for appeal. *See United States* v. *English*, 629 F.3d

311, 319-320 (2d Cir. 2011).  Because it is undisputed that Mr. Litvak poses no risk of flight or danger to the community; Mr. Litvak's appeal raises substantial questions likely to result in reversal or a new trial; and Mr. Litvak would otherwise serve a substantial portion, if not all, of his sentence before his appeal is decided, the Court should grant Mr. Litvak continued release pending its review.

## I.  IT IS UNDISPUTED THAT MR. LITVAK POSES NO RISK OF FLIGHT OR DANGER TO THE COMMUNITY

The government does not dispute that Mr. Litvak, who has no prior criminal history and has faithfully complied with all of the terms of his release pending trial and sentencing, satisfies the first requirement for release pending appeal.  From the district court's perspective, "there wouldn't be any contest" as to this factor, and the government confirmed before the district court that "there's no likelihood of flight."  A198, A202.[3]

## II.  MR. LITVAK'S APPEAL RAISES SUBSTANTIAL QUESTIONS LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL

Despite its finding as to the first requirement, the district court denied the motion for bail because it did not see in its own prior rulings "a mistake or a com-

---

[3] The district court deemed it unnecessary even to mention danger to the community, which has never been an issue with regard to Mr. Litvak.  To the contrary, the district court expressed its view, based on the "record  .  .  .  number of sentencing letters  .  .  .  of support" it received, that Mr. Litvak is "very thoughtful, caring, kind, I guess good-natured," and, "in a nutshell,  .  .  .  a person worth knowing."  A194-196.  The court also noted that it saw no chance that Mr. Litvak would commit other crimes.  A193.

bination of mistakes that would result in the reversal of the convictions on all 15 counts." A203. The district court told Mr. Litvak that this Court will "take a look at [his bail motion]. If they see something that they think is going to result in a likely or at least a serious question for them, they obviously can give you this relief." A203.

## A. The Appeal Raises Substantial Questions

A substantial question is "one of more substance than would be necessary to a finding that it was not frivolous," a "close question" or one "that very well could be decided the other way." *United States* v. *Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (internal quotation marks and citation omitted). This appeal raises substantial questions concerning materiality, the relevance of certain excluded evidence, and the scienter required for the offenses at issue.

### 1. *Materiality*

The district court erred in concluding that the evidence was sufficient to prove, for each count of conviction, that the misrepresentations were material. In order to establish materiality, the government must prove beyond a reasonable doubt "a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision." *United States* v. *Vilar*, 729 F.3d 62, 89 (2d Cir. 2013).

In what appears to be the sole case in which this Court has addressed mis-

representations relevant only to negotiations—like the misrepresentations at issue here—this Court held such misrepresentations immaterial as a matter of law. In *Feinman* v. *Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996), the plaintiffs alleged that brokerage firms charged fees which they classified as costs, but which "far exceed[ed] the cost to the firms of such items and instead represent[ed] hidden, fixed commissions," and further alleged that disguising those commissions "prevent[ed] customers from negotiating the fees." *Id.* at 540. Holding the misstatements immaterial, this Court clarified that "[c]ases in which we have refused to find that representations were not material as a matter of law have involved misstatements or omissions that did, or at least had the potential to, cause the plaintiff financial harm" by affecting the value of the security. *Id.* at 541.

This Court has thus already rejected the argument, advanced by the government and accepted by the district court here, that misstatements about how the total price was derived could be material merely because they "affected [the counterparties'] negotiations." A163. Rather, as this Court has cautioned, "[i]f brokerage firms are slightly inflating the cost of their transaction fees, the remedy is competition among the firms in the labeling and pricing of their services, not resort to the securities fraud provisions." *Feinman*, 84 F.3d at 541; *see also Appert* v. *Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 613 (7th Cir. 2012) (relying on *Feinman* in holding that "any alleged misrepresentation . . . that the stated [fee] was tied

to actual costs was not *material* to investors' decisions to buy or sell securities" as a matter of law).[4]

*Feinman* is consistent with the long line of common-law decisions that have deemed misrepresentations of this type immaterial. For example, a misrepresentation to "an experienced real estate man" who "had dealt in stocks" that the seller of the stock was making 75 cents per share of commission was considered "pure 'dealer's talk'" that was immaterial because "the identical thing promised is delivered, at the price agreed, and the parties are dealing at arm's length." *Steiner* v. *Hughes*, 44 P.2d 857, 860 (Okla. 1935) (per curiam); *see also McCaw* v. *O'Malley*, 249 S.W. 41, 45 (Mo. 1923) (stating that "it is fundamental that the mere statement by the vendor of what an article cost him would not be regarded as a matter on which a vendee should rely where, as here, the vendee had an unrestricted opportunity to learn the actual value of the property, and where, as here, he actually undertook to ascertain such value"). Just so here. In light of this Court's decision in *Feinman* and the common-law principles supporting it, this appeal raises a substantial question about whether Mr. Litvak's misrepresentations were material—a question that implicates every count of conviction.

---

[4] In denying Mr. Litvak's motion for an acquittal, the district court essentially ignored *Feinman*, mentioning it only in a footnote and attempting to distinguish it on the quixotic ground that *Feinman* "dealt with the stock market" and "price was a heavily negotiated term" in this case. *See* A170 n.1.

## 2. *Evidentiary Rulings*

Even assuming that the types of misrepresentations at issue could be material, the critical questions for the jury were whether Mr. Litvak's statements would have been important to a reasonable investor's decision to transact, *Vilar*, 729 F.3d at 89, and whether Mr. Litvak's misrepresentations were made in good faith without knowledge that such puffery was unlawful, *cf.* A23, A25, A27 (conceding, in proposed jury instructions, that a bad purpose to disregard the law is an element of each count).  As the centerpiece of its case, the defense sought to present expert testimony on those issues, as well as lay testimony establishing the prevalence of such conduct separate from any "scheme" in which Mr. Litvak was involved.  The district court erroneously excluded both the expert and lay testimony, crippling Mr. Litvak's ability to present his defense.

*a.    Expert Testimony.* — The defense planned to call two experts, Ram Willner and Mark Menchel, whose testimony would have been probative of materiality and good faith.  Dr. Willner, a former portfolio manager with extensive industry experience, would have testified about the process of selecting and valuing the securities, opining that a broker-dealer's acquisition cost would be irrelevant to a reasonable investment manager's decisionmaking.  A29-30.  Based on analysis of comparable bonds, he would have testified that the trades at issue were executed at a fair market value, were generally priced more favorably than comparable bonds,

and were overwhelmingly profitable, A30-36—all of which made it more probable that reasonable investors would have executed the trades regardless of the profit to Jefferies. He also would have testified that, given market volatility, minor variances in price would not have mattered to sophisticated investors in their investment decisions, especially in light of significant potential gains. A31. Mr. Menchel, the former general counsel of the Financial Industry Regulatory Authority (FINRA), would have testified about several topics (including the structure of a broker-dealer's compensation), clarifying for the jury that these were arm's-length transactions in which Mr. Litvak owed no duty to the counterparties. A36, A40-41, A43.

The district court deemed substantial parts of Mr. Menchel's testimony irrelevant, limiting him to testifying about definitions of terms such as "principal" and "agent." A147-149; *see also* A62. And it excluded Dr. Willner's testimony altogether on relevance grounds. *See, e.g.*, A60 (explaining that, "[a]s to testimony that suggested as to what's fair market value or were the prices paid fair, was there a profit made after the fact, in my opinion, those are not relevant").[5]

---

[5] The district court excluded other evidence on the same theory throughout trial. For instance, the court required the defense to redact an exhibit reflecting that one of the alleged victims had a locked-in profit at the time he purchased the bond from Mr. Litvak, even though a jury could conclude that a reasonable investor would not decline to transact where the gain from the transaction was guaranteed. *See* A113-117.

*b.*     *Lay Testimony.* — Mr. Litvak also sought to introduce testimony (and documents) about the widespread use of similar negotiation tactics at Jefferies. That testimony would have shown that others engaged in the same conduct and that it was approved by supervisors and by Jefferies' compliance department. In addition to its relevance to materiality, that evidence would have established Mr. Litvak's good faith, which was indisputably a defense to each count. Evidence that such conduct was widely approved would make it more likely that Mr. Litvak was unaware that his actions were unlawful. As this Court has explained, "[t]estimony concerning the ordinary practices of those engaged in the securities business . . . [can] enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *See Marx & Co.* v. *Diners' Club, Inc.*, 550 F.2d 505, 509 (2d Cir. 1977). But the district court prevented the jury from performing that function by excluding as irrelevant all evidence of conduct that did not directly involve Mr. Litvak. *See* A142-144.[6]

Evidence "is relevant if it has any tendency to make a material fact more or less probable than it would be otherwise." *United States* v. *Certified Environmental Services, Inc.*, 753 F.3d 72, 90 (2d Cir. 2014). Moreover, "[e]vidence need not

---

[6] As a result, the only evidence of misrepresentations allowed at trial involved Mr. Litvak. That inevitably created the misimpression, invited by the government and voiced by the district court at sentencing, that Mr. Litvak was "the star of this conduct." A192; *see also* A156 (describing Mr. Litvak in closing as "the ringleader"). If admitted, the proffered evidence would have established the very opposite.

be conclusive in order to be relevant[;] [a]n incremental effect is sufficient." *Id.* (internal quotation marks, citation, and ellipsis omitted). Under this standard, the district court's evidentiary rulings, which dismissed as irrelevant crucial defense evidence on core disputed issues, constituted a clear abuse of discretion. *Cf. id.* (holding that the district court abused its discretion in excluding testimony that could bear on "the defendants' intent and good faith" because it "was a contested issue in this case, and the definition of relevance under Fed. R. Evid. 401 is very broad"). *A fortiori*, the district court's evidentiary rulings unquestionably present a substantial question for appeal.

### 3.    *Scienter*

The district court also erred in instructing the jury as to the scienter required for securities fraud and in determining that the evidence was sufficient on that element. To obtain a conviction for securities fraud, the government must prove that the defendant "intended to defraud [the victim] in connection with his sale of the [security]." *Vilar*, 729 F.3d at 93.

This Court has explained the intent-to-defraud requirement in detail in two cases arising out of mail- and wire-fraud prosecutions. In *Regent Office Supply*, *supra*, the defendant's salesmen engaged in aggressive marketing techniques designed to sell their products, including frequent misrepresentations of certain facts, such as stating that they had been referred by a friend; that they had a large inven-

tory to dispose of due to a death; and that the seller was a doctor who needed to dispose of stationery. *See* 421 F.2d at 1176. In *United States* v. *Starr*, 816 F.2d 94 (2d Cir. 1987), the defendants contracted to provide mailing services to their customers, representing that the funds deposited would be used only to pay the customers' postage fees. *Id.* at 99. In fact, they buried the higher-rate mailings in lower-rate bulk mailings, without paying the Postal Service the correct postage, and pocketed the difference. They then sent altered Postal Service forms to their customers falsely indicating that the legally correct postage had been paid. *Id.*

In both *Regent Office Supply* and *Starr*, this Court reversed the underlying convictions because the evidence was insufficient to establish intent to defraud. For intent to defraud to exist, the Court explained, "deceit must be coupled with a contemplated harm to the victim," and "the harm contemplated must affect the very nature of the bargain itself." *Starr*, 816 F.2d at 98. The customers' defeated expectations about "the use to which the money would be put," even if part of the bargain between the parties, were insufficient because the misrepresentations did not "affect the nature or quality of the services that was the basis of the customers' bargain." *Id.* at 99-100.[7]

---

[7] Although a contemplated harm affecting the nature of the bargain is required, there is no requirement that the defendant intend to "steal" from the victim. For example, exposing a victim to risk by inducing her to invest in a venture that does not in fact exist and then misappropriating the funds for personal expenses is sufficient even if the defendant hopes to repay her. *See Vilar*, 729 F.3d at 68-69, 93.

For the same reason, the government failed to establish intent to defraud here, because the customers received securities that the district court itself described as "wonderful," A189, and which the government's witnesses testified they would purchase again at the price they paid, *see, e.g.*, A87 (Canter). The misrepresentations were irrelevant to "the object of the contract," which was to receive securities of a certain value at the agreed-upon price. *Starr*, 816 F.2d at 100; *see also Regent Office Supply*, 421 F.2d at 1181 (stating that, if the defendant did not "intend[] to get more for [his] merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendant['s] falsehoods"). Because Mr. Litvak's statements did not mislead anyone about the "quality or effectiveness of the thing being sold," they did not "go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it." *Regent Office Supply*, 421 F.2d at 1180.

Despite those binding decisions from this Court—which the defense repeatedly brought to the court's attention—the district court instructed the jury that "[t]o act with intent to defraud here means to act willfully and with the specific intent to deceive," without requiring the jury to find any contemplated harm to the counterparty. A158. The district court also denied Mr. Litvak's motion for acquittal based on the insufficient evidence of intent to defraud without even citing either *Regent Office Supply* or *Starr*. The court concluded that "[e]vidence that Litvak's

victims were satisfied with the price at the time and unaware of a better price elsewhere does not negate proof that his lies were the product of a conscious objective and had the *purpose of inducing victims* into accepting his made-up prices." A173 (emphasis added); *but see Starr*, 816 F.2d at 98 (reversing conviction where, "[a]t most, the evidence had shown an intent to deceive and to *induce the customers* to enter into the transaction" (emphasis added)).[8] In addition to the other issues he intends to raise, therefore, Mr. Litvak's appeal presents a substantial question regarding the validity of the district court's ruling and instruction on scienter.

---

[8] Mr. Litvak intends to raise the intent-to-defraud argument, which applies to all ten securities-fraud counts, along with specific challenges to the remaining counts. Regarding the false-statements counts, because the Treasury Department never received information about the dealer's markup or profit, A75-76, A91, and had no authority over the decision to transact, how much to pay for each security, or how to conduct the negotiations, A67, A70, A72-73, the misrepresentations did not have "a natural tendency to influence, or be capable of influencing, the decision of" the Treasury, *see United States* v. *Gaudin*, 515 U.S. 506, 509 (1995) (internal quotation marks, citation, and alteration omitted), nor did the Treasury have "authority to act upon the information," as is required for a conviction on those counts, *see United States* v. *Bilzerian*, 926 F.2d 1285, 1300 (2d Cir. 1991).

As to the TARP-fraud count, the district court itself recognized: "I think it's the first charge in the country. I mean, maybe I got it wrong. We sort of—not made it up. It had to be written by us." A203. Mr. Litvak intends to argue, *inter alia*, that the jury instruction on that count constructively amended the indictment by including in the jury instructions a "right to control" theory when the indictment charged only a scheme to obtain money and property. *Compare* A18 *with* A159; *see United States* v. *Mucciante*, 21 F.3d 1228, 1233-1234 (2d Cir. 1994); *United States* v. *Viloski*, No. 12-265, 2014 WL 401074, at *32-*33 (2d Cir. Feb. 4, 2014) (summary order). The district court itself recognized that this indictment "clearly do[es] not have" the phrase that expressly alleged a "right to control" theory in *Viloski*, and added that "I don't find a lot of case law" and "I could be making the wrong judgment" in allowing that theory to go forward. A151, A153.

## B.    A Favorable Ruling Would Lead To Reversal Or A New Trial

To warrant release pending appeal, a substantial question must be one that, if it "is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts." *Randell*, 761 F.2d at 125 (internal quotation marks and citation omitted).  The district court apparently denied Mr. Litvak's motion for bail in the belief that no combination of the alleged errors would affect every count.  *See* A203.  But that belief was flatly wrong.  It is undisputed that materiality is an element for each count in this case.  *See* A162-163 (government filing acknowledging materiality requirement); *see also Basic Inc.* v. *Levinson*, 485 U.S. 224, 238 (1988) (securities fraud); *United States* v. *Mandanici*, 205 F.3d 519, 523 (2d Cir. 2000) (Section 1001); *Neder* v. *United States*, 527 U.S. 1, 25 (1999) (statute with identical operative language to Section 1031).  In fact, the district court itself so instructed the jury.  A157 (securities fraud); A159 (Section 1031); A160 (Section 1001).  A determination that evidence of materiality was insufficient would therefore result in a reversal of every count of conviction.

The district court's error as to the evidentiary rulings also (and independently) compels reversal on every count.  If this Court were to conclude that the district court erred in excluding the evidence, a new trial would be warranted as to every count, because the evidence was relevant to materiality and to Mr. Litvak's state of mind—elements of each count of conviction.  *See Certified Environmental Ser-*

*vices*, 753 F.3d at 96 (ordering new trial based, in part, on improperly excluded testimony).

Finally, while a favorable determination as to the intent to defraud bears most directly on the securities-fraud counts, *Regent Office Supply* and *Starr* also inform the materiality inquiry. *See Feinman*, 84 F.3d at 541 (noting that "[c]ases in which we have refused to find that representations were not material as a matter of law have involved misstatements or omissions that did, or at least had the potential to, cause the plaintiff financial harm"). And in any event, the group of arguments Mr. Litvak intends to raise together with intent to defraud will, if resolved in Mr. Litvak's favor, result in reversal or a new trial as to each count. *See* p. 17 n.8, *supra*.

\*     \*     \*     \*     \*

There is little question that, if his conviction is affirmed on appeal, Mr. Litvak, who is only 39 years old and poses no risk of flight or danger to the community, will be able to serve his full 24-month sentence. Unless this Court orders continued release, however, Mr. Litvak's sentence will be well underway before his appeal can run its course. *See* Administrative Office of the U.S. Courts, *Judicial Business of the United States Courts*, tbl.B-4A (2013) (noting that the median time from notice of appeal to final disposition for criminal cases in this Court is approximately 13 months). Given the length of the sentence, incarcerating Mr.

Litvak "immediately upon conviction could substantially diminish the benefit he would ordinarily receive from an appeal." *United States* v. *Garcia*, 340 F.3d 1013, 1019 (9th Cir. 2003); *see also Gupta* v. *United States*, No. 12-4448, ECF No. 47 (2d Cir. Dec. 6, 2012) (granting motion for release pending appeal where, as here, the district court imposed a 24-month sentence).

As the government has frankly acknowledged, this prosecution is novel in many respects. *See* A190-191. The Court should have a chance to determine the legitimacy of the government's theory and the substantial questions presented by the district court's rulings before Mr. Litvak is sent to prison, where he would serve much if not all of the imposed punishment for conduct that may not have constituted a crime.

## CONCLUSION

The motion for release pending appeal should be granted.

Respectfully submitted,

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM
DANE H. BUTSWINKAS
ALLISON B. JONES
MASHA G. HANSFORD
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *(202) 434-5000*

August 22, 2014

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for defendant-appellant Jesse C. Litvak and a member of the Bar of this Court, certify that, on August 22, 2014, a copy of the attached Motion for Release Pending Appeal was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM