# Addendum

# TABLE OF CONTENTS

Page

1.  Indictment, January 25, 2013 .......................................................... A1

2.  Government's Proposed Jury Instructions,

    November 15, 2013 (excerpts) ................................................... A22

3.  Expert Disclosure, December 24, 2013 ....................................... A28

4.  Pre-Trial Hearing Transcript, February 6, 2014 (excerpts) ......... A56

5.  Trial Transcript, February 18 – March 5, 2014 (excerpts) .......... A65

6.  Government's Opposition to Mr. Litvak's Motion

    for Judgment of Acquittal, May 12, 2014 (excerpts) .............. A161

7.  Order Denying Mr. Litvak's Motion for Judgment

    of Acquittal, July 2, 2014 ....................................................... A164

8.  Sentencing Hearing Transcript and Oral Ruling on

    Motion for Release Pending Appeal, July 23, 2014 (excerpts) ............... A188

9.  Judgment, July 25, 2014 .......................................................... A204

10. Notice of Appeal, August 5, 2014 ............................................ A208

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

GRAND JURY N-12-3

2013 JAN 25 PM 4 46

U.S. DISTRICT COURT
NEW HAVEN, CT.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:13CR___ (___) |
| | : | |
| v. | : | VIOLATIONS: |
| | : | 15 U.S.C. §§ 78j(b), 78ff [Securities Fraud] |
| JESSE C. LITVAK | : | 18 U.S.C. § 1031 [TARP Fraud] |
| | : | 18 U.S.C. § 1001 [False Statements to the |
| | : | Government] |

## INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment:

### The Defendant

1.     Defendant JESSE C. LITVAK, a licensed securities broker, resided in the State of New York and was a senior trader and managing director at Jefferies & Co., Inc. (referred to herein as "Jefferies").  LITVAK was hired by Jefferies on or about April 14, 2008 and was terminated on or about December 21, 2011.

2.     Jefferies is a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory Authority ("FINRA") member firm. Jefferies is a global securities and investment banking firm, with headquarters in New York. Jefferies also has a trading floor in Stamford, Connecticut where LITVAK and other members of its Mortgage and Asset-Backed Securities Trading group worked.

3.     LITVAK specialized in trading certain types of residential mortgage-backed securities ("RMBS"), which are securities within the meaning of the federal securities laws.

### The Victim-Customers

4.     LITVAK's victims are known by the Grand Jury to have been certain of Jefferies' customers.

**A1**

5.     LITVAK's victim-customers included funds established by the United States Department of Treasury's Legacy Securities Public-Private Investment Program ("PPIP"). PPIP was, and is, a part of the United States Government's Troubled Asset Relief Program ("TARP"), the Government bailout plan created in 2009 in response to the financial crisis.

6.     In March 2009, Treasury announced the creation of PPIP, the purpose of which was to purchase certain troubled real estate-related securities, including types of RMBS, from financial institutions to allow those financial institutions to free up capital and extend new credit.

7.     Beginning in late 2009, the Government used more than $20 billion of bailout money from TARP to fund Public-Private Investment Funds ("PPIFs"), which would purchase the troubled securities. The Government matched every dollar of private investment in a PPIF with one dollar of equity and two dollars of debt. Thus, 75% of each PPIF's money consists of taxpayer funds disbursed by the Government as part of its bailout plan through TARP.

8.     Each PPIF was established and managed by a Legacy Securities PPIP fund manager (a "PPIF Manager") selected by the Department of Treasury. Each PPIF Manager owed fiduciary duties to the investors that contributed money to its PPIF, which was primarily the Government.

9.     Each PPIF received between approximately $1.4 billion to $3.7 billion of bailout money.

10.     Under the rules of PPIP, a PPIF could buy or sell only certain types of RMBS, including the types of RMBS that LITVAK specialized in.

11.     The following six PPIFs are known by the Grand Jury to have been LITVAK's victim-customers (each a "TARP-Funded Victim"):

- 2 -

**A2**

a.    AG GECC PPIF Master Fund, L.P. (PPIF Manager: Angelo, Gordon & Co., LP);

b.    AllianceBernstein Legacy Securities Master Fund, L.P. (PPIF Manager: AllianceBernstein, LP);

c.    BlackRock PPIF, L.P. (PPIF Manager: BlackRock, Inc.);

d.    Invesco Legacy Securities Master Fund, L.P. (PPIF Manager: Invesco Ltd.);

e.    RLJ Western Asset Public/Private Master Fund, L.P. (PPIF Manager: RLJ Western Asset Management, LLC); and

f.    Wellington Management Legacy Securities PPIF Master Fund, LP (PPIF Manager: Wellington Management Company, LLP).

12.    In addition, the following non-PPIP entities or their affiliates, or funds or entities managed by or affiliated with them, are known by the Grand Jury to also have been LITVAK's victim-customers (each a "Privately-Funded Victim"):

a.    DE Shaw & Co.;

b.    DW Investment Management LP;

c.    EBF & Associates;

d.    Magnetar Capital;

e.    MFA Financial, Inc.;

f.    Monarch Alternative Capital;

g.    Oak Hill Capital;

h.    Pine River Capital Management;

i.    Putnam Investments;

j.      QVT Financial;

k.      Red Top Capital Investments;

l.      Soros Fund Management LLC;

m.      Third Point LLC; and

n.      York Capital Management, LLC.

### Other Relevant Persons

13.     Supervisor #1 is known by the Grand Jury to have been one of LITVAK's supervisors at Jefferies.

### RMBS Trading

14.     RMBS are bonds comprised of large pools of residential mortgages and home equity loans.  The RMBS owners receive payments on a monthly basis based on repayments from the homeowners that took out the mortgages or loans, until the homeowners repay their debt, refinance or default.  Unlike stocks, RMBS bonds are not publicly traded on an exchange, such as the New York Stock Exchange or NASDAQ, and pricing information is not publicly-available.  Instead, buyers and sellers of bonds use broker-dealers, like Jefferies, to execute individually negotiated transactions.

15.     The unit at Jefferies that handles RMBS trading is known as the Mortgage and Asset-Backed Securities group, which employs traders and salespeople.  In general, a trader, like LITVAK, specializes in particular kinds of RMBS or "sectors," while a salesperson is responsible for certain customers or "accounts."

16.     RMBS bonds typically are sold in three ways:

a.      from a broker-dealer's inventory, in which the broker-dealer like Jefferies is selling a bond that it has owned for a period of time;

b.    as an order, in which the seller commissions the broker-dealer to seek a buyer, or the buyer commissions the broker-dealer to seek a seller, for a particular bond; or

c.    as part of a "bid list" or "BWIC" ("bids wanted in competition"), in which the seller circulates a list of specific bonds it is interested in selling so that the broker-dealer may seek a potential buyer willing to negotiate terms for the trade.

17.    Orders and bid list trades are considered "riskless" trades for broker-dealers like Jefferies because in those transactions broker-dealers merely act as match-makers, serving as a conduit for a bond to pass from a seller to a buyer.

18.    In orders and bid list trades, the buyer and the seller do not know each other's identity, but communicate exclusively through the broker-dealer's traders and salespeople.

19.    Buyers attempt to purchase bonds at the lowest price available in the market, and sellers try to sell bonds at the highest price available. This is called "best execution." Where a buyer does not obtain best execution, its investment will be less profitable than it would have been otherwise.

20.    A broker-dealer's profit, if any, on a set of trades is the difference or "spread" between the price it pays the seller and the price it charges the buyer. In the bond industry, prices are measured in 1/32s of a dollar, commonly referred to as "ticks." For instance, if a broker-dealer buys a bond for $65.25 (meaning $65.25 per $100 of current face value), the price would be expressed as "65 dollars and 8 ticks," "65 and 8" or "65-8." If the broker-dealer then sells that bond for $65.50 (meaning $65.50 per $100 of current face value), the price would be expressed as "65 dollars and 16 ticks," "65 and 16," or "65-16." The broker-dealer's profit on this set of trades would be $0.25 per $100 of current face value, or 8 ticks.

21.     A customer can compensate a broker-dealer for a trade in one of two ways, either on an "all-in" or an "on-top" basis.

     a.     In an "all-in" trade, the buyer agrees to a price without reference to the price the broker-dealer paid to the seller; the spread between the amount paid by the buyer and the amount paid to the seller is the broker-dealer's compensation.

     b.     In an "on-top" trade, the buyer and the broker-dealer agree on a specific amount that is added to the price the broker-dealer paid to the seller; in other words, the broker-dealer's compensation is a commission added to the cost of the bond.

22.     Inventory trades are usually "all-in" transactions, while bid lists are "on top" trades, and orders can be either depending on what the broker-dealer, buyer and seller negotiate.

Jefferies' Codes of Conduct

23.     Jefferies maintained (i) a Code of Ethics, (ii) Compliance and Supervisory Policies and Procedures for Mortgage & Asset-Backed Securities Sales and Trading Personnel, and (iii) Compliance and Supervisory Policies and Procedures for Fixed Income Sales and Trading Personnel.

24.     In the section entitled "Fair Dealing," Jefferies' Code of Ethics stated that "[t]aking unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice is a violation of the Code."

25.     Both the Compliance and Supervisory Policies and Procedures for Mortgage & Asset-Backed Securities Sales and Trading Personnel and the Compliance and Supervisory Policies and Procedures for Fixed Income Sales and Trading Personnel include the following statement: "Traders should bear in mind that the anti-fraud provisions of the Exchange Act and

- 6 -

**A6**

the best execution provisions of FINRA-NASD rules continue to apply to all securities transactions, regardless of the customer's status, and that trading that is suggestive of abuse will not be permitted."

26.     Before and during the acts alleged in this Indictment, LITVAK completed acknowledgement forms certifying that he had "read, understood, complied and agree[d] to comply with" these policies.

COUNTS ONE through ELEVEN
Securities Fraud
15 U.S.C. §§ 78j(b), 78ff

The Scheme and Artifice

27.     The allegations set forth in paragraphs 1 through 26 of this Indictment are realleged and incorporated as though fully set forth herein.

28.     Beginning in approximately 2009 and continuing until approximately December 2011, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, LITVAK knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the mails, in connection with the purchase and sale of RMBS, would and did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (i) employing devices, schemes and artifices to defraud, (ii) making untrue statements of material facts and omitting to state material facts necessary to make the statements made not misleading in the light of the circumstances under which they were made and (iii) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit on purchasers and sellers of such RMBS.

29. As a result of this scheme, LITVAK caused victim-customers to sustain losses of more than $2,000,000.

### Purpose of the Scheme and Artifice

30. A purpose of LITVAK's scheme was to enrich Jefferies and himself by using materially false and fraudulent misrepresentations and omissions to take secret and unearned compensation from TARP-Funded Victims and Privately-Funded Victims on RMBS trades.

31. LITVAK's supervisors at Jefferies, including Supervisor #1, established and communicated specific annual profit goals for the Mortgage and Asset-Backed Securities group. As LITVAK knew, his individual trading revenue was tracked by his supervisors and steadily declined each year—from a profit of more than $40,000,000 in 2009 to a loss of more than $10,000,000 in 2011.

32. LITVAK's scheme increased the profitability of his trades. For example, on or about June 22, 2011, LITVAK corresponded with a trader at another broker-dealer firm about a RMBS bond being offered via a bid list. The approximate "on-top" compensation a broker-dealer can expect on a bid list transaction is between four ticks and eight ticks (between 4/32s and 8/32s per $100 of the bond's current face value). In discussing the price that LITVAK hoped to induce a specific TARP-Funded Victim to pay for this bid list bond, LITVAK wrote "f this 4 - 8/32 sht [sic]," to which the other trader responded, "that doesnt feed anyone."

### Manner and Means of the Scheme and Artifice

The manner and means by which LITVAK sought to accomplish the scheme included, among others, the following:

33. In certain order and bid list transactions:

- 8 -

**A8**

      a.     where the buying victim-customer had agreed upon a specified commission "on top" of the price that Jefferies had negotiated with the seller of a RMBS bond, LITVAK would and did misrepresent to the buyer the price Jefferies had agreed to pay the seller, providing Jefferies with an extra and unearned profit at the buying victim-customer's expense; and

      b.     where the selling victim-customer had agreed upon a specified commission to be deducted from the price at which Jefferies had negotiated to sell a RMBS bond, LITVAK would and did misrepresent to the seller the price the buyer had agreed to pay to Jefferies, providing Jefferies with an extra and unearned profit at the selling victim-customer's expense.

34.     In certain sales of bonds from Jefferies' inventory, LITVAK would and did misrepresent to the buying victim-customer that the transaction was an order or bid list trade requiring "on top" compensation, providing Jefferies with an extra and unearned profit at the buying victim-customer's expense.

35.     LITVAK perpetrated this scheme by the use of means and instruments of interstate commerce and the mails in various ways:

      a.     LITVAK used electronic communications with victim-customers, including telephone, email, instant messages and electronic group "chats," to communicate false statements and misrepresentations with the intent and purpose of soliciting and negotiating fraudulent RMBS bonds trades;

      b.     LITVAK sent and caused to be sent to victim-customers trade confirmations or tickets documenting fraudulent transactions; and

c.     LITVAK caused victim-customers to wire funds to Jefferies, and Jefferies to wire funds to victim-customers, to pay for fraudulent transactions.

Misrepresented Prices

36.     It was part of the scheme that LITVAK would defraud victim-customers buying RMBS bonds in bid list and order trades, where the victim-customers agreed to pay Jefferies specific amounts of compensation "on top" of the prices paid to the sellers, by misrepresenting the acquisition costs to be higher than the prices actually paid by Jefferies to the sellers, fraudulently increasing Jefferies' compensation on the transactions.

37.     For instance, on or about March 31, 2010, LITVAK executed his scheme in connection with the purchase by the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. of two RMBS bonds, HVMLT 2006-10 2A1A (the "HarborView Bond") and LXS 2007-15N 2A1 (the "Lehman Bond"), as follows:

a.     On March 31, 2010 at approximately 10:32 a.m., the seller placed an order with Jefferies to sell these two bonds. The seller's offering price at that time was 58 on the HarborView Bond and 57 on the Lehman Bond.

b.     At approximately 10:49 a.m., LITVAK approached the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. about buying these bonds, writing "wanted to give you first crack on em." The PPIF Manager asked for details, and LITVAK responded by misrepresenting the seller's offering prices as 59 on the HarborView Bond (instead of the actual offering price of 58) and 58-16 on the Lehman Bond (instead of the actual offering price of 57).

c.     Between approximately 11:21 a.m. and 11:42 a.m., LITVAK and the PPIF Manager spoke by telephone.

d.     At approximately 11:42 a.m., LITVAK electronically communicated with

Supervisor #1 as follows:

> alliance just bid me 58 on the 06-10s [the HarborView Bond]....i
> know he will pay us 4/32s if i tell him we have to pay 58-16.... he
> also bid us 57-16 on the lxs [the Lehman Bond]....i am thinking of
> telling him that one has to be 58-8 cuz its one of the bigger ones....

[Ellipses in original.]

e.     At approximately 11:48 a.m., Supervisor #1 replied to LITVAK "boom!

tell me when to go in." In this context, "tell me when to go in" means when Supervisor #1

should intercede to buy the bonds from the seller.

f.     At approximately 12:45 p.m., Supervisor #1 electronically communicated

with the seller to confirm Jefferies was buying the HarborView Bond for 57-16 and the Lehman

Bond for 56-16. Supervisor #1 then described these prices to LITVAK as "layups."

g.     At approximately 12:45 p.m., LITVAK misrepresented the state of

negotiations with the seller to the PPIF Manager:

> ok big man....here is what i got from him...i beat him up pretty
> good.....but this is what he came back with:
> he will sell to me 20mm orig of hvmlt 0610 @ 58-00
> but he is being harder to knock back on the lxs bonds...said that he
> thinks that one is much cheaper yada yada yada....he told me he
> would sell them to me at 58-8 (30mm orig)......i would be fine
> working skinnier on these 2....but think you are getting good
> levels on these....let me know what you want to do big man....

[Ellipses in original.]

h.     At approximately 1:14 p.m., the PPIF Manager responded by inquiring

whether these would be "all-in" or "on-top" trades, asking "is he [the seller] paying u or am i?"

i.     At approximately 1:21 p.m., LITVAK responded with additional

misrepresentations:

> all the levels i put in this [chat]room are levels he wants to sell to
> me…i tried to beat him up so i could get these levels to
> you…….but those are the levels he wants to sell to me…i will
> work for whatever you want on these…

[Ellipses in original.]

j. The PPIF Manager replied back "gonna finish lunch first then re-run it all," and at approximately 1:24 p.m., LITVAK repeated and summarized his earlier misrepresentations:

> sounds good…..so to recap the levels he is offering to me:
> hvmlt 06-10 2a1a (20mm orig) @ 58-00
> lxs 40mm orig at 58-8

[Ellipsis in original.]

k. At approximately 1:45 p.m., LITVAK told the PPIF Manager "bot em," indicating that LITVAK had purchased the HarborView Bond and the Lehman Bond. The PPIF Manager replied by proposing Jefferies not receive any compensation on (or "wash") the smaller HarborView Bond trade and add five ticks as compensation on the Lehman Bond trade. Approximately one minute later, LITVAK responded "thats fine."

38. The AllianceBernstein Legacy Securities Master Fund, L.P. paid approximately $7,000,000 for the HarborView Bond and approximately $20,000,000 for the Lehman Bond.

39. The seller did not offer to sell the HarborView Bond for 59, as LITVAK misrepresented to the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. In truth and in fact, as LITVAK knew, the seller's offer was actually 58.

40. The seller did not offer to sell the Lehman Bond for 58-16, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, the seller's offer was actually 57.

- 12 -

**A12**

41.     LITVAK did not communicate to the seller the PPIF Manager's bids made between approximately 11:21 a.m. and 11:42 a.m., as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, all his statements about the seller's reaction to those bids were false.

42.     When LITVAK electronically communicated with the PPIF Manager after approximately 12:50 p.m., the seller was no longer seeking 58 for the HarborView Bond or 58-8 for the Lehman Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, the seller had already agreed to accept lower prices.

43.     Jefferies did not pay the seller 58 for the HarborView Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies paid 57-16.

44.     Jefferies did not pay the seller 58-8 for the Lehman Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies paid 56-16.

45.     Jefferies did not work without compensation on the HarborView Bond trade, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, on this riskless trade, LITVAK took 16 ticks as compensation for Jefferies, or approximately $60,000.

46.     Jefferies did not work for five ticks of compensation on the Lehman Bond trade, or approximately $50,000, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, on this riskless trade, LITVAK took 61 ticks as compensation for Jefferies, or approximately $650,000.

<u>Misrepresented Inventory Trades as Orders or Bid List Trades</u>

47.     It was further part of the scheme that LITVAK would defraud victim-customers buying RMBS bonds held in Jefferies' inventory by misrepresenting those as orders and bid list trades with compensation for Jefferies "on-top," taking increased and unearned profits because, on inventory transactions, broker-dealers are not entitled to extra compensation in addition to the price paid.  By doing this, LITVAK falsely portrayed himself to victim-customers as their ally in negotiations against non-existent sellers, rather than admitting that he was, in fact, negotiating directly against his victim-customers.

48.     To effect his scheme, LITVAK would invent a fictitious seller for a bond that Jefferies already had in its inventory and was seeking to sell to a victim-customer.  LITVAK would then falsely describe the fictitious seller's offering price and reaction to LITVAK's negotiating tactics.

49.     For instance, on or about December 23, 2009, LITVAK executed his scheme in connection with the purchase by the PPIF Manager for the Wellington Management Legacy Securities PPIF Master Fund, LP of the RMBS bond WFMBS 2006-AR12 1A1 (the "Wells Fargo Bond"), as follows:

        a.      On or about December 14, 2009, LITVAK paid 70 (meaning $70 per $100 of current face value) for the Wells Fargo Bond, with an original face value of $6,230,000, for Jefferies' inventory.

        b.      On or about December 18, 2009, LITVAK first offered to sell Jefferies' Wells Fargo Bond to the Wellington Management Legacy Securities PPIF Master Fund, LP. LITVAK misrepresented that he had an order from a third party seller, writing "i have a guy that has 6+mm orig of wfmbs 06-ar12 1a1…my guy would sell to me at 77…. [ellipses in original.]"

- 14 -

**A14**

The PPIF Manager bid 74, and LITVAK responded by describing his communications with the fictitious seller:

> i will reflect that in big man and see what he says....
> at this point...he really wants me to work it longer (i just got the bonds this am to work)....so he actually gave me the ol "just keep working em at 77" rap.....didnt even give me any room off 77.....fck [sic]
> he appreciates it...but has some internal conversations about where he told them he can sell it and at 75 he would not be looking good internally is what he said....
> i thought i could work him over...but he is kind of being a weenie

[Ellipses in original.]

      c.      On or about December 23, 2009 at 7:46 a.m., LITVAK approached the PPIF Manager for the Wellington Management Legacy Securities PPIF Master Fund, LP again, asking for information about another trade and suggesting "maybe i can use that as leverage to go beat the guy up that owns the 06-ar12 1a1 bonds....as of last nite it sounded like he was starting to warm up to the idea of coming off his level [ellipsis in original]."

      d.      At approximately 7:48 a.m., the PPIF Manager expressed interest, asking "what's the current size and offer on the 06-ar12 1a1 again?" Approximately one minute later, LITVAK responded "it's 3+mm current and he was offering them at 77..... [ellipsis in original.]"

      e.      At approximately 8:14 a.m., LITVAK updated the PPIF Manager by making further misrepresentations about the fictitious seller, writing "he is still red-dotted....usually rolls in around now.....so should know soon brotha..... [ellipses in original.]" ("Red-dotted" in this context means that the fictitious seller was unavailable to participate in electronic communications.)

      f.      At approximately 8:46 a.m., LITVAK misrepresented to the PPIF Manager that he had concluded negotiations with the seller at a price that would result in a four-tick profit to Jefferies, writing "winner winner chicken dinner......he is gonna sell em to me at

75-28 as i told him to not get cute and just sell the bonds so you can own them at 76....he said cool..... [ellipses in original.]"

50.     The Wellington Management Legacy Securities PPIF Master Fund, LP paid approximately $2,300,000 for the Wells Fargo Bond.

51.     LITVAK did not engage in any negotiations or communications with the seller of Wells Fargo Bond on December 23, 2009, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, there was no third party seller, since Jefferies already owned the Wells Fargo Bond.

52.     Jefferies did not purchase the Wells Fargo Bond from a third party seller on December 23, 2009, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, Jefferies purchased that bond nine days earlier, on or about December 14, 2009.

53.     Jefferies did not pay the seller 75-28 for the Wells Fargo Bond, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, Jefferies paid 70 or approximately $2,100,000.

54.     Jefferies' profit on this set of transactions was not four ticks, or approximately $3,800, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, Jefferies's profit was 192 ticks, or approximately $185,000.

The Securities

55.     Beginning in approximately 2009 and continuing until approximately December 2011, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, Defendant JESSE C. LITVAK knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the mails, in connection with the purchase and sale of securities, to wit, the RMBS set forth below, would and did use and

employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of

Federal Regulations, Section 240.10b-5 by (i) employing the aforementioned devices, schemes

and artifices to defraud, (ii) making untrue statements of material facts and omitting to state

material facts necessary to make the statements made not misleading in the light of the

circumstances under which they were made and (iii) engaging in acts, practices and courses of

business that would and did operate as a fraud and deceit on purchasers and sellers of such

securities as set forth below, each constituting a separate count of this Indictment:

| Count | Trade Date | Security |
|-------|-----------|----------|
| 1 | 3/31/10 | HVMLT 2006-10 2A1A (HarborView Bond) |
| 2 | 3/31/10 | LXS 2007-15N 2A1 (Lehman Bond) |
| 3 | 6/22/11 | HVMLT 2007-7 2A1A |
| 4 | 7/1/10 | SARM 2005-21 7A1 |
| 5 | 12/23/09 | WFMBS 2006-AR12 1A1 (Wells Fargo Bond) |
| 6 | 5/28/09 | INDX 2007-AR7 2A1 |
| 7 | 12/9/09 | NYMT 2005-2 A |
| 8 | 1/7/10 | DLSA 2006-AR1 2A1A |
| 9 | 3/29/10 | CWALT 2006-OA3 1A1 |
| 10 | 4/1/10 | LXS 2007-15N 2A1 |
| 11 | 11/22/10 | FHAMS 2005-AA10 2A1 |

All in violation of Title 15, United States Code, Sections 78j(b) and 77ff, and Title 18,

United States Code, Section 2.

COUNT TWELVE
TARP Fraud
18 U.S.C. § 1031

56.     The allegations set forth in paragraphs 1 through 26 and 28 through 54 of this Indictment are realleged and incorporated as though fully set forth herein.

57.     Beginning in approximately December 2009 and continuing until approximately December 2011, in the District of Connecticut and elsewhere, Defendant JESSE C. LITVAK devised a scheme and artifice to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations and promises in connection with grants, contracts, subcontracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance—including TARP, an economic stimulus, recovery or rescue plan provided by the Government, and the Government's purchase of troubled assets as defined in the Emergency Economic Stabilization Act of 2008—the value of such Federal assistance, or any constituent part thereof, being in excess of $1,000,000.

58.     On or about the following dates, in the District of Connecticut and elsewhere, defendant LITVAK knowingly executed and attempted to execute the aforementioned scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations and promises in connection with such Federal assistance in the following RMBS bond transactions with a TARP-Funded Victim:

        a.     the March 31, 2010 sale of the HarborView Bond to AllianceBernstein Legacy Securities Master Fund, L.P.;

        b.     the March 31, 2010 sale of the Lehman Bond to AllianceBernstein Legacy Securities Master Fund, L.P.;

        c.     the June 22, 2011 sale of the HVMLT 2007-7 2A1A bond to AllianceBernstein Legacy Securities Master Fund, L.P.;

- 18 -

**A18**

d.     the July 1, 2010 sale of the SARM 2005-21 7A1 bond to Invesco Legacy Securities Master Fund, L.P.; and

e.     the December 23, 2009 sale of the Wells Fargo Bond to Wellington Management Legacy Securities PPIF Master Fund, LP.

All in violation of Title 18, United States Code, Sections 1031 and 2.

### COUNTS THIRTEEN through SIXTEEN
False Statements to the Government
18 U.S.C. § 1001

59.     The allegations set forth in paragraphs 1 through 26 and 28 through 54 of this Indictment are realleged and incorporated as though fully set forth herein.

60.     On or about the following dates, in the District of Connecticut and elsewhere, LITVAK, in a matter within the jurisdiction of the United States Department of Treasury, a department and agency of the United States, did knowingly and willfully make and cause to be made a materially false, fictitious, and fraudulent statement and representation to a PPIF Manager for a TARP-Funded Victim, each statement set forth below constituting a separate count of this Indictment:

- 19 -

**A19**

| Count | Date of Statement | Recipient | False Statement | Correct Fact |
|---|---|---|---|---|
| 13 | 3/31/10 | Trader at PPIF Manager for AllianceBernstein Legacy Securities Master Fund, L.P. | "[S]o to recap the levels he is offering to me: hvmlt 06-10 2a1a (20mm orig) [the HarborView Bond] @ 58-00." | Jefferies had already negotiated with the seller to purchase the HarborView Bond at 57-16. |
| 14 | 3/31/10 | Trader at PPIF Manager for AllianceBernstein Legacy Securities Master Fund, L.P. | "[S]o to recap the levels he is offering to me: … lxs 40mm orig [the Lehman Bond] at 58-8." | Jefferies had already negotiated with the seller to purchase the Lehman Bond at 56-16. |
| 15 | 12/23/09 | Trader at PPIF Manager for Wellington Management Legacy Securities PPIF Master Fund, LP | "[H]e is gonna sell em to me at 75-28 as i told him to not get cute and just sell the bonds  so you can own them [the Wells Fargo Bond] at 76….he said cool." | Jefferies had actually purchased the Wells Fargo Bond in question on December 14, 2009 at 70. |
| 16 | 6/24/10 | Trader at PPIF Manager for Invesco Legacy Securities Master Fund, L.P. | In electronic chat between LITVAK and seller forwarded to trader at PPIF Manager for Invesco Legacy Securities Master Fund, L.P., LITVAK altered chat in original message to show Jefferies' purchase price of "79-26." | In original electronic chat between LITVAK and seller, chat reflected Jefferies' actual purchase price of 79-24. |

All in violation of Title 18, United States Code, Sections 1001 and 2.

A TRUE BILL

/s/

———————————————————
FOREPERSON

UNITED STATES OF AMERICA

/s/ David B. Fein

———————————————————
DAVID B. FEIN
UNITED STATES ATTORNEY

/s/ Jonathan N. Francis

———————————————————
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY

/s/ Eric J. Glover

———————————————————
ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:13CR19(JCH) |
| | : | |
| v. | : | |
| | : | |
| JESSE C. LITVAK | : | November 15, 2013 |

## **GOVERNMENT'S PROPOSED JURY INSTRUCTIONS**

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. phv05083
jonathan.francis@usdoj.gov

ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT23923
eric.glover@usdoj.gov

157 Church Street
New Haven, CT 06510
(203) 821-3700

PROPOSED INSTRUCTION NO. 17
COUNTS ONE THROUGH ELEVEN: SECURITIES FRAUD—SECOND ELEMENT—
KNOWLEDGE, INTENT AND WILLFULNESS

The second element that the government must establish beyond a reasonable doubt is that the defendant participated in the scheme to defraud knowingly, willfully and with intent to defraud.

To act "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.

To act "willfully" means to act knowingly and purposely, with an intent to do something the law forbids, that is to say, with bad purpose either to disobey or to disregard the law.

"Intent to defraud" in the context of the securities laws means to act knowingly and with the intent to deceive.

The question of whether a person acted knowingly, willfully and with intent to defraud is a question of fact for you to determine, like any other fact question. This question involves one's state of mind.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent. Such direct proof is not required.

The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, or based upon a person's outward manifestations, his words, his conduct, his acts or all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom. Circumstantial evidence, if believed, is of no less value than direct evidence.

Since an essential element of the crime charged is intent to defraud, it follows that good faith on the part of a defendant is a complete defense to a charge of securities fraud. A

22

**A23**

defendant, however, has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt.

Under the anti-fraud statutes, even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statements may have turned out to be.

In considering whether or not a defendant acted in good faith, you are instructed that a belief by the defendant that ultimately everything would work out so that no investors would lose any money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for everyone, or will not cause anyone harm, will excuse fraudulent actions or false representations by him.

As a practical matter, then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to deceive and he nonetheless associated himself with the alleged fraudulent scheme.

The government may prove that the defendant acted knowingly in either of two ways. First, it is sufficient, of course, if the evidence satisfies you beyond a reasonable doubt that the defendant was actually aware he was making or causing a false statement to be made. Alternatively, the defendant's knowledge may be established by proof that the defendant was aware of a high probability that the statement was false, unless, despite this high probability, the facts show that the defendant actually believed the statement to be true.

**A24**

PROPOSED INSTRUCTION NO. 23
COUNT TWELVE: TARP FRAUD—SECOND ELEMENT—KNOWING, WILLFUL
EXECUTION OF THE SCHEME WITH INTENT TO DEFRAUD THE UNITED STATES

The second element the government must prove beyond a reasonable doubt is that the

defendant executed or attempted to execute the scheme knowingly, willfully and with specific

intent to defraud the United States.

"Knowingly" means to act voluntarily and deliberately, rather than mistakenly or

inadvertently.

"Willfully" means to act knowingly and purposely, with an intent to do something the

law forbids, that is to say, with bad purpose either to disobey or to disregard the law.

To act with intent to defraud means to act willfully and with the specific intent to

deceive, for the purpose of causing some financial loss to another.

The question of whether a person acted knowingly, willfully and with intent to defraud is

a question of fact for you to determine, like any other fact question. This question involves one's

state of mind.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a

rare case where it could be shown that a person wrote or stated that as of a given time in the past

he committed an act with fraudulent intent. Such direct proof is not required.

The ultimate facts of knowledge and criminal intent, though subjective, may be

established by circumstantial evidence, based upon a person's outward manifestations, his words,

his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the

rational or logical inferences that may be drawn therefrom. Circumstantial evidence, if believed,

34

**A25**

is of no less value than direct evidence. In either case, the essential elements of the crime

charged must be established beyond a reasonable doubt.

---

2 Sand, Instruction 44-11.  *See also* 18 U.S.C. § 1031.

**A26**

PROPOSED INSTRUCTION NO. 32
COUNTS THIRTEEN-SIXTEEN: FALSE STATEMENTS—FOURTH ELEMENT—
KNOWING AND WILLFUL CONDUCT

The fourth element the government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully.

Remember, an act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidentally.

An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law. It is not necessary for the government to establish that the defendant knew he was breaking any particular law or rule. Mr. Litvak need only have been aware of the generally unlawful nature of his actions.

---

2 Sand, Instruction 36-13, as adapted; *United States v. Whab*, 355 F.3d 155, 159-62 (2d Cir. 2004); *see also* Jury Instruction, *United States v. Zerbe*, 06 CR 322 (SRU), 2009 WL 3045508 (D. Conn. Feb. 18, 2009).

**DLA Piper LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
www.dlapiper.com

Patrick J. Smith
patrick.smith@dlapiper.com
**T** 212.335.4685
**F** 917.778.8685

December 24, 2013

*VIA EMAIL*

Jonathan N. Francis
Assistant United States Attorney
United States Attorney's Office
District of Connecticut
Connecticut Financial Center
157 Church Street, Floor 23
New Haven, CT 06510

    **Re:**   *United States v. Jesse C. Litvak*

Dear Mr. Francis:

    Pursuant to Fed. R. Crim. P. 16(b)(1)(C)(i) and the Court's December 17, 2013 order, defendant Jesse C. Litvak provides updated summaries of the testimony of the two previously identified expert witnesses who may be called if the defense presents a case. For the reasons set forth below, these summaries and all exhibits hereto are subject to revision.

    As previously noted, due to the fee dispute with Jefferies & Co. ("Jefferies"), Mr. Litvak was denied his right to the advancement of expenses to defend himself in this case. As a result, he lacked the resources to retain expert witnesses and to fund the projects necessary to prepare their testimony, including a thorough review of the discovery material provided to date by the government. While the fee dispute appears to be resolved, certain projects are still ongoing as of the date of this updated disclosure. Further, our ability to complete all work in progress has been impeded by the government's long overdue disclosure, on December 17, 2013, of information material to the preparation of the defense of this case concerning the valuation, trade execution, and performance of the Residential Mortgage Backed Securities ("RMBS") bonds at issue. The defense was first able to access only some of this material on December 20, 2013 – nearly 7 weeks after the Court directed the government to produce it. Large segments of this production remain incomprehensible. From the documents that are accessible and understandable, the monthly and quarterly reports from the Public-Private Investment Program ("PPIP") managers, it is abundantly clear that these reports contain data material to the preparation of the defense and which is highly relevant to the opinions of the expert witnesses. Extensive review and analysis of this data will be necessary. As a result of the government's ongoing Rule 16 and *Brady* violations, we are moving for a continuance today.

**A28**

Jonathan N. Francis
December 24, 2013
Page Two

Mr. Litvak therefore may revise or supplement the summaries of testimony set forth below. Further, Mr. Litvak may designate additional expert witnesses if it is determined that such witnesses are necessary as trial preparation proceeds.

**1)** **Ram Willner**

a) <u>Qualifications:</u> Mr. Willner has extensive experience in portfolio management in the fixed income asset class, including extensive experience in the analysis and purchase of Residential Mortgage Backed Securities. With a focus on dealing with securities from an investor's perspective, Mr. Willner has significant investment industry experience. He most recently managed global fixed income portfolios for Analytic Investors, LLC and Global Fixed Income Partners, LLC, a hedge fund, where his oversight included both quantitative and qualitative review of global bonds, credit bonds, international fixed income, equity derivatives, and mortgage security purchases. Prior to that, he headed Bank of America Capital Management's International Fixed-Income department, where he was responsible for the management of nearly $1 billion in global sovereign and credit bonds. Mr. Willner worked for Morgan Stanley Investment Management in London as a portfolio manager and director of global fixed-income analytics, and for PIMCO as a senior member of the International Fixed-Income team.

Prior to practicing in the field, Mr. Willner served as a professor at the Tuck School of Business at Dartmouth and the Stern School of Business at New York University. He served as a visiting professor at the University of California at Irvine and has lectured at USC and UCLA.

Mr. Willner earned a Ph.D. (DBA) in business administration (finance/quantitative methods) from Harvard University, an MBA from Carnegie Mellon University, and a bachelor's degree in mathematics from Brandeis University. Mr. Willner has published in such journals as the *Journal of Fixed Income* and the *Journal of Portfolio Management* and has lectured in many venues.

A copy of Mr. Willner's CV was attached to our initial notice.

b) <u>Summary of Opinions and Bases Therefore</u>: It is anticipated that Mr. Willner would, if called as a witness, testify as to his opinions on the following issues:

- <u>RMBS analysis and trading from the professional manager's perspective</u>: Based upon his education, training, and experience, Mr. Willner will describe the

Jonathan N. Francis
December 24, 2013
Page Three

process of selecting and valuing RMBS for inclusion in an investment portfolio, including analytical tools and methods available to an investment manager, and the development of an investment thesis for a particular RMBS.

- Mr. Willner will refer to several examples from the available records of the alleged victim funds that show the analytical process actually followed in evaluating RMBS. *See* Gov't Exs. 409, 647, 648, 741, 742; documents bearing bates numbers INVESCO 000001-INVESCO 000018, MFA-00031-MFA-00072, AB 000005, AB 000006-000013, AB000100-AB000157. Mr. Willner will opine that the analytical procedures set forth in these materials are consistent with the procedures one would expect to find at a sophisticated investment management firm.

- Mr. Willner will offer his opinion on the nature of an investment manager's fiduciary duty to his or her client (*i.e.*, the investment fund and the investors therein), and describe how that fiduciary duty mandates that certain professional standards be adhered to, including rigorous analysis and valuation procedures.

- Mr. Willner will further opine that where a manager follows rigorous valuation procedures, as was the case here, consideration of, or reliance on, statements by sell-side salesmen or traders concerning the value of a RMBS or the price at which the broker-dealer acquired it or could acquire it, are not relevant to that fund's determination with respect to how much to pay for a bond. In Mr. Willner's opinion, such statements from sell-side sales representatives or traders are generally biased, often misleading, and unworthy of consideration in trading decisions. Accordingly, such statements from sell-side sales representatives or traders are not material to a professional investment manager's decision-making.

- Analysis of relevant RMBS transactions and opinion regarding fair market value: Based upon his education, training, and experience, as well as an analysis of available market data relevant to RMBS transactions referenced in the Indictment (the "Subject Trades" or "Subject Bonds"), including historical transaction data, comparable bond transactions, and certain statistical tests, Mr. Willner will offer his opinion that prices paid for RMBS were in the context of the market and within the range of fair value and that the Subject Trades did not take place at inflated prices.

**A30**

Jonathan N. Francis
December 24, 2013
Page Four

o <u>General Observations on the Nature of the Market for RMBS in the Relevant Time Frame</u> – Mr. Willner will describe generally the RMBS market as being quite volatile, with wide bid-ask spreads, poor liquidity, and difficult price discovery. Given these market conditions, market participants would have expected to transact across a range of prices for the same RMBS on a given day.

o <u>Analysis of PPIP transaction data confirms market volatility, illiquidity and wide bid-ask spreads.</u>

    ■ An analysis of PPIP transaction data in the Indictment period (program inception through December 31, 2011) is attached hereto as Exhibit A. This analysis first shows all PPIP trades in the Indictment period, and then isolates RMBS trades.

    ■ The analysis shows multiple trades of the same bond on the same date and multiple trades of the same bond on the same date by the same manager. The analysis then segments the results to show the variability in price for a bond on a given day, as well as the magnitude of the variability.

    ■ This analysis illustrates the volatility in the market due to poor liquidity and other market factors.

    ■ In Mr. Willner's opinion, given these market conditions, minor variances in price would not have mattered to sophisticated investors and traders, particularly where, as here, the bonds were heavily discounted but still mostly performing and the investment thesis anticipated significant potential gains on the trade.

o <u>Analysis of Fairness of Pricing on Subject Trades through Comparable Bond Analysis</u>

    ■ <u>Selection of Comparable Bonds</u>

        ■ The selection of comparable bonds for the Subject Bonds followed a consistent and systematic methodology which used origination characteristics-based criteria as well as performance

**A31**

Jonathan N. Francis
December 24, 2013
Page Five

characteristics-based criteria to match the bond characteristics. The "Comparable Bond Universe" consisted of securities trades from all the transactions involved in nine Public-Private Investment Funds (PPIFs). A wider data set showing transactions by non-PPIF funds was not available.

- Bonds from the "Comparable Bond Universe" were subjected to the following criteria to select the Comparable Bonds and to filter out bonds that are not appropriate comparables:

  - The bonds must have been traded in the period of two calendar weeks before and after the trade date of the Subject Bond. The trade should not be an odd-lot trade unless the Subject Bond trade is an odd-lot.

  - The bonds must match origination characteristics of the Subject Bond such as collateral type, original ratings (Moody's and S&P at origination), tranche seniority level, deal structure and collateral vintage (bonds from one vintage before and after were also included).

  - The bonds must match performance characteristics of the Subject Bond such as credit support, cumulative loss, delinquency buckets and weighted average life of loan.

- The securities which matched all these criteria were selected as comparable bonds for the purpose of analysis.

- Of the twelve Subject Trades referenced in the Indictment, two had no comparables and were therefore excluded from the analysis.

- Attached as Exhibit B is a list of the Subject Bonds and their comparables.

Jonathan N. Francis
December 24, 2013
Page Six

- Analysis to Determine Whether the Prices Charged on the Subject Trades Were Consistent with the Prices on Comparable Trades.

  - For each of the Subject Bonds, yield data for its comparable bonds was input into Intex, a commercially available and standard valuation tool for RMBS. Applying typical assumptions on RMBS performance, including that CPR, CDR, and severity from the prior six month period should be assumed to be the same going forward, an average price was generated as a basis for comparison to the price on the Subject Trade.

  - Attached as Exhibit C is a chart showing that the distribution of prices on the Subject Trades compared to the implied prices from comparable bond analysis. The comparison shows that prices on Subject Trades were lower than the comparable price in 6 of 10 instances.

  - Statistical tests were applied to this result to ensure that the weighted average of the 4 instances in which the Subject Trades had prices higher than the implied prices generated by the comparable bonds was not of such a magnitude as to render these comparisons misleading. The results of these tests were that, statistically, one could not reject the hypothesis that the prices on the Subject Trades were the same as the implied prices.

  - Testing to Determine Whether the Prices Charged on the Subject Trades Were Statistically Distinguishable from the Comparable Trades.

    - An additional statistical test was conducted, the Kolmogorov-Smirnov test, to determine whether the prices on the Subject Trades were, as a group, distinguishable from the comparable trades.

    - The result of these tests is that we cannot reject the hypothesis that the Subject Trades came from the same

**A33**

Jonathan N. Francis
December 24, 2013
Page Seven

underlying distributions as the comparable trades at a conventional level of statistical significance.

o Based upon the foregoing, it is Mr. Willner's opinion that the prices Jefferies charged for the Subject Bonds were fair market value prices and were not inflated. Further, since the investment funds that purchased the Subject Bonds paid cash for a fairly valued asset, no investment loss took place as of the transaction dates.

- <u>Analysis of Rate of Return and Net Profits on Subject Trades</u>

    o The calculation of the Net Profit/Loss and Rate of Return involved three steps:

        ▪ 1) Identifying Buy Price (Entry Price) and Sell Price (Exit Price): The buy price information along with original notional amount bought on the charged bond trades was collected from trade tickets of the trades. To identify the corresponding sell transaction, the original notional amount was matched to the sell transaction of the same bond by the same fund. If a PPIF fund already had a position in the Subject Bond from prior transactions, or had collected additional positions after the charged transaction with Jefferies and exited the position through multiple transactions at different level or different times or both, then last-in-first-out (LIFO) was used to match the entry transaction to the exit transaction. For the Subject Trades which were not traded with PPIF funds, information on exit level and price was not available and hence analysis on those funds was not conducted.

        ▪ 2) Collecting data on interest and principal received: Data of interest and principal received by the fund for holding on to the Subject Bond was collected using the standard industry software such as Intex and Bloomberg. The "Factor" of the principal left in the bond was collected from Intex using the settlement date of the transaction.

        ▪ 3) Calculations: Profits/Losses were calculated using the difference in market value of the exit trade and market value of the entry trade, interest and principal collected were added to the above difference. Market value of a trade is calculated by multiplying the bonds price (expressed as percentage) with original face amount of the bond and

**A34**

Jonathan N. Francis
December 24, 2013
Page Eight

the "Factor"(percentage of original principal unpaid). The rate of return is also given by calculating the Internal Rate of Return (IRR) for a transaction by taking into account all the out-flows (market value paid to buy the bond) and in-flows (market value received on selling a bond, interest received and principal received) along with the timing of such cash-flows.

Attached as Exhibit D is a summary of the rate of return and net profit calculations for the Subject Trades where exit price data is available.[1]

o   For transactions for which exit prices were available, the alleged victim funds experienced, with one exception, positive returns.

o   The exception is the FHASI 07-AR1 1A1 acquired by Invesco on June 24, 2010 and sold on March 13, 2012, the net loss on which was $1,043. However, given the small magnitude of the alleged misstatement – 2 ticks – this bond would have experienced a loss at the manager selected exit time and price in any event. The loss on this bond is attributable to a combination of security selection, timing of sale and market conditions for this RMBS.

o   The government's contention is that but for Mr. Litvak's tactics, a lower transaction price should have been available. While it is unclear whether Jefferies would have been willing to transact at lower prices, the difference between the actual trade price and the assumed lower price can be assessed in terms of impact on net return. For purposes of this analysis, the lower assumed transaction price is the actual trade price less any potential increase in trade price that fairly resulted from Mr. Litvak's tactics (the "Alleged Overcharge").

o   The Alleged Overcharges did not have a significant impact on the attractiveness of projected returns or actual net profits on the Subject Bonds. Put differently, fund managers would have transacted at either price and would not have passed up the significant potential upside that their analytics indicated were available at the actual transaction prices. The Alleged Overcharges were not significant and did not have a meaningful impact on the funds' returns. Market volatility for RMBS at the time as well as the inability

---

[1] The defense is endeavoring to acquire additional exit price information, some of which may be in materials produced on December 17, 2013.

**A35**

Jonathan N. Francis
December 24, 2013
Page Nine

to ascertain, whether contemporaneously or historically, a single market price for RMBS (as opposed to a range of fair market values) is further support for these conclusions.

o The Subject Bond transactions as a group performed approximately as well as the average RMBS investment in the PPIP universe.

o The Alliance Bernstein Subject Bond transactions performed significantly better than the average Alliance Bernstein RMBS investment.

## 2) **Marc Menchel**

a) Qualifications:

*September 2012 to Present, Principal, Menchel Consulting LLC*

Founder of a firm designed to engage in non-legal expert consulting services such as: expert witness; strategic consultancy during the pendency of a regulatory problem, examination, or disciplinary proceeding; oversight for remedial undertakings in response to a regulatory matter; or guidance as to the sufficiency of compliance programs in response to regulatory requirements.

*May 2002 to May 2012, General Counsel, Executive Vice President, FINRA*

General Counsel of the largest U.S. securities self-regulatory organization, based in Washington, D.C. and New York. Management responsibility for the Office of General Counsel (OGC), which is comprised of 45 staff members including 25 attorneys and a $10 million annual budget. OGC is divided among the Appellate Group, Regulatory Groups, and the Ahead of the Curve Group (ATC Group). The Appellate Group serves as counsel to the National Adjudicatory Council (the appellate body for disciplinary proceedings) and writes all FINRA appellate decisions and appears as FINRA's counsel on all appellate briefs submitted to the SEC; the Regulatory Group is charged with determining FINRA regulatory policy both in conjunction with and independently from the operating divisions of FINRA, preparing, filing, and shepherding all rule filings with the SEC, issuing Regulatory Notices, interpretive guidance, and other publications dealing with FINRA policy, providing a liaison function to all standing committees of FINRA, and providing counsel and policy guidance to all operating departments of FINRA

**A36**

Jonathan N. Francis
December 24, 2013
Page Ten

and senior management. The General Counsel regularly presents on regulatory matters and rule proposals to the FINRA Board of Governors and represents and speaks on behalf of FINRA at national and international securities forums, panels, and conferences throughout the year.

Achievements include creation of the mission statement and operating protocols of the ATC Group in May 2002 for the purpose of identifying nascent regulatory issues with potential pernicious and wide-ranging impact (the ATC Group has identified over 50 regulatory topic areas and the program has been emulated by the SEC and NYSE); development of sweeping rule amendments across a broad topical spectrum including the areas of supervisory control, CEO certification of compliance processes, debt mark-up, quality of market rules for the unlisted OTC market, transparency and dissemination protocols for debt instruments, new securities issuance, variable annuity sales, business continuity planning, limit and market order protection rules; securities analyst conflicts rules; leadership participation in various FINRA task forces on mutual funds breakpoints and account transfer issues; policy statements on best execution in bonds, obligations attached to the sale of non-conventional instruments, retail participation in hedge funds, and investment issues pertaining to the sale of structured and new products.

*July 1995 to March 2002, Director and Corporate Secretary, Executive Vice President and General Counsel, Member of the Board of Directors, Tucker Anthony Incorporated*

General Counsel of a Boston based broker-dealer, investment bank and investment adviser. Overall management responsibility for the firm's legal and compliance departments staffed by five attorneys, nine compliance/registration professionals, and four support staff. Position entailed broad direct legal responsibilities beyond the management of professionals and the departments. Responsibilities included the determination of legal and compliance policy concerning all aspects of the firm's business; providing counsel in the following areas: investment/merchant banking, broker-dealer and investment advisory matters, capital markets, operations, regulatory capital issues, and personnel matters; the supervision and management of outside counsel for all matters; handling regulatory matters before the SEC and the self-regulatory organizations; and directing the conduct of firm litigation.

Achievements during this period included legal management and due diligence in the buyout of the parent company (Freedom Securities Corporation) from John

**A37**

Jonathan N. Francis
December 24, 2013
Page Eleven

Hancock Mutual Life Insurance Company; negotiation and implementation of conversion from self-clearing firm to introducing broker; legal and regulatory counsel and management of the private placement of a firm sponsored private-equity fund (a fund of select and top performing venture capital and private-equity funds); responsibility for a range of legal matters regarding the initial public offering of the parent company, Freedom Securities (listed on the NYSE); and complete restructuring and enhancement of firm compliance and trading policies.

*January 1991 to June 1995, Senior Vice President and International Counsel, Prudential Securities Incorporated*

Chief international legal officer, based in London (and subsequently New York), and responsible for supervision of legal and compliance departments located in London, Paris, Hong Kong, and Melbourne. Duties included responsibility for the oversight of significant international litigation; acting as corporate secretary and counsel to the futures, foreign exchange, money broker and equity broker subsidiaries; providing counsel to branch offices throughout Europe, South America, Asia, and Australia; oversight of regulatory matters in all locations; providing counsel on capital market issues, regulatory capital matters, and matters pertaining to the provision of financial services generally.

Chief achievement during this period was the establishment of a private bank (based in Luxembourg) with EC-wide passport privileges during the period (1991 to 1992 and following) that the Banking Directive was first implemented and the Financial Services and Capital Adequacy Directives were pending (which added significant difficulties to the implementation of this project because of an uncertain and shifting legal and political environment). Project included directing and managing counsel in various countries and in-depth negotiation with various central banks including the IML in Luxembourg, The Bank of England, and the U.S. Federal Reserve Board.

*April 1990 to December 1991, Vice President and Compliance Officer, Prudential-Bache Securities (UK) Incorporated*

Chief legal and compliance officer, based in London, for the UK subsidiary of Prudential Securities Incorporated and its affiliated futures, foreign exchange, money broker, and equity broker companies. Responsibility for all UK and applicable U.S. regulatory matters; UK capital market issues; European litigation;

**A38**

Jonathan N. Francis
December 24, 2013
Page Twelve

UK property matters; provision of counsel relative to branch and operational inquiries; and UK corporate matters. Served as a member of the UK investment banking commitment committee. Wrote the UK compliance manual based on AFBD and TSA (later updated for SFA) regulations (these were the UK self-regulatory organizations prior to the advent of the FSA). Developed surveillance program for Eurobond and foreign exchange trading.

*September 1989 to March 1990, Vice President and Associate General Counsel, Prudential Securities Incorporated*

Served as counsel to the Correspondent Clearing Division, Bank Certificate of Deposit Division, Precious Metals Division and general corporate area of the firm. Duties involved negotiating and drafting legal agreements and providing counsel based on the regulatory and legal requirements applicable to each of these areas.

*November 1986 to August 1989, Vice President and Associate General Counsel, Thomson McKinnon Securities Incorporated*

Duties included the negotiation of the firm's leasehold agreements throughout the United States and Europe; drafting of contracts; review and drafting of documentation attendant to the firm's capital market transactions and registered commodity pool offerings; management of significant litigation; preparation of pleadings and appearing on behalf of the firm in arbitrations; and representation of the firm and various employees before the SEC and self-regulatory organizations. Worked extensively on asset sale of firm's clearing operation to ADP and eventual asset sale of remainder of business to Prudential Securities.

*January 1983 to October 1986, Vice President and Deputy Director of Compliance, Thomson McKinnon Securities Incorporated*

Directly managed and supervised a staff of 40 compliance professionals including five attorneys. Was primarily responsible for resolving and representing the firm before all principal U.S. regulatory bodies. Managed complex litigation with outside counsel. Wrote firm compliance manual. Provided counsel to the banking, institutional, trading, and retail areas of the firm.

Jonathan N. Francis
December 24, 2013
Page Thirteen

*August 1980 to December 1982, Compliance Officer, Thomson McKinnon Securities Incorporated*

> Responsibilities included handling customer complaints and correspondence; responding to regulatory inquiries; processing special securities transactions (Rule 144); managing outside counsel and litigation; preparation of pleadings in arbitration, research, and response to general broker-dealer trading and retail issues.

*Professional Affiliation*

> Past member of the Executive Committee of the Securities Industry Association, Compliance and Legal Division (SIACL). Received the SIACL President's award as Regulator of the Year in 2006.

*Professional Qualification*

> Member of The New York State Bar

*Education*

> Syracuse University College of Law – Juris Doctor Degree awarded 1980
> Davidson College – Bachelor of Arts Degree awarded 1977

b)  Summary of Opinions and Bases Therefore:  It is anticipated that Mr. Menchel, if called as a witness, would testify as to his opinion on the following issues:

- Securities Industry Terminology and Practices:  Based upon Mr. Menchel's extensive experience in the securities industry and as a securities regulator, Mr. Menchel will offer his expert opinion on the meaning of certain terms relevant to RMBS trading, and related industry practices that are used in the Indictment, including:

  - A broker-dealer is a securities firm that is in the business of buying and selling securities.  "Broker" refers to a broker-dealer effecting securities transactions, in an agency capacity for others.  When acting as agent, broker-dealers charge a commission to their customers.  "Dealer" refers to a broker-dealer acting as "principal," which means buying securities for

**A40**

Jonathan N. Francis
December 24, 2013
Page Fourteen

and selling securities from its own account. When acting as principal, a broker-dealer is compensated through mark-ups or mark-downs – or profit – embedded in the price of the security. No commission is charged when a broker-dealer acts as principal.

o   The Indictment's references to "commissions" are misplaced. Jefferies charged no commissions on any of the trades referenced in the Indictment. The term "commission" applies when a broker-dealer is acting in the capacity of agent and are virtually unheard of in the fixed-income market (which includes RMBS). Rather, examination of the relevant trade tickets and confirmations indicates that Jefferies, acting as principal and trading for its own account, earned profit by selling RMBS bonds to counter-parties at prices higher than its acquisition costs. Jefferies was not receiving any other remuneration or charging any other fee for the execution of principal transactions.

o   The terms "all-in" and "on-top" in Paragraph 21 of the Indictment are not terms that are derived from, or recognized by securities industry regulation. Rather, they are jargon used by market participants as part of a price negotiation. Strictly speaking, all trades with a broker-dealer acting as principal are "all in" because when an agreement is reached, the deal is always memorialized as one price to the customer for a quantity of a bond. There are no other separate fees or charges for the transaction.

o   Trade confirmations reflect this "all in" understanding. As governed by SEC Rule 10b-10, which was promulgated under the anti-fraud provisions of the federal securities laws, in the context of fixed income transactions, a broker-dealer, when acting in the capacity of principal on a fixed income transaction, is under no duty to disclose its cost or the amount of mark-up that it charges on the sale of a bond. Consistent with applicable disclosure requirements, when acting as principal, dealers in debt securities do not disclose their costs or mark-ups. For illustration, Mr. Menchel will review several trade confirmations that Jefferies provided to customers following the transactions referenced in the Indictment. Among other aspects of these confirmations, Mr. Menchel will observe that the dealer's cost is not disclosed and no commission was charged.

**A41**

Jonathan N. Francis
December 24, 2013
Page Fifteen

o Mr. Menchel will also review the rationale for this regime, and opine that
several attempts to change the rules to require dealers to disclose mark-ups
failed because bond market participants – on both the "sell" side and the
"buy" side did not want full disclosure. Mr. Menchel will opine that
institutional bond market participants such as investment funds, hedge
funds and pension funds do not regard disclosure of a dealer's costs or
profits as important; rather institutional bond buyers focus on total price
and yield, which necessarily take into account any embedded profit in the
price quoted by a dealer, and are equipped to evaluate the fairness of a
price and negotiate accordingly.

o Paragraph 21(b)'s description of what purports to be an "on-top" trade
does not comport with industry disclosure requirements and fixed income
trading practices. Since a broker-dealer typically does not disclose its
costs (*i.e.*, the "price the broker-dealer paid it to the seller") and does not
quote prices in relation to its costs, the customer typically, and from a
regulatory perspective appropriately, has no way of knowing how much
additional compensation might be "on top" of a broker-dealer's cost.
Rather, a more typical negotiation would involve a customer agreeing to
pay some price greater than its bid. It is incorrect to assume that a
customer's bid is the equivalent of a broker-dealer's cost.

o Mr. Menchel will opine that the allegation in paragraph 32 of the
Indictment concerning the size of mark-ups on bid list transactions is not
grounded in any regulatory guidance. There is no rule that places a
specific limit on the mark-ups that may be charged on a bid list trade.

o The Indictment's summary in paragraph 19 of the best execution principle,
to the extent it refers to a broker-dealer's duty of best execution to a
customer, is incomplete and misleading in that it is defined solely in
relation to price. "Best execution" is a term that encompasses three
concepts: speed of execution, certainty of execution, and price.
Institutional market participants routinely choose to execute with
brokerage firms that offer the best execution in terms of the size of the
negotiated order without regard to getting the lowest price at which a
particular bond may trade at a given time.

**A42**

Jonathan N. Francis
December 24, 2013
Page Sixteen

o As alluded to in paragraph 25 of the Indictment, broker-dealers owe a duty
of "best execution" to their customers. In the stock market, where the
markets are transparent, this duty is more straightforward and easier to
apply. A brokerage firm has to route held market orders to the market
where it has the highest likelihood of achieving the best price. Thus,
instead of simply filling an order at the firm's quoted price, it must check
around to other markets and route the order accordingly. In some
segments of the bond market, including the RMBS market in 2009 through
2011, there was no consolidated or listed market and no ready access to all
market participants. There were no alternative exchanges or electronic
trading platforms. The fact that the bond markets are negotiated, not order
driven, lack robust pre-trade price discovery mechanisms, and lack
electronic access to firm quotes, assessing best execution in real time, let
alone after the fact, is a much different process for a bond dealer than for
an equity dealer. A bond dealer does not have the same pre-trade point of
quote discovery that an equity dealer has in seeking to obtain best
execution and in reviewing executions after the fact to determine if, in
fact, best execution was achieved.

o In any event, the duty of best execution is inapplicable to the situation in
which a broker-dealer is transacting with a Qualified Institutional Buyer
("QIB") in non-investment grade bonds. The duty of best execution is
subsumed by the QIB exemption for non-investment grade bonds as set
forth in FINRA IM 2440-2 as that exception in effect puts broker-dealers
and their QIB customers in the role of arms-length counter-parties as to
the pricing of non-investment grade bonds. Jefferies and Mr. Litvak had
no duty to offer better prices to its counter-party, or otherwise assist that
counter-party in executing at a better price. Rather, Jefferies and Mr.
Litvak were free to negotiate any price with a QIB, irrespective of profit
earned on the trade. The whole point of the QIB exemption is that the
sophistication of the QIB in negotiating the transaction is the sole check
on the price of the transaction.

o From the buy-side perspective, there is a different duty of best execution:
that of the investment manager to his clients to get the most favorable
price for his client under the circumstances. This is typically done by
comparing price quotes from many dealers and negotiating that price with
one or more dealers. Again, price is not the sole consideration. Speed,

**A43**

Jonathan N. Francis
December 24, 2013
Page Seventeen

certainty, and other factors with respect to a transaction of institutional size may also be relevant, as well as relationships that an investment manager may have with brokerage firms that may benefit its client.

o   A buy-side account is not required to transact with a particular broker. Nothing that Mr. Litvak did prevented any buyer from checking prices at other broker-dealers. Given the fiduciary duties these sophisticated buy side professional investment firms owed their clients, which are assumed to have been fully adhered to, there is nothing that Mr. Litvak did that caused his counter-parties to transact with Jefferies at prices higher than the prices available from other firms unless it was in the interest of these buy-side firms to do so. If lower prices were available, the buy-side accounts likely would have traded away from Jefferies. The fact that the buy side account chose to transact with Jefferies indicates that Jefferies in all likelihood had the best price (or only price) for a transaction of the size in the market at the time.

o   From the buy-side account's perspective, one could only say that the price component of a trade execution was poor in terms of a comparison to what was available from other broker-dealers. If the price negotiated was the only price available in the market there would be no basis to conclude that the execution was poor and that the price should have been better.

•   <u>Importance of Broker-Dealer Compliance Function</u>: Based upon Mr. Menchel's extensive experience in the securities industry and as a securities regulator, Mr. Menchel will offer his expert opinion on role of the compliance function in a broker-dealer generally. With regard to training, Mr. Menchel will opine:

o   Internal compliance training is important in brokerage firms. Through training, the compliance function at a broker-dealer distills the securities' industry's many rules to provide clarity to brokers, traders and sales representatives on how to conduct themselves. Internally within a firm, the interpretation of the compliance staff on what is permissible is very important and is appropriately understood by the employees of that firm as authoritative.

**A44**

Jonathan N. Francis
December 24, 2013
Page Eighteen

- Trade Specific Opinions:

  o <u>Wellington-Wells Fargo Trade -- Count Five</u>

    ▪ On this trade, Jefferies was acting as principal and trading for its own account.

    ▪ At the time of the transaction, the Wells Fargo bond was a non-investment grade debt security.

    ▪ At the time of transaction, Wellington was a QIB as that term is used in FINRA IM 2440-2.

    ▪ As a general matter, neither Jefferies nor Mr. Litvak had any duty to disclose the price at which Jefferies acquired the Wells Fargo bond on.

    ▪ As a general matter, neither Jefferies nor Mr. Litvak had any duty to offer the Wells Fargo Bond to Wellington at a price that was calculated in relation to its acquisition cost.

    ▪ Jefferies did not charge any commission on this transaction.

    ▪ Whether or not Mr. Litvak's sales tactics had any impact on the price negotiations and final execution price is not an issue on which Mr. Menchel has an opinion. That said, because Jefferies was acting as a principal on a non-investment grade bond sale to a QIB, Jefferies's acquisition cost of the bond is not relevant. Having reviewed the communications set forth in proposed government exhibits 520, 523, 533, 534, Jefferies did not offer the bond at a price that related to its historical acquisition cost. The statements about the fictitious seller do not relate to Jefferies historical acquisition cost, something that Wellington would not have been entitled to know and would not reasonably have expected to know. Whatever impact Mr. Litvak's tactics had on the purchaser, and the price it agreed to pay, they are independent of the historical acquisition cost.

**A45**

Jonathan N. Francis
December 24, 2013
Page Nineteen

- o Harborview and Lehman Trade – Counts One and Two

  - On this trade, Jefferies was acting as principal and trading for its own account.

  - At the time of the transaction, each of the Harborview and Lehman bonds was a non-investment grade debt security.

  - At the time of transaction, Alliance Bernstein was a QIB as that term is used in FINRA IM 2440-2.

  - As a general matter, neither Jefferies nor Mr. Litvak had any duty to disclose the price at which Jefferies acquired these bonds.

  - As a general matter, neither Jefferies nor Mr. Litvak had any duty to offer the Lehman and Harborview bonds to Alliance Bernstein at a price that was calculated in relation to its acquisition cost.

  - Jefferies did not charge any commission on either of these trades.

  - Whether or not Mr. Litvak's sales tactics had any impact on the price negotiations and final execution price is not an issue on which Mr. Menchel has an opinion.

  - Review of the relevant communications and trade tickets on these two trades indicates that Jefferies acquired each of the Harborview and Lehman bonds from Wayzata Investment Partners at no later than approximately 12:45 p.m. As of the time this trade was complete, Jefferies did not have a buyer on the other side of the trade. Alliance Bernstein, while it had bid on these bonds, had not yet agreed to buy them. In other words, Alliance Bernstein was free to walk away from these negotiations; Jefferies was free to sell the bonds to another customer.. Jefferies owned each of the Harborview and Lehman bonds prior to the later sale to Alliance Bernstein and was subject to market risk during the approximately one hour and forty-five minutes that it owned them.

  - Paragraph 45 of the Indictment incorrectly categorizes the Harborview bond trade as a riskless trade.

**A46**

Jonathan N. Francis
December 24, 2013
Page Twenty

- Paragraph 46 of the Indictment incorrectly categorizes the Lehman
  bond trade as a riskless trade.

Please do not hesitate to contact me at 212-335-4685 with any questions.

Sincerely,

Patrick J. Smith

EAST\67213552.5

**A47**

## A.1 - Summary of Multiple Trades

**Summary Table of PPIF Trades from October 2009 to December 2011[1]**

| | |
|---|---|
| Total Number of Multiple Trades of the Same Bond on the Same Date | **164** |
| Total Number of Multiple Trades of the Same Bond on the Same Date Traded by the Same Fund | **154** |
| | |
| Maximum Price Difference on Multiple Trades of the Same Bond on the Same Date | **$4.19** |
| Maximum Price Difference on Multiple Trades of the Same Bond on the Same Date Traded by the Same Fund | **$4.09** |
| | |
| Price Difference of More than $0.50 on Multiple Trades of the Same Bond on the Same Date | **67** |
| Price Difference of More than $0.50 on Multiple Trades of the Same Bond on the Same Date Traded by Same Fund | **62** |
| | |
| Price Difference of More than $1 on Multiple Trades of the Same Bond on the Same Date | **40** |
| Price Difference of More than $1 on Multiple Trades of the Same Bond on the Same Date Traded by Same Fund | **37** |
| | |
| Price Difference of More than $2 on Multiple Trades of the Same Bond on the Same Date | **13** |
| Price Difference of More than $2 on Multiple Trades of the Same Bond on the Same Date Traded by the Same Fund | **11** |

**Notes:** [1] Bonds with CUSIPs that cannot be found in Bloomberg are excluded from the analysis.
**Source:** BONY-000105-226 and BONY-000227-240.

## A.2 - Summary of Multiple Trades for RMBS

**Summary Table of PPIF Trades from October 2009 to December 2011 - RMBS[1]**

| | |
|---|---|
| Total Number of Multiple Trades of the Same Bond on the Same Date | **103** |
| Total Number of Multiple Trades of the Same Bond on the Same Date Traded by the Same Fund | **93** |
| | |
| Maximum Price Difference on Multiple Trades of the Same Bond on the Same Date | **$4.19** |
| Maximum Price Difference on Multiple Trades of the Same Bond on the Same Date Traded by the Same Fund | **$4.09** |
| | |
| Price Difference of More than $0.50 on Multiple Trades of the Same Bond on the Same Date | **50** |
| Price Difference of More than $0.50 on Multiple Trades of the Same Bond on the Same Date Traded by Same Fund | **46** |
| | |
| Price Difference of More than $1 on Multiple Trades of the Same Bond on the Same Date | **33** |
| Price Difference of More than $1 on Multiple Trades of the Same Bond on the Same Date Traded by Same Fund | **30** |
| | |
| Price Difference of More than $2 on Multiple Trades of the Same Bond on the Same Date | **12** |
| Price Difference of More than $2 on Multiple Trades of the Same Bond on the Same Date Traded by the Same Fund | **10** |

**Notes:** [1] Bonds with CUSIPs that cannot be found in Bloomberg are excluded from the analysis.
**Source:** BONY-000105-226 and BONY-000227-240.

**A49**

| CUSIP | Bond Name | Sell Price | Fund Name | Broker | Date of Trade | Comments |
|---|---|---|---|---|---|---|
| **1** | *Subject Bond* | | | | | |
| **12668BB44** | **CWALT 2006-OA3 1A1** | **51.19** | **QVT Financial** | **Jefferies Group, Inc.** | **3/29/2010** | |
| | *Comparable Bonds* | | | | | |
| 23332QAC7 | DSLA 2006-AR2 2A1A | 57.75 | Alliance Bernstein LS MF | Deutsche Bank | 3/23/2010 | |
| 23332QAC7 | DSLA 2006-AR2 2A1A | 59.13 | Alliance Bernstein LS MF | Nomura | 3/23/2010 | |
| 362631AB9 | GSR 2006-OA1 2A1 | 75.13 | BlackRock PPIF, LP | Credit Suisse Securities LLC | 3/19/2010 | |
| 74922HAA0 | RALI 2007-QH1 A1 | 56.88 | Alliance Bernstein LS MF | Jefferies Group, Inc. | 4/1/2010 | |
| 576433H33 | MARM 2006-OA1 4A1 | 46.06 | RLJ Western Asset PP MF | Bank of America | 3/30/2010 | Not a final comparable |
| 39538AAA4 | GPMF 2006-AR5 A1A | 88.13 | RLJ Western Asset PP MF | RBS | 3/23/2010 | Not a final comparable |
| 75115FAA8 | RALI 2006-QO8 1A1A | 91.31 | RLJ Western Asset PP MF | Credit Suisse Securities LLC | 3/24/2010 | Not a final comparable |
| 761118VY1 | RALI 2006-Q02 A1 | 40.56 | BlackRock PPIF, LP | Cantor | 3/22/2010 | Not a final comparable |
| 362631AB9 | GSR 2006-OA1 2A1 | 75.13 | BlackRock PPIF, LP | Credit Suisse Securities LLC | 3/15/2010 | Not a final comparable |
| **2** | **Subject Bond** | | | | | |
| **23332UGM0** | **DSLA 2006-AR1 2A1A** | **61** | **RLJ Western Asset PP MF** | **Jefferies** | **1/7/2010** | |
| | *Comparable Bonds* | | | | | |
| 86359DUL9 | LXS 2005-5N 1A1 | 61.75 | RLJ Western Asset PP MF | Cohen | 12/28/2009 | |
| 45661EAV6 | INDX 2006-AR4 A1A | 54.75 | RLJ Western Asset PP MF | Wells Fargo/Wachovia | 1/5/2010 | |
| 45661EAB0 | INDX 2006-AR2 1A1B | 53.375 | RLJ Western Asset PP MF | Cantor Fitzgerald | 1/12/2010 | |
| 86359DUR6 | LXS 2005-5N 3A1A | 65 | RLJ Western Asset PP MF | Credit Suisse | 1/15/2010 | |
| 75114NAC8 | RALI 2006-Q06 A3 | 41.625 | Alliance Bernstein LS MF | Caprock | 1/7/2010 | Not a final comparable |
| 75114NAC8 | RALI 2006-Q06 A3 | 41.4375 | Alliance Bernstein LS MF | Caprock | 1/8/2010 | Not a final comparable |
| 362631AB9 | GSR 2006-OA1 2A1 | 77.25 | RLJ Western Asset PP MF | Goldman Sachs | 1/20/2010 | Not a final comparable |
| **3** | **Subject Bond** | | | | | |
| **32051GA88** | **FHAMS 05-AA10 2A1** | **53.25** | **Magnetar Capital LLC** | **Jefferies Group, Inc.** | **11/22/2010** | |
| | *Comparable Bonds* | | | | | |
| 45660LQW2 | INDX 2005-AR13 1A1 | 59.13 | Wellington Management LSP | Credit Suisse | 11/15/2010 | |
| 45660LQW2 | INDX 2005-AR13 1A1 | 59.13 | Wellington Management LSP | Citigroup | 11/15/2010 | |
| 45660LQW2 | INDX 2005-AR13 1A1 | 58.11 | Wellington Management LSP | Citigroup | 11/30/2010 | |
| 61748HWT4 | MSM 2006-3AR 2A3 | 60.09 | Wellington Management LSP | Bank of America | 11/30/2010 | |
| 07386HP88 | BALTA 06-3 32A1 | 52.50 | Invesco LS MF, LP | Citigroup Fixed Income | 12/3/2010 | |
| 07386HP88 | BALTA 06-3 32A1 | 52.50 | Invesco LS MF, LP | Citigroup Fixed Income | 12/3/2010 | |
| 41161QAM3 | HVMLT 2006-3 1A1A | 54.38 | BlackRock PPIF, LP | Caprock | 11/23/2010 | |
| 41161QAM3 | HVMLT 2006-3 1A1A | 55.38 | BlackRock PPIF, LP | Auriga | 12/2/2010 | |
| 007036QK5 | ARMT 2005-8 4A11 | 90.00 | BlackRock PPIF, LP | Keybanc | 11/24/2010 | |
| 45660LW54 | INDX 2005-AR31 3A1 | 64.25 | RLJ Western Asset PP MF | Goldman Sachs | 11/16/2010 | |
| 45660LXA2 | INDX 2005-AR19 A1 | 77.25 | BlackRock PPIF, LP | Oppenheimer | 11/12/2010 | Not a final comparable |
| 86360KAX6 | SAMI 2006-AR3 22A1 | 52.75 | BlackRock PPIF, LP | Banes (Shay Financial) | 12/2/2010 | Not a final comparable |
| 007036MX1 | ARMT_05-7-4A1 | 90.88 | BlackRock PPIF, LP | Goldman Sachs | 12/6/2010 | Not a final comparable |
| 45660LVL0 | INDX 2005-AR15 A1 | 84.50 | AG GECC PPIF Master Fund | Deutsche Bank | 11/9/2010 | Not a final comparable |
| 007036VE3 | ARMT 2005-11 2A42 | 45.50 | RLJ Western Asset PP MF | Barclays | 11/10/2010 | Not a final comparable |
| 007036VE3 | ARMT 2005-11 2A42 | 44.00 | RLJ Western Asset PP MF | Nomura | 11/12/2010 | Not a final comparable |
| 41161PMV2 | HVMLT 2005-4 1A | 62.25 | RLJ Western Asset PP MF | Bank of America | 11/10/2010 | Not a final comparable |
| **4** | **Subject Bond** | | | | | |
| **32053EAA6** | **FHASI 2007-AR1 1A1** | **80.00** | **Invesco** | **Jefferies Group, Inc.** | **6/24/2010** | |

| CUSIP | Bond Name | Sell Price | Fund Name | Broker | Date of Trade | Comments |
|-------|-----------|-----------|-----------|--------|---------------|----------|
| *Comparable Bonds* | | | | | | |
| 32053AAB2 | FHASI 2006-AR4 1A2 | 76.00 | AG GECC PPIF Master Fund | Southwest Securities | 7/1/2010 | |
| 362290AC2 | GSR 2007-AR1 2A1 | 72.00 | Invesco LS MF, LP | RW Pressprich | 6/11/2010 | |
| 78473TAC4 | STARM 2007-2 2A1 | 71.50 | Stephens | Stephens | 6/24/2010 | |
| 81744MAM4 | SEMT 2007-3 2AA1 | 67.00 | BlackRock PPIF, LP | Stephens | 6/10/2010 | |
| 81744MAQ5 | SEMT 2007-3 2BA1 | 68.00 | BlackRock PPIF, LP | Stephens | 6/10/2010 | |
| 81744MAQ5 | SEMT 2007-3 2BA1 | 65.06 | Wellington Management LSP | Nomura | 6/16/2010 | |
| 81744MAQ5 | SEMT 2007-3 2BA1 | 66.00 | Wellington Management LSP | Nomura | 6/30/2010 | |
| 93363EAA3 | WAMU 2006-AR10 1A1 | 75.00 | Invesco LS MF, LP | RW Pressprich | 7/1/2010 | |
| 94984LAA4 | WFMBS 2006-AR17 A1 | 80.28 | Alliance Bernstein LS MF | Credit Suisse | 6/16/2010 | |
| 073881AA2 | BSARM 2007-3 1A1 | 71.31 | BlackRock PPIF, LP | Amherst Securities | 6/11/2010 | Not a final comparable |
| 07401CAV5 | BSARM 2007-4 22A1 | 77.63 | AG GECC PPIF Master Fund | Jefferies Group, Inc. | 6/15/2010 | Not a final comparable |
| 17313FAA0 | CMLTI 2007-AR8 1A1A | 74.88 | Wellington Management LSP | MF Global Inc | 6/28/2010 | Not a final comparable |
| 17313FAA0 | CMLTI 2007-AR8 1A1A | 75.44 | Wellington Management LSP | Bank Of America | 6/29/2010 | Not a final comparable |
| 46630PAQ8 | JPMMT 2007-A2 3A2 | 83.50 | AG GECC PPIF Master Fund | Merrill Lynch | 7/2/2010 | Not a final comparable |
| 46630PBB0 | JPMMT 2007-A2 4A2 | 77.50 | Invesco LS MF, LP | RW Pressprich | 6/16/2010 | Not a final comparable |
| 4663I JAA6 | JPMMT 2007-A4 1A1 | 78.25 | Invesco LS MF, LP | Keybanc Capital Markets | 6/16/2010 | Not a final comparable |
| 59025JAB1 | MLMBS 2007-3 2A1 | 70.50 | Wellington Management LSP | Nomura | 6/30/2010 | Not a final comparable |
| 78473WAF0 | STARM 2007-4 3A1 | 70.06 | Wellington Management LSP | Bank Of America | 6/24/2010 | Not a final comparable |
| 81744LAL8 | SEMT 2007-2 2AA1 | 64.50 | BlackRock PPIF, LP | Caprock | 6/10/2010 | Not a final comparable |
| 81744LAL8 | SEMT 2007-2 2AA1 | 64.91 | BlackRock PPIF, LP | ICP Capital | 6/17/2010 | Not a final comparable |
| 86363GAD6 | SARM 2007-3 2A1 | 63.63 | BlackRock PPIF, LP | Further Lane Securities L.P. | 7/8/2010 | Not a final comparable |
| 86363GAK0 | SARM 2007-3 4A2 | 59.31 | BlackRock PPIF, LP | Stephens | 6/24/2010 | Not a final comparable |
| 86363GAK0 | SARM 2007-3 4A2 | 61.94 | BlackRock PPIF, LP | ICP Capital | 7/8/2010 | Not a final comparable |
| 86364JAD9 | SARM 2007-9 2A1 | 64.00 | Wellington Management LSP | JP Morgan | 6/29/2010 | Not a final comparable |
| 86364JAD9 | SARM 2007-9 2A1 | 64.50 | Wellington Management LSP | Morgan Stanley | 6/29/2010 | Not a final comparable |
| 92925VAA8 | WAMU 2007-HY1 1A1 | 72.50 | Invesco LS MF, LP | Oppenheimer | 6/21/2010 | Not a final comparable |
| 933634AG2 | WAMU 2007-HY3 3A3 | 79.87 | RLJ Western Asset PP MF | Cantor Fitzgerald | 7/1/2010 | Not a final comparable |
| 933634AG2 | WAMU 2007-HY3 3A3 | 81.50 | RLJ Western Asset PP MF | Cantor Fitzgerald | 6/29/2010 | Not a final comparable |
| 933634AG2 | WAMU 2007-HY3 3A3 | 80.75 | RLJ Western Asset PP MF | Cantor Fitzgerald | 6/30/2010 | Not a final comparable |
| 93363EAA3 | WAMU 2006-AR10 | 77.25 | AG GECC PPIF Master Fund | Merrill Lynch | 6/15/2010 | Not a final comparable |
| 93363NAH8 | WAMU 2006-AR12 1A2 | 76.50 | Alliance Bernstein LS MF | MF Global Inc | 6/22/2010 | Not a final comparable |
| 93363PAD2 | WAMU 2006-AR14 1A4 | 73.00 | Marathon LS PPIP, LP | Barclays | 6/18/2010 | Not a final comparable |
| 93363PAK6 | WAMU 2006-AR14 2A3 | 68.13 | BlackRock PPIF, LP | Further Lane Securities L.P. | 6/28/2010 | Not a final comparable |
| **5** | **Subject Bond** | | | | | |
| **41162CAC5** | **HVMLT 2006-10 2A1A** | **58.00** | **Alliance Bernstein LS MF** | **Jefferies Group, Inc.** | **3/31/2010** | |
| *Comparable Bonds* | | | | | | |
| 362631AB9 | GSR 2006-OA1 2A1 | 75.13 | BlackRock PPIF, LP | Credit Suisse Securities Llc | 3/15/2010 | |
| 362631AB9 | GSR 2006-OA1 2A1 | 75.13 | BlackRock PPIF, LP | Credit Suisse Securities Llc | 3/19/2010 | |
| 23332QAC7 | DSLA 2006-AR2 2A1A | 59.13 | Alliance Bernstein LS MF | Nomura | 3/23/2010 | |
| 23332QAC7 | DSLA 2006-AR2 2A1A | 57.75 | Alliance Bernstein LS MF | Deutsche Bank | 3/23/2010 | |
| 576433H33 | MARM 2006-OA1 4A1 | 46.06 | RLJ Western Asset PP MF | Bank Of America | 3/30/2010 | |
| 761118VY1 | RALI 2006-Q02 A1 | 40.56 | BlackRock PPIF, LP | Cantor Fitzgerald | 3/22/2010 | |
| 74922HAA0 | RALI 2007-QH1 A1 | 57.25 | Alliance Bernstein LS MF | Jefferies Group, Inc. | 4/14/2010 | |

| | CUSIP | Bond Name | Sell Price | Fund Name | Broker | Date of Trade | Comments |
|---|---|---|---|---|---|---|---|
| | 39538AAA4 | GPMF 2006-AR5 A1A | 88.13 | RLJ Western Asset PP MF | RBS | 3/23/2010 | |
| | 75115FAA8 | RALI 2006-QO8 1A1A | 91.31 | RLJ Western Asset PP MF | Credit Suisse | 3/24/2010 | |
| 6 | **Subject Bond** | | | | | | |
| | **45670CAC1** | **INDX 2007-AR7 2A1** | **42.25** | **MFA Mortgage Investments, Inc.** | **Jefferies Group, Inc.** | **5/28/2009** | |
| | **Comparable Bonds** | | | | | | |
| | N/A | N/A | N/A | N/A | N/A | N/A | |
| 7 | **Subject Bond** | | | | | | |
| | **52524VAG4** | **LXS 2007-15N 2A1** | **58.41** | **Alliance Bernstein LS MF** | **Jefferies Group, Inc.** | **3/31/2010** | |
| | **Comparable Bonds** | | | | | | |
| | 74922JAA6 | RALI 2007-QH2 A1 | 53.00 | Alliance Bernstein LS MF | Wells Fargo/Wachovia | 3/12/2010 | |
| | 23332QAC7 | DSLA 2006-AR2 2A1A | 59.13 | Alliance Bernstein LS MF | Nomura | 3/23/2010 | |
| | 23332QAC7 | DSLA 2006-AR2 2A1A | 57.75 | Alliance Bernstein LS MF | Deutsche Bank | 3/23/2010 | |
| | 74922HAA0 | RALI 2007-QH1 A1 | 57.25 | Alliance Bernstein LS MF | Jefferies Group, Inc. | 4/14/2010 | |
| | 39538AAA4 | GPMF 2006-AR5 A1A | 88.13 | RLJ Western Asset PP MF | RBS | 3/23/2010 | Not a final comparable |
| | 75115FAA8 | RALI 2006-QO8 1A1A | 91.31 | RLJ Western Asset PP MF | Credit Suisse | 3/24/2010 | Not a final comparable |
| 8 | **Subject Bond** | | | | | | |
| | **52524VAG4** | **LXS 2007-15N 2A1** | **57.56** | **QVT Financial, LP** | **Jefferies Group, Inc.** | **4/1/2010** | |
| | **Comparable Bonds** | | | | | | |
| | 74922JAA6 | RALI 2007-QH2 A1 | 53.00 | Alliance Bernstein LS MF | Wells Fargo/Wachovia | 3/12/2010 | |
| | 23332QAC7 | DSLA 2006-AR2 2A1A | 59.13 | Alliance Bernstein LS MF | Nomura | 3/23/2010 | |
| | 23332QAC7 | DSLA 2006-AR2 2A1A | 57.75 | Alliance Bernstein LS MF | Deutsche Bank | 3/23/2010 | |
| | 74922HAA0 | RALI 2007-QH1 A1 | 57.25 | Alliance Bernstein LS MF | Jefferies Group, Inc. | 4/14/2010 | |
| | 39538AAA4 | GPMF 2006-AR5 A1A | 88.13 | RLJ Western Asset PP MF | RBS | 3/23/2010 | Not a final comparable |
| | 75115FAA8 | RALI 2006-QO8 1A1A | 91.31 | RLJ Western Asset PP MF | Credit Suisse | 3/24/2010 | Not a final comparable |
| 9 | **Subject Bond** | | | | | | |
| | **94984GAA5** | **WFMBS 2006-AR12 1A1** | **76.00** | **Wellington Management LSP** | **Jefferies Group, Inc.** | **12/23/2009** | |
| | **Comparable Bonds** | | | | | | |
| | 17307G6K9 | CMLTI 2006-AR2 1A1 | 73.00 | Wellington Management LSP | Jefferies Group, Inc. | 12/21/2009 | |
| | 94984GAD9 | WFMBS 2006-AR12 2A1 | 78.00 | BlackRock PPIF, LP | Goldman Sachs | 12/10/2009 | |
| | 949789AA9 | WFMBS 2006-AR19 A1 | 81.00 | BlackRock PPIF, LP | Goldman Sachs | 12/10/2009 | |
| | 058928AK8 | BAFC 2006-B 5A1 | 67.14 | Alliance Bernstein LS MF | Jefferies Group, Inc. | 12/16/2009 | |
| | 07387AGG4 | BSARM 2005-12 24A1 | 69.00 | RLJ Western Asset PP MF | Morgan Stanley | 12/16/2009 | |
| | 94984MAP9 | WFMBS 2006-AR14 2A3 | 67.50 | Wellington Management LSP | Southwest Securities | 12/14/2009 | |
| | 17306SAA1 | CMLTI 2006-AR3 1A1A | 78.00 | BlackRock PPIF, LP | Goldman Sachs | 12/10/2009 | |
| | 36185MDN9 | GMACM 2006-AR1 1A1 | 69.17 | Wellington Management LSP | Nomura | 12/14/2009 | |
| | 36185MDN9 | GMACM 2006-AR1 1A1 | 72.00 | BlackRock PPIF, LP | National Alliance Capital | 1/6/2010 | |
| | 46630PAG0 | JPMMT 07-A2 2A3 | 75.50 | Invesco LS MF, LP | Chase Securities | 12/17/2009 | |
| | 36185MDQ2 | GMACM 2006-AR1 2A1 | 79.00 | BlackRock PPIF, LP | Goldman Sachs | 12/18/2009 | |
| | 170256AD3 | CWHL 2006-HYB5 2A1 | 53.00 | BlackRock PPIF, LP | BB&T Capital Markets | 12/23/2009 | |
| | 466247YP2 | JPMMT 2005-A8 2A3 | 71.16 | RLJ Western Asset PP MF | Jefferies Group, Inc. | 12/23/2009 | |
| | 76111XZA4 | RFMSI 2005-SA5 1A | 59.38 | RLJ Western Asset PP MF | MF Global Inc | 12/28/2009 | |
| 10 | **Subject Bond** | | | | | | |
| | **411640AB1** | **HVMLT 2007-7 2A1A** | **67.78** | **Alliance Bernstein LS MF** | **Jefferies Group, Inc.** | **6/22/2011** | |
| | **Comparable Bonds** | | | | | | |

Case 14-2902, Document 19-2, 08/22/2014, 1301848, Page54 of 211

| CUSIP | Bond Name | Sell Price | Fund Name | Broker | Date of Trade | Comments |
|-------|-----------|-----------|-----------|--------|---------------|----------|
| 75115GAA6 | RALI 2006-QH1 A1 | 60.00 | Alliance Bernstein LS MF | Nomura | 6/9/2011 | |
| 75116EAA0 | RALI 2007-QH5 AI1 | 65.00 | Alliance Bernstein LS MF | Goldman Sachs | 6/16/2011 | |
| 45667WAA6 | INDX 2006-FLX1 A1 | 65.13 | Alliance Bernstein LS MF | Jefferies Group, Inc. | 6/10/2011 | |
| 45667WAA6 | INDX 2006-FLX1 A1 | 66.00 | Alliance Bernstein LS MF | Jefferies Group, Inc. | 7/5/2011 | |
| 41162NAD9 | HVMLT 2006-14 2A1B | 19.75 | BlackRock PPIF, LP | Odeon Capital Group | 6/17/2011 | Not a final comparable |
| 52522GAE4 | LXS 2006-18N A5A | 41.06 | BlackRock PPIF, LP | Caprock | 6/8/2011 | Not a final comparable |

**11** | *Subject Bond* | | | | | | |

| | | | | | | |
|-------|-----------|-----------|-----------|--------|---------------|----------|
| **649603AD9** | **NYMT 2005-2 A** | **80.00** | **Redtop** | **Jefferies Group, Inc.** | **12/9/2009** | |
| *Comparable Bonds* | | | | | | |
| 07386HVG3 | BALTA 2005-7 11A1 | 67.00 | Invesco LS MF, LP | Goldman Sachs | 11/20/2009 | Not a final comparable |
| 07386HVG3 | BALTA 2005-7 11A1 | 67.00 | Invesco LS MF, LP | Goldman Sachs | 11/20/2009 | Not a final comparable |
| 05950MAB6 | BAFC 2006-G | 66.88 | AG GECC PPIF Master Fund | Braver Stern | 12/1/2009 | Not a final comparable |
| 07386HQG9 | BALTA 2005-1 A1 | 68.06 | RLJ Western Asset PP MF | Credit Suisse | 11/20/2009 | Not a final comparable |
| 17307GVV7 | CMLTI 2005-WF2 AV | 80.78 | AG GECC PPIF Master Fund | Jefferies Group, Inc. | 12/14/2009 | Not a final comparable |

**12** | *Subject Bond* | | | | | | |

| | | | | | | |
|-------|-----------|-----------|-----------|--------|---------------|----------|
| **863579C63** | **SARM 2005-21 7A1** | **79.94** | **Invesco LS MF, LP** | **Jeffieries Group Inc.** | **7/1/2010** | |
| *Comparable Bonds* | | | | | | |
| 07387AGE9 | BSARM 2005-12 23A1 | 70.00 | Wellington Management LSP | Deutsche Bank | 6/17/2010 | |
| 07387AAW5 | BSARM 2005-3 2A1 | 78.75 | Wellington Management LSP | RBS | 6/24/2010 | |
| 59020UXH3 | MLMI 2005-A4 1A1 | 66.00 | Invesco LS MF, LP | Keybanc Capital Markets | 6/23/2010 | |
| 59020UXH3 | MLMI 2005-A4 1A1 | 66.00 | Invesco LS MF, LP | Keybanc Capital Markets | 6/29/2010 | |
| 59020UXH3 | MLMI 2005-A4 1A1 | 65.44 | BlackRock PPIF, LP | Keybanc Capital Markets | 6/29/2010 | |
| 00703QAA0 | ARMT 2006-3 1A1 | 76.50 | Alliance Bernstein LS MF | Morgan Stanley | 6/22/2010 | |
| 12669GM24 | CWHL 2005-HYB4 2A1 | 72.50 | Alliance Bernstein LS MF | Nomura | 6/22/2010 | |
| 863579XK9 | SARM 2005-18 6A1 | 75.56 | Alliance Bernstein LS MF | Amherst Securities | 6/30/2010 | |
| 126694BH0 | CWHL 2005-HYB6 | 68.50 | AG GECC PPIF Master Fund | Jefferies Group Inc. | 6/17/2010 | |
| 61748HSE2 | MSM 2005-10 2A1 | 78.50 | Marathon LS PPIP, LP | Deutsche Bank | 6/15/2010 | |
| 76111XG72 | RFMSI 2006-SA1 1A1 | 70.00 | Wellington Management LSP | Guggenheim | 6/28/2010 | Not a final comparable |
| 126694C63 | CWHL 2006-HYB2 1A1 | 63.69 | Invesco LS MF, LP | Nomura | 7/1/2010 | Not a final comparable |
| 76111XZA4 | RFMSI 2005-SA5 1A | 57.00 | BlackRock PPIF, LP | Southwest | 7/2/2010 | Not a final comparable |
| 590219AG6 | MLCC 2006-2 4A | 90.44 | BlackRock PPIF, LP | Nomura | 7/15/2010 | Not a final comparable |
| 36242D4U4 | GSR 2005-AR3 4A1 | 70.16 | RLJ Western Asset PP MF | Credit Suisse | 6/30/2010 | Not a final comparable |
| 36185MDQ2 | GMACM 2006-AR1 2A1 | 75.25 | BlackRock PPIF, LP | Credit Suisse Securities LLC | 6/15/2010 | Not a final comparable |
| 36185MBL5 | GMACM 2005-AR6 3A1 | 79.50 | BlackRock PPIF, LP | Cantor | 6/23/2010 | Not a final comparable |
| 36185MDN9 | GMACM 2006-AR1 1A1 | 72.50 | BlackRock PPIF, LP | Stephens | 7/1/2010 | Not a final comparable |
| 36185MBJ0 | GMACM 2005-AR6 2A1 | 76.00 | BlackRock PPIF, LP | ICP Capital | 7/2/2010 | Not a final comparable |

| Name | Date of Trade | min comp yield | max comp yield | (avg.) Implied Price | max implied price | Cheap |
|---|---|---|---|---|---|---|
| CWALT 2006-OA3 1A11    12668BB44 | 3/29/2010 | 13.19 | 15.98 | 52.95 | 55.03 | + |
| DSLA 2006-AR1 2A1A1    23332UGM0 | 1/7/2010 | 10.50 | 17.10 | 55.95 | 63.59 | - |
| FHAMS 05-AA10 2A11    32051GA88 | 11/22/2010 | 5.90 | 11.17 | 55.91 | 62.16 | + |
| FHASI 2007-AR1 1A11    32053EAA6 | 6/24/2010 | 9.55 | 15.68 | 68.50 | 73.40 | - |
| HVMLT 2006-10 2A1A1    41162CAC5 | 3/31/2010 | 13.19 | 15.98 | 58.85 | 62.25 | + |
| HVMLT 2007-7 2A1A1    411640AB1 | 6/22/2011 | 10.07 | 12.23 | 65.32 | 69.31 | - |
| LXS 2007-15N 2A11    52524VAG4 | 4/1/2010 | 13.36 | 16.32 | 58.74 | 60.84 | + |
| LXS 2007-15N 2A11    52524VAG4 | 3/31/2010 | 13.36 | 16.32 | 58.75 | 60.85 | + |
| SARM 2005-21 7A11    863579C63 | 7/1/2010 | 8.28 | 14.18 | 71.78 | 78.75 | - |
| WFMBS 2006-AR12 1A11    94984GAA5 | 12/23/2009 | 7.36 | 15.43 | 76.47 | 88.13 | + |
| NYMT 2005-2 A1   CUSIP: 649603AD9 | 12/9/2009 | N/A | | | | |
| INDX 2007-AR7 2A11   CUSIP: 45670CAC1 | 5/28/2009 | N/A | | | | |

** **Implied Price**: Average from  pricing subject bonds using the yields of comparable bonds in Intex. The CPR and CDR assumptions are based on the preceding six-months actual CPR and CDR.

Exhibit C - Subject to Revision

Case 14-2902, Document 19-2, 08/22/2014, 1301848, Page56 of 211

**Rate of Return on Subject Bonds**

| | Cusip | Bond Name | Fund's Buy Date | Fund's Sell Date | Fund's Buy Price/ Entry Price | Fund's Sell Price / Exit Price | Rate of Return - Selling Price | Total Profit/Loss |
|---|---|---|---|---|---|---|---|---|
| 1 | 12668BB44 | CWALT 06-OA3 1A1 | 3/29/2010 | N/A | $51.19 | N/A | N/A | N/A |
| 2 | 23332UGM0 | DSLA 06-AR1 2A1A | 1/7/2010 | N/A | $62.38 | N/A | N/A | N/A |
| 3 | 32051GA88 | FHAMS 05-AA10 2A1 | 1/22/2010 | N/A | $53.25 | N/A | N/A | N/A |
| 4 | 32053EAA6 | FHASI 07-AR1 1A1 | 6/24/2010 | 3/13/2012 | $80.00 | $61.63 | -0.23% | ($1,043) |
| 5 | 41162CAC5 | HVMLT 2006-10 2A1A | 3/31/2010 | 8/8/2012 | $58.00 | $67.27 | 14.95% | $2,121,490 |
| 6 | 411640AB1 | HVMLT 07-7 2A1A | 6/22/2011 | 7/19/2012 | $67.78 | $74.06 | 15.63% | $952,772 |
| 7 | 45670CAC1 | INDX 07-AR7 2A1 | 5/28/2009 | N/A | $42.25 | N/A | N/A | N/A |
| 8 | 52524VAG4 | LXS 07-15N 2A1 | 3/31/2010 | 8/6/2012 | $58.41 | $65.11 | 15.64% | $6,014,989 |
| 9 | 52524VAG4 | LXS 07-15N 2A1 | 4/1/2010 | N/A | $57.56 | N/A | N/A | N/A |
| 10 | 649603AD9 | NYMT 05-2 A | 12/9/2009 | N/A | $80.00 | N/A | N/A | N/A |
| 11 | 863579C63 | SARM 05-21 7A1 | 7/1/2010 | 3/1/2012 | $79.94 | $80.16 | 12.13% | $3,867,512 |
| 12 | 94984GAA5 | WFMBS 06-AR12 1A1 | 12/23/2009 | 11/14/2012 | $76.00 | $84.00 | 13.04% | $334,235 |

<pre>
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF CONNECTICUT

 3   _____
     United States of America   )February 6, 2014
 4             Government  )11:59 a.m.
     v.                        )
 5   Jesse C. Litvak           )3:13cr19(JCH)
               Defendant.  )
 6   _____)

 7
                            141 Church Street
 8                          New Haven, Connecticut

 9              PRETRIAL HEARING

10
     B E F O R E:
11                THE HONORABLE JANET C. HALL, U.S.D.J.

12   A P P E A R A N C E S:

13

14   For The Government  :   Jonathan N. Francis
                             Eric Glover
15                           U.S. Attorney's Office-NH
                             157 Church St., 23rd floor
16                           New Haven, CT 06510

17   For the Defendant  :   Ross H. Garber
                            Michael Chase
18                          Shipman & Goodwin
                            One Constitution Plaza
19                          Hartford, CT 06103-1919

20                          Patrick Smith
                            Sarah B. Zimmer
21                          John Michael Hillebrecht
                            DLA Piper US LLP-NY
22                          1251 Avenue of the Americas,
                            27th Floor
23                          New York, NY 10020-1104

24

25          -- continued --
</pre>

**A56**

74

1    meet the standard of materiality.  I don't happen to share

2    the defendant's view of how limited the government is in the

3    proof of this case.

4          With respect to the Motion to Preclude, the

5    defendant has repeatedly and appropriately reminded the court

6    he has a right under the Constitution of particularly the due

7    process clause thereto to mount a defense to the case put on

8    by the government, and it's certainly not ever going to be

9    and it is not now my intention from preventing him from being

10   able to do that.

11         However, as strongly as his counsel reminds me of

12   that fact, I will likewise remind him of the Supreme Court's

13   statement in Taylor versus Illinois sometime ago, clearly the

14   accused does not have an unfettered right to offer testimony

15   that's incompetent, privileged or inadmissible under the

16   standard of rules of evidence.  The United States versus

17   England decision from the Second Circuit in 1999 obviously

18   adopts that view because it is Supreme Court law and applies

19   it in the context of relevancy.

20         With respect to the motion to preclude the two

21   experts, the Court will grant it in part and deny it in part.

22   I will start first with the government's argument that the

23   disclosure in early November on the date required was

24   deficient.  I would agree with the government it was woefully

25   deficient.  However, the defense subsequently sought, I

**A57**

1    believe it was Attorney Garber's motion, an extension of time

2    if I recall correctly, to some date in January.  I granted

3    that motion in part and gave until December 24 which is the

4    date upon which the disclosures that the government is citing

5    to and arguing about were filed.

6         So to the extent we're going to measure the ability

7    of these experts to testify based upon the adequacy of the

8    disclosures, I'm looking to the December 24 disclosure.  In

9    my view, I gave the defense until then to make a disclosure

10   so I'm not going to preclude it, even though it was late in

11   the sense of the trial scheme that I set forth months ago,

12   maybe now almost a year ago, I still had given the defense

13   time until the 24th.  So in my view, it is not late.

14        With respect to Mr. Willner, it is the Court's view

15   of much of what is proposed to be testified to by him is

16   irrelevant to the case before the court.  For example, to the

17   extent he wants to the talk about the often misleading nature

18   of trader statements in the immateriality.  Let's back up.

19   He talks about -- first of all, I will say that I find the

20   disclosure under 702 to be lacking.  Again it is sort of a --

21   how shall I put it -- a recitation sort of what he's going to

22   describe, what he's going to refer to, occasionally there's a

23   word that he will opine, but when there's such a phrase he

24   will opine, there's not the required disclosure of the basis

25   for that opinion.  When I questioned counsel, he would often

1    say you have to look at what's said later in this disclosure

2    is where he's laying out his basis.  That's I think is a

3    risky business because it requires me and the other side but

4    most particularly me in deciding has there been proper

5    disclosure to sort of hunt and peck among many, many pages,

6    10, 15, whatever with respect to Mr. Willner not knowing what

7    later pages relate to which of the opinions.  In my view, a

8    disclosure the witness will opine that the bearing broke and

9    caused the injury, and the basis for that opinion is testing

10   as follows: observations as follows: review of documents as

11   follows: and a listing of them.  That's not how the

12   disclosure is.  I'm not going to stop at that as a reason to

13   prevent the testimony.  I have to say it makes it difficult

14   for the Court to make a judgment about questions like 401 and

15   403 if I'm not certain what exactly which opinions he's

16   giving, whether he's qualified to give those opinions,

17   whether they're opinions stated to a reasonable degree of

18   certainty in his profession and finally is there a basis of

19   those opinions that would have some basis in his expertise.

20          To the extent I find in the disclosure the

21   suggestion that he would opine about or testify to fiduciary

22   duty owed to the client, that mandates certain professional

23   standards about whether, for example, you must disclose

24   something or you don't have to disclose something.  I don't

25   find that relevant as I suggested in my questioning of

1    counsel.  It isn't here a question of there was a sale and

2    you know, Mr. Litvak made too much money.  The question is

3    Mr. Litvak caused the sale to happen by saying something

4    which was false, and the issue is is it material.

5         As to testimony that suggested as to what's fair

6    market value or were the prices paid fair, was there a profit

7    made after the fact, in my opinion, those are not relevant to

8    this case.  I mean after the transaction occurred whether

9    there was a profit made or not is a function of things that

10   happened long after the statements that are at issue that are

11   claimed to be false were made.

12        In my view, the case focuses on what Mr. Litvak said

13   and whether what he said was false, whether what he said was

14   false was done with the intent to deceive or part of a scheme

15   to deceive, and whether it was material as that term is

16   understood as a legal term.  That is that it affects the mix

17   of things that enter into the person receiving the

18   information decision.

19        I don't think under 401 that the testimony proffered

20   by this expert about fair market values or about profits in

21   the future and trades being within a realm of what's

22   reasonable is relevant.

23        MR. SMITH:  May I ask a question?  Your Honor seems

24   to have put two concepts together in there.  I understand the

25   profit piece.  On the intent to defraud piece to fair market

78

1    value, that goes straight to Mr. Litvak's intent.  There's

2    objective proof that that transaction was a million dollars

3    for a bond and you got back a bond fairly valued at a million

4    dollars, means that there was no harm.

5            THE COURT:  If you let me finish, maybe at the end

6    if you have any questions, you can ask me then.

7            Also to the extent that he proffered testimony about

8    the analysis of real estate -- mortgage backed securities

9    transactions, quote, in the context of the market and within

10   its fair value, I also conclude it is not relevant under 401

11   and will tend to confuse under 403.

12           A fair value is what a willing buyer will pay a

13   willing seller, so in my view, it is almost metaphysically

14   difficult to think about these being opined about as being

15   fair if, in fact, that the jury concludes that the willing

16   buyer wouldn't have been willing had they been told the

17   truth.  If he is told the truth, he's a willing buyer.  The

18   price is fair even if he paid five times in actuality here.

19           Finally I think Mr. Willner is offered for the

20   question on the opinion that this is a volatile market.

21   Again I think it is irrelevant.  The fact that it is

22   volatile.  It is volatile.  We're talking about a transaction

23   at a particular time based on a certain mix of information

24   provided to the buyer.  There's one aspect of the testimony

25   that the Court reserves on.

**A61**

1            With respect to Mr. Menchel, as to the testimony, it

2    appears he's offering opinions about their being no duty to

3    disclose.  I find that irrelevant under 401.  With respect to

4    the terms that he's offered to testify to about, what they

5    mean, based upon his expertise and further with respect to

6    what I would call background evidence about the nature of

7    these markets that they function in a different way, they

8    aren't of the New York Stock Exchange.  How do people

9    communicate, how do they buy and sell things, the Court

10   reserves on that.  I think that I should wait until I hear

11   how much comes in on that but I also think the defendant has

12   a right, if there's still some dispute or the record isn't

13   clear, he doesn't think the jury understands, he's allowed to

14   offer that evidence, even though the government thinks it

15   will be very clear, I suspect the defendant won't think it is

16   very clear, it sounds like the two sides don't necessarily

17   agree about what terms mean.  I want to caution that when the

18   issue comes up again, which I would ask or invite the

19   defendant to indicate as the government's case gets close to

20   a close, that you see a need to offer testimony on these

21   subjects that I have broadly framed, that you be prepared to

22   tell me what it is you think they can offer and why it would

23   be helpful.  I.e., not confuse them more than it adds sort of

24   probative information to them.

25            And secondly, I would also state that if it is

```
 1   allowed, which I'm inclined to think I would allow it, that
 2   it not be viewed as a way to open the door to the matters
 3   which I have already ruled are irrelevant and which if
 4   introduced in my opinion, the prejudicial value, the
 5   confusion will greatly, greatly outweigh, I don't think it
 6   has probative value but things like the post-transaction
 7   performance of the bond.  I mean if the day after one of
 8   these transactions took place, the president announced he was
 9   by executive order guaranteeing 100 percent of face value of
10   every mortgage backed securitized bond, clearly these people
11   would have made a heck of a killing.  It has nothing to do
12   with this case, so I don't know why what happens in the
13   market after this transaction, which may show that these
14   people made money, that isn't what this case is about.  So I
15   don't think post-transactional performance is admissible, and
16   I don't think this proffer at least as I understand it, as it
17   is disclosed in the 702 disclosure, as I commented on, is not
18   done in a manner that makes it easy for someone of my limited
19   abilities to understand, I do not find the things they are
20   speaking about in here about what's the fair market value or
21   its within the fair range or things like that that took place
22   at the fair market value, I don't find those to be relevant.
23   Therefore, further under 403, they are irrelevant their
24   ability to confuse the jury about what the issue really is in
25   this case greatly outweighs any probative value which I don't
```

**A63**

1    think it has any.

2          To the extent particularly that Mr. Menchel talks

3    about going to opine, on page 15, that institutional bond

4    market participants such as investment funds do not regard

5    the disclosure of dealer's cost or profits as important, the

6    Court finds he has no basis for that opinion.  One, he hasn't

7    told me and two, I look at his experience, I don't see how he

8    would.

9          There's another subject matter that Mr. Menchel was

10   offered for about training and compliance which I gather the

11   government intends to offer evidence on, and I would invite

12   the defendant to, in effect, tell me if he feels that he

13   needs to offer evidence on that subject and what exactly he

14   would want to offer as the government's case goes in.  It may

15   be that we don't need it.  I'm sure the defendant would

16   rather put their own witness up and have testimony about it.

17   Maybe that testimony would be different than what the

18   government witnesses say.  I can't make that judgment about

19   it until I heard what the government is doing on the subject

20   so that was another area that I meant to indicate in effect I

21   reserve on so vocabulary, the general nature of the market

22   and training are I think the three areas I identified that I

23   will reserve on and may allow testimony on depending on where

24   we were at the time it becomes relevant, so that's the

25   Court's ruling on the motion.  Yes sir.

1

```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3     _____
       United States of America   )February 18, 2014
 4                  Government     )9:00 a.m.
       v.                         )
 5     Jesse C. Litvak            )3:13cr19(JCH)
                    Defendant.    )
 6     _____)


 7
                            141 Church Street
 8                          New Haven, Connecticut

 9                DAY ONE OF TRIAL


10
       B E F O R E:
11                 THE HONORABLE JANET C. HALL, U.S.D.J.
                   AND JURY OF 16
12

13     A P P E A R A N C E S:

14     For The Government   :    Jonathan N. Francis
                                 Eric Glover
15                               U.S. Attorney's Office-NH
                                 157 Church St., 23rd floor
16                               New Haven, CT 06510

17
       For the Defendant    :
18                               Michael Chase
                                 Shipman & Goodwin
19                               One Constitution Plaza
                                 Hartford, CT 06103-1919
20
                                 Patrick Smith
21                               Sarah B. Zimmer
                                 John Michael Hillebrecht
22                               DLA Piper US LLP-NY
                                 1251 Avenue of the Americas,
23                               27th Floor
                                 New York, NY 10020-1104
24

25
```

**A65**

1   limited partnership agreement?

2       A.   Yes.

3       Q.   I think as you told us earlier that they are all the

4   same, are they not?

5       A.   Substantially the same.

6       Q.   So we would see a similar one for Invesco, we'd see

7   a similar one for Wellington, correct?

8       A.   Yes.

9       Q.   So we won't waste any time taking a look at those.

10          So I think you told us it was Treasury's choice to

11  do it this way, correct?

12      A.   Correct.

13      Q.   For very particular reasons, to make sure that the

14  private investors and the private fund managers would

15  participate in this program, correct?

16      A.   Correct.

17      Q.   Did that lend credibility to the PPIF program?

18      A.   Did what lend credibility?

19      Q.   The fact that you could attract the best private

20  money managers to run these programs, did that give

21  credibility to the program?

22      A.   Yes.

23      Q.   And did -- the credibility that came from having the

24  best private money managers working the structure, did that

25  further the two goals we talked about, restoring liquidity

**A66**

1 plus making some return, correct?

2     A.   Correct.

3     Q.   I think you told us there was a list, but only the

4 best of the best money managers made it through the screening

5 process and were selected to the run these funds, correct?

6     A.   The best of those who applied, yes.

7     Q.   Fair to say, they were all are expert money

8 managers, correct?

9     A.   I think that's a fair statement.

10     Q.   It's a very important job to manage these funds,

11 correct?

12     A.   Correct.

13     Q.   Was it not the thinking of Treasury, and your

14 thinking at Treasury, that this made the most sense of the

15 program to put the investment decision-making in the hands of

16 the private money managers and keep the government out of a

17 direct role, correct?

18     A.   Absolutely, that was the intent of the program, to

19 keep the Treasury away from making buy and sell decisions.

20     Q.   And this helped that bad reputation concern we

21 talked about earlier that TARP was kind of an unpopular

22 program?

23     A.   It was unpopular, not because we were making

24 investment decisions.  It was just because it was

25 unpopular.

1    Q.   Now, under these agreements we just looked at,

2   doesn't each of them give all of the investment authority for

3   each of these funds to the private money managers who were

4   selected?

5    A.   Yes.

6    Q.   So you have a contract which is the limited

7   partnership agreement, right?  You need to answer out loud.

8    A.   Yes.

9    Q.   Then you have a general partner that's essentially

10  the manager of the fund, correct?

11    A.   Yes.

12    Q.   And then the general partner is sort of a creature

13  or a vehicle created by one of the managers that was

14  selected to the participate in the program, right?

15    A.   Yes.

16    Q.   In other words, they would create a special purpose

17  general partner to sit there and be the vehicle through which

18  the management took place, correct?

19    A.   Yes.

20     MR. SMITH:  And if we can look at Government's

21  Exhibit 930 again, we can go to pages 25, 26, take a look at

22  that, Mr. McLoud.  If we just blow up that bottom, that

23  powers of the general partner.  Everyone see that?

24    Q.   Okay.  And this just memorializes what we were just

25  talking about, right, Mr. Miller?

**A68**

178

```
1      A.   Yes.

2      Q.   It says the management operation and policy, the

3  partnership shall be vested exclusively in the general

4  partner, right?

5      A.   Yes.

6      Q.   So exclusively, the general partner and none of

7  those powers remained with the government, correct?

8      A.   Yes.

9      Q.   And it goes on, which shall have the power by itself

10 and shall be authorized and empowered on behalf and in the

11 name of the partnership.  Let me stop there.

12         The partnership refers to the Alliance Bernstein

13 Master Legacy Investment Fund, correct?  The PPIF vehicle,

14 right?

15     A.   (No audible response.)

16     Q.   And it goes on, to carry out any and all of the

17 objects and purposes of the partnership and to perform all

18 acts and enter into and perform all contracts and other

19 undertakings that may deem necessary or advisable or

20 incidental thereto, correct?

21     A.   That's what it says, yes.

22     Q.   Pretty clear that when it comes to running this

23 fund, the only entity that has the authority to do anything

24 with respect to that fund is the general partner, correct?

25     A.   Correct.
```

**A69**

1    Q.   The Treasury had no authority to tell the investment

2  managers which bonds to buy, correct?

3    A.   Correct.

4    Q.   The Treasury had no authority to tell the general

5  partner of each of these funds how much to pay for a bond,

6  correct?

7    A.   Correct.

8    Q.   All of that decision-making under this program, as

9  Treasury designed it, was sent over to the investment

10  managers, correct?

11    A.   By design.  Once these were signed, they had the

12  authority to -- to invest.

13    Q.   Now, when the Alliance Bernstein PPIF bought a bond

14  for one of these funds -- for this particular fund, the

15  Alliance Bernstein PPIF, who owned that bond?

16    A.   The fund.

17    Q.   Did the government own that bond?

18    A.   Indirectly.

19    Q.   Now, let's stop there, Mr. Miller.  What type of

20  interest did the government have in that PPIF?

21    A.   Partnership interest.

22    Q.   So it had its limited partnership interest,

23  correct?

24    A.   Correct.

25    Q.   Much like we see in the private sector when limited

1    partners invest in the fund, they trust the manager to make

2    good investment decisions, correct?

3        A.    Right.

4        Q.    The Treasury also made a loan to these funds,

5    correct?

6        A.    Correct.

7        Q.    They put in debt, correct?

8        A.    That's right.

9        Q.    So isn't it true that what Treasury owned was its

10   limited partnership interest?

11       A.    That is true.

12       Q.    And through that limited partnership interest they

13   had a share in what was going on in the fund, a share of the

14   equity, correct?

15       A.    Correct.

16       Q.    They didn't own a piece of any individual bond;

17   isn't that true?

18       A.    That's true.

19       Q.    They owned their interest, and if the investment

20   performance of the fund was positive then they would earn

21   money on their equity interest, correct?

22       A.    Correct.

23       Q.    And if the investment performance was positive, the

24   debt would be paid back at the stated interest rate, correct?

25       A.    Correct.

1    Q.   That's all Treasury had, correct, in terms of

2  ownership interest or financial interest, that's what the

3  Treasury had?

4    A.   Well, the Treasury also got warrants on the fund,

5  which are largely insignificant here, so --

6    Q.   Another right to receive money based upon the

7  performance of the fund?

8    A.   Correct.

9    Q.   So Treasury had no right to go in and say, I want a

10 piece of that bond sent to me, correct?

11   A.   Correct.

12   Q.   All they had was the right to receive the return on

13 the equity and repayment of the debt that we talked about?

14   A.   That's right.

15   Q.   And that was by design, right?

16   A.   Yes.

17   Q.   That's the way you guys at Treasury set it up?

18   A.   Yes.

19   Q.   I asked you about buying bonds, but, of course,

20 Treasury had no power to tell any of these PPIF managers to

21 sell a particular bond either, right?

22   A.   Right.

23   Q.   They couldn't say, you know, we think the market is

24 up lately, why don't you sell some of these bonds?

25   A.   Well, I could say it, but they didn't have to do

182

1    it.

2        Q.   Because the general partner and the investment

3    managers had all the authority?

4        A.   Correct.

5        Q.   Based upon the program that you guys set up.

6             You talked a little earlier.  Oh, one last question

7    on this before I move on.

8             Now, mortgage-backed securities, they generate

9    return in a couple of ways, don't they?

10       A.   They can.

11       Q.   So one of the ways you get a return from a

12   mortgage-backed security is the principle payments from the

13   underlying mortgages come in and that's one way to make some

14   money, correct?

15       A.   Yes.

16       Q.   And then the interest on the underlying mortgages

17   that homeowners have to pay, that comes in, too, and that

18   goes to the mortgage-backed securities holders, right?

19       A.   Correct.

20       Q.   Then, of course, the value of the mortgage-backed

21   security might go up, and that's another source of potential

22   return, right?

23       A.   It is.

24       Q.   Now, none of that principal and interest that was

25   coming into these funds after they bought bonds, none of that

**A73**

1    went directly to the government, right?

2        A.    No, it went to the fund.

3        Q.    Went to the fund.  Okay.  Now, you used a term a

4    little earlier that I want to ask you a few questions about.

5    You said something about in terms of the set-up of this fund

6    and how it fit into the legal structure, there were a lot of

7    legal gymnastics.  Remember you said that?

8        A.    Correct.

9        Q.    That wasn't your job to figure that out?

10       A.    That's correct.

11       Q.    Your job was to be a chief investment officer and

12   making important decisions about how TARP was supposed to

13   work effectively, right?

14       A.    Correct.

15       Q.    And you did that job, right?

16       A.    I did.

17       Q.    And you did it well?

18       A.    Thank you.

19       Q.    So what I want to ask you about is a -- is a report.

20   You mentioned some audit reports that the special inspector

21   general did over the years, this watchdog agency.

22       A.    Yeah, they did all kinds of reports.

23       Q.    Now, they did an audit or the selecting managers

24   process, didn't they?

25       A.    I'm sure they did.  I don't remember.  They did

1    Q.   Isn't it true, Mr. Miller, there was no requirement

2   in these reports and nowhere reflected in these reports how

3   much the investment managers were paid in terms of markups or

4   ticks on top of anything when they were dealing with the

5   private broker/dealers?  Isn't that a fact?

6    A.   I don't know.

7    Q.   Well, I guess what I would like you to do is take a

8   look at Defendant's 1301.

9        MR. SMITH:  If we could switch over to that, Mr.

10  McLoud.  And just scroll to the second page, Mr. McLoud.

11   Q.   Now, this description of partnership holdings is

12  very, very small.

13       MR. SMITH;  Maybe we should just blow up a line

14  before everyone goes blind here, Mr. McLoud. Just that small

15  section.

16   Q.   Okay.  And this tells us the types of securities,

17  dates of purchase, ratings.

18       MR. SMITH:  And maybe -- we need to see the right

19  side of this, Mr. Cloud, because there's some more data.

20  Okay.  And slide over.

21   Q.   Par value, market value, market price, total cost,

22  unrealized gain or loss and accrued interest, right?

23   A.   Yes.

24   Q.   Nothing on this page that has to do with transaction

25  costs, markups, anything like that?

1    A.    It would be all in the mark -- it would be all in

2    the total cost.

3    Q.    It would be all in the total cost, right?    And you

4    previously worked on Wall Street before you went to work at

5    Department of Treasury, right?

6    A.    I did.

7    Q.    What did you do?    I think at some point you worked

8    at Goldman Sachs and some other firms.    What did you do?

9    What was your job?

10    A.    I had a variety of corporate finance jobs as well as

11    investment advisory jobs.

12    Q.    In the investment advisory role, did you have any

13    responsibility for buying and selling bonds?

14    A.    Investment analyst, but I didn't actually trade

15    them.

16    Q.    Are you familiar with the fact that when you buy and

17    sell bonds like these, the bonds are purchased at a stated

18    price and there's no disclosure of the profit that the

19    broker/dealer is making?

20    A.    You pay a price, correct.    There's --

21    Q.    Just the price, correct?

22    A.    -- no commission on top of that.

23    Q.    So when Treasury set up these funds,

24    right -- withdrawn.

25          When Treasury set up this program and agreed to

**A76**

USA v.
Jesse C. Litvak

**Day Two Of Trial**

February 19, 2014

---

Page 249

```
 1           UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3
   United States of America  )February 19, 2014
 4            Government      )9:00 a.m.
                              )
 5   v.                       )3:13cr19(JCH)
   Jesse C. Litvak            )
 6            Defendant.      )
                              )
 7
                        141 Church Street
 8                      New Haven, Connecticut
 9            DAY TWO OF TRIAL
10
11   B E F O R E :
              THE HONORABLE JANET C. HALL, U.S.D.J.
12               AND JURY OF 16
13   A P P E A R A N C E S :
14   For The Government  :    Jonathan N. Francis
                              Eric Glover
15                            U.S. Attorney's Office-NH
                              157 Church St., 23rd floor
16                            New Haven, CT 06510
17
18   For the Defendant  :
                              Michael Chase
19                            Shipman & Goodwin
                              One Constitution Plaza
20                            Hartford, CT 06103-1919
21                            Patrick Smith
                              Sarah B. Zimmer
22                            John Michael Hillebrecht
                              DLA Piper US LLP-NY
23                            1251 Avenue of the Americas,
                              27th Floor
24                            New York, NY 10020-1104
25
```

Page 250

1    THE COURT: Good morning. I ended up with two
2  copies. One of them meant for the clerk of these documents?
3    MR. GLOVER: Yes, Your Honor.
4    THE COURT: Good morning. We're here in the matter
5  of the United States of America versus Jesse Litvak,
6  13-CR-19. If I can have appearances, please.
7    MR. GLOVER: Yes, Your Honor. Eric Glover and
8  Jonathan Francis for the United States. We have at counsel
9  table Special Agents O'Connor and Marston from SIGTARP.
10    THE COURT: Yes. Good morning to all of you.
11    MR. SMITH: Good morning, Your Honor. Patrick
12  Smith, John Hillebrecht, Michael Chase, Sarah Zimmer for the
13  defendant, Jesse Litvak.
14    THE COURT: Good morning to all of you, as well. I
15  was advised there was an issue. I was here at a quarter to
16  9:00, but some tech person was here because of the fact that
17  we're ready to go now with all of you folks.
18    MR. SMITH: Yes, your Honor, we have an application,
19  Judge.
20    THE COURT: Yes.
21    MR. SMITH: And the application is to preclude the
22  Government from adding to their exhibit list and offering
23  into evidence the materials that I think are now before your
24  Honor. We think it is a Rule 16 violation. And I would like
25  to give you a little background information.

Page 251

1    From what I understand, the Government has gone
2  back to Jefferies, who, as your Honor knows, has entered into
3  a nonprosecution agreement with the Government. And they
4  have asked them to go back and recreate physical hard copies
5  of the Bloomberg messages, Bloomberg chats and e-mails with
6  what the Government now contends are updated and corrected
7  time stamps. The problem with that, Judge, is that, you
8  know, we got discovery -- they could replicate items that
9  were produced in the discovery, but they'd have different
10  time stamps, as I will explain in a minute. There are other
11  important differences between what's been marked as a
12  Government exhibit than what we have on the exhibit list and
13  what's now being proposed as a potential exhibit.
14    The background to this is that six weeks ago, or
15  longer, it was before Christmas, the Government raised with
16  us the idea of entering into a stipulation with respect to
17  the time stamps on the documents. It is this Greenwich
18  Meantime Eastern Time issue that Bloomberg witness Adam Wolf
19  was unable to give us full clarity.
20    THE COURT: Could someone tell me what UTC stands
21  for?
22    MR. SMITH: Universal Time. I don't know.
23  Greenwich Meantime, whatever it was.
24    THE COURT: Okay. Go ahead.
25    MR. SMITH: So, Your Honor, we said, well, in

Page 252

1  principle, you know, for the IB chats -- this is back in
2  December -- you know, when there's a 24-hour time stamp we're
3  not going to have much of a problem with that. But there's
4  some other issues, why don't you send us over a proposed
5  stipulation, a proposal. That's back in December.
6    We had an updated conversation, I would say roughly
7  a week or two before trial. And again, we said, you know, we
8  have some issue with the time stamps, the principle of the
9  imbedded Bloomberg chats in the military time, we don't think
10  we have an issue with. But there's some other issues, the
11  headers, the messages, and how all that works.
12    We got a proposal on Friday night before trial, a
13  proposed stipulation that was, to say the least, full of
14  errors in terms of what the actual time stamps were. So over
15  the weekend, we told the Government, well, we're not going to
16  be able to enter into that stipulation. We just don't know.
17  We're not saying no on the principle of the stipulation at
18  some point, but we at least have to hear from the Bloomberg
19  witnesses.
20    So then we started our trial, and as your Honor
21  recalls, in opening statement, I did make some statements
22  about the timing of key statements. So the timing and
23  sequencing things really matters in the trial. So the night
24  before opening, the Government tells us they now want to call
25  an additional witness. Her name is Tracy Lincoln. And that

USA v.
Jesse C. Litvak

Day Two Of Trial

February 19, 2014

Page 405

1  comes out of this.  So understanding how that happens, this
2  witness can offer testimony that --
3     THE COURT: So you are proffering to me that at the
4  end of all of this, once -- if we understand what he
5  understood this to mean, we will then learn there was a
6  trade?
7     MR. FRANCIS: Yes.
8     THE COURT: The objection is overruled.
9     Q.  So Mr. Canter, what do you understand Mr. Schick to
10  be asking when he asked the question, will you take 65-05 on
11  the Harborview?
12    A.  This is, again, relevance to the bid list that we
13  saw as coming up at 1:00 p.m., we're asking Mr. Litvak -- I'm
14  sorry -- Mr. Schick is asking Mr. Litvak, will you take 65
15  and 5 ticks on the Harborview.  And what that means is that
16  will Mr. Litvak and Jefferies use that bid on the auction,
17  meaning if we give you this order, will you use it.  Because
18  like I described before, once we give it to them, it is an
19  order but they have the right not to accept it and say that
20  order is just silly, we're not going to do that.  And that's
21  what the "will you take" means, meaning will you use this in
22  this particular bid list.
23    Q.  Did Mr. Litvak accept the order to bid 65 and 5
24  ticks on the Harborview bond?
25    A.  No.

Page 406

1     MR. FRANCIS: I apologize, Judge.  Scrolling down
2  the same page.
3     Q.  So did Mr. Litvak buy the bond, the Harborview bond
4  in his own account?
5     A.  For Jefferies account, yes.
6     Q.  What price did Mr. Litvak tell Alliance Bernstein he
7  paid?
8     A.  67 and 21 ticks.
9     Q.  And at what price did Mr. Schick propose that
10  Alliance Bernstein would buy it?
11    A.  Down at the bottom of the page, Mr. Schick asks, can
12  we buy them plus 4, which in the lingo of our market just
13  means by them 4 ticks higher than the price Mr. Litvak
14  paid.
15    MR. SMITH: I'm confused.  Is this one of these
16  BWICs or something else?  If Mr. Francis could follow up on
17  that.
18    THE COURT: I think if it is not clear, that's his
19  problem.  You can follow up on cross.
20    MR. SMITH: Thank you.
21    Q.  Mr. Litvak's response to the question, does he agree
22  to sell the bond to Alliance Bernstein at 67 and 25?
23    A.  Yes.
24    Q.  What's the difference between the price that Mr.
25  Litvak said he bought the bond at and the price he agreed to

Page 407

1  sell to Alliance Bernstein?
2     A.  The 4 ticks.
3     Q.  At the time, would it have been important to you to
4  know that Mr. Litvak paid 67 and 15 ticks rather than 67 and
5  21 ticks?
6     A.  Yes.
7     Q.  Why?
8     A.  Then if we paid 4 ticks on top of that, my investors
9  would have gotten a better price.
10    Q.  Would it have been important for you to know that
11  Mr. Litvak was taking 10 ticks in compensation instead of 4?
12    A.  Yes.
13    Q.  Why?
14    A.  It is not what we agreed on.
15    MR. FRANCIS: May I have a moment, Your Honor?
16    THE COURT: You may.
17    MR. FRANCIS: I would like to offer Government's
18  Exhibit 11.
19    THE COURT: Any objection to Government's Exhibit
20  11?
21    MR. SMITH: No, Your Honor.
22    THE COURT: Government's Exhibit 11 is a full
23  exhibit.
24    Q.  So this communication on March 30, 2010, between you
25  and Mr. Litvak -- scroll down to the bottom.  What are you

Page 408

1  talking about with Mr. Litvak in these e-mails?
2     A.  I'm sorry.  Could you go back to the top?
3     Q.  Sure.  Is it easier if I just put the whole thing
4  up?
5     A.  Yes.  Okay.  We're talking about the HVMLT 06-10
6  bond.
7     Q.  And did you know that bond the HVMLT 06-10?
8     A.  Yes.  We already owned that particular bond so we
9  were familiar with it.
10    Q.  What is Mr. Litvak informing you is going to happen
11  with the HVMLT 06-10?
12    A.  What he's saying below -- he says, I'm going to some
13  MTA to work on tomorrow.  For all intents and purpose, the
14  MTA is the same as the POA we talked about earlier, Pay
15  Option Arms, it's kind of an RMBS bond.  He's saying that it
16  -- he's going to be -- of the three classifications that I
17  just talked about, he's saying that he's going to have some
18  orders from the seller that he's going to be the only
19  broker/dealer to work on them, and he's mentioning some of
20  the bonds that he thinks will be included in that order.
21    Q.  Is one of them this HVMLT 06-10?
22    A.  Yes.
23    MR. FRANCIS: Government's Exhibit 13A.  It is
24  already in evidence.
25    Q.  So that last one we saw was March 30th, 2010.

458

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT

3    _____
     United States of America    )February 20, 2014
4                Government       )9:22 a.m.
     v.                           )
5    Jesse C. Litvak              )3:13cr19(JCH)
                 Defendant.       )
6    _____)

7
                            141 Church Street
8                           New Haven, Connecticut

9              DAY THREE OF TRIAL

10
     B E F O R E:
11              THE HONORABLE JANET C. HALL, U.S.D.J.
                AND JURY OF 16
12

13   A P P E A R A N C E S:

14   For The Government  :    Jonathan N. Francis
                              Eric Glover
15                            U.S. Attorney's Office-NH
                              157 Church St., 23rd floor
16                            New Haven, CT 06510

17
     For the Defendant   :
18                            Michael Chase
                              Shipman & Goodwin
19                            One Constitution Plaza
                              Hartford, CT 06103-1919
20
                              Patrick Smith
21                            Sarah B. Zimmer
                              John Michael Hillebrecht
22                            DLA Piper US LLP-NY
                              1251 Avenue of the Americas,
23                            27th Floor
                              New York, NY 10020-1104
24

25

**A79**

538

1    price that appears on this confirm, Mr. Canter?

2        A.    I'm sorry.  I don't remember whether these

3    particular bonds were orders in inventories or bid list.

4        Q.    Would you agree on whether it's an order trade, a

5    bid list trade or an inventory trade, each and every confirm

6    is just going to come out and it's all telescoped into one

7    price, correct?

8        A.    Yes.

9        Q.    No separate commissions are charged, correct?

10       A.    No, that's right.

11       Q.    So whatever your thinking was about compensation,

12   that was part of the negotiating dynamic with the broker

13   dealer, correct?

14       A.    Yes.

15       Q.    Would you agree with me, Mr. Canter, that when you

16   used the term "on top," you mean on top of your bid, would

17   you agree with me on that?

18       A.    Yes.

19       Q.    You told us yesterday that typically when you are

20   dealing with big Wall Street firms, you don't know what the

21   dealer's cost is, correct?

22       A.    On bid lists, we do.

23       Q.    On order trades you don't, do you?

24       A.    Not unless it's told to us.

25       Q.    I hear you, Mr. Canter.  But you typically don't

**A80**

539

1    know that information, correct?

2        A.    Typically, no.

3        Q.    When you agree to pay a big broker dealer on top on

4    an order trade, again, it's on top of your bid like you just

5    told us, correct?

6        A.    Again, when we use the phrase "on top," it could be

7    on top of our bid.  Our bid, however, may be constructed

8    based on the information we received about where the seller

9    is willing to sell the bond.  So we're paying on -- our bid

10   is based on that information, and we're paying on top of

11   that.

12       Q.    Generically as you said, on top means on top of your

13   bid, right?

14       A.    Right.

15       Q.    Now, I think we talked a little earlier about your

16   role when you got into the day-to-day trading of RMBS.  I

17   want, starting in October, 2009, I want to ask you a few

18   questions about that.

19             On the other side of the trade is going to be a

20   salesman that covers you from the broker dealer or the trader

21   himself, him or herself, correct?

22       A.    Yes.

23       Q.    And can you tell us why it is that sometimes you

24   deal directly with the trader and sometimes just with the

25   sales coverage person?

**A81**

540

1     A.   Well, there's no particular reason.  The traders are

2  typically very busy during the day trying to make

3  transactions.  They are doing analysis, just like we are, in

4  buying bonds.  And so, the salespeople are there to

5  communicate with clients and find buyers and sellers.

6     Q.   So from the sell side, from the broker dealer side,

7  since they make money by marking up bonds and making a

8  spread, you would agree with me that the sales representative

9  and the traders are typically trying to get you pay more for

10  a bond, correct?

11     A.   Yes, generally, sure.

12     Q.   You, as a fund manager with fiduciary duty to your

13  clients, you are trying to pay less for a bond, correct?

14     A.   Yes.

15     Q.   That's the basic of the negotiating dynamic between

16  buy side firms and sell side firms, correct?

17     A.   Yes.

18     THE COURT:  I think we'll take our morning break at

19  this time.  Ladies and gentlemen, I have something I have to

20  take up with the lawyers, a legal question.  So I think you

21  should count on it being 20 minutes, otherwise we won't get a

22  break.  I will see you back at 25 to 12:00.  Thanks very

23  much, ladies and gentlemen.

24     You can step down, Mr. Canter.

25     (In the absence of the jury.)

**A82**

1    Q.    Are you familiar with the term "opportunity cost"?

2    A.    Yes.

3    Q.    What's an opportunity cost?

4    A.    Generally, the cost of missing out on something.

5    Q.    So if you are sitting in cash that's in the fund and

6    miss out on a potentially valuable investment opportunity,

7    that's an opportunity cost, correct?

8    A.    Only if prices go up.

9    Q.    We talked a fair amount about the models a little

10   bit earlier, Mr. Canter.  In all of those models and all of

11   those inputs we discussed, there's no model input for the

12   dealer's cost, is there?

13   A.    No.

14   Q.    There's no model input for any commission or fee

15   that might be paid to the dealer to transact with you,

16   correct?

17   A.    Correct.

18   Q.    What's input is the price, which is the all-in price

19   to the fund, correct?

20   A.    That's right.

21   Q.    So for the model analytics, dealer cost,

22   commissions, are all irrelevant, correct?

23   A.    Did you ask for the model returns?

24   Q.    The model inputs which are -- what goes into the

25   model --

1    A.   Not relevant, right.

2    Q.   That's not surprising because in most instances, you

3  had no idea what the dealer cost was, correct?

4    A.   On bid lists, we thought we did, but on the other

5  transaction, not --

6    Q.   Like order of inventory trades?

7    A.   Not necessarily.

8    Q.   And even that information you had on bid list

9  trades, you didn't go around and make it a model input,

10  right?  You didn't set it up to input dealer cost, correct?

11    A.   No.  Because we knew it was 4 ticks every time.

12    Q.   That had no impact on returns as a separate feature,

13  did it?

14    A.   That was imbedded into the price.

15    Q.   Because you're putting the whole, full price in,

16  that take care of the whole thing, correct?

17    A.   That's right.

18    Q.   I think we discussed this a little bit earlier, but

19  you retained, at all times, complete control over how much to

20  pay in terms of price, correct?

21    A.   Either I or somebody else on my team.

22    Q.   And if you don't like the price, as we discussed,

23  that's offered to you, don't pay it, correct?

24    A.   Of course.

25    Q.   I think you just told us, you draw a line.  You have

1  bond still had excellent profit potential, correct?

2      A.   I don't know about excellent.  We obviously bought

3  the bond so we liked it.

4      Q.   Again your judgment was based upon all this models

5  and all of the work that you had done to get to an

6  appropriate judgment that that's the price that was in the

7  best interest of the fund, correct?

8      A.   Yes.

9      Q.   What was your maximum price you would have paid for

10  the bond that day?

11      A.   I have no idea.

12      Q.   Now before you came to court today, did you have the

13  opportunity to review the analytic spreadsheets we looked at

14  earlier today on the Harborview 077?

15      A.   No.

16      Q.   Do you know whether anyone at the company at

17  AllianceBernstein has gone back and looked for that?

18      A.   I heard some discussion.

19      Q.   No one has been able to find it to date, isn't that

20  correct, Mr. Canter?

21      A.   I'm not sure that's any longer true.

22      Q.   Well, we'll see about that.  Mr. Canter, it is not

23  here in court to ask you about as of right now is it?

24          MR. FRANCIS:  Objection.  Misleading.

25          THE COURT:  Also not relevant -- sustained.

**A85**

1     Q.   Mr. Canter, we went over this on Harborview, like I

2 said no one is suggesting you didn't do your job in terms of

3 best execution.  You made a decision to transact with

4 Jefferies that day because you liked the bond and liked the

5 price?

6     A.   Yes.

7     Q.   It was either the only price or the best price that

8 day, correct?

9     A.   Yes.

10     Q.   And using your expert judgment all of your

11 analytics, you made a good decision the buy that bond at that

12 price, correct?

13         MR. FRANCIS:  Objection.

14         THE COURT:  Basis?

15         MR. FRANCIS:  Characterization good.

16         THE COURT:  Overruled.

17     A.   I don't recall whether we made money from this

18 particular transaction or not.

19     Q.   I can refresh your recollection on that.

20         THE COURT:  I think what you need to do is either

21 answer the question or tell him you can't answer it.  The

22 question was you made a good decision to buy this bond at

23 this price, correct?

24     A.   I think that if we bought that bond and held it, we

25 would have made a lot of money.  I don't know if I made a

**A86**

1    subsequently bad decision to sell it.  It was a good decision

2    to buy it at the time relative to what transpired

3    thereafter.

4        Q.    Given all the analytics you brought to bear, your

5    expertise, education, training, you made a sound decision on

6    March 31, 2010?

7        A.    Yeah, I think so.

8        Q.    Solely in terms of the price, solely in terms of

9    price, you would do that trade again at this price, wouldn't

10   you?

11       A.    Yes.

12       Q.    Now Mr. Canter, a couple quick questions here on

13   transaction costs.  The way the fund was set up, was there a

14   mechanism to capture the amount of markups or profits on the

15   actual books and records of the fund?  Do you know one way or

16   the other?

17       A.    I don't believe so.

18       Q.    Just in terms of the fund, the accounting worked

19   basically you buy a bond.  It is that all in price we saw in

20   on the confirm, then that price is what's recorded on the

21   books on the fund, correct?

22       A.    Yes.

23       Q.    In fact, would I be correct to say that there's no

24   way to track those type of costs, whether you call them

25   markups, profits or commissions, the fund was just not set up

**A87**

645

1  to track those, correct?

2      A.   Well other than on bid lists we don't really know

3  necessarily how much dealers are making so there would be no

4  information to track.

5      Q.   So this type of information -- withdrawn.  There's a

6  pretty -- under the limited partnership agreement, there's a

7  recordkeeping requirement, right?

8      A.   Yes.

9      Q.   There was a reporting requirement?

10     A.   Yes.

11     Q.   The records had to be accurate.  It wasn't your job

12 to keep them but they had to be accurate, right?

13     A.   Yes.

14     Q.   I think you told us several times under the limited

15 partnership agreement there was some important compliance

16 rules?

17     A.   Yes.

18     Q.   As a matter of recordkeeping, if you went back and

19 combed through the books and records, we wouldn't see

20 anywhere that keeps track of these costs, markups or

21 profits?

22     A.   No.

23     Q.   No one is writing the ticks down and keeping them in

24 like the general ledger of the fund, right?

25     A.   No.

**A88**

646

1    Q.   So there's no -- just in terms of how, I'm not an

2    accountant.  I don't think you are but you have at least been

3    to business school.  The way these are recorded, there's no

4    separate expense recorded for the transaction costs in

5    connection with a RMBS trade, correct?

6    A.   That's right.

7    Q.   There's no way in terms the books and records on the

8    fund and the accounting, there's no way to record a loss in

9    connection with the transaction cost as of the trade date,

10   correct?

11   A.   I don't think so.

12   Q.   Fair to say that just in terms of the transactions

13   costs, no loss occurred in connection with the transaction

14   cost, right?

15   A.   By definition it is a cost.

16   Q.   It is embedded in the price?

17   A.   Yes.

18   Q.   It is what we say goes into the basis of an asset,

19   right?

20   A.   Yes.

21   Q.   We wouldn't think of the loss or any component of

22   that price?

23   A.   No.

24   Q.   The only losses would take place if the value of the

25   bond moved up or down with the market, correct?

**A89**

647

1    A.    That's right.

2    Q.    If you buy at bond at 58 and a week later the market

3  says it is only worth 57, you are down a point, correct?

4    A.    Yes.

5    Q.    You used a valuation service to give you fair market

6  value prices on the bond each month, correct?

7    A.    Every day, yes.

8    Q.    Every day.  That was a service called IVP?

9    A.    IDC.

10   Q.    What does IDC stand for?

11   A.    I don't know.

12   Q.    It is a business whose job it is to look at an

13  investment fund portfolio and tell you what the bonds are

14  worth, correct?

15   A.    Correct.

16   Q.    That's part of the reporting requirement for the

17  Treasury that you had to hire a pricing service like IDC and

18  value the bonds every month, correct?

19   A.    Not like IDC.  We had to hire IDC.

20   Q.    In terms of gains or losses, if you were down a

21  point a week later that's what we can an unrealized point,

22  correct?

23   A.    Correct.

24   Q.    That means you haven't lost money until you sell the

25  bond?

648

```
 1       A.    That's correct.

 2       Q.    If the bond was up a point that would be unrealized

 3   gain, correct?

 4       A.    Yes.

 5       Q.    None of those have anything to do with the

 6   transaction cost, correct?

 7       A.    Correct.

 8       Q.    Because you didn't track transaction costs, if you

 9   call them markups or when we use the government term

10   commissions because we didn't track them, you didn't report

11   them to Treasury, did you?

12       A.    No.

13       Q.    There's no report that anybody filled out and gave

14   to Treasury with respect to ticks, correct?

15       A.    I don't think so, no.

16       Q.    That's not something Treasury has to get as an

17   condition of its investment in these funds, correct?

18       A.    That's right.

19       Q.    It wasn't information that you needed in terms of

20   your investment analysis in deciding how much to pay for a

21   bond either, correct?

22       A.    No.

23             MR. SMITH:  May I have a moment, Judge?

24             THE COURT:  Yes.

25       Q.    Okay, Mr. Canter.  You said you met with the
```

763

1        UNITED STATES DISTRICT COURT

2          DISTRICT OF CONNECTICUT

3    _____
     United States of America   ) February 21, 2014
4                   Government  ) 9:22 a.m.
     v.                         )
5    Jesse C. Litvak            ) 3:13cr19(JCH)
                    Defendant.  )
6    _____ )

7

8                          141 Church Street
                           New Haven, Connecticut

9              DAY FOUR OF TRIAL

10

11   B E F O R E:
                 THE HONORABLE JANET C. HALL, U.S.D.J.
12               AND JURY OF 16

13   A P P E A R A N C E S:

14   For The Government   :    Jonathan N. Francis
                               Eric Glover
15                             U.S. Attorney's Office-NH
                               157 Church St., 23rd floor
16                             New Haven, CT 06510

17

18   For the Defendant    :
                               Michael Chase
19                             Shipman & Goodwin
                               One Constitution Plaza
20                             Hartford, CT 06103-1919

21                             Patrick Smith
                               Sarah B. Zimmer
22                             John Michael Hillebrecht
                               DLA Piper US LLP-NY
23                             1251 Avenue of the Americas,
                               27th Floor
24                             New York, NY 10020-1104

25

**A92**

1    Q.   Have you ever paid compensation on top in an

2    inventory trade?

3    A.   No.

4         MR. FRANCIS:  Nothing further, your Honor.

5         THE COURT:  Cross-examination.

6         MR. SMITH:  Thank you, your Honor.

7         MR. SMITH:  Good morning, everyone.  Good morning,

8    Mr. Vlajinac.

9         May I inquire, your Honor?

10        THE COURT:  Yes, you may.

11   CROSS-EXAMINATION BY MR. SMITH:

12   Q.   Mr. Vlajinac, you just used a phrase I would like to

13   ask more about what it means.  You used the phrase "With a

14   grain of salt."  Remember you just said that in response to

15   one of Mr. Francis's questions?

16   A.   Sure.

17   Q.   Does that mean that you listen to what someone tells

18   you and you have some doubt about whether they are telling

19   you the truth about something or not, correct?

20   A.   I'm always going to be skeptical, sure.

21   Q.   Typically are you always going to be skeptical when

22   you are dealing with representatives of broker/dealers on

23   Wall Street, correct?

24   A.   I'm skeptical of anyone when I'm dealing with anyone

25   else's money.

**A93**

1    A.    It didn't or I don't or it doesn't?

2    Q.    It didn't, at the time?

3    A.    At the time, it's definitely weighing into how I

4 approach it.  But if I'm going to assume it's fact, then,

5 sure, it didn't matter.

6    Q.    Mr. Vlajinac, didn't you meet with government

7 agents from SIGTARP back in September of 2012?

8    A.    Yes, I did.

9    Q.    And you also met with some representatives of the

10 Securities and Exchange Commission in that meeting; is that

11 right?

12    A.    That's correct.  There was one representation.

13    Q.    One of the representatives of the prosecution team,

14 Mr. Francis, was also at that meeting?

15    A.    Yes, he was.

16    Q.    Do you recall in that meeting that you told the

17 government representatives that Mr. Litvak's

18 misrepresentations concerning the existence of a third-party

19 seller and the acquisition cost did not affect my thinking

20 about the bond itself?

21    A.    That's correct.

22    Q.    And did you also tell the government representatives

23 in that meeting that:  Information from Mr. Litvak concerning

24 the seller mattered to you because it sets the parameters of

25 the negotiations, but did not influence the valuation of the

```
 1    securities?

 2            Did you tell them that?

 3       A.   That's correct.

 4       Q.   Did you also tell them that:  In this sense, it did

 5    not particularly matter to you that the bonds were held in

 6    inventory rather than purchased from a third-party seller?

 7            Did you tell them that?

 8       A.   That's correct.

 9       Q.   Nothing that Mr. Litvak said about there being a

10    seller out there prevented you from bidding 74 on December 18

11    as we discussed, correct?

12       A.   I don't know.

13       Q.   And when you bid and agreed on a transaction price

14    at 76 on December 13 -- withdrawn.

15            When you agreed on a transaction price of 76 on

16    December 23, 2009, you got to that price despite any

17    statements that Mr. Litvak made about some seller, correct?

18       A.   I don't know.

19       Q.   Well, you got to an agreement about price, correct?

20       A.   Yes.

21       Q.   And that price was 76, correct?

22       A.   That's correct.

23       Q.   And Mr. Litvak said the things that he said,

24    correct?

25       A.   You said "despite."
```

**A95**

1    Q.   Thank you, Mr. Vlajinac.  So you got there, to 76,

2    right?

3    A.   Yes.

4    Q.   And Mr. Litvak said what he said about the seller,

5    correct?

6    A.   That's correct.

7    Q.   There was a transaction at the price of 76?

8    A.   That's correct.

9    Q.   You made a determination on December 23, 2009, that

10   that was an appropriate price given your role as a trader at

11   Wellington?

12   A.   That's correct.

13   Q.   And solely with respect to price on December 23,

14   2009, you'd do that trade again, wouldn't you?

15        MR. FRANCIS:  Objection.  Your Honor, I think he

16   tried this before and objected on the grounds of relevance.

17        MR. SMITH:  I think it was allowed yesterday, Judge.

18        THE COURT:  Yeah, the objection is overruled.

19   A.   Can you repeat that?

20   Q.   Solely with respect to price, you would do that

21   trade again at a price of 76 on December 23, 2009 --

22        MR. FRANCIS:  Objection; relevance.  And I think --

23        THE COURT:  You just objected.  If I said sustained,

24   I got it backwards.  And I can't see what it says, so I

25   thought I said overruled.  Thank you, Terri.

823

1    Q.   You can answer.

2    A.   Without seeming crass, could you repeat it?

3         THE COURT:   Solely with respect to price, you would

4    do that trade again on price of 76 on December 23, 2009?

5    A.   I would say that I achieved best execution with the

6    parameters that were set to me internally, whether or not I

7    thought there was a value to it at 76, I don't know.

8         Would I do it again at 76, just based on price,

9    probably.

10   Q.   In terms of best execution, that means that in terms

11   of your ability to assess what else was out there for this

12   bond that day, this was the best price available to you as a

13   trader at Wellington for this bond on December 23, right?

14   A.   Given the circumstances.

15   Q.   And that just means you did your job in terms of

16   discharging your best execution responsibilities to the

17   Wellington funds that were buying this bond, correct?

18   A.   That's correct.

19   Q.   Now, we talked a little bit about the investment

20   processes at Wellington just a few minutes ago, remember

21   that?

22   A.   Um-hum.

23   Q.   Did you ever hear the term "price maker"?  Do you

24   ever recall hearing that term?

25   A.   Sure.

**A97**

890

1    A.   Correct.

2    Q.   There's a all-in price that's used as you are

3    performing your analysis, correct?

4    A.   Correct.

5    Q.   There's no separate input for any fees, right?

6    A.   Correct.

7    Q.   There's no separate input for how much profit a

8    broker/dealer might be making on a given transaction,

9    right?

10   A.   Correct.

11   Q.   And on many transactions, you don't have the

12   faintest idea how much profit a given broker/dealer is making

13   on a transaction, right?

14   A.   On bid lists, we do.

15   Q.   Take your point.

16        On orders in inventory trades, you have no idea,

17   most of time, how much profit they make, right?

18   A.   If a broker/dealer owns a bond in their inventory,

19   we do as much research as we can to try to figure out where

20   they bought the bond, where they own it at to help us try to

21   buy it as cheaply as we can.  If the broker/dealer is taking

22   the risk of owning the bond, then, no, there's no set

23   commission that's paid.

24   Q.   They just get to markup the bond to what the market

25   will bear, right?

1   doesn't result based on your analytics, the projected yield

2   of 7 percent or higher, you don't buy the bond, right?

3      A.   It depends on where I find this price that you speak

4   of, I guess.  I mean, if -- if -- you know, if I see the same

5   exact bond on a dealer inventory that's offered, you know, 5

6   points above where we're able to buy the bond, then it is

7   unlikely that we would win the bond on a bid list bidding our

8   level, yes.

9      Q.   And in terms of whether you like a bond at a given

10   price or don't like a bond at a given price, that's something

11   that you determine using your expertise and your own

12   judgment, right?

13      A.   Again, I mean, particularly for this mandate, we

14   were fairly dependent, almost exclusively dependent on what

15   the output of our research team gave us.  We were certainly

16   -- it was a high-profile account for us.  We were certainly

17   focused on it and, you know, we were trying to -- you know,

18   fulfill our mandate as -- as -- as best we could.  So we were

19   trying to find bonds and buy bonds as much as we could for

20   the account.

21      Q.   I understand that.  And you were trying to buy bonds

22   that, as I think you just said, met your yield profile and

23   your threshold, right?

24      A.   Right.

25          MR. HILLEBRECHT:  Can you show the witness what's

903

1     Q.   I asked you briefly about this earlier.  I just want

2  to orient you and I will ask some additional questions.

3  That's you putting in your original bid of 80, right?

4     A.   Yes.

5     Q.   And Mr. Glover walked you through some

6  communications with Mr. Litvak that you indicated were

7  deceptive or untruthful, right?

8     A.   Yes.

9     Q.   This bid of 80 is before you saw any of those,

10  right?

11     A.   Yes.

12          MR. HILLEBRECHT:  And, Mr. McLoud, if we do a

13  side-by-side of 673D in evidence and Government Exhibit 162A

14  just for a minute.

15     Q.   And when you tell Jesse Litvak in the e-mail here

16  that you are bidding 80, that bid was based, in part, on your

17  analytic table, your yield table that we saw that has at the

18  price of 80 a yield of 7.43?

19     A.   In the very large part, yes.

20     Q.   So this bid of 80 was based, in very large part, on

21  Invesco's own expertise and analysis and it was before

22  anything that Jesse Litvak told you about this bond,

23  correct?

24     A.   Yes.

25     Q.   And Mr. Glover also established you ended up buying

**A100**

1    this bond at 80 on this day, right?

2        A.   Yes.

3        Q.   And the economics of the trade, the yield and the

4    other important attributes of the -- of the trade are locked

5    in at 80 once you buy it at 80, right?

6        A.   Yes.

7        Q.   In other words, if your analytics tell you that the

8    base yields are going to be a pretty attractive 7.43 at 80,

9    you buy it at 80, nothing that anybody tells you after that

10   is going to change the fact that your base yield is going to

11   be 7.43?

12       A.   Right, based on our projections, yes.

13       Q.   And the economics of the deal, the projected yield

14   of the deal were not affected by later learning that Mr.

15   Litvak told you untruths, right?

16       A.   The investment analysis aspect of it does not

17   change.

18       Q.   Because the investment analysis on which you very

19   largely relied on coming to the bid of 80 was independent of

20   what Mr. Litvak may have said --

21       A.   Correct.

22       Q.   -- right?

23       A.   Correct.

24       Q.   And those analytics and your yield table and your

25   expertise told you on the day you did this trade that buying

905

1    this bond at 80 was a smart investment decision for Invesco,

2    right?

3    A.   Based on our analytics, yes.

4    Q.   And based on price, this trade, knowing everything

5    you know as you sit here today, buying that bond at 80 on

6    that day was a smart investment decision for Invesco,

7    right?

8          MR. GLOVER:  Objection, your Honor.

9          THE COURT:  Basis?

10         MR. GLOVER:  Relevance.

11         THE COURT:  Sustained on other grounds.  It's been

12   asked and answered.

13    Q.   To be clear, I want to make sure it is clear, you

14   got exactly the bond you thought you were buying, right?

15    A.   Correct.

16    Q.   You got the FHASI-2007 AR-1 1A1 bond, right?

17    A.   Correct.

18    Q.   It's not like somebody slipped you another bond when

19   you weren't looking, right?

20    A.   Correct.

21    Q.   And nothing that Jesse Litvak said that day affected

22   -- affected the nature or quality of the bond that you

23   purchased that day, right?

24    A.   Correct.

25    Q.   I want to turn to the SARM bond that Mr. Glover

**A102**

1    asked you about.

2        MR. HILLEBRECHT:  Let's, if we could, have up

3    Government Exhibit 43, which is in evidence.  If we go to the

4    second page, zoom in on the top part there.

5        Q.    And, again, Mr. Norris, a similar question.  This is

6    you putting in your bid 79-24.  We can bid 79-24 on the SARM

7    bond.

8        A.    Yes.

9        Q.    That there.  And again, that's your original bid,

10   right?

11       A.    Yes.

12       Q.    And nothing that Jesse Litvak said or did caused you

13   to make that particular bid of 79-24, right?  That's your

14   bid?

15       A.    Correct.

16       Q.    If we go to the preceding page, right at the bottom,

17   and you indicate here that you got some room, too.

18       A.    Yes.

19       Q.    I think you already told us, but just so I have got

20   it straight.  What does that mean?  Why are you telling Mr.

21   Litvak that you got room on top of your 79-24 bid?

22       A.    Based on the analytics package that our credit team

23   put together, it indicated that we had the ability to pay

24   more than 79-24, if we had to, to win the bond.  And I wanted

25   to notify Mr. Litvak of that because of various time

**A103**

1   A.   Yes.

2   Q.   If we look briefly at Defendant's Exhibit 620D, as

3   in dog, that's in evidence.  Zoom in on the yield tables one

4   last time now.  You just reminded me, sir, that you

5   ultimately ended up paying on this bond a price of 79-30,

6   correct?

7   A.   Yes.

8   Q.   And as we saw before, when you are calculating yield

9   potential, profit potential, you calculate it in full dollar

10  increments, correct?

11  A.   For this particular bond we did, yes.

12  Q.   So 79-30, I think I got this right, is somewhere

13  between 79 and 80, correct?

14  A.   Yes.

15  Q.   So the yield between 79 and 30 would be somewhere

16  7.24 and 7.55.  Have I got that right?

17  A.   Yes.

18  Q.   Both of those are well above your 7 percent

19  threshold, right?

20  A.   They are above it, yes.

21  Q.   Conducting all your due diligence on the day of this

22  trade for that bond, this bond was not available to you at a

23  better price than the bond at which you bought it, right?

24  A.   Not that I'm aware of at this point.

25  Q.   If you had been aware of the lower price, you would

921

1    have bought it at a lower price, right?

2        A.    Right.   It is possible this bond was offered on an

3    inventory away from this list, and we may have attempted to

4    purchase it there as well so basically we try to buy the bond

5    as cheaply as we can wherever it is so.

6        Q.    By the fact that you know having looked at the

7    document that you indeed on this day bought this bond at a

8    price of 79-30?

9        A.    Yes.

10       Q.    Would you agree with me there was no comparable

11   substitute bond available at a lower price?

12       A.    I can't say that at this point.   This exact piece of

13   this bond at the time I believe 79-30 was the price we had to

14   pay to purchase it.   Like I said, there's comparable bonds

15   all over the place that we try to buy.   We weren't

16   necessarily -- we weren't saying we're going to buy this one

17   bond and that's it for today.   We were trying to buy as many

18   as we could.

19       Q.    Okay.   I'm not suggesting anything to the contrary.

20   I'm not suggesting you didn't purchase comparable bonds. I'm

21   saying you paid 79-30 because it was the best price available

22   to fill the need you saw, right?

23       A.    At the time we believed so, yes.

24       Q.    Again similar questions I asked about the other

25   bond, at the time you made the decision to buy the bond at

**A105**

1  79-30, you believe the bond was a smart investment decision

2  for Invesco and the PPIF Fund, right?

3      A.   At the time of the trade, yes.

4      Q.   Focusing on the economics of the trade, potential

5  yield and profit, nothing about Jesse's tactics or what he

6  said to you changed the economics of buying that bond at

7  79-30 on that day, right?

8      A.   At 79-30 the investment analysis was the same.

9      Q.   The investment analysis and the economics of the

10  deal were not changed in any way by learning later that

11  Jefferies may have made a larger amount of profit than you

12  understood, right?

13      A.   We would argue that we should have been able to buy

14  the bond cheaper.

15      Q.   That's a hypothetical, right?  That's not what

16  happened, right?

17      A.   Well, we didn't know, right, we don't know --

18  obviously we didn't know at the time how much Jefferies was

19  making on the trade.

20      Q.   But you knew how much you were paying, right? You

21  knew you were paying 79-30?

22      A.   Yes.

23      Q.   And you knew what you were getting, right?

24      A.   Yes.

25      Q.   My question is the fact that you later learned

923

```
 1   additional information didn't change the economics of the

 2   deal at the price of 79-30?

 3        MR. GLOVER:  Objection.  Asked and answered.

 4        THE COURT:  Sustained.

 5   Q.   You would agree with me, wouldn't you, that nothing

 6   that Jesse said that day affected the nature or quality of

 7   the bond of the purchased?

 8        MR. GLOVER:  Asked and answered.

 9        THE COURT:  Sustained.

10        MR. HILLEBRECHT I have not asked this question about

11   this bond.  I asked the same question about the other bond.

12        THE COURT:  It will take me longer to confirm which

13   of us is right so I'll allow him to answer but I'm pretty

14   sure I heard this question about this bond but you may

15   answer.

16   A.   Repeat the question.

17   Q.   Nothing that Jesse said to you that day affected the

18   nature or quality of the bond you were buying, right?

19   A.   Correct.

20   Q.   In 2010 for the PPIF Fund, what was the total

21   invested value of the fund?

22   A.   I don't have that recollection.  I know from memory

23   that at some point during its existence it got to slightly

24   over 2 billion, but I don't know about in 2010 in

25   particular.
```

**A107**

928

1    where the bond actually traded and so we would like that to

2    be reflected as realistically as possible.

3    Q.   I understand that's what folks in the marketplace

4    want.  We're talking about the folks who may feel like they

5    overpaid and want inaccurate information injected into the

6    marketplace so they have a better chance of reselling that

7    bond at profit, right?

8    A.   Yes.

9    Q.   And I understand you express the view that you have

10   done it rarely but that kind of thing happens all the time in

11   the RMBS market, doesn't it?

12   A.   That I don't know.  Like I said it is volunteer

13   information investors such as myself take it a with a grain

14   of salt.

15   Q.   One of the reasons you take that kind of information

16   with a grain of salt is precisely because the context we're

17   discussing now that people sometimes intentionally put out

18   misleading information into the market, right?

19   A.   Yes.

20        MR. HILLEBRECHT:  Mr. Norris, thank you very much.

21   I have no further questions.

22        THE COURT:  A brief redirect.

23        MR. GLOVER:  I will try, your Honor.

24   REDIRECT EXAMINATION BY MR. GLOVER:

25   Q.   Mr. Norris, that $285 that Mr. Hillebrecht was

1    first talk about a different bond, correct, the RALI,

2    R-A-L-I, 07 bond.

3        A.    Yes.

4        Q.    See that there 15:04:40?

5        A.    Yes.

6        Q.    And Mr. Litvak gives you the name of that bond and

7    you respond, okay, running now.

8        A.    Right.

9        Q.    And you mean -- the jury is pretty familiar with

10   this by now, by running it you mean you -- you are going to

11   run it through your analytics and do some analysis of that

12   bond and make some projections about yield and try and come

13   to some -- thinking about at what price you would like that

14   bond.  Is that fair?

15       A.    That's fair, yeah.

16       Q.    And in this case, at least, as a result of that

17   analysis and your expertise, you decide you didn't like that

18   bond so much, right?

19       A.    Right, at least at that price, yeah.

20       Q.    Okay.  And it says there, a little lower, not loving

21   the bond right now, right?

22       A.    Yeah.

23       Q.    And then Mr. Litvak flips to the -- switches to the

24   next bond, in a couple of lines down there.

25            MR. HILLEBRECHT:  Show that, Mr. McLoud, please.

**A109**

992

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF CONNECTICUT

 3    _____
      United States of America  )February 24, 2014
 4                  Government  )8:56 a.m.
      v.                        )
 5    Jesse C. Litvak           )3:13cr19(JCH)
                  Defendant.    )
 6    _____    )


 7

 8                              141 Church Street
                                New Haven, Connecticut

 9                    DAY FIVE OF TRIAL

10
      B E F O R E:
11                    THE HONORABLE JANET C. HALL, U.S.D.J.
                      AND JURY OF 16
12

13    A P P E A R A N C E S:

14    For The Government   :    Jonathan N. Francis
                                Eric Glover
15                              U.S. Attorney's Office-NH
                                157 Church St., 23rd floor
16                              New Haven, CT 06510

17
      For the Defendant    :
18                              Michael Chase
                                Shipman & Goodwin
19                              One Constitution Plaza
                                Hartford, CT 06103-1919
20
                                Patrick Smith
21                              Sarah B. Zimmer
                                John Michael Hillebrecht
22                              DLA Piper US LLP-NY
                                1251 Avenue of the Americas,
23                              27th Floor
                                New York, NY 10020-1104
24

25
```

**A110**

1  THE COURT: All right. Just want to make sure we're

2  not --

3  MR. HILLEBRECHT: Also, your Honor, we're going to

4  do this with the witness, I hope. If you do a side-by-side

5  comparison of the times, they link very closely. He says "X"

6  to Mr. Litvak and then within moments relays "X" to

7  Mr. Steffa.

8  THE COURT: Yes, sir.

9  MR. FRANCIS: I don't have a problem with any of

10  those. This was helpful -- it's good to get a proffer of how

11  the defense is going to use these documents. I don't have a

12  problem with any of that materiality evidence they want to

13  put on. The problem is, it ends with Mr. Wollman selling at

14  a profit. That's my concern. That was our 403 objection and

15  our relevance objection. If they want to propose a redacted

16  version of this document --

17  THE COURT: What would you have them redact?

18  MR. FRANCIS: I think the information about the

19  price where he buys it. I'm not sure.

20  THE COURT: 17:53:04: I would buy half at 15-24.

21  MR. FRANCIS: I agree at least that. But I think if

22  what they're trying to prove is that Mr. Wollman, contrary to

23  his testimony, didn't care what price he bought it for, then

24  it seems to me everything above that establishes that because

25  what they've -- what Mr. Hillebrecht just argued he wants to

**A111**

1  get in is the fact that he had a contemporaneous --

2          THE COURT:  I need to tell you me where you would

3  redact before I go back to counsel.

4          MR. FRANCIS:  I think I would redact from 17:53:04,

5  just above there --

6          THE COURT:  17 what?

7          MR. FRANCIS:  17:53:04 where Mr. Steffa says:  I buy

8  half.

9          I suppose if they want the whole, don't tell the

10  guy, I'm not sure how that's relevant.  I would just say the

11  rest of that page.

12          THE COURT:  Where is the don't tell the guy?

13          MR. FRANCIS:  That's in that large block at

14  17:54:44:  This guy is going to be mad at me.

15          THE COURT:  What about that?

16          MR. FRANCIS:  I think it's irrelevant.  I think

17  everything from 17:53:04 down could be redacted in a discreet

18  way.  They can make all of their points about materiality and

19  I wouldn't have my 403 issue.

20          THE COURT:  Thank you.

21          MR. HILLEBRECHT:  May I respond, your Honor?

22          THE COURT:  Just a moment, please.

23          THE COURT:  We have a juror issue, but let's finish

24  this up then I will advise you what the issue is.

25          MR. HILLEBRECHT:  If I can respond, the government

**A112**

1001

1  suggests redacting from 17:53:04 on 1215 which where

2  Mr. Steffa says:  I buy half at 57-24.

3          THE COURT:  I see it.

4          MR. HILLEBRECHT:  But it's not -- in government

5  Exhibit 102, it's not until almost a minute later that

6  Mr. Wollman, at 17:53:58, agrees to buy the bond from Mr.

7  Litvak.  That's when he says:  Okay, let's do this.

8          So when your Honor ruled about future profitability

9  and ruled about what, in your Honor's view, was the

10  irrelevant subsequent market developments and other things,

11  we understood the basis of that ruling was what happened six

12  months or a year from now can't possibly affect the

13  investment decision on the day the bond was bought.  This

14  document is before the bond is bought.  It guarantees

15  Mr. Wollman a locked in profit on half of what he's buying

16  from Mr. Litvak to Mr. Steffa at the time, at the time that

17  Mr. Wollman agrees to purchase the bond from Mr. Litvak,

18  because that doesn't happen until a first minute after

19  Mr. Steffa says:  I will buy it from you at 57-24, which is

20  higher than the price that Mr. Wollman agrees with Mr. Litvak

21  53 seconds later.  It goes directly to the contemporaneous

22  decision to enter into the investment decision.  It goes to

23  the heart of the testimony of this witness.

24          MR. FRANCIS:  May I respond to that, your Honor,

25  briefly.

**A113**

1002

```
 1          THE COURT:  I don't understand how people can type

 2   at message at 53:55 and also type one three-100ths of a

 3   second later, or a minute later.  Three-100ths of a minute

 4   later is 1.8 seconds later.

 5          MR. HILLEBRECHT:  Your Honor, these traders have

 6   usually multiple screens up.

 7          THE COURT:  They only have two hands.

 8          MR. HILLEBRECHT:  It's a fast-paced business.  The

 9   time stamp isn't when you start typing, it's when you hit the

10   send button.

11          THE COURT:  Yes, sir.

12          MR. FRANCIS:  To briefly respond what Mr.

13   Hillebrecht just said.  They keep trying to make loss an

14   element of the securities fraud.  We talked about this during

15   the charge conference and your Honor actually has a charge on

16   this.

17          THE COURT:  No.  I don't think they are arguing

18   that.  I think they are arguing, as you, I think, conceded,

19   in the time before 52:42, that they are talking about his

20   state of mind, which goes to even your view of the

21   materiality, the language from basic or TSC, you know, the

22   total mix significantly alter, et cetera.  And, in effect,

23   the argument is, this is a look into the window of the mind

24   of Mr. Wollman as he's negotiating with the defendant.

25          MR. FRANCIS:  I understand that.  They can get that,
```

**A114**

1003

```
 1    I think, with just above where I want to redact, where
 2    Mr. Steffa says:  I buy from you wherever you want to sell,
 3    as much or as little as you want to sell.
 4              That's a couple of lines up.
 5              THE COURT:  When he says I buy at what you buy, he
 6    doesn't buy.  He, meaning Mr. Steffa, doesn't buy at what
 7    Mr. Wollman buys.  He buys at more than what Mr. Wollman
 8    buys, which you don't see until the 53:04.
 9              MR. FRANCIS:  I understand.  If their objection is
10    that --
11              THE COURT:  Which occurred before he buys --
12    actually does make the purchase at 18 over on the other --
13    102-A.
14              MR. FRANCIS:  It seems to me what they want to show
15    here is -- what they're saying is they want to show is that
16    Mr. Wollman knew he was going to make a profit.
17              THE COURT:  Right.  Therefore, in the total mix of
18    things, it wouldn't significantly alter him to have known.
19    And I'm just making what I think is their argument, that Mr.
20    Litvak was making, I can't even remember how many ticks it
21    was, more than Mr. Litvak said he was making.
22              So if Mr. Wollman knew what Mr. Litvak was, in fact,
23    making, their argument is this shows it wouldn't have made my
24    difference to him because he was still going to make a
25    profit.
```

**A115**

1    MR. FRANCIS:  So then my relevance response to that

2  is he -- whatever amount of profit he was going to make, it

3  would have been greater --

4    THE COURT:  I understand.  That's your redirect.

5    MR. FRANCIS:  And my 403 response is by introducing

6  the concept of Mr. Wollman making a profit, we fear that it

7  risks confusing the jury that making a profit on a trade in

8  which you are defrauded makes it not a crime.  And this is

9  what I was attempting, unsuccessfully, to point out to your

10  Honor.  We discussed it in the charge conference and we

11  discussed it in a bunch of different hearings, and I think

12  your Honor's instruction as it stands now, I know in your

13  draft, loss is not an element of securities fraud.  And so,

14  this confusion is not just sort of, well, you know, we're

15  worried for the poor jury.  We actually think this is

16  substantive.

17    THE COURT:  Do you want the last word?

18    MR. HILLEBRECHT:  Yeah, I don't see any real risk of

19  confusion.  Your Honor is going to instruct the jury.  This

20  is direct evidence of what happens in this transaction.  It's

21  important information that clearly was in the mind of the

22  decision maker, Mr. Wollman.  And the jury should be able to

23  get a full picture of it.  There's nothing here that would

24  confuse anybody, your Honor.  It's pretty straightforward.

25    THE COURT:  I'm contemplating because I think on

1   materiality, that the chat -- is this a chat, I assume?

2           MR. HILLEBRECHT:  Yes, your Honor.

3           THE COURT:  The chat is relevant certainly up to the

4   17:52:42.  That I think is fairly clear.  It's relevant and I

5   don't see undue prejudice under 403.

6           Really the only issue is the government's argument

7   about -- and in my view, anything that comes after the

8   purchase in 102-A is not relevant, or I'm not going to

9   consider its admission.  So really what I'm focused on at

10  this point is the offer of the three lines that go from 53:04

11  to 53:55, which occur before the final commitment over in

12  102-A, but which, as the government argues, does reveal a

13  quote, profit, end quote, to Mr. Wollman, which is not, in my

14  view, relevant to the issue of the securities fraud.

15          So it really does come down to a 403 balancing and

16  whether it's sufficiently probative -- additionally probative

17  about Mr. Wollman's state of mind to overcome the confusion

18  prejudice piece of 403 that I think it presents.

19          I think on balance, the Court is going to exclude

20  the entries beginning at 17:53:04 to the end of the chat in

21  the proposed Defense Exhibit 1215.  The Court will permit the

22  defense to examine Mr. Wollman and to introduce what will

23  become 1215-A, which is the chat from the beginning through

24  the entry 17:52:42 with the last words or sentence:  Let me

25  just confirm total size.

1       MR. SMITH:  Your Honor, as alternative application,

2  we request that you admit 17:04 through the time that the

3  sale is finalized pursuant to a limiting instruction that

4  it's being offered solely for the purpose of materiality and

5  what the information was that was available to Mr. Wollman.

6  And we think that limiting instruction would appropriately

7  cure any risk of confusion under 403.  We had other

8  situations in this trial where a limiting instruction has

9  been discussed.  We think a limiting instruction that just

10  goes to materiality.  If you want to also instruct about

11  profits, put them out of your mind, fine.  A limiting

12  instruction that's materiality of the investment decision and

13  should come in pursuant to that limiting instruction.

14       THE COURT:  There's two problems with that.  One is,

15  I think Attorney Hillebrecht was up on his feet on this

16  issue, so I just -- going forward, I'm not getting double

17  teamed.  He's perfectly capable.

18       Second, it's not only double teaming me, it's like

19  let me have another shot at the apple.  I would think that

20  argument should get made in the initial the argument.

21       Putting all of that aside, I actually thought of

22  that on my own as I deliberated under 403, how to balance

23  this, but as I read the rest of the chat, it seems to me you

24  have everything you want to argue in the chat up to 52:42.

25       Terri, when I'm saying 52:42, you know that's 52

1007

1  colon 42, just so that whoever reads this can correlate it to

2  the document.

3       You have everything that you need to argue at 52:42.

4  The only thing the next three lines of chat add is that, in

5  fact, he made an actual profit. Because the man says

6  earlier, I will buy from you wherever you want to sell and as

7  much or as little. So it seems to me your line of

8  examination of Mr. Wollman, just using those lines, is

9  sufficient to establish that he knew he wasn't going to lose

10 anything on this, and indeed probably make a profit. I

11 don't -- I'm concerned that there's been a lot of focus by

12 defense on whether there's profits made, whether these things

13 are the worthwhile, et cetera, valuable in the long run, did

14 he lose anything and that sort of thing. Obviously, I said I

15 didn't think that was relevant here.

16      I think that introducing these three lines is

17 prejudicial in the sense of confusion prejudice, that it will

18 introduce an issue to the jury. Yes, I trust jurors. I give

19 them limiting instructions a lot, and I really have a high

20 degree of confidence they will follow them. I don't see any

21 point in introducing it. It's sort of like, why do you let

22 the cat out of bag on the idea that, well, I can catch him

23 and put him back in when I don't need to let the cat out of

24 the bag at all because I think you've already gotten

25 everything you want to argue from the prior chats at 52:42

**A119**

1    Q.    Correct.

2    A.    Bond trading information would not give me an edge.

3    Keeping information to myself would give me an edge.    Bond

4    trading information wouldn't give me an edge.

5    Q.    Well, here, you volunteered information which

6    indicates to Mr. Litvak that you can't pay more than 57 or

7    maybe a little bit more because above that you dropping below

8    your 10 percent yield target, right?

9    A.    Yeah.    I'm explaining the 57.    I'm explaining why I

10   want to buy it at 57.

11   Q.    Right.    And it is not a trick question.    The reason

12   you are telling him that is because you want to communicate

13   to him that at a higher price, I'm not getting the yield I

14   want to see so I can't pay a higher price, right?

15   A.    Correct.

16   Q.    And you know, do you not, that in negotiations the

17   other side does the same thing, right?    You hear information

18   from the other side that's designed to let you know that they

19   can't sell it here.    They have got to get more.    They can't

20   go forward with the transaction, right?

21            MR. FRANCIS:    Objection to form.    Compound

22   question.

23            THE COURT:    Sustained.

24   Q.    I will ask a better question.    You understand when

25   engaging in the negotiation that the other side provides you

**A120**

1    information to communicate to you reasons why they can't sell

2    for less than they are asking?

3        A.   Correct, yes.

4        Q.   And you understand in those negotiations that

5    sometimes that kind of information that's volunteered to you

6    may not be 100 percent truthful, right?

7        A.   Yes.

8        Q.   And that's something you've got to be on guard with

9    about when you are engaging in these kind of negotiations,

10   correct?

11       A.   Yes.

12       Q.   Do you know a gentleman by Joseph Steffa?

13       A.   Yes.

14       Q.   Can you tell us who Joseph Steffa is, where he

15   works?

16       A.   Where he works currently?

17       Q.   No, where he worked back in the time frame we're

18   look at here in this chat.

19       A.   I'm sorry, which chat?

20       Q.   Yeah, back in 2010.

21       A.   2010, I believed he was at RBS.

22       Q.   Just so the jury understands, what is RBS?

23       A.   Royal Bank of Scotland.

24       Q.   At the time when Mr. Steffa was as the Royal Bank of

25   Scotland, what kind of jobs did he hold when you were

1027

1    you see that?

2        A.    Correct, yes.

3        Q.    Then you go on to say --

4            MR. HILLEBRECHT:    Go ahead and highlight all, Mr.

5    McLoud.

6        Q.    But supposedly just traded at 59?

7        A.    Correct.

8        Q.    Yet will sell to me at 58.    Now, they are relating

9    to him what Mr. Litvak had told you in the chat we saw on

10   Friday, correct?

11       A.    Correct.

12       Q.    Then you go on to say to Mr. Steffa, in a

13   parenthetical here, believe as much of that as you will.    Do

14   you see that there?

15       A.    Correct.

16       Q.    Because you knew at the time when a broker tells you

17   something like this in the middle of the negotiation, you

18   should have a degree of skepticism about what he's relating

19   to you, correct?

20       A.    Not because of that generally, no.

21       Q.    Well, you know that when you are dealing with the

22   counter-party in the bond market, the counter-parties

23   sometimes spin the information a little bit, right?

24       A.    That's true.

25       Q.    Sometimes shade the color of what's going on in the

**A122**

1028

1  marketplace?

2       A.   The counter-party does so sometimes, yes.

3       Q.   The counter-party sometimes shades the information

4  you are getting, correct?

5       A.   Certain parts yes.

6       Q.   And there's shades of truth that occur when you are

7  negotiating in the RMBS market, right?

8       A.   Well, there's only one truth.

9       Q.   You understand that when you are negotiating with a

10 counter-party, sometimes the counter-party tells you things

11 and they are shading the truth, right?

12      A.   So when you say "shading the truth," -- I mean, the

13 truth is the truth.  They are shading what they are telling

14 me.

15      Q.   That's what I'm asking you, sir.  You understand,

16 right, when you are dealing with the counter-parties in the

17 RMBS market, sometimes what you are being told you are being

18 given shades of the truth, correct?

19      A.   Correct.  Correct.

20      Q.   This is just you stating the obvious to Mr. Steffa,

21 right?  Believe as much of what a broker/dealer tells you as

22 you will?

23      A.   No, that's not what I'm saying.

24      Q.   That's what you are saying right there, right?

25      A.   I can tell you what I'm saying, if you'd ask.

**A123**

1   Q.   Tell me what you are saying, sir.

2   A.   I'm saying that the bond -- he said the bond just

3   traded at 59.  He's saying that he can sell them to me at 58.

4   That seemed a little bit -- those two facts that he first --

5   that he'd just traded at 59 but that the seller is still

6   willing to sell a full point lower at 58, that's the part

7   that I find suspicious.  I'm not saying which of those facts

8   is necessarily untrue.  I'm saying the combination of all of

9   those things seem inconsistent that so shortly after he had

10   traded at 59 he's willing to sell at 58.  So it could be that

11   he didn't really trade at 59.  It could be that if I try at

12   buy at 58 he won't be there, or it could be that the seller

13   is sort of surprising in his behavior.

14   Q.   So you knew from what you had heard to be somewhat

15   suspicious of what you heard, and that's all you are saying

16   to Mr. Steffa, correct?

17   A.   Yeah.  I was relaying the facts and I was indicating

18   that they don't seem to be all entirely consistent.

19   Q.   Then Mr. Steffa from RBS discusses the yield that

20   you both see on the specific bond with the price point of 58.

21   MR. HILLEBRECHT:  Go ahead and highlight that, if

22   you would, Mr. McLoud.

23   Q.   He says, I think they are right around 10 percent

24   yield at 58.  You say, down at the bottom, yeah, that's what

25   I see.  Do you see that, Mr. Wollman?

1030

 1    A.   Yes, I see that.

 2    Q.   Based on your analysis in this conversation with

 3  Mr. Steffa at RBS, you are agreeing with his analysis that

 4  you see a 10 percent yield at a price point of 58.  Correct?

 5    A.   Yes.

 6    Q.   That's different from what you told Jesse Litvak in

 7  Government's Exhibit 102 that we looked at on Friday,

 8  correct?

 9    A.   Correct.

10    Q.   Because you told Jesse Litvak that you saw 10

11  percent yield at the price point of 57, right?

12    A.   Correct.

13    Q.   Here, you are saying -- you are agreeing that

14  there's a yield of 10 at the price point of 58, a full point

15  higher?

16    A.   Correct.

17    Q.   Let me put context on the timing here.

18         MR. HILLEBRECHT:  I would ask Mr. McLoud if he can

19  display both documents that we have been referencing

20  side-by-side, Government's Exhibit 102 and Defendant's

21  Exhibit 1215A.

22    Q.   If you look at the screen, the one on the top, the

23  one we were just looking at, Defendant's 1215A, the one on

24  the bottom is Government's Exhibit 102 that's shown by the

25  Government on Friday, correct?

**A125**

1    A.   Correct.

2    Q.   I just want to put a little context in here

3  time-wise.  The exchange between you and Mr. Steffa in which

4  you agree that's a 10 percent yield at 58 seems to be at

5  17:27 and change.  Do you so that there?

6    A.   Where I say -- yup.

7    Q.   On the top we're highlighting now?

8    A.   Yup.

9    Q.   Just so we're clear.  You know these Bloomberg chats

10  are always in this military time or Greenwich Meantime?

11   A.   Yes.

12   Q.   You know you have subtract four or five hours,

13  depending what time of year it is, correct?

14   A.   Correct.

15   Q.   So there we're around 17:27 with Mr. Steffa.  And if

16  we look down below your conversation with Mr. Litvak at 57, I

17  say 10 percent yield.  Do you see that there?

18   A.   Yes.

19   Q.   It's about three minutes after you tell Mr. Steffa

20  that you agree that there's a 10 percent yield to the price

21  point of 58, right?

22   A.   Correct.

23   Q.   I have a few more questions about this chat with

24  Mr. Steffa, 1215A.

25        MR. HILLEBRECHT:  Mr. McLoud, if we can go on to the

1    Q.    Does Mr. Litvak respond about a minute later?  He

2  came off on point to 54, vladimir.  I'm getting the sense

3  that he really doesn't want to sell bonds that much lower

4  based on my last conversation.

5    A.    Okay.

6    Q.    Then how do you respond?

7    A.    In the next line that you highlighted I say you tell

8  me isn't it a low fifties bond?  I responded by this

9  question.

10    Q.    And Mr. Litvak replies seems pretty cheap to me in

11  the low fifties?

12    A.    Correct.

13    Q.    Then do you see 18:59 you pose another question to

14  Mr. Litvak.  What is that, sir?

15    A.    If I just read it here?

16    Q.    Yes.

17    A.    You think 52 and a half is fair?

18    Q.    Does Mr. Litvak respond I think if you can buy them

19  there that's cheap in my humble opinion?

20    A.    That's what Mr. Litvak said, yes.

21    Q.    I will scroll up so you can see the last response.

22  How do you respond, Mr. Lemin, to that last statement by Mr.

23  Litvak what do you say at 19:01:36?

24    A.    I respond by saying -- it is not printed here

25  properly.  I think it says let's try them because this E is

1065

1   reading like C's. Let's try them, don't want to nickel and

2   dime you through a 51, dot dot dot 5-16 bs S show him 52-16

3   but then you know the seller better if the other approach

4   works better do that. Definitely do not want to pay more

5   than what I have, but will give you this two point

6   improvement.

7      Q. Does Mr. Litvak respond okay? Let me go beat him up

8   and see what I can do?

9      A. That's right.

10      Q. Then he comes back at 19:30 and says he's a 56-16,

11   bro. I beat him up pretty good to get that. Think we are

12   getting to the end of the rope with him. I.e., I may be able

13   to get four to 8/32 out of him. Do you see that?

14      A. I see that.

15      Q. What's your response to that, Mr. Lemin?

16      A. My response is see if you can buy them at 53 for me

17   please.

18      Q. Mr. Litvak says okay?

19      A. Yes.

20      Q. When you say 53 for me, what does that mean 53 for

21   me?

22      A. It mean that I wanted to buy them at 53. See if you

23   can buy them at 53 for me. If I pay you 53 for those

24   bonds.

25      Q. Mr. Litvak comes back at 19:51, does he not, saying

**A128**

1066

1 all right, dude, he sold me bonds at 53 but it was painful

2 getting him to do it.  He literally was talking about BWICing

3 them and I was like dude, you can't.  So whatever the case I

4 bought bonds at 53 then gives you the original size.  Do you

5 see that?

6    A.   I see that.

7    Q.   Now, a couple minutes later 19:53 there's something

8 from Mark Plansky.  Who is Mark Plansky?

9    A.   Mark Plansky is the salesperson at Jefferies.

10    Q.   Does he say to you -- does he say nice job Jesse

11 53-08 to Magnater work for you Vladimir.  Do you see that?

12    A.   Yes, I interpret it as a question that he asked me.

13 He asked me whether 53 and a quarter to Magnetar work for

14 me.

15    Q.   You respond at 19:55:13.  What's your response?

16    A.   My response is yeah, just have Jesse on the horn.

17    Q.   So you agreed to 53 and eight; is that right?

18    A.   So the first part of the statement yeah means I

19 agree and I clarify just had Jesse on the horn so I must be

20 referring to phone conversation with Jesse.

21    Q.   Okay.  And if you would, Mr. Lemin, when Mr. Litvak

22 says back up at 19:51:39, I bought bonds at 53 and then

23 Mr. Plansky says to you 53-08 to Magnetar work for you,

24 Vladimir, what do these eight ticks represent in this trade?

25    A.   I think I would refer to that as a commission for

**A129**

1116

1  earlier bluff, in other words, you want the other guy to

2  believe you won't go higher than 65 in the hope that they'll

3  come down and meet you at the 65 level?

4      A.   I particularly wouldn't use this term.  You know, if

5  you choose to use it, that's your choice.  I wouldn't call it

6  a bluff because at that juncture you think you want to buy at

7  65, but then something changes and it changes your opinion as

8  well.

9      Q.   But back and forth, as you are saying things to the

10  seller, you have to come down, and he's saying things to you

11  to get you to come up, correct?

12      A.   I'm trying to buy, I'm saying things to the seller

13  trying to the negotiate the price down and vice versa,

14  correct, yes.

15      Q.   And when you are in these negotiations, whether you

16  are buying bonds in our example or selling bonds in some

17  other scenario, you understand that you have to have

18  skepticism about what the other guy is saying to you,

19  correct?

20      A.   I have to have skepticism, correct, yeah.

21      Q.   You have to think about whether what the other guy

22  is saying to you about price is completely accurate, right?

23      A.   Correct.

24      Q.   Because he may be using a similar negotiating tactic

25  that's designed to get you to improve, and you don't want to

**A130**

1   improve, correct?

2       A.   Similar to what?

3       Q.   A similar negotiating tactic.  He's saying things

4   about price, about the bond, about the market context that

5   are designed to make you bid higher, right?

6       A.   Yes, correct, I think.

7       Q.   This is a scenario you often get in these bid list

8   auctions, these BWICs, right?

9       A.   Less.  A lot less, so no, not correct.

10      Q.   There's some types of term that sellers running a

11  BWIC auction use to try to get bidders to image prove their

12  bids, right?

13      A.   A BWIC situation is different from negotiating an

14  exclusive offer when there are just three parties involved.

15      Q.   We'll turn to bid lists in a minute.  But you

16  understand that skepticism is appropriate when you're

17  negotiating price to buy and sell bonds on Wall Street,

18  right?

19      A.   Correct.  I can't say for the Wall Street.  I can

20  say what I do in mortgages, it is appropriate to use

21  skepticism, correct?

22      Q.   Let's narrow it down to the RMBS market?

23      A.   Okay.

24      Q.   Appropriate to use skepticism?

25      A.   I think so.

**A131**

1118

Q. Kind of like take what the other guy says with a grain of salt?

A. That's interesting. I guess if you want to use colloquial. Skepticism is more cut and dry, I guess, yeah.

Q. We'll stick with skepticism. You have very powerful tools to deal with this, don't you, this issue about whether the other guy is blowing smoke at you in the negotiations? Don't you have powerful tools?

MR. GLOVER: Objection, your Honor. The prior motion.

THE COURT: Move on. We'll take that up at the break.

Q. You use analytic tools like models they are pretty good?

A. To evaluate the securities.

Q. As you evaluate a RMBS bond, you have tremendous resources at Magnetar to evaluate whether or not you should be paying a certain price for a bond, correct?

A. We use models, correct.

Q. Are they custom models?

A. Proprietary models, yes.

Q. Did you help build those models?

A. To some extent, yes.

Q. You used the Ph.d in math and other things to assist you building out these models?

**A132**

1119

1    A.    Ph.d in math, I don't think -- it's probably six
2    years wasted.  I wouldn't recommend anyone -- I use some
3    training, yeah.
4    Q.    I'm sorry to hear.  There's a refund from Penn State
5    you can get.
6    A.    I use some training.  Maybe more so the MBA training
7    than --
8    Q.    In addition to these tools, these analytical models,
9    you have your expert judgment and feel for the market and the
10   bond, don't adopt you?
11   A.    Yes.
12   Q.    You are an expert at what you do, correct?
13   A.    I have done it for a while, yes.
14   Q.    Magnetar is one of the savviest investors in our
15   country, correct, Magnetar is a very sophisticated hedge
16   fund?
17   A.    It's a sophisticated hedge fund, correct.
18   Q.    And the tool that I'm talking about here, isn't that
19   tool discipline about price, Mr. Lemin?  Are you not
20   disciplined about the price you will pay for an RMBS bond?
21   A.    You are referring to the models?
22   Q.    I'm referring to your models together with your
23   expert judgment, and I'm asking you whether or not those
24   allow you to be disciplined about your approach to price and
25   how much you will pay?

**A133**

1206

1     A.    Yes.

2     Q.    This reference to curves, is that a reference to the

3   analytics that you and your colleagues at York Capital use to

4   value these bonds and make projections of what they might be

5   worth?

6     A.    Yes.

7     Q.    In other words, you are trying to, the day before

8   this trade, coming up with an appropriate price at which you

9   might want to sell, correct?

10    A.    Yes.

11    Q.    Having checked the analytics just the day before

12  when you were contacted by Jesse Litvak, you had a frame of

13  reference about where you might want to sell the bond,

14  correct?

15    A.    Yes.

16    Q.    And 60 area, low 60s sounded like an acceptable

17  level, at least, at which to begin negotiations to sell the

18  bond, right?

19    A.    Yes.

20    Q.    And if the levels that Mr. Litvak had suggested were

21  too low based upon our analytics, you would have passed,

22  correct?

23    A.    Yes.

24    Q.    And if the levels were higher than he indicated,

25  well, you would have been happy to negotiate a higher level

**A134**

1   for those bonds, correct?

2       A.   Yes.

3           MR. SMITH:   I'm going to move Government's Exhibit

4   81-A into evidence.   It's a different version of the

5   Bloomberg chat, but it's the one we have in electronic form.

6   81-A.

7           THE COURT:   Hold on just a minute.   Don't put it up.

8   Can the government put up 81-A for him?

9           MR. SMITH:   81-F, your Honor, it's a different

10  version.

11          THE COURT:   But 81-A is in evidence, no?

12          MR. SMITH:   I don't think 81-A is in yet.   They

13  offered 81-F.

14          THE COURT:   It came in with on cross-examination of

15  Mr. Wolf, I believe.

16          MR. SMITH:   Excellent.   So we'll go with 81-A.

17          THE COURT:   Does the government disagree.

18          MR. GLOVER:   No, it's in.

19          MR. SMITH:   I recall it now, thank you.

20      Q.   So 81-A, if you go to the next page, this one goes

21  from the bottom up.   At 11:43 a.m., we have a discussion here

22  between you and Mr. Litvak.   He essentially tells you that

23  you may be able to sell at 61, correct?

24      A.   Yes.

25      Q.   And based upon your analysis, checking your curves,

1    61 was an acceptable price for York Capital, correct?

2        A.    Yes.

3        Q.    And then you have this discussion back and forth

4    about 61 and trying to get the other guy to pay a certain

5    amount on top of 61, correct?

6        A.    Yes.

7        Q.    You asked Mr. Litvak, how much do you work for,

8    right?

9        A.    Yes.

10       Q.    Then there's this discussion about best execution,

11   right?

12       A.    Yes.

13       Q.    And your instruction to Mr. Litvak is, get the other

14   guy to pay 61-8 so we can get our price of 61, correct?

15       A.    Well, correct, in the context of wanting best

16   execution.

17       Q.    You said at 12:00, well, I want best execution, so

18   obviously try to get him to 61-8, right?

19       A.    Yes.

20       Q.    The in that scenario, you and York Capital, or you

21   on behalf of York Capital, would be paid a price of 61,

22   right?

23       A.    Right.

24       Q.    The 8 ticks on top would be paid by whoever that

25   buyer might be, right?

1      A.   Right.

2      Q.   In other words, the 8 ticks on top were not coming

3   out of York Capital's funds, right?

4      A.   How so?

5      Q.   You had an agreement with Mr. Litvak to sell the

6   bond to him at a price of 61, correct?

7      A.   Correct.

8      Q.   And the 8 ticks, that would be added on to the price

9   of the bond that would be charged to the buying customer on

10  the other side of the trade, correct?

11     A.   Correct.

12     Q.   So the proceeds to York Capital at a price of 61

13  would be 61 -- do the math -- on the trade ticket, out pops a

14  dollar amount that comes over to York Capital, right?

15     A.   Right.

16     Q.   No part of the cost of the 8 ticks was going to be

17  coming out of the proceeds of this sale at the agreed upon

18  price at 61, correct?

19     A.   Correct.

20     Q.   You defined best execution that way.  Get him to

21  61-8, correct?

22     A.   I define best execution as the highest price

23  possible, but in this connection, yes, it was 61-8.

24     Q.   61 was a perfectly acceptable price for York Capital

25  based upon your analytics that day, correct?

1210

1    A.   Correct.

2    Q.   If you didn't want to sell at 61, you had complete

3    control over that decision, correct?

4    A.   Yes.

5    Q.   Were there any other bids to buy your bonds at that

6    level that day?

7    A.   I don't remember.

8    Q.   I want to see if I can understand something just

9    exactly right here.   I think you are in agreement in at a

10   price of 61, every penny was going to be wired over from

11   Jefferies to York Capital on settlement date, correct?

12   A.   Yes.

13        MR. SMITH:   Can we offer Defendant's Exhibit 1334

14   into evidence, please?

15        THE COURT:   Any objection?

16        MR. GLOVER:   I will look, your Honor.   No

17   objection.

18        THE COURT:   1334 may be published.

19   Q.   If we can, this is a copy of a trade ticket that was

20   sent over by Beth from Jefferies, correct?

21   A.   Correct.

22   Q.   She was the sales coverage person from Jefferies at

23   the team?

24   A.   Yes.

25   Q.   You see there's a trade price of 61 here?

**A138**

1460

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF CONNECTICUT

 3    _____
      United States of America  ) February 26, 2014
 4              Government       ) 8:51 a.m.
      v.                         )
 5    Jesse C. Litvak            ) 3:13cr19(JCH)
                 Defendant.      )
 6    _____   )

 7

 8                               141 Church Street
                                 New Haven, Connecticut

 9                 DAY SEVEN OF TRIAL

10

11    B E F O R E:
                    THE HONORABLE JANET C. HALL, U.S.D.J.
12                  AND JURY OF 15

13    A P P E A R A N C E S:

14    For The Government  :     Jonathan N. Francis
                                Eric Glover
15                              U.S. Attorney's Office-NH
                                157 Church St., 23rd floor
16                              New Haven, CT 06510

17

18    For the Defendant   :     Michael Chase
                                Shipman & Goodwin
19                              One Constitution Plaza
                                Hartford, CT 06103-1919

20
                                Patrick Smith
21                              Sarah B. Zimmer
                                John Michael Hillebrecht
22                              DLA Piper US LLP-NY
                                1251 Avenue of the Americas,
23                              27th Floor
                                New York, NY 10020-1104

24

25
```

**A139**

1  Merritt Parkway.  That's all it is.  The notion -- it is not

2  relevant at all to the indictment or to what's being tried

3  here in this courtroom.  And, in fact, the notion -- and I

4  think Mr. Smith recognizes it by switching to impeachment --

5  the fact of impeaching Mr. Eveland with respect on his

6  employment decision with respect to Mr. Litvak it is not

7  relevant.  It has great potential, I think the entire data is

8  with Mr. Eveland, for jury confusion and relevancy.  And this

9  is a prime example of getting far afield from the charge in

10  the indictment and relevant facts to any defense of that

11  indictment.

12          MR. SMITH:  I would note, your Honor, that it is the

13  government's official position as memorialized in a

14  nonprosecution agreement we reviewed yesterday, that at some

15  point in time after this, Jefferies made a determination

16  through its own investigation and lawyers that the conduct

17  was not limited to Mr. Litvak, that numerous others were

18  involved, and that more than one supervisor had knowledge of

19  the conduct.  And that is core proof.

20          THE COURT:  Core proof of what?

21          MR. SMITH:  The environment and culture at Jefferies

22  and the supervisory approval of the tactics.

23          THE COURT:  The culture in poor inner city America

24  is to walk around with guns and shoot people when you feel

25  like it.  And that's what the culture is and everybody does

1    it.  I don't think we'd say it is okay for someone to shoot

2    you.  I don't think it matters what the culture at Jefferies

3    is. It doesn't wipe a way the federal criminal statutes.

4         MR. SMITH:  In terms of the intent to defraud, as

5    your Honor recognizes --

6         THE COURT:  I recognize that, but I haven't heard

7    you say one word this morning about these five documents that

8    go to Mr. Litvak's state of mind.

9         MR. SMITH:  If Mr. Eveland approved these tactics by

10   his actions in taking no further action and Mr. Eveland is

11   the one who is supervising Mr. Litvak --

12        THE COURT:  Let's have documents about what Mr.

13   Eveland did vis-a-vis Mr. Litvak's conduct.  That I'm open

14   to.  I think I told you that.

15        MR. SMITH:  That's what this is, this is

16   circumstantial proof.  The conduct is not distinguishable.

17   There's two basic alleged misrepresentations in the case,

18   your Honor.  There's alleged lies about price, and some of

19   which we've owned in front of the jury, that you say one

20   thing about where you can buy a bond or have bought a bond,

21   and you tell the prospective buyer a higher level.  That

22   conduct -- and, there's several vignettes that we have teed

23   up for today, that conduct was participated in and approved

24   by supervisors, that's the point.  Supervisory approval of

25   the so-called price misrepresentation.

**A141**

1467

```
 1        The second alleged misrepresentation is the
 2   so-called inventory misrepresentation.  That's the one, as
 3   you recall from the Al Vlajinac testimony in Count Five and
 4   the Vladimir Lemin testimony in Count 11, that's when you
 5   say, I'm working an order.  Let me go beat the guy up.  And
 6   falsely portrays, as the government contends, that there is a
 7   seller of the bond.  We have specific examples set up where
 8   supervisors participate in and approve of that identical
 9   tactic.
10        THE COURT:  Involving Mr. Litvak?
11        MR. SMITH:  Not involving Mr. Litvak.
12        THE COURT:  It is not coming in.
13        MR. SMITH:  It is circumstantial evidence that
14   directly goes --
15        THE COURT:  All it tends to prove is Jefferies
16   approved criminal conduct, if we assume it is criminal
17   conduct.  It doesn't go to what I said I would permit
18   evidence of and I thought you were going to offer, that Mr.
19   Litvak's state of mind was that what he was doing wasn't
20   wrong because his supervisors told him it was okay.
21        MR. SMITH:  We have specific examples of that.
22        THE COURT:  Then that's fine.
23        MR. SMITH:  But other examples go to the supervisory
24   approval.  So if the supervisors didn't think that the very
25   same thing, that what Mr. Litvak was doing was fraud and
```

**A142**

1472

```
 1   tend to prove the absence of intent as is required in these
 2   crimes.
 3            As to other people at Jefferies engaging in the same
 4   type of conduct and as to other -- or any supervisor
 5   approving others engaging in the conduct, and by approving I
 6   mean, encouraging, suggesting, leading on, passing upon after
 7   the fact, I find that irrelevant when it does not involve
 8   Mr. Jefferies -- Mr. Litvak.  Because at the end of the day,
 9   as I have said, all of this can only go to state of mind
10   proof.  And if it is something Mr. Jefferies didn't know,
11   then it can't go to a state of mind.  If he's not on the
12   documents, then there's no evidence he knew.  Unless there's
13   a witness who will say he told it to Mr. Litvak or Mr. Litvak
14   said I knew about all of these, we were sitting in a room,
15   et cetera, et cetera.  But without that, I don't see how it
16   is at all relevant under 401 and that's before I even get to
17   a 403 issue of introducing evidence to the jury that
18   effectively, its only purpose, it seems to me, is to suggest
19   that everybody did it and therefore it isn't illegal, or we
20   should feel sympathy for Mr. Litvak because he's the only one
21   of all of other people who did it who is being prosecuted.  I
22   don't believe either of those arguments is an appropriate
23   argument.  Therefore I don't believe the evidence is
24   appropriate.
25            So absent some other foundation, the documents we're
```

**A143**

1473

1   discussing are not coming in and the testimony is not coming

2   in.

3           MR. GLOVER:  And the next --

4           MR. SMITH:  Can we just stick with that one for a

5   second.  I understand that --

6           THE COURT:  Bear in mind, sir, that we have a jury

7   waiting in 18 minutes.  Go ahead and add what you want to

8   add, but --

9           MR. SMITH:  I think that your relevance ruling is

10  cutting off the type of inference you would instruct the jury

11  is an inference that could be drawn circumstantially.  When

12  we were joking in the charging conference about the wet

13  umbrella, the fact that a supervisor approves an identical

14  set of representations that Mr. Litvak is on trial for is

15  circumstantial evidence of approval, right?  That when Mr.

16  Litvak does the same things in the supervisory environment,

17  he lacks the intent to defraud and his state of mind is such

18  that the practice was approved.  And legal and compliance

19  review of that and supervisory approval of that is all

20  relevant to Mr. Litvak's state of mind.

21          THE COURT:  I respectfully disagree.  My ruling is

22  what it was.

23          MR. GLOVER:  Defendant's Exhibit 1229 is a letter

24  from FINRA to Jefferies.  It is simply a letter -- I'm sorry,

25  to Mr. Litvak, indicating that FINRA has completed its

**A144**

1732

1    So to wheel in someone who is willing to testify on

2  kind of general background, that's not expert testimony at

3  all.  That's particularly not useful expert testimony in this

4  case.  It is not for the jury to determine what the legal

5  relationship was principal versus agent.  It is to determine

6  whether or not the misrepresentations were material, and

7  Mr. Wollman's testimony goes to the materiality in his

8  circumstances.

9    They want to create this form over substance world

10  where we're in a principal relationship, then you can lie all

11  you want to your customers because it doesn't matter to them.

12  That's not the world that Mr. Wollman testified her

13  understood himself to be operating in, or Mr. Lemin or Ms.

14  Corso.  So this is just improper expert testimony.

15    THE COURT:  When I reviewed the disclosure of the

16  defendant dated December 24th, I wrote the word "no" next to

17  the first full bullet on page 14.  I will tell you now as I

18  sit here why I still don't believe such testimony is

19  appropriate.  And it goes in part somewhat to the nature of

20  the, quote, disclosure, end quote, as required by the defense

21  of any expert it intends to call.

22    Again, I would normally expect to see, this is the

23  opinion he's going to offer and this is the basis for the

24  opinion and this is what I have looked at to form my opinion.

25    With respect to the first full bullet, which I

**A145**

1733

1  understand to be what has just been addressed by Attorney

2  Smith, there is a statement of, in effect, fact that

3  Jefferies charged no commissions.  This witness is not a fact

4  witness.  If I'm supposed to insert the words it is this

5  witness's opinion that they charged no commissions, I have

6  difficulty because I look and see to the extent this witness

7  has disclosed, or counsel has for him, the basis for that

8  opinion.  I see that he references examination of relevant

9  trade tickets and confirmations indicate that Jefferies was

10 about as a principal and trading for his own account.

11      I believe under Rule 702 that the testimony has to

12 be based on sufficient facts or data.  And this disclosure is

13 deficient in that it does not inform me that his -- if this

14 is an opinion as opposed to a statement of fact, that it is

15 based on sufficient facts or data or that it is a product of

16 reliable principals or methods on that he's applied those

17 principals or methods to the facts which he examined or was

18 asked to examine.

19      When I said he could testify about what terms mean,

20 I meant he could tell us, in effect, at the bottom of 13,

21 what a broker refers to, what a dealer is, what a principal

22 is.  But for him to testify that Jefferies charged no

23 commissions, he is not a fact witness so he has no basis to

24 say that.  If it is that he has an opinion they charged no

25 commissions, I don't believe he has a sufficient basis upon

**A146**

1734

1  which to form that opinion even though it wasn't disclosed as

2  an opinion.

3       As to, you know, words that are jargon that have

4  understandings in the industry based on his experience like

5  "all in" or "on top," he can tell us what his opinion is as

6  to what those terms mean.  And the basis for his opinion, I

7  guess, is his experience as revealed, and that's okay,

8  subject to cross-examination.

9       MR. SMITH:  If I may, your Honor, at the bottom of

10  page 13 in the sub (b) summary of opinions and bases

11  therefore, I think we have language that tee this up in the

12  bullet securities industry and practices that plainly

13  indicates that everything that follows is his expert opinion

14  on the meaning of certain terms.

15       THE COURT:  Meaning of certain terms, I do not

16  include in that phrase, the meaning of certain terms or an

17  opinion about the meaning of certain terms, I do not find the

18  following words to equate to his opinion of the meaning of

19  certain terms, quote, Jefferies charged no commissions on any

20  of the trades referenced in the Indictment.  That is -- in

21  effect, it is a statement of fact.  But as I say, if I read

22  in the words it is his opinion that they charged no

23  commission, I don't think that's the meaning of certain

24  terms.  As to related industry practices, I don't think I

25  have ever said he could opine on that.

**A147**

1735

1    MR. SMITH:  In the prior bullet we do have, which I

2  don't think your Honor had a problem, which is the bottom of

3  13, carrying over to 14.

4    THE COURT:  Yes, sir.

5    MR. SMITH:  That in the scenario when one is acting

6  as principal.  So he could describe what it means for a

7  dealer to trade for its own, acting as principal.

8    THE COURT:  When?  Right.  When acting.

9    MR. SMITH:  When.  And not tie it back to Jefferies.

10    THE COURT:  Right.

11    MR. SMITH:  We'll in closing be able to tie that to

12  Mr. Paradiso's testimony.  So we've got --

13    THE COURT:  I don't know if the Government objects,

14  but I would have trouble with keeping that out.  I mean, I

15  don't know that it's been disputed.

16    MR. SMITH:  I think what he could say is that in a

17  scenario when a broker/dealer is acting as principal, the

18  term commission is inapplicable.  That's what the last

19  sentence of the first bullet says.  And he wouldn't tie it

20  back to Jefferies.

21    THE COURT:  I don't know that it's applicable.  I

22  suppose somebody could agree to it, but I think what he's

23  saying a principal trades in his own account and he doesn't

24  charge a commission.

25    MR. FRANCIS:  I agree.  Those are the definitions of

1736

1    the terms.

2         THE COURT:  You don't disagree with them.  You could

3    stipulate to them, I would assume.

4         MR. FRANCIS:  I suppose we probably could.  The

5    issue here is that's not what they want him for.

6         THE COURT:  I understand.  That doesn't mean that's

7    what they are getting him for.

8         MR. FRANCIS:  As long as we are talking about the

9    same thing then.  I don't think this is a definition at all.

10   They are saying, he's going to define terms.  He's going to

11   take the stand and he's going to opine broadly about the way

12   the world works.  That's not a definition of a word "broker"

13   or "agent" or "dealer" or "principal," that's just telling

14   the jury how it should be because he's a paid expert.

15        THE COURT:  As I said, it's been a long day and I'm

16   tired, but I thought I was very clear.  I have said today and

17   I have said in the past, he would be allowed to testify

18   about, quote, the meaning of certain terms relevant to RMBS

19   trading, end quote, period.  There's a period at the end of

20   that, Attorney Smith, and I hope that if you have any

21   question about what I'm allowing, I would ask you to ask me

22   because you have, on occasion, in my view, maybe mis -- not

23   understood what I thought was appropriate.  So I just want to

24   be sure you know exactly what I am allowing this man to

25   testify to.

**A149**

1983

```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3   _____
     United States of America  )February 28, 2014
 4               Government  )12:39 p.m.
     v.                       )
 5   Jesse C. Litvak          )3:13cr19(JCH)
                 Defendant.   )
 6   _____)

 7

 8                           141 Church Street
                             New Haven, Connecticut

 9              CONTINUED CHARGE CONFERENCE

10

11   B E F O R E:
                   THE HONORABLE JANET C. HALL, U.S.D.J.

12

13   A P P E A R A N C E S:

14   For The Government  :    Jonathan N. Francis
                              Eric Glover
15                            U.S. Attorney's Office-NH
                              157 Church St., 23rd floor
16                            New Haven, CT 06510

17

18   For the Defendant   :
                              Patrick Smith
19                            John Michael Hillebrecht
                              DLA Piper US LLP-NY
20                            1251 Avenue of the Americas,
                              27th Floor
21                            New York, NY 10020-1104

22

23

24

25
```

**A150**

2057

1      THE COURT:  I don't think that's what I do at this

2  stage.  I think what I do is I look at the Indictment because

3  that's what you got and your client got and does it plead

4  this theory.

5      MR. SMITH:  The answer is it clearly it doesn't.

6  The allegations that the Government is pointing to you are

7  allegations with the respect to materiality.  That the

8  information is important.  Not that there was a property

9  right that involved the right to receive honest information

10  so one could make informed economic decisions.

11      THE COURT:  In Voloski which is a recently reported

12  Fed Appendix case, the Defendant Voloski doesn't contest

13  deprivation of the right to control as approved by the Second

14  Circuit.  He contests no such theory was contained in the

15  Indictment.  However he's simply incorrect that the

16  Indictment did not correctly allege a right to control.  In

17  all the fraud counts, the object of the conspiracy is alleged

18  to have been "to obtain money and property and to deprive of

19  potentially valuable information that could have an economic

20  decisions".  We clearly do not have the last phrase of what I

21  quoted to you in this Indictment.  I don't have the

22  indictment in front of me.  It is not the Indictment so much.

23  It is the filing that I wrote certain numbers down on.  But I

24  decided that the way it is pled at least my current decision

25  is to let it go to the jury on this.  I think there's enough

**A151**

2058

1    alleged about false information.  I don't have it in front of

2    me so I don't want to speak.

3          MR. SMITH:  I'm not so sure what your is referring

4    to what we would go about if the theory goes to the jury and

5    is flawed.

6          THE COURT:  You would move for a judgment

7    notwithstanding the verdict.  I would rule at time which

8    might be in your favor in which case they will appeal me.  If

9    I don't rule in your favor and you'll go to the circuit and

10   they will tell them the Government whether the indictment was

11   deficient.  Your issue is preserved.  As I say my judgment

12   right now as I sit here is there's sufficient for it to get

13   to the jury.  My view is such that I have a feeling I may

14   revisit that decision, okay, but right now coming down on the

15   issue, I'm coming down on side that it is going to the jury.

16   If it is going to jury then I'm going to charge them on that

17   theory.  Obviously if I agree with you that it is not the

18   Indictment, this thing comes out.  The Government would

19   agree, right, I can't charge them on theory not in the

20   Indictment so anyway.

21         MR. GLOVER:  I'm not entirely sure in the sense like

22   a gun case, for instance, if you allege possession, you know,

23   you can go to the jury on constructive possession.

24         THE COURT:  That's because as a matter of law

25   constructive possession is possession.

**A152**

2059

1    MR. GLOVER:  Correct.  As a matter of law on the

2    these cases Carlo and --

3    THE COURT:  Depriving of money and property as a

4    matter of law depriving of honest information.

5    MR. GLOVER:  Information is a component of the

6    property so.

7    THE COURT:  Then why did Voloski --

8    MR. GLOVER:  Because they were disposing of the

9    issue.  He's wrong.  We would obviously do it differently.

10   That doesn't me we have to because Voloski said you are

11   wrong.  It is in here.  Here you go.

12   THE COURT:  Again I don't find a lot of case law.  I

13   could be making the wrong judgment.  I may change my mind

14   about my judgment.  Right now my judgment is I'm going to go

15   to the jury because I think there's sufficient.  I can't

16   remember the particular paragraphs.  They may not be

17   sufficient but that was my judgment.

18   MR. SMITH:  Your Honor, if you were to charge this I

19   don't think you should, we have to add language to

20   demonstrate that it was a deprivation of the United States

21   Treasury's right to receive information because they are the

22   victim here.  It is not some person out there.  It is the

23   United States Treasury, so we just have to insert the words

24   United States Treasury somewhere in the formulation up the

25   top of that page.  So we could put it in that last line right

**A153**

2329

```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3    _____
      United States of America  )March 5, 2014
 4              Government       )8:45 a.m.

 5    v.                         )
      Jesse C. Litvak            )3:13cr19(JCH)
 6              Defendant.       )
      _____   )
 7                               )

 8                              141 Church Street
                                New Haven, Connecticut
 9
                      DAY TEN OF TRIAL
10

11    B E F O R E:
                    THE HONORABLE JANET C. HALL, U.S.D.J.
12                  AND JURY OF 15

13

      A P P E A R A N C E S:
14
      For The Government  :     Jonathan N. Francis
15                              Eric Glover
                                U.S. Attorney's Office-NH
16                              157 Church St., 23rd floor
                                New Haven, CT 06510
17

18    For the Defendant   :
                                Michael Chase
19                              Shipman & Goodwin
                                One Constitution Plaza
20                              Hartford, CT 06103-1919

21                              Patrick Smith
                                Sarah B. Zimmer
22                              John Michael Hillebrecht
                                DLA Piper US LLP-NY
23                              1251 Avenue of the Americas,
                                27th Floor
24                              New York, NY 10020-1104

25
```

**A154**

1   own common sense and obviously the law that the judge will

2   give you.

3           The second, this whole notion Mr. Smith protests to

4   a little too much when he said this isn't about other people

5   doing that.  He told you that for 20 minutes, that all these

6   people who do it at Jefferies with Mr. Litvak.  Number one,

7   it is just simply not the case.  When you look at the

8   evidence or review it in the jury room or use your

9   recollection to remember it, who is at the epicenter?

10  Whether it's Mark Plansky or Bill Jennings or anybody else,

11  it is Mr. Litvak.

12          You go back and look at the Vladimir Lemin's

13  transaction.  That's a really disturbing one because Plansky

14  and Litvak certainly know that is an inventory trade.

15  Plansky jumps in and says 53-8, Vladimir.  Yeah, with 8

16  ticks.  It was commission.  Mr. Smith is just wrong.  And

17  that's what Mr. Lemin told you.  In that transaction, Mr.

18  Lemin -- remember, this is one that Mr. Litvak makes up a

19  seller and goes through this long recitation of this

20  negotiation.  And finally, Mr. Lemin says, okay, 53 to me.

21  And the Mr. Plansky jumps in and says 53-8 okay with you,

22  Vladimir?  That's the 8 ticks commission for putting a

23  matchmaker together when there's no matchmaking at all.

24  None.

25          If you go to Government's Exhibit 113, which is in

2472

1    that -- it's Count Eleven, so it's 112, 113.  You can see

2    Plansky and Litvak were kind of yakking up in the chat room

3    sort of in the back.  Plansky is like, oh, I couldn't wait to

4    go in.

5           They all deal with Mr. Litvak.  He's the ringleader.

6    Look at Bill Jennings' deal on Counts One and Two.  Who is

7    running that show?  Mr. Litvak is running the show.  So is

8    the notion that everyone doing it at Jefferies affected his

9    state of mind somehow?  Look at the evidence and see what Mr.

10   Litvak's state of mind of was.  Look at the state of mind of

11   Katie Corso when he sold her a bond.  Think of the state of

12   mind when he backed up the bid and keeps the difference.

13          Think of all that state of mind when he tells one of

14   Jefferies' people no shot whatsoever, F this.  That's his

15   state of mind.  And the state of mind is -- is an excuse for

16   basically, I got pulled over on the highway and nobody else

17   did.  Well, that doesn't cut it out there.  And you will be

18   the decision makers as to whether it cuts in here.  But the

19   judge will tell you that it doesn't.  That whether someone

20   else is, you pay no regard to whoever -- whatever person or

21   entity is not on trial in this case.

22          Your job is to, under oath, take the facts here and

23   the law and apply them to this case to determine whether, in

24   fact, the elements of the offenses have been met that have

25   been charged in the Indictment, securities fraud, TARP fraud

**A156**

1  transaction.

2      It is not a defense to an overall scheme to defraud that

3  Mr. Litvak was not involved in the scheme from the start or

4  played only a minor role with no contact with sellers or

5  purchasers of the securities in question.  Nor do you need to

6  find that Mr. Litvak was the actual seller or offeror of the

7  securities.  It is sufficient if Mr. Litvak participated in

8  the scheme or fraudulent conduct involving the purchase or

9  sale.

10     The government need not prove that Mr. Litvak directly

11  or personally made the misrepresentation or omitted the

12  material fact.  It is sufficient if the government proves

13  that Mr. Litvak caused the statement to be made or the fact

14  to be omitted.  With regard to the alleged misrepresentations

15  and omissions, you must determine whether the statement was

16  true or false when it was made and, in the case of alleged

17  omissions, whether the omission was misleading.

18     If you find the government has proven beyond a

19  reasonable doubt that the statement was false or omitted, you

20  must next determine whether the fact misstated or omitted was

21  material under the circumstances.  A material fact is one

22  which would have been significant to a reasonable investor in

23  making an investment decision.  In order for you to find that

24  a misrepresentation or omission was material, the government

25  must prove beyond a reasonable doubt that a reasonable

**A157**

2519

1    prove, however, that he was aware of the generally unlawful

2    nature of his acts, and that his acts were not due to

3    negligence, inadvertence, or mistake.

4        To act with intent to defraud here means to act

5    willfully and with the specific intent to deceive.  An act is

6    intentional only if it is deliberate and purposeful.  That

7    is, to be intentional, Mr. Litvak's acts must have been the

8    product of his conscious objective, rather than the product

9    of mistake or accident.  The misrepresentation or omission

10   must have had the purpose of inducing the victim of the fraud

11   to undertake some action.

12       The question of whether Mr. Litvak acted knowingly,

13   willfully, and with intent to defraud is a question of fact

14   for you to determine, like any other fact question.  The

15   question involves Mr. Litvak's state of mind.

16       Direct proof of knowledge and fraudulent intent is

17   almost never available.  It would be a rare case where it

18   could be shown that a person wrote or stated that, as of a

19   given time in the past, he committed an act with fraudulent

20   intent, but I instruct you that such direct proof is not

21   required in this case.

22       Knowledge and intent may be proved by circumstantial

23   evidence, based upon the person's outward manifestations, his

24   words, his conduct, his acts, and all the surrounding

25   circumstances disclosed by the evidence and the rational or

**A158**

2527

1    concealment of material facts, and the expression of an

2    opinion not honestly entertained may constitute false or

3    fraudulent representations.  The false or fraudulent

4    representation must relate to a material fact or matter.  A

5    material fact is one which would reasonably be expected to be

6    of concern to a reasonable and prudent person in relying upon

7    the representation or statement in order to make an

8    investment decision.  This means that if you find a

9    particular statement of fact to have been false, you must

10   then determine whether that statement was one that a

11   reasonable person might have considered important in making

12   his or her decisions.  The same principal applies to

13   fraudulent half truths or admissions of material facts.  In

14   addition to proving that a statement was false or fraudulent

15   and related to a material fact, the government must prove

16   beyond a reasonable doubt that the alleged scheme

17   contemplated a deprivation of money or property.  Such a

18   contemplated deprivation of money or property can include a

19   deprivation of material information necessary to make

20   discretionary economic decisions.  It is not necessary,

21   however, that Mr. Litvak originated the alleged scheme, nor

22   is it necessary that he actually realized any gain from the

23   scheme or that the United States or Troubled Asset Relief

24   Program actually suffered any loss.

25              The five transactions that the government alleges

**A159**

1   as to that count.  However, if you find the government has

2   proven beyond a reasonable doubt the first element, then you

3   should proceed to consider the second element on which I'll

4   now charge you.  The second element of the crime charged in

5   Counts Thirteen through Sixteen is that Mr. Litvak's alleged

6   statement or representation was material.  A false statement

7   is material if it has a natural tendency to influence or is

8   capable of influencing the decision of a reasonable decision

9   maker in a matter within the jurisdiction of the United

10  States government.  However, proof of actual reliance on the

11  statement by the decision maker is not required.  If you find

12  that as to a count of a making a false statement in a matter

13  within the jurisdiction of the United States government, the

14  government failed to prove beyond a reasonable doubt this

15  second element, that the statement was material, then your

16  deliberation is finished and you must return a verdict of not

17  guilty as to that count.  However, if you find that the

18  government has proven beyond a reasonable doubt this second

19  element as well as the first element on that count, then you

20  should proceed to consider the third element on which I will

21  now charge you.  The third element of the crime charged in

22  Counts Thirteen through Sixteen is that the statement or

23  representation was false, fictitious or fraudulent.  A

24  statement or representation is false or fictitious if it was

25  untrue when made and known at the time to be untrue by the

**A160**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:13CR19(JCH) |
| | : | |
| v. | : | |
| | : | |
| JESSE C. LITVAK | : | May 12, 2014 |

**GOVERNMENT'S MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY


JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov

ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT23923
eric.glover@usdoj.gov

157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

**A161**

the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (citation omitted). The "government need not negate every theory of innocence" to defeat a Rule 29(c) motion. *Autuori*, 212 F.3d at 113; *Candelario*, 2012 WL 2597559, at *2. "If the Court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Autuori*, 212 F.3d at 113 (citations omitted).

Under this standard, when viewed in its totality, in the light most favorable to the prosecution and drawing all inferences in favor of the Government, the evidence was plainly sufficient for any reasonable jury to find Litvak guilty beyond a reasonable doubt on all counts.

## B. The Evidence At Trial Proved The Materiality Of Litvak's Lies

Litvak argues that the Government failed to prove the materiality of his admitted lies, claiming that they "simply would not (and should not) have mattered to reasonable sophisticated institutional investors who care principally about price and yield." Litvak Mem. at 6. In fact, the trial established that his misrepresentations were material exactly because they affected bond prices and trade negotiations to the detriment of his victims.

In the context of securities fraud and TARP fraud,[1] materiality is neither the same as "but-for" causation, nor reliance; it requires only "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 ("it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made") (2d Cir.

---

[1] *But see United States v. Merrill*, 685 F.3d 1002, 1012 (11th Cir. 2012) (applying § 1001 materiality standard in § 1031 procurement fraud case).

2000) (internal quotation marks omitted).  For purposes of § 1001, any statement is material to the Government if it has "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *United States v. Gaudin*, 515 U.S. 506, 509 (1995).  However, proof of actual reliance on the statement by the Government is not required.  *United States v. McBane*, 433 F.3d 344, 350 (3d Cir. 2005) ("It is also clear that a statement may be material even if no agency actually relied on the statement in making a decision."); *United States v. Rogers*, 118 F.3d 466, 472 (6th Cir. 1997) ("The statement need not actually influence the agency, but it must have the capacity to do so.").

### 1.       Litvak's Misrepresentations Were Material to His Customers

#### a.       Litvak's victims testified to materiality

The most straightforward evidence of materiality was the trial testimony of Litvak's direct victims.  As the Court will recall from the trial, Litvak misrepresented facts which affected the price his victims agreed to, namely the supposed price that Jefferies had reached with the party on the "other" side of the transaction.  *See, e.g.,* Trial Transcript [hereinafter "Tr."] 1225:4-10 (Corso:  deal was that "Litvak was making eight ticks in the spread between the buy and sell as an explicit arrangement with [her]," not that he "could keep whatever he wanted for the amount he sold [her] bond for."); 974:10-21 (Wollman:  understood Litvak had "an agreement with me whereby [he] will facilitate the transfer of a security at a price where that price reflects the cost that [he had] paid to acquire it plus a fair market spread . . . .  Since [he is] not taking any risk, typically that spread is on the order of a few ticks . . . ."), 975:13-22 (Wollman:  "That price -- and that's sort of why these chats, I guess, exist is that it's clear what -- how that price was derived.  That price was derived as a price that you go and source it and then a commission on top.").  Litvak's victims in these deals flatly stated that the false factual information that Litvak provided to them mattered to them and affected their negotiations.

- 4 -

**A163**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 13-CR-19 (JCH) |
| | : | |
| JESSE C. LITVAK, | : | JULY 2, 2014 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL**
**AND FOR NEW TRIAL (Doc. No. 237)**

**I.      INTRODUCTION**

On March 7, 2014, defendant Jesse C. Litvak was convicted of ten counts of

securities fraud, one count of Trouble Asset Relief Program ("TARP") fraud, and four

counts of making a false statement in a matter within the jurisdiction of the U.S.

government.  Litvak now moves for a judgment of acquittal pursuant to Rule 29 of the

Federal Rules of Criminal Procedure.  In the alternative, Litvak moves for a new trial

pursuant to Rule 33.

For the reasons set forth below, Litvak's Motions for a Judgment of Acquittal and

for a New Trial (Doc. No. 237) as well as his pending Motion for Directed Verdict (Doc.

No. 212) are **DENIED**.

**II.     BACKGROUND**

On January 25, 2013, a federal grand jury returned a sixteen-count indictment

against Litvak, charging him with securities fraud, in violation of 15 U.S.C. §§ 78j(b) &

78ff (Counts One through Eleven); TARP fraud, in violation of 18 U.S.C. § 1031 (Count

Twelve); and making false statements in a matter within the jurisdiction of the U.S.

government, in violation of 18 U.S.C. § 1001 (Counts Thirteen through Sixteen).

Indictment (Doc. No. 1) ¶¶ 27-60.  The Indictment alleged that Litvak, a licensed

securities broker and former senior trader and managing director at Jeffries & Co., Inc. ("Jeffries"), defrauded six Public-Private Investment Funds ("PPIFs") and at least fourteen privately funded entities by making misrepresentations in the purchase and sale of residential mortgage-backed securities ("RMBS"). Id. ¶¶ 1, 11-12 & 33-34. In particular, the Indictment alleged that, as part of his scheme to defraud, Litvak lied about the price at which seller and buyer agreed to sell and buy a security through Jeffries in bid list and order trades, id. ¶ 36, and invented nonexistent sellers with whom Litvak would pretend to negotiate on victims' behalf in inventory trades, where Jeffries already held the security, id. ¶ 47; and that, through this scheme, Litvak increased the profitability of the charged trades, id. ¶¶ 32, 33(a), 34, 36 & 47.

On February 17, 2014, the day before trial, the government moved to dismiss Count Seven, which Motion the court granted. The government's evidence at trial consisted of: (1) time-stamped verbatim online chats ("Bloomberg chats") showing communications between Litvak, co-workers at Jeffries, and victims; (2) trade tickets showing the price at which Jeffries bought and sold a given security; (3) testimony by a Bloomberg employee, Adam Wolf, and a custodian at Jeffries, Tracy Lincoln, as to the nature and accuracy of the Bloomberg chats; (4) testimony by another Jeffries employee, Al Paradiso, as to the accuracy of the trade tickets; (5) testimony by Thomas Carocci of the Financial Industry Regulatory Authority ("FINRA") as to the Series 7 examination passed by Litvak; (6) testimony by victims—Michael Canter of AllianceBernstein, Alan Vlajinac of Wellington Management Company ("Wellington"), Brian Norris of Invesco, Joel Wollman of QVT Financial, Vladimir Lemin of Magnetar, and Katherine Corso of York Capital—as to their negotiations with Litvak and the impact

2

A165

of his lies on trade execution; (7) testimony by David Miller, former Chief of Investment for the Office of Financial Stability at Treasury, describing the Public-Private Investment Program ("PPIP") through which the PPIFs were established; and (8) testimony by Special Agent James O'Connor of the Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), who investigated Litvak following Canter's report to Treasury of possible fraud in connection with securities transactions between Litvak and AllianceBernstein, one of the PPIFs.

On February 26, 2014, at the close of the government's case, Litvak moved for a judgment of acquittal pursuant to Rule 29(a). See Oral Motion for Directed Verdict (Doc. No. 212); Def's Trial Mem. in Supp. of Mot. for J. of Acquittal (Doc. No. 210). The court reserved pursuant to Rule 29(b). On March 5, the case was submitted to the jury. On March 7, the jury returned a verdict of guilty on all remaining counts: Counts One through Six and Eight through Eleven of securities fraud; Count Twelve of TARP fraud; and Counts Thirteen through Sixteen of making false statements. See Verdict (Doc. No. 229). Following the jury's verdict, Litvak filed the instant post-trial Motions.

## III.   MOTION FOR JUDGMENT OF ACQUITTAL

### A.   Legal Standard

Rule 29 requires the court, upon motion by the defendant, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). However, in challenging the sufficiency of the evidence supporting his conviction, "the defendant faces an uphill battle, and bears a very heavy burden." United States v. Mi Sun Cho, 713 F.3d 716, 720 (2d Cir. 2013) (citation and internal quotation marks omitted). In deciding such a motion, the court must view the evidence in the light most favorable to the government, draw all inferences in favor of

the government, and defer to the jury's assessment of the witnesses' credibility.  United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008).  The jury verdict should stand so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Mi Sun Cho, 713 F.3d at 720 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  In deciding a Rule 29 motion, "the evidence must be viewed in its totality, as each fact may gain color from others," and the court must exercise care not to substitute its determination of the weight of the evidence, and of the reasonable inferences to be drawn therefrom, for that of the jury.  United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005).

B.    Securities Fraud

To convict Litvak of the crime of securities fraud charged in Counts One through Six and Eight through Eleven, the jury had to find that the government had proven beyond a reasonable doubt the following three elements:

(1) In connection with the purchase or sale of the security identified in that count, [ ] Litvak—

(a) employed a device, scheme, or artifice to defraud, or

(b) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

(2) [he] acted willfully, knowingly, and with the intent to defraud; and

(3) [he] knowingly used, or caused to be used, the mails or any means or instruments of transportation or communication in interstate commerce in furtherance of the fraudulent conduct.

Jury Charge (Doc. No. 225) at 46; see 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5 ("Rule 10b-5"); 3 Leonard B. Sand et al., Modern Federal Jury Instructions:  Criminal,

4

**A167**

Instruction 57-20. Litvak contests the sufficiency of the evidence as to the first and second elements, specifically, the government's proof of materiality and intent to defraud.

        1.     Materiality

To find that the government had proven beyond a reasonable doubt the first element of securities fraud, the jury had to find that Litvak's lies were material under the circumstances. In the context of securities fraud, materiality means that Litvak's lies "would have been significant to a reasonable investor in making an investment decision," that is, that his lies "significantly altered the total mix of information available." Jury Charge at 49; see United States v. Vilar, 729 F.3d 62, 88-89 (2d Cir. 2013) ("[T]he long-established law of [this] Circuit . . . is that, when the government (as opposed to a private plaintiff) brings a civil or criminal action under Section 10(b) and Rule 10b–5, it need only prove, in addition to scienter, materiality, meaning a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision, and not actual reliance."); Ganino v. Citizens Utilities Co., 228 F.3d 154, 161-62 (2d Cir. 2000) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); 3 Sand et al., supra, Instruction 57-21. The court's full instruction on materiality was lengthy in light of the importance of this element to this case. See Jury Charge at 49-50.

In arguing that proof of materiality is lacking, Litvak claims that his lies could not have been material, given that his victims were professional investment managers and that, in the RMBS market at issue, they rarely had access to the information about which Litvak lied. See Def.'s Mem. in Supp. of Mot. for J. of Acquittal ("Def.'s Mem.") (Doc. No. 237-1) at 13-16. The government does not contest these facts, only the

conclusion that Litvak argues one must necessarily draw from them that trade execution and transaction costs are per se incidental, i.e., not material, to such investors.

Litvak has offered this argument regarding the insignificance of his lies to sophisticated investors in the RMBS market several times, including in his pretrial Motion to Dismiss the Indictment (Doc. No. 52). However, there is no bright-line test for materiality, which is a mixed question of fact and law for the jury. TSC Indus., 426 U.S. at 450. Thus, the court left this determination, in the first instance, to the jury. The same argument presented by Litvak here was presented to the jury at trial, and the jury clearly rejected it in their verdict.

Having reviewed the record, the court concludes that the trial evidence sufficiently supported a finding of materiality. First and foremost, Litvak's victims testified that his lies mattered to them because his lies affected the price they paid for the underlying securities. For example, Michael Canter of AllianceBernstein, one of the PPIFs, testified that Litvak's lies about cost and compensation harmed the fund's bottom line—that is, that the amount above what Litvak agreed to take as compensation should have gone to the PPIF, that a higher acquisition cost made the investment less profitable, and that, had Canter known the true acquisition price for the security and how much compensation Litvak was actually taking "on top," he would have sought to negotiate a better deal for the PPIF. Trial Tr. at 423-29. Other victims testified to similar effect. Id. at 787-88 (Vlajinac), 870-78 (Norris), 1086 (Lemin), 954-55 (Wollman) & 1199-1200 (Corso). One after the other, these victims testified that the false price information given to them by Litvak—information to which they conceded they typically did not have access in the RMBS market—became part of their calculations and

6

**A169**

influenced their negotiations with Litvak; that Litvak's actual compensation (measured in 1/32s of a dollar referred to as "ticks") not only contravened their explicit agreements with him but also went, in some cases, well beyond the normal range of compensation to a broker of four to eight ticks; and that they would not knowingly have agreed to compensate such amounts "on top" for the bid list and order trades and certainly would not knowingly have agreed to additional compensation for inventory trades. As one victim attested, "every tick counts." Id. at 878 (Norris).

Moreover, the Bloomberg chats showed protracted negotiations over price, and a rational jury could have inferred materiality from the lengths to which Litvak went to deceive his victims. Michael Canter testified that, upon discovering Litvak's lies and confronting him, Litvak apologized and explained that "it was a hard year and guys were doing whatever they needed to make money." Id. at 388. A rational jury could have inferred that Litvak himself lied in order to make money and that, absent a potential profit, he would not have provided false information to his victims.

As Litvak stresses, and as is undisputed by the government, unlike the stock market, the RMBS market is not transparent, and Litvak's victims, all finance professionals, chose which bonds to invest in based on sophisticated yield models.[1] In Litvak's view, such facts necessarily render his lies immaterial. The court disagrees. While these victims had other powerful investment tools, and while buyer and seller in

---

[1] The lack of transparency in the RMBS market and the nature of LItvak's negotiations with his victims also distinguish the instant case from Feinman v. Dean Witter Reynolds, Inc., 84 F. 3d 539 (2d Cir. 1996), which dealt with the stock market. There, while the transaction fees, as contained on the trade confirmations, were claimed not to reflect actual costs, the fees were correctly stated, and the market was not otherwise alleged to have been distorted as a result. Id. at 541-42. Here, in contrast, the transaction costs for bid list and order trades—as agreed-upon markups or commissions in numbers of ticks—were embedded in the price, and the evidence showed that price was a heavily negotiated term and that the markups Litvak represented himself to be taking were false.

this market ordinarily lack access to the other's price information, there was ample evidence at trial that, in misstating his acquisition price in bid list and order trades and holding himself out to be buying from a fictional seller in inventory trades, Litvak exploited the opacity of the RMBS market to his victims' detriment and to Jeffries' and his own advantage.

Taken together, this evidence was sufficient to support a finding of materiality. Thus, the court concludes that, as to the first element of securities fraud, the jury's verdict has an adequate evidentiary basis.

2.      Intent to Defraud

Litvak next challenges the sufficiency of the proof as to the second, or <u>mens rea</u>, element of securities fraud, arguing that the government failed to prove intent to defraud.  In the context of securities fraud, "[t]o act with 'intent to defraud' means to act willfully and with the specific intent to deceive."  Jury Charge at 52; <u>see United States v. Vilar</u>, 729 F.3d 62, 93 (2d Cir. 2013); <u>United States v. Kaiser</u>, 609 F.3d 556, 570 (2d Cir. 2010); <u>United States v. Schlisser</u>, 168 F. App'x 483, 486 (2d Cir. 2006); 3 Sand et al., <u>supra</u>, Instruction 57-24.

In challenging the sufficiency of the proof as to his intent to defraud, Litvak would have the court rewrite the jury charge to require proof, in addition, that he acted "<u>for the purpose of causing [his victims] some financial loss</u>."  Def.'s Mem. at 18 (emphasis added).  Litvak argued for including this language several times.[2]  In the court's view, such language misstates the requisite <u>mens rea</u>.  <u>Vilar</u>, 729 F.3d at 93 (rejecting that

_____

[2] Litvak recapitulates here his argument that the government elected, in the "speaking" portions of the Indictment, to proceed exclusively on a theory of economic loss.  Def.'s Mem. at 12 (citing Indictment ¶ 29).  While the Indictment includes a loss allegation, the court does not share Litvak's view that this allegation transformed the intent element of the crime of securities fraud charged.

intent to defraud requires intent to steal in securities fraud).  However, having been directed by Litvak to a Sixth Circuit case, United States v. DeSantis, 134 F.3d 760 (6th Cir. 1998), the court inserted into the jury charge on "intent to defraud" broader language, as follows:  "The misrepresentation or omission must have had the purpose of inducing the victim of the fraud to undertake some action."  Jury Charge at 52; see DeSantis, 134 F.3d at 764 ("[T]he misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission.").

The circumstantial evidence at trial adequately supported a finding of intent to defraud, as charged by this court.  The government introduced numerous Bloomberg chats demonstrating that Litvak knowingly lied and benefitted as a result.  For example, there was evidence that Litvak knew the actual price at which the seller was selling the HVMLT bond to Jeffries and yet misrepresented and inflated the price when selling the bond to Michael Canter of AllianceBernstein.  Gov't's Exs. 13A & 17.  There was evidence, including Special Agent O'Connor's testimony and Litvak's own apology to Canter, that the lies made the charged trades more profitable and that this increased profitability was a motive for Litvak's lying.  Trial Tr. 388 (Canter); 1399-1423 (O'Connor).  Further, a rational jury could have inferred from the fact that Litvak misrepresented price information characteristically unavailable in the RMBS market that his purpose in providing this information was to induce his victims to agree to the price he was representing as the actual price from the counterparty and not to engage in further negotiation, as they might otherwise have done, absent the lie.

9

Such evidence sufficed to support a finding that Litvak acted with the intent to defraud. Litvak's challenge to the sufficiency of this evidence relates only to the asserted lack of proof that he intended to cause his victims a financial loss. The intent element of securities fraud, however, requires no such proof. Vilar, 729 F.3d at 93.[3] Evidence that Litvak's victims were satisfied with the price at the time and unaware of a better price elsewhere does not negate proof that his lies were the product of a conscious objective and had the purpose of inducing victims into accepting his made-up prices. A rational jury could have concluded that, absent Litvak's lies, his victims could have negotiated a better deal with him.

Having reviewed the trial record, the court determines that there was sufficient evidence for a rational jury to convict Litvak of Counts One through Six and Eight through Eleven of securities fraud and that the jury's verdict on these counts must, accordingly, stand.

C.    TARP Fraud

To convict Litvak of the crime of TARP fraud charged in Count Twelve, the jury had to find that the government had proven beyond a reasonable doubt the following four elements:

> (1) There was a scheme or artifice to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises, as charged in the Indictment;

---

[3] The trial evidence may also be sufficient to support a finding of intent to cause financial loss. However, the court did not charge the jury as to financial loss because, in the court's view, such instruction is not required for securities fraud. Further, the concept of financial loss is ambiguous under the circumstances of this case, and an instruction as to financial loss risked confusing the jury by conflating long-term soundness of the investments with immediate injuries in connection with the process of negotiating and executing a given trade. There is no dispute that Litvak's scheme pertained only to the latter, that is, trade execution, and not to whether the RMBS bonds were ultimately profitable.

10

**A173**

(2) This scheme or artifice took place in a form of Federal assistance, including either through the Troubled Asset Relief Program (or "TARP"), an economic stimulus, recovery, or rescue plan provided by the government, or through the Government's purchase of a troubled asset as defined in the Emergency Economic Stabilization Act of 2008;

(3) [ ] Litvak executed or attempted to execute this scheme or artifice (as set forth in paragraphs 1 and 2 above) knowingly, willfully, and with specific intent to defraud; and

(4) The value of such form of Federal assistance, or any constituent part thereof, was at least one million dollars ($1,000,000).

Jury Charge at 59; <u>see</u> 18 U.S.C. § 1031(a); <u>cf.</u> Sand et al., <u>supra</u>, Instruction 18-8.[4]  As with securities fraud, Litvak challenges the proof of materiality and intent to defraud, under the first and third elements of TARP fraud, respectively.  In addition, Litvak challenges the proof of the second element—that is, that Litvak's scheme took place in a form of federal assistance.

    1.    Materiality

To find that the government had proven beyond a reasonable doubt the first element of TARP fraud, the jury had to find that Litvak's lies related to a material fact or matter, that is, "a fact or matter which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement to make an investment decision."  Jury Charge at 60.[5]

---

[4] This court appears to be the first to have charged a jury on TARP fraud under the Major Fraud Statute, as amended in 2009.  The standard Sand charge is tailored to procurement fraud.  The court substantively modified this charge to address the circumstances of the instant case, which are specific to the PPIFs established under TARP.

[5] Although the wording of the materiality instruction here differs from the court's instructions on materiality under securities fraud and false statements, this language largely tracks the standard language in Sand and in the parties' proposed jury instructions.  See 1 Sand et al., <u>supra</u>, Instruction 18-10; Gov't's Proposed Jury Instructions (Doc. No. 92) at 39 ("A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision (e.g., with respect to a proposed investment)."); Def.'s Revised Proposed Jury Instructions (Doc. No. 183) at 55 ("A material fact is one which would reasonably be expected to be

11

**A174**

The transactions alleged to constitute TARP fraud in Count Twelve are the same as those alleged to constitute securities fraud in Counts One through Five. The same proof supporting a finding of materiality in securities fraud, see Part III.B.1, supra, suffices to support a finding of materiality under TARP fraud as well. From such evidence—particularly, the PPIF managers' testimony—the jury could reasonably have found that Litvak's lies concerning price were capable of influencing the PPIFs' negotiations and, hence, that his lies related to facts which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement to make a decision. Trial Tr. at 423-29 (Canter), 787-88 (Vlajinac) & 870-78 (Norris).

In challenging the proof of materiality, Litvak argues that his lies could not have mattered to Treasury because, under PPIP, decision-making authority over these investments was delegated to PPIF managers, who were not required to report to Treasury, and did not report to Treasury, brokers' markups or commissions on trades. Def.'s Mem. at 10. Of course, in the RMBS market, such information is ordinarily inaccessible to anyone but the broker. While Litak and the government each characterize Treasury's role relative to the PPIFs somewhat differently, this issue relates, in the court's view, not to materiality but to the second element of TARP fraud— that is, whether the trades took place in a form of federal assistance.

For purposes of TARP fraud, materiality requires only that the facts about which Litvak lied be the sort that reasonably would be expected to matter to a reasonable and

---

of concern to the United States Treasury in relying upon the representation or statement."). The court circulated a draft containing similar language on February 7 and this exact language on March 2. On neither occasion did the parties object or propose other language regarding materiality under TARP fraud.

prudent person in relying upon these facts to make a decision, in this case, as to the purchase of a given security at a given price. Taken as a whole, the trial evidence was sufficient to support the jury's finding of materiality.

### 2. In a Form of Federal Assistance

With respect to the second element of TARP fraud, the jury had to find that Litvak's scheme took place in a form of federal assistance, including through TARP or the government's purchase of any troubled asset as defined in the Emergency Economic Stabilization Act of 2008 ("EESA"). Jury Charge at 62; see 18 U.S.C. § 1031(a); cf. 1 Sand et al., supra, Instruction 18-12. Litvak argues that, whereas the government's investment in the PPIFs qualified as the government purchasing a troubled asset, subsequent purchases of RMBS bonds by the PPIFs did not, because such purchases were not within Treasury's control. Litvak claims that his lies thus necessarily fell outside the scope of section 1031. The court disagrees.

It fell to the jury to determine whether the government had proven beyond a reasonable doubt that Litvak's scheme took place in a form of federal assistance. The court charged the jury on the law, as follows:

> [U]nder EESA, the Secretary of the Treasury may establish "vehicles that are authorized, subject to supervision by the Secretary, to purchase, hold, and sell troubled assets." EESA defines public-private investment funds (or "PPIFs") as financial vehicles established by the Federal government and funded by a combination of funds from private investors and funds provided by the Secretary or appropriated under EESA. These vehicles were created to purchase troubled assets.

> PPIF managers are required to retain all books, documents, and records relating to the PPIFs, including electronic messages. And the Special Inspector General of the Troubled Asset Relief Program (or "SIGTARP") of the Department of Treasury may access all books and records of the PPIFs, including all records of financial transactions. It is the duty of SIGTARP to conduct and coordinate audits and investigations of the

13

**A176**

purchase, management, and sale of troubled assets by the Secretary of the Treasury under the TARP program.

EESA defines "troubled assets" as including residential or commercial mortgage-backed securities originated or issued on or before March 14, 2008, the purchase of which the Secretary of the Treasury determines promotes the stability of the financial markets.

Jury Charge at 62; see 12 U.S.C. §§ 5202, 5211, 5231 & 5231a.

David Miller testified at length about the PPIFs based on his experience as former Chief of Investment for the Office of Financial Stability at Treasury. In particular, Miller testified that that Treasury set up the PPIFs, devised their form, selected their managers, dictated which types of assets they could buy and sell, and oversaw their performance. Trial Tr. at 161-64 & 201-02. In addition, PPIF managers attested to their understanding that they owed fiduciary duties to the government, that they were investing on the government's behalf, and that they were bound by rules imposed by Treasury. Id. at 392 (Canter), 773 & 779 (Vlajinac). Miller testified as well to the extent of Treasury's supervisory authority, which included the ability to get trade-level data from the PPIFs, stating that Treasury's goal in establishing such oversight was to prevent fraud, waste, and abuse. Id. at 162-63. Taken together, such evidence was sufficient to support a finding that the charged trades took place in a form of federal assistance.

In challenging the government's proof of this element of TARP fraud, Litvak relies heavily on Miller's testimony, on cross-examination, that "subsequent purchases by the PPIF managers . . . were not government acquisitions of the troubled asset." Trial Tr. at

14

A177

192.  However, this testimony must be read in light of the record as a whole.[6]  While it is

arguably helpful to Litvak in isolation, in the context of the court's instruction on the law

and the weight of the other trial evidence—including the other substantial testimony by

Miller himself—the jury reasonably could have discounted this testimony, crediting those

parts of Miller's testimony with which it is arguably at odds.  United States v. O'Connor,

650 F.3d 839, 855 (2d Cir. 2011) ("'It is the province of the jury and not of the court' to

determine whether a witness who may have been 'inaccurate, contradictory and even

untruthful in some respects' was nonetheless 'entirely credible in the essentials of his

testimony.'" (quoting United States v. Tropiano, 418 F.2d 1069, 1074 (2d Cir. 1969),

cert. denied, 397 U.S. 1021 (1970))).  Furthermore, the statute does not limit in which

forms of federal assistance the scheme must be found to have taken place.  18 U.S.C. §

1031(a) ("any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other

form of Federal assistance, including [TARP] . . . or the government's purchase of any

trouble asset" (emphasis added)).  Even assuming the jury construed Miller's isolated

---

[6] Miller's testimony here came at the end of a series of questions focused on a SIGTARP audit report that discusses the selection of PPIF managers.  Def.'s Ex. 920.  As explained in that Report, Treasury determined that, because it established the PPIFs as limited partnerships, they were "investment counterparties" rather than contractors or financial agents and were therefore exempt from the Federal Acquisition Regulation ("FAR").  Id. at 29-30.

This legal determination regarding the application of FAR to Treasury's selection of PPIF managers is of limited relevance to Litvak's criminal case.  Nothing in the report mentions, let alone prevents, prosecution of fraud in connection with the PPIFs' purchases of RMBS bonds.  Further, as to whether such purchases constitute federal assistance for purposes of criminal liability under section 1031, the language of the Major Fraud Statute—"any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance," 18 U.S.C. § 1031(a)—is clearly meant to be broad and inclusive.  The use of "any" undercuts the argument for imposing a narrowing construction.  Salinas v. United States, 522 U.S. 52, 57 (1997); cf. Fischer v. Untied States, 529 U.S. 667, 678 (construing similar language in section 666 as "reveal[ing] Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs").

Moreover, Miller, who is not a lawyer and was not qualified as an expert witness, disclaimed having any personal knowledge of this audit report, and the court instructed the jury that, where a witness like Miller testifies about the law, such testimony should be regarded only as his understanding and must be disregarded if it differs from the court's detailed instructions on the law at the end of the trial.  Trial Tr. at 145.

testimony here as credible evidence that the charged trades did not qualify as the government's purchase of troubled assets, the totality of evidence was sufficient to support a finding that these trades transpired in a form of federal assistance, whether a form enumerated in the statute or some "other form of Federal assistance." Id.

It is undisputed that Treasury left day-to-day investment decisions to the PPIF managers and that, although subject by law to more stringent oversight, the PPIFs were designed to look like private funds. Trial Tr. at 161-62, 174, 176-79 (Miller). Further, with respect to at least one transaction, there was some evidence that an RMBS bond purchased by a PPIF manager might have been allocated between the PPIF and another non-PPIF account. Id. at 1564-65. Litvak argues from these facts that construing section 1031 to reach his lies would allow trades to become crimes after the fact, depending on how the PPIF manager allocated the money. Def.'s Mem. at 27-28. While the court is mindful of the potentially broad scope of forms of federal assistance cognizable under section 1031, Congress clearly limited the reach of section 1031 by requiring both that this federal assistance have a minimum value of $1 million and that the fraudulent scheme be executed knowingly, willfully, and with specific intent to defraud. Because the issue raised here by Litvak concerns, in reality, the latter element—not whether Litvak's scheme was in a form of federal assistance but whether he knew it was—the court addresses the issue under proof of intent. See Part III.C.3, infra.

As to the second element of TARP fraud, upon review of the record, the court concludes that there was sufficient evidence, even in the face of Miller's arguably

16

**A179**

conflicting testimony, to support a finding that Litvak's scheme took place in a form of federal assistance.

    3.   <u>Mens</u> <u>Rea</u>

To find that the government had proven beyond a reasonable doubt the third, or <u>mens</u> <u>rea</u>, element of TARP fraud, the jury had to find that Litvak acted knowingly, willfully, and with specific intent to defraud. Jury Charge at 64. Litvak challenges the proof of both knowledge and intent to defraud.

As amended in 2009, the Major Fraud Statute reads, in pertinent part:

Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

(1) to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any . . . form of Federal assistance . . shall [be guilty of a crime].

18 U.S.C. § 1031(a). In this case, the government elected to proceed exclusively under the second of the two alternative intent prongs.

    a.   Knowledge

With respect to the knowledge required under TARP fraud, the issue is one of first impression. The court construed "knowingly" to extend to the part of the statute that follows the two specific intents. As the court instructed the jury, Litvak's knowledge must have encompassed the fact that the scheme took place in a form of federal assistance. Jury Charge at 64-65. In challenging the proof of knowledge, Litvak argues that the evidence was lacking that he knew that his counterparties were transacting for the government and that, possibly in some cases, their trading status could even have

been decided after the fact, if they allocated a bond to different PPIF and non-PPIF accounts. Def.'s Mem. at 27-28.

There was ample evidence, however, that the execution of Litvak's <u>scheme</u> in trades involving PPIF money was not unwitting or accidental but knowing, regardless of any speculation as to the one individual trade, which might have been allocated between PPIF and non-PPIF accounts after the fact. The Bloomberg chats showed Litvak discussing PPIP and the PPIF managers by name, <u>see, e.g.</u>, Gov't's Exs. 303, 306R, 314R & 337, and Michael Canter of AllianceBernstein testified that he had explicit conversations with Litvak about the PPIFs, Trial Tr. 360-64, 366-67.[7]

Such evidence was sufficient to support a finding that Litvak knowingly executed the scheme in a form of federal assistance.

### b. Intent to Defraud

With respect to intent to defraud, the court instructed the jury that, in the context of TARP fraud, "to act with 'intent to defraud' means to act willfully and with the specific intent to deceive, for the purpose of depriving another of money or property, including material information necessary to make discretionary economic decisions." Jury Charge at 64. Based on the same circumstantial evidence supporting a finding of intent to defraud under securities fraud, <u>see</u> Part III.B.2, <u>supra</u>, the jury reasonably could have found that Litvak's lies were made for the purpose of depriving his victims of money or property, including material information necessary to make discretionary economic decisions. In effect, Litvak challenges not proof of intent to defraud, as that element

---

[7] Indeed, Canter testified to yelling at Litvak when confronting him about his lies: "Are you freaking crazy doing this to the United States Treasury Department. Because of this, I'm going to have to report this." <u>Id.</u> at 390.

was charged by this court, but the charge itself, which Litvak would rewrite to require proof that his lies "were made for the purpose of deceiving and economically harming the United States government specifically." Def.'s Mem. at 28. The "intent to defraud" instruction under TARP fraud was the subject of extensive discussion at the charge conference, and the court's charge on this element reflects its considered view of the law in this Circuit.[8]

As already noted, the amended Major Fraud Statute provides for two alternative specific intents: "intent—(1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1031(a). The government chose to proceed solely under the money or property prong. However, the standard Sand charge reads: "To act with intent to defraud means to act willfully and with the specific intent to deceive, for the purpose of causing some financial loss to another." 1 Sand et al., supra, Instruction 18-11. The court modified the language regarding financial loss, over strong objections by Litvak, because, in the court's view, that language incorrectly states the law governing prosecution of major fraud under the second of the two intent prongs, 18 U.S.C. § 1031(a)(2). In construing other criminal statutes which employ "money or property" as an alternative prong, such as the mail and wire frauds statutes, 18 U.S.C. §§ 1341 & 1343, the Second Circuit has held "property" to include a right to control one's assets and information necessary to make discretionary economic decisions, United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007); United States v. Rossomando, 144 F.3d 197,

---

[8] Given that the closest statutory analog to the TARP fraud statute is the bank fraud statute, 18 U.S.C. § 1344, the Supreme Court's recent decision in Loughrin v. United States, No. 13–316, slip op. (U.S. June 23, 2014), would appear to support the court's charge in this regard. See id. at 4–5, 6.

201 n.5 (2d Cir. 1998); United States v. Dinome, 86 F.3d 277, 284 (2d Cir. 1996). The court's charge on "intent to defraud" tracks this case law.

The trial evidence sufficiently supports a finding that Litvak acted with specific intent to deceive, for the purpose of depriving his victims of money or property. Hence, based on the trial record, a rational jury could have found each of the elements necessary to convict Litvak on Count Twelve of TARP.

D.    False Statement

To convict Litvak of the crime of false statement charged in Counts Thirteen through Sixteen, the jury had to find that the government had proven beyond a reasonable doubt five elements:

(1) On or about the date specified [in that count,] Litvak made a statement or representation;

(2) This statement or representation was material;

(3) The statement or representation was false, fictitious, or fraudulent;

(4) The false, fictitious, or fraudulent statement was made knowingly and willfully; and

(5) The statement or representation was made in a matter within the jurisdiction of the government of the United States.

Jury Charge at 70; see 18 U.S.C. § 1001; 2 Sand et al., supra, Instruction 36-9. Litvak contests the sufficiency of the evidence as to the second, forth, and fifth elements.

1.    Materiality

Although the court's charge on materiality differed here from the related charges under securities fraud and TARP fraud, the evidence supporting a finding of materiality in those other contexts was sufficient to support a finding of materiality under section

20

**A183**

1001 as well.  See Parts III.B.1 & C.1, supra.[9]  Indeed, Litvak's argument on materiality is identical to the argument under section 1031—that is, that his lies did not matter to Treasury.  Def.'s Mem. at 9-10.  In the court's view, this argument does not bear on materiality and is properly addressed under the fifth, or jurisdictional, element.  See Part III.D.3, infra.

        2.    Knowledge

Litvak's challenge to proof of knowledge under section 1001 is likewise identical to his challenge under section 1031.  However, unlike TARP fraud, the crime of making a false statement requires no proof that Litvak knew his lies were in a matter within the jurisdiction of the U.S. government.  United States v. Yermian, 468 U.S. 63, 75 (1984) ("[P]roof of actual knowledge of federal agency jurisdiction is not required under § 1001.").  As a matter of first impression, the court construed knowledge under section 1031 to cover TARP fraud's jurisdictional analog—that the scheme was executed in a form of federal assistance.  With respect to section 1001, however, the court does not write on a blank slate, and it is well settled that "knowingly" in this statute comprehends "only the making of 'false, fictitious or fraudulent statements,' and not the predicate circumstance that those statements be made in a matter within the jurisdiction of a federal agency."  Id. at 69.  Litvak does not challenge the proof that he knew his statements were false, and the circumstantial evidence was clearly sufficient to support a finding of such knowledge.

---

[9] To be material under section 1001, Litvak's lies must have had a natural tendency to influence, or must have been capable of influencing, the decision of a reasonable decisionmaker in a matter within the jurisdiction of the United States government.  Jury Charge at 72; see United States v. Gaudin, 515 U.S. 506, 509 (1995); United States v. Whab, 355 F.3d 155, 163 (2d Cir. 2004); cf. 2 Sand et al., supra, Instruction 36-11.

21

3.      Jurisdiction

To find that the government had proven beyond a reasonable doubt the fifth

element, the jury had to find that "it was contemplated that the statement or

representation was to be utilized in a matter which was within the jurisdiction of an

agency or department of the United States government."  Jury Charge at 75; see United

States v. Candella, 487 F.2d 1223, 1227 (2d Cir. 1973).  The court instructed the jury:

> To be within the jurisdiction of an agency or department of the United
> States government means that the statement must concern an authorized
> function of that department or agency.  Not everything concerning an
> agency or department is within the jurisdiction of the United States.  The
> phrase "within the jurisdiction" differentiates the official, authorized
> functions of an agency or department from matters peripheral to the
> business of that body.  A federal department or agency has jurisdiction
> when it has the power to exercise authority in a particular situation,
> regardless of whether the Federal agency chooses to exercise that
> authority or not.
>
> A false statement may fall within the jurisdiction of the United States
> government even when it is not submitted to a Federal department or
> agency directly and the Federal department or agency's role is financial
> support of a program that it does not itself directly administer.  The use of
> federal funds by itself does not put the matter within the jurisdiction of the
> United States.  However, where the deception at issue is made to a
> private party receiving Federal funds, such deception may be within the
> jurisdiction of the United States government if it affected a Federal
> department or agency because of that department or agency's
> responsibility to ensure that its funds are properly spent.

Jury Charge at 75; see Candella, 487 F.2d at 1229; United States v. Davis, 8 F.3d 923,

929 (2d Cir. 1993) (citing United States v. Rodgers, 466 U.S. 475, 479 (1984)); United

States v. Ross, 77 F.3d 1525, 1544-1545 (7th Cir. 1996); United States v. Petullo, 709

F.2d 1178, 1180 (7th Cir. 1983); cf. 2 Sand et al., supra, Instruction 36-14.

Litvak argues that the PPIFs were purely private entities, in which Treasury's role

was limited to that of an investor.  Def.'s Mem. at 31.  As a matter of law, however,

Treasury had the statutory authority under TARP to establish and fund the PPIFs as

22

**A185**

"vehicles that are authorized, subject to supervision by the Secretary, to purchase, hold, and sell troubled assets," 12 U.S.C. § 5211(c)(4); 5231a(e), and there was ample evidence that Treasury, in fact, created the PPIFs as such vehicles, determining the types of eligible assets in which the PPIFs could invest, and exercising oversight in various forms, from conducting audits and requiring reports to holding monthly meetings, Trial Tr. at 161-64 & 201-02 (Miller). Further, Miller testified that Treasury's oversight, which included the ability to get trade-level data, was designed to prevent fraud and abuse in the program. Id. at 162-63. Finally, from Canter's testimony—in particular, his confrontation with Litvak about Litvak's lies—a rational jury could have concluded that the PPIF managers understood themselves to be acting on Treasury's behalf and to be governed by its rules. Id. at 390, 392. The fact that Treasury delegated day-to-day investment decisions to PPIF managers does not negate the evidence establishing Treasury's supervisory authority over the PPIFs. Such evidence was sufficient to support a finding that Litvak's lies were made in a matter within the jurisdiction of the U.S. government.

In sum, a rational jury could have found each of the elements necessary to convict Litvak of Counts Thirteen through Sixteen of making a false statement under section 1001. Accordingly, the jury's verdict on these counts must stand.

## IV.    MOTION FOR NEW TRIAL

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Litvak moves the court, in the alternative, for a new trial. Under Rule 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Pro. 33(a). A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33

23

**A186**

authority 'sparingly' and in 'the most extraordinary circumstances.'" United States v. Ferguson, 246 F.3d 129, 134 (2d Cir.2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir.1992)). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Id. In exercising its discretion, the court may weigh the evidence and credibility of witnesses. United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000). However, the court may not "wholly usurp" the jury's role, id., and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." Ferguson, 246 F.3d at 134.

Litvak identifies no extraordinary circumstances which would warrant a new trial here. Having examined the record, the court concludes that no such circumstances are present, that the jury's verdict is adequately supported by the record, and that the interests of justice do not require a new trial. Accordingly, the court denies Litvak's Rule 33 Motion.

## V. CONCLUSION

For the reasons set forth above, the court **DENIES** Litvak's Motion for a Judgment of Acquittal and for a New Trial (Doc. No. 237). Pending before the court is also Litvak's Oral Motion for Directed Verdict (Doc. No. 212), which Motion is likewise **DENIED** for the reasons stated in Part III of this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of July, 2014.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

24

**A187**

1

```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3    _____
      United States of America   )July 23, 2014
 4              Government  )10:00 a.m.
      v.                         )
 5    Jesse C. Litvak            )3:13cr19(JCH)
                Defendant.   )
 6    _____)

 7
                              141 Church Street
 8                            New Haven, Connecticut

 9                  SENTENCING HEARING

10

      B E F O R E:
11                      THE HONORABLE JANET C. HALL, U.S.D.J.

12

13    A P P E A R A N C E S:

14    For The Government  :    Jonathan N. Francis
                                Christopher Mattei
15                              U.S. Attorney's Office-NH
                                157 Church St., 23rd floor
16                              New Haven, CT 06510

17
      For the Defendant   :
18                              Patrick Smith
                                John Michael Hillebrecht
19                              DLA Piper US LLP-NY
                                1251 Avenue of the Americas,
20                              27th Floor
                                New York, NY 10020-1104
21
                                Ross Garber
22                              Shipman & Goodwin
                                One Constitution Plaza
23                              Hartford, CT  06103-1919

24

25
```

**A188**

55

1    presenting evidence to demonstrate he actually intended to

2    cause a lesser loss.  It seems to me that in this instance it

3    is not -- as Attorney Smith has argued, it is not that the

4    instruments were fraudulent.  Indeed, he put forward a lot of

5    evidence about what wonderful buys they were.  The problem is

6    they weren't quite as wonderful as they could have been

7    absent fraud. And so it's my view it is a reasonable

8    inference to estimate the loss here, the loss as used in the

9    table, by either -- because it's the same number in my view,

10   the actual intended or the gain.

11        And I have also looked at U.S. vs. Confrito, which

12   is a Second Circuit case about five years ago, which the

13   Circuit talks about the flexibility that the court has in

14   estimating loss, perhaps for just the reason that Attorney

15   Francis points out, and that is that when you have fraud, you

16   never have what would have happened happen.  And so we can't

17   say that, yes, for sure this transaction would have occurred,

18   but I think it is a reasonable inference to conclude based on

19   all the trial testimony of all the victims, in particular the

20   ones I cited, that the transactions would not have occurred

21   at the prices that Mr. Litvak, in effect, induced them to pay

22   because of his lie, but rather would have occurred at what

23   the seller was willing to sell plus a normal commission.

24        So that allows me to conclude for purposes of the

25   guideline calculations that the base offense level here under

**A189**

1    and TARP, and they included pension funds and these

2    endowments.

3         And to the extent that the suggestion of it was in

4    the papers and now been repeated, so I need to respond to it,

5    that we did something to demonize Mr. Litvak or he's been

6    singled out.  The evidence at trial was Mr. Litvak's own

7    words.  We never characterized Mr. Litvak at all other than

8    just to say that what he had done was a crime.  This argument

9    that he's being singled out, this is offensive, Judge.  We

10   followed the evidence and it led to Mr. Litvak.  That's how

11   we got to him.  There was nothing about Mr. Litvak.  I've

12   never heard him say a word that wasn't directed to your

13   Honor, and most of them were not guilty.  And I don't intend

14   to testify.  I hear you, Judge.  I never heard him

15   substantively discuss this at all.  No one at the government

16   has.

17        The fact is we picked Mr. Litvak because that's

18   where the evidence led.  For him now to say I'm being singled

19   out, he's like the guy that gets pulled over in a red Ferrari

20   going 120 miles an hour and says, but all of those are guys

21   are going 65.  It's not fair.  He was the worst of the lie.

22   Someone has to go first, Judge.  We needed to prosecute

23   someone first in this market.  As your Honor says, maybe

24   there's others that will follow.  As Mr. Smith says, maybe

25   there are others that might come.  But someone has to go

1    first.  In this case, it's Mr. Litvak.  In this instance,

2    it's Mr. Litvak.

3           THE COURT:  I'm moved to ask a question, not because

4    I disagree with what you have just said necessarily, but

5    because what you said leads me to the question.  And that is,

6    accepting all of that, what sentence is sufficient for the

7    first person who has been told, no, you really can't go 125

8    in a red Ferrari on the merit.  We don't allow that.  That

9    violates our concept of free markets, you are playing, you

10   are putting your finger on the scale.  All of it's very

11   wrong, and the jury told you that.  I don't know that I

12   should -- I mean -- I guess, how much is sufficient?

13          When the guidelines were adopted, Justice Briar

14   wrote remarks about the loss table, which I think are very

15   enlightening.  I happen, in some significant, not a small

16   measure, let's put it that way, to agree with him.

17          Judge Cleary, who was a beloved member of this court

18   when I was practicing as a lawyer.  Some of the folks in your

19   office will remember him.  Probably you could ask John Durham

20   about him.  Very, very wise judge.  He was a judge long

21   before there was anything known as the guidelines, long

22   before anybody thought about a loss table, empirically based

23   or otherwise.

24          His view was that in every white-collar criminal

25   that came before him, they needed to go to jail.  His

**A191**

1    circumstance of the crime you committed.

2         Your counsel has made much of the climate on Wall

3    Street, the climate at Jefferies.  I did see evidence that

4    what you did, at least in that one instance that I

5    specifically recall, was applauded.  I would view it as an

6    applaud by your supervisor.  It sounds like the government

7    has recognized there were others who engaged in conduct like

8    this beside you, but I also heard the government -- and I

9    didn't hear any evidence certainly presented or proposed or

10   proffered by your lawyer that you were, shall we say, the

11   star of this conduct.  That while others may have done it and

12   there may have been people telling you, yeah, this is a good

13   thing to do, you seem to have really run with it in a way

14   that others did not at the company.

15        I guess part of the circumstance of this crime that

16   I can't ignore is the context in which this market was

17   operating.  This was a market that was dead in the water.

18   These bonds were going to be nonmarketable, right, but for

19   the government's infusion of money over great debate and

20   disagreement of whether that money should have gone to this

21   purpose.  All the sudden there's buyers out there for this

22   market that you could then benefit from by being the broker.

23        And I don't disagree with counsel that, you know,

24   the United States isn't the victim here.  The way it is, say,

25   in a tax case, but you were mindful, I think.  I think there

**A192**

1    crime that's ever been committed.  I think in that respect,

2    my assessment of the need for the sentence in terms of the

3    seriousness of the offense will be really driven in large

4    part by my conclusions and what I have already said about the

5    nature and circumstance.

6          The second need for the sentence is to provide

7    adequate deterrence to future criminal conduct.  I think I

8    got the government to agree with me -- well, certainly they

9    agreed with me that you won't commit this crime again because

10   you won't be able to commit it.  The government has taken

11   away your license and they will not give it back to you.  So

12   your ability to commit this crime again is, in my opinion,

13   zero.  But I also -- it's my pretty confidentially held view,

14   I am never going to say I am always going to be right, but

15   even with the view that it bothers me a little that you feel

16   like you were singled out or a victim, I don't see you as

17   committing any other crimes.  And I think the government kind

18   of agreed with me on that.  And I actually happen to think

19   that in crimes like this, that need for the sentence is a

20   very important one.  I think I referenced it earlier talking

21   to Attorney Francis.  But if I thought that there was any

22   chance you would go out and commit another fraud, the

23   sentence today would be significantly different than what I

24   think it's going to be.  But I don't see that as present in

25   this case, as far as a need for your sentence.

**A193**

154

```
 1           I think your case has probably set the record in the
 2  number of sentencing letters, I guess, of support that I have
 3  received.  I think it probably has.  I don't want to say that
 4  to encourage another lawyer to try to break the record.
 5  Sounds like you and your family have a wonderful time in
 6  Hampton Beach every summer.  I have to say, my grandfather
 7  owned a house on Hampton Beach until the hurricane of '38
 8  when the end of M Street was swept out to the sea.  I haven't
 9  been to Hampton Beach in a long time, but it sounds like you
10  have a very loving and supporting and large family that comes
11  together, that values family, which to me is a very important
12  thing and it tells me that you value family.  Obviously, you
13  were this hard-charging Wall Street broker, right, and yet it
14  sounds like every year you found the time to go up there and
15  spend it with your family.  I think that's a very positive
16  aspect of your history and characteristics.  Not just
17  particularly the vacation, but what the letters represent.
18           They also tell me that you are a very thoughtful,
19  caring, kind, I guess good-natured, I flagged some and I went
20  back and reread some of them.  Those are probably the main
21  themes that come through.  I don't know if you read them all.
22  It's kind of like having your wake before you die.  I mean,
23  in some respects, you are blessed in that respect.  I know
24  you don't feel that way right now.  Some people don't hear
25  good things about themselves because they are not good
```

**A194**

1   people.  But even good people don't hear good things about

2   themselves just because people don't feel comfortable saying

3   them and there's no occasion to say them.

4          What struck me is that you are a friend.  You are a

5   friend just to be a friend, but you are also a friend when

6   people are in need of a friend.  I was particularly struck --

7   I don't mean to single out one letter over another, they are

8   all very compelling and very thoughtful.  I have to say, I

9   don't know whether your lawyer told them to say this or you

10  did, but I appreciate that they inevitably ended with, Judge,

11  we know you have a tough job and we know you have to do it.

12  Please think of what I have said.  That's nice, for me

13  anyways.  The one I just mentioned is written by Father

14  Noonan, I guess, is on the Noonan side of your family,

15  talking about a situation involving, I think, his sister and

16  the fact that you reached out.  I have to say I agree with

17  him, I think that people generally are afraid to reach out to

18  people who are in need and who have suffered some type of

19  loss or bad situation, maybe that's better way to say it.

20  Because you feel awkward and you don't know what to say.  You

21  feel that they might not want to talk about it.  But he wrote

22  very compellingly about how important that was to her and how

23  thoughtful it was, as I said, and supportive.  I think that

24  sort of resonates throughout all the letters, that type of

25  thoughtfulness on your part.  So, obviously, I could go on a

**A195**

156

1    really long time as a lot of people went on a really long

2    time.  I think in a nutshell, you sound like a person that's

3    a person worth knowing.  And a person who, if I could ignore

4    today what brings you before me, is someone who is a good

5    person and I probably would enjoy knowing.

6         You also, by all measure, sound to be like an

7    outstanding son and son-in-law, I will say, as well.  I'm

8    very sorry about your father's situation.  I hope that he

9    enjoys a speedy recovery.  And with a few bumps in the road,

10   you sound like you have been a very good spouse and obviously

11   a good father.

12        That brings me, of course, to your son's situation.

13   I didn't find extraordinary family circumstances.  Again, I

14   didn't because I just didn't chose to exercise my discretion,

15   but I don't want you to think that I, in any way, that would

16   diminish my view of the challenge that you and your wife face

17   in trying to bring your son along to a life that can be full

18   for him.  The difficulty -- the reason why I'm sure the

19   government opposed the departure, among others, is that the

20   case law suggests, and probably appropriately so, that such a

21   departure is only appropriate when the facts are there's a

22   single mother and there's no other relative to be of any

23   assistance.  Obviously, unfortunately, all of the letters

24   that were written and all of what I found from Officer Lopez

25   and his investigation is that you have a very loving and

**A196**

1    of October 23, just in the case that the Bureau of Prisons

2    was really efficient and designated a date in the next few

3    weeks.  The judgment, Diahann, should say he should surrender

4    to the marshal by November 5 to their custody, if not

5    earlier.  But at no date earlier than October 23.  FCI camp

6    at Otisville.

7         The other thing I think I need to advise you of, Mr.

8    Litvak, you have been subject to certain conditions and

9    supervision by the probation office, I believe, by the

10   Southern District of New York office and those conditions

11   continue.  As you walk out the door, they are going to be the

12   same as when you walked in.  If the officer told you to do

13   something or not do something, if you signed a piece of paper

14   that says you must do this or you can't do that, all of those

15   conditions remain exactly the same.  Do you understand?

16             THE DEFENDANT:  I understand.

17             THE COURT:  Any violation would be treated seriously

18   by me and would likely result in revoking the self surrender

19   aspect of the judgement.

20             MR. SMITH:  I'm going to make a brief oral

21   application.

22             THE COURT:  I know what issues you are going to

23   raise.  The problem I think for you is that even if I charged

24   wrong on TARP, even if I'm wrong on securities fraud, what is

25   the grounds?  I will get the statute.  What's the

**A197**

```
 1    grounds that you are likely to prevail on?
 2            MR. SMITH:  I will outline it briefly.  I think
 3    because your Honor is familiar with it, I don't think it
 4    requires briefing.  I think we all agree we had plenty of
 5    briefing in this case.
 6            THE COURT:  I understand your arguments.  If you
 7    give me a minute, I will find the statute that I had copied
 8    for this purpose, which tells me the standard.
 9            MR. SMITH:  3143.
10            THE COURT:  Thank you.  That's exactly what it is.
11    You need to show that there's a substantial likelihood that
12    the motion for acquittal or new trial -- that's pending
13    sentence.  Pending appeal, you have to show by clear and
14    convincing evidence he's not going to flee.  That there
15    wouldn't be any contest.  Let the government tell me that.
16            It's not for the purpose of the delay and raises a
17    substantial question of law likely to result in a reversal,
18    an order for a new trial, a sentence that does not include
19    imprisonment or a reduced sentence that would be less than
20    the total of the time served by the time the appeal process
21    ends.  These days is about a year.  Especially given the
22    transcripts were done, I think might it be less than that.
23            MR. SMITH:  So we appreciate the findings on the
24    first two issues.  On substantial questions, as I think your
25    Honor will know, substantial question means close question.
```

**A198**

1    Because you resolved certain issues against us does not

2    nonetheless mean that the issues are not close.  So let me

3    flag what I think the four substantial issues are.  One is

4    the sufficiency of the evidence.

5           THE COURT:  On which count?  All of them?

6           MR. SMITH:  All counts as to materiality.  Across

7    the board.  It's an issue we briefed on a motion to dismiss,

8    it's an issue we argued extensively.  The Second Circuit case

9    that we cited to you in the Rule 29, Fineman versus Dean

10   Witter Reynolds, this case squarely fits within that.  That's

11   84 F.3d 539 Second Circuit, 1996.  We think the circuit may

12   well view your Honor ruling otherwise.  That's a close

13   question on materiality as a matter of law and it goes to

14   each count of conviction.

15          The second issue, your Honor, is whether Mr. Litvak

16   acted with adequate intent to defraud under the

17   circumstances.  This is essentially the United States versus

18   Starr argument that we had raised with your Honor at several

19   junctures in the proceedings.  And that since the victims got

20   the benefit of the bargain in terms of -- I hate to revisit

21   this.  I will be very brief -- fair market value bond at the

22   price they agreed to pay, that this is just not a situation

23   where adequate intent to defraud is shown.  I think that's

24   substantial issue.  There's just not sufficient basis for

25   economic harm here.  And we had this argument at the time of

172

```
 1   the jury charge, whether, under the authority we cited to

 2   your Honor from the Southern District, the U.S. versus

 3   Whitman case, whether the Starr standards, the economic harm

 4   standard, should apply under 10(b)(5).  We think that's a

 5   substantial question that's close and could go the other way.

 6   The third is the cluster of evidentiary rulings related to

 7   the experts, your Honor, which we think are substantial

 8   evidence of good faith.  And evidence that would have more

 9   appropriately framed, the materiality and intent to defraud

10   issue.  We think, respectfully, your Honor, abused the

11   Court's discretion in denying our application to put on

12   expert evidence.  That's all contained in the briefing there

13   and the proffer of evidence that your Honor has written on

14   that.  And finally, your Honor, the last issue is simply the

15   loss issue.  We think that was a close issue.  I think your

16   Honor --

17            THE COURT:  That's a sentencing issue.  I have just

18   said I would have given him the same sentence if the loss was

19   zero.

20            MR. SMITH:  If the --

21            THE COURT:  That's how unhelpful loss was in this

22   case to me, I guess, if it doesn't say anything else, it says

23   that.

24            MR. SMITH:  We do think it's an issue that could

25   reduce the sentence.  We think there are sentencing issues
```

**A200**

173

```
 1    that we may raise that may result in a reduced sentence.
 2    That's the fourth issue.
 3            We think the three issues that we framed are
 4    substantial, that's our motion.  And we move for bail pending
 5    appeal.
 6            THE COURT:  I'm about to say something again that I
 7    shouldn't say -- I will restrain myself.
 8            MR. SMITH:  I'm very mindful --
 9            THE COURT:  You are going to have a hard time
10    sustaining the sentence I imposed on appeal.
11            MR. SMITH:  We're very thoughtful and mindful of --
12            THE COURT:  I'm not being critical of you.  I'm
13    saying that's not a serious grounds for appeal.
14            MR. SMITH:  I want to be complimentary to your
15    Honor --
16            THE COURT:  You don't need to be.
17            MR. SMITH:  Very thoughtful and mindful of the
18    thoughtful sentence you imposed, but I feel we need to make
19    the motion.  Those are the grounds.
20            THE COURT:  Attorney Francis, to the first three
21    grounds, would you respond to those as he has a serious
22    question on getting a reversal or a new trial, whatever on
23    those.  I think he argued sufficiency of the evidence on
24    materiality and the intent defraud and I'm sorry --
25            MR. FRANCIS:  Experts.
```

**A201**

1          THE COURT:  The proof of the fact there wasn't any

2     really loss here.

3          MR. FRANCIS:  The experts were precluded.

4          THE COURT:  Were precluded, right.  Okay.

5          MR. FRANCIS:  So whether or not it raises a question

6     of law or fact, apparently he disagrees, but the standard in

7     the statute is likely of prevailing on these.  Your Honor's

8     decisions on these three points are completely consistent

9     with the Second Circuit and Supreme Court.  The facts as

10    phrased in order to torture them into being able to make

11    these arguments, your Honor, those facts to obtain unless the

12    arguments they were making were premised on the factual

13    misstatements or misunderstanding of what the circumstances

14    was.  It seems there is practically no chance of success on

15    these three arguments, much less likelihood of success.

16    Although they are creative and do justice to counsel's

17    creativity and hard work, they are unlikely to prevail in the

18    Second Circuit.  And bail in this circumstance would be,

19    pending appeal, would be unwarranted under the statute.  I

20    agree that there's no likelihood of flight to the extent that

21    your Honor posed a question, we have no dispute.

22         THE COURT:  On the first three points raised by

23    Attorney Smith, we have argued about them.  I have decided

24    them several different times, most recently in the ruling

25    post trial.  You know, anyone can make a mistake and I put

1    myself right of top of list.  Obviously, my goal is not to

2    make a mistake.  I don't want people to have to go through

3    this again to start with.  Also just because that's just.

4    And so I hope I haven't made any mistakes, but I cannot see a

5    mistake or a combination of mistakes that would result in the

6    reversal of the convictions on all 15 counts.  The TARP

7    fraud, I think it's the first charge in the country.  I mean,

8    maybe I got it wrong.  We sort of -- not made it up.  It had

9    to be written by us.  But there's other counts that, you

10   know, in many respects it's a fact finding by the jury.  And

11   there certainly was sufficient evidence for them to draw the

12   inferences they needed to draw.  There was evidence on the

13   record.  So I think -- I don't think.

14        My ruling is to deny the oral motion for release

15   pending appeal because I do not find a substantial question

16   of law or fact that's likely to result in a new trial or

17   reversal or a lower sentence.  Obviously, you are able to go

18   to the circuit.  They'll take a look at it.  If they see

19   something that they think is going to result in a likely or

20   at least a serious question for them, they obviously can give

21   you this relief, but I could not.  Again, I'm not -- I know

22   I'm far from perfect, but I just can't any basis on which I

23   can make the finding required by 3143 BB.  I don't have a

24   basis to make that finding, so the motion is denied.  Is

25   there anything further?

**A203**

AO245b (USDC-CT Rev. 9/07)

UNITED STATES DISTRICT COURT

Page 1                                    District of Connecticut
_____

UNITED STATES OF AMERICA                 **JUDGMENT IN A CRIMINAL CASE**

v.                              CASE NO. *3:13CR19 (JCH)*
                                         USM NO: *21467-014*

Jesse C. Litvak

                                         *Jonathan Francis*
                                         Assistant United States Attorney

                                         *Patrick Smith/Ross Garber*
                                         Defendant's Attorney

**THE DEFENDANT:  was found guilty on counts 1-6, 8-11, 12 and 13-16 of the Indictment.**

Accordingly the defendant is adjudicated guilty of the following offenses:

| Title & Section | Nature of Offense | Offense Concluded | Counts |
|---|---|---|---|
| Title 18, United States Code, Sections 78(b), 78ff | Securities Fraud | December 2011 | 1-6, 8-11 |
| Title 18, United States Code, Section 1031 | Asset Relief Program (TARP) Fraud | December 2011 | 12 |
| Title 18, United States Code, Section 1001 | False Statements | December 2011 | 13, 14, 15, 16 |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984.  The sentence imposed is a non-guideline sentence based upon the loss tables overstating the guidelines, the nature and circumstances of the offense and the history and characteristics of the defendant.  The sentence is sufficiently long to serve the need for deterrence.

**IMPRISONMENT**

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total of 24 months on each of counts 1-6 and 8-16, all to run concurrently, for a total term of imprisonment of 24 months.

**SUPERVISED RELEASE**

Upon release from imprisonment, the defendant shall be on supervised release for a total term of 3 years on each of counts 1-6 and 8-16, all to run concurrently, for a total term of supervised release of 3 years.  The Mandatory and Standard Conditions of Supervised Release as attached, are imposed. In addition, the following Special Conditions are imposed:

1.   The defendant shall participate in a program approved by the Probation Office for inpatient or outpatient substance abuse treatment and testing.  The defendant shall pay all or a portion of the costs associated with treatment based on the defendant's ability to pay as determined by the Probation Office.

2.   Restitution to be determined and Order of Restitution entered upon filing of submission, by the government within 45 days. The defendant shall pay any restitution that is imposed by this judgment, payable immediately, and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month.  The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court.

3.   The defendant shall pay the  fine that is imposed by this judgment, payable immediately, if not paid in full within 30 days, interest shall accrue at the legal/T-Bill rate in accordance with the statute,  and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month. The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court

4.   The defendant shall not incur new credit card charges above $250 or open additional lines of credit without the prior permission of the Probation Office until the defendant's criminal debt obligation is paid.  The defendant shall not add any new names to any lines of credit, shall not be added as a secondary card holder on another's line of credit, and shall provide the Probation Office with electronic access to any online management of any lines of credit, including lines of credit for businesses/LLC's that are owned, operated or otherwise associated with the defendant.

**A204**

Page 2

5.   The defendant shall close all other savings/checking accounts, transfer all assets into one main bank account and shall not add any new account holders to that account (the account may include the defendant's spouse if there are joint marital assets/expenses).  The defendant shall provide the Probation Office with electronic "read only" access to any online management of the account.  The defendant shall provide the final statement from each account that is closed to ensure that no funds are dissipated during the closing of existing accounts and opening of the single account.

6.   The defendant shall permit the Probation Office to monitor investment and retirement accounts, to include coordinating with the account administrator to notify the Probation Office of any activity on the account.

7.   The defendant shall not encumber personal homes or investment properties without permission of the court, and shall not transfer, sell, give away, barter, or dissipate in any way any assets, including personal property (ie: motor vehicles, recreational vehicles) without the express permission of the Probation Office and notification to the court.

8.   Upon request, the defendant shall submit a proposed budget (detailing expected income and expenses) to the Probation Office, after which the Probation Office shall communicate his/her approval to the defendant.  The defendant shall adhere to the approved budget and any deviations must be approved before incurring and paying the expense.  Any receipt of income or asset not anticipated by the approved budget shall be reported to the Probation Office within two days of the receipt of the income or asset, or within two days of the defendant's receipt of knowledge that such income or asset will be received, whichever comes sooner.  Such unanticipated income or asset can not be disposed of without prior permission of the Probation Office.

9.   The defendant shall retain receipts for inspection, upon reasonable notice, any expenditures greater than $250.

10.  The defendant shall not possess ammunition, a firearm or other dangerous weapon.


**CRIMINAL MONETARY PENALTIES**
The defendant must pay the total criminal monetary penalties under the schedule of payments (as follows) or (as noted on the restitution order).

| | | |
|---|---|---|
| **Special Assessment:** | $1,500.00 | $100 on each of counts 1-6 & 8-16, for a total of $1,500 to be paid immediately. |
| **Fine:** | $1,750,000.00 | The defendant shall pay the fine that is imposed by this judgment, payable immediately, if not paid in full within 30 days, interest shall accrue at the legal/T-Bill rate in accordance with the statute,  and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month.  The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court |
| **Restitution:** | | Restitution to be determined and Order of Restitution entered upon filing of submission, by the government within 45 days. The defendant shall pay any restitution that is imposed by this judgment, payable immediately, and any amount that remains unpaid at the commencement of the term of supervised release shall be paid at a rate of no less than 10% of the defendant's net income per month.  The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court. |


It is further ordered that the defendant will notify the United States Attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs and special assessments imposed by this judgment, are paid.

**A205**

Page 3

**JUDICIAL RECOMMENDATION(S) TO THE BUREAU OF PRISONS**

The defendant shall be designated to the Satellite Camp at FCI Otisville.

**The defendant shall self surrender no sooner than 10/23/2014 and no later than 11/5/2014.  In the event the defendant does not receive designation by the Bureau of Prisons by 11/5/2014, the defendant must self surrender to the United States Marshal, at New Haven, Connecticut by noon on 11/5/2014.**

7/23/2014 _____
Date of Imposition of Sentence


/s/Janet C. Hall _____
Janet C. Hall
United States District Judge
Date:  7/25/2014


**RETURN**

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____, with a certified copy of this judgment.


_____
Joseph P. Faughnan
United States Marshal


By _____
Deputy Marshal


*CERTIFIED AS A TRUE COPY*
*ON THIS DATE _____*
*ROBERTA D. TABORA, Clerk*
*BY: _____*
     *Deputy Clerk*

**A206**

AO245b (US

Page 4

# CONDITIONS OF SUPERVISED RELEASE

In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:

## MANDATORY CONDITIONS

■ (1)   The defendant shall not commit another federal, state or local offense;

■ (2)   The defendant shall not unlawfully possess a controlled substance;

☐ (3)   The defendant who is convicted for a domestic violence crime as defined in 18 U.S.C. section 3561(b) for the first time shall attend a public, private, or private non-profit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is available within a 50-mile radius of the legal residence of the defendant;

■ (4)   The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter for use of a controlled substance;

☐ (5)   If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an installment schedule to pay that fine;

■ (6)   The defendant shall (A) make restitution in accordance with 18 U.S.C. sections 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and (B) pay the assessment imposed in accordance with 18 U.S.C. section 3013;

☐ (7)   (A)   In a state in which the requirements of the Sex Offender Registration and Notification Act  (see 42 U.S.C. §§ 16911 and 16913) do not apply, a defendant convicted of a sexual offense as described in 18 U.S.C. § 4042(c)(4) (Pub. L. 105-119, § 115(a)(8), Nov. 26, 1997) shall report the address where the defendant will reside and any subsequent change of residence to the probation officer responsible for supervision, and shall register as a sex offender in any State where the person resides, is employed, carries on a vocation, or is a student; or

         (B)   In a state in which the requirements of Sex Offender Registration and Notification Act apply, a sex offender shall (i) register, and keep such registration current, where the offender resides, where the offender is an employee, and where the offender is a student, and for the initial registration, a sex offender also shall register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence; (ii) provide information required by 42 U.S.C. § 16914; and (iii) keep such registration current for the full registration period as set forth in 42 U.S.C. § 16915;

■ (8)   The defendant shall cooperate in the collection of a DNA sample from the defendant.

While on supervised release, the defendant shall also comply with all of the following Standard Conditions:

## STANDARD CONDITIONS

(1)   The defendant shall not leave the judicial district or other specified geographic area without the permission of the court or probation officer;

(2)   The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

(3)   The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

(4)   The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living);

(5)   The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

(6)   The defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after such change;

(7)   The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician;

(8)   The defendant shall not frequent places where controlled substances are illegally sold,  used, distributed, or administered, or other places specified by the court;

(9)   The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

(10)  The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

(11)  The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

(12)  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

(13)  The defendant shall pay the special assessment imposed or adhere to a court-ordered installment schedule for the payment of the special assessment;

(14)  The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.

**The defendant shall report to the Probation Office in the district to which the defendant is released within 72 hours of release from the custody of the U.S. Bureau of Prisons.  Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.**

**These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.**


(Signed) _____                    _____

         **Defendant**                                            **Date**



         _____                    _____
         **U.S. Probation Officer/Designated Witness**              **Date**


# A207

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

## United States District Court

District of **Connecticut**

*FILED*

2014 AUG 5 PM 1 41

U.S. DISTRICT COURT
NEW HAVEN, CT.

Caption:

**United States of America** v.

**Jesse C. Litvak**

Docket No.: **3:13cr19**

**Janet C. Hall**

(District Court Judge)

Notice is hereby given that **Jesse C. Litvak** appeals to the United States Court of Appeals for the Second Circuit from the judgment [✔], other [ ] _____

(specify)

entered in this action on **July 25, 2014**

(date)

This appeal concerns: Conviction only [ ]  Sentence only [ ]  Conviction & Sentence [✔]  Other [ ]

Defendant found guilty by plea [ ]  trial [✔]  N/A [ ]

Offense occurred after November 1, 1987?  Yes [✔]  No [ ]  N/A [ ]

Date of sentence: **July 23, 2014**  N/A [ ]

Bail/Jail Disposition: Committed [✔]  Not committed [ ]  N/A [ ]

Self-surrender date is scheduled for no sooner than 10/23/2014 and no later than 11/5/2014.

Appellant is represented by counsel?  Yes [✔]  No [ ]  If yes, provide the following information:

Defendant's Counsel:  **Ross H. Garber, Shipman & Goodwin LLP**

Counsel's Address:  **One Constitution Plaza**

**Hartford, CT 06103**

Counsel's Phone:  **860-251-5901**

Assistant U.S. Attorney:  **Jonathan N. Francis**

AUSA's Address:  **Connecticut Financial Center, 157 Church Street**

**New Haven, CT 06510**

AUSA's Phone:  **203-821-3811**

Signature

**A208**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice of Appeal was filed manually with the district clerk, together with a CD-ROM disc containing a copy of the same in PDF format. I also certify that a copy of the foregoing was mailed, postage prepaid, this 5th day of August, 2014, to the following counsel of record:

Jonathan Francis
U.S. Attorney's Office
157 Church St., 25th floor
New Haven, CT 06510
Tel: 203-821-3811
Email: jonathan.francis@usdoj.gov

By: _____
Ross H. Garber (ct17689)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: 860-251-5901
Fax: 860-251-5219
Email: rgarber@goodwin.com

**A209**