# 14-2902

*To Be Argued By:*
JONATHAN N. FRANCIS

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 14-2902

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

JESSE C. LITVAK,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### BRIEF FOR THE UNITED STATES OF AMERICA

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

JONATHAN N. FRANCIS
HEATHER CHERRY
SANDRA S. GLOVER *(of counsel)*
*Assistant United States Attorneys*

# Table of Contents

Table of Authorities ........................................... vi

Statement of Jurisdiction ................................. xiii

Statement of Issues Presented for Review ...... xiv

Preliminary Statement ........................................1

Statement of the Case ..........................................3

I. The RMBS bond market ...................................3

II. The Legacy Securities Public-Private Invest-
    ment Program ("PPIP") ..................................7

III. The evidence at trial...................................10

    A. Litvak's motive ......................................10

    B. Discovery of Litvak's scheme...................11

    C. The offense conduct................................12

        1. Litvak's misrepresentations...............13

        2. Effect of misrepresentations ..............17

Summary of Argument ......................................21

Argument...........................................................24

I. The evidence was sufficient for the jury to con-
   vict Litvak of securities fraud, TARP fraud,
   and making false statements ........................ 24

A. Standard of review ...................................... 24

B. The evidence established that Litvak's lies
   were material for purposes of securities
   fraud ............................................................ 26

   1. Relevant facts ......................................... 26

   2. Governing law ......................................... 27

   3. Discussion ............................................... 29

      a. The evidence presented was sufficient
         to support a finding of materiality un-
         der Rule 10b-5 ..................................... 29

      b. Litvak's Rule 10b-5 materiality argu-
         ments are unavailing .......................... 31

C. The evidence established Litvak's intent to
   commit securities fraud ............................. 37

   1. Governing law ......................................... 37

   2. Discussion ............................................... 38

ii

D. The evidence established that Litvak's lies were material for purposes of TARP fraud and § 1001 ................................................... 42

    1. Governing law ........................................ 42

    2. Discussion .............................................. 42

E. The evidence established Litvak's lies occurred "in [a] matter within the jurisdiction" of Treasury, satisfying the jurisdictional element of § 1001 .......................................... 46

    1. Governing law ........................................ 46

    2. Discussion .............................................. 47

II. The district court properly instructed the jury on the elements of securities fraud, TARP fraud, and making false statements ............ 48

A. Standard of review ................................... 48

B. The district court properly instructed the jury on intent to commit securities fraud ......................................................... 49

    1. Relevant facts ....................................... 49

    2. Discussion ............................................. 50

C. The district court properly instructed the jury on the materiality elements of § 1001 and § 1031 .................................... 52

iii

1. Relevant facts ...................................... 52

2. Governing law ..................................... 53

3. Discussion ........................................... 53

D. The district court properly instructed the jury on the definition of a "scheme and artifice to obtain...money and property" under § 1031 ................................................ 55

    1. Relevant facts ...................................... 55

    2. Governing law ..................................... 55

    3. Discussion ........................................... 56

III. The district court acted well within its discretion in excluding irrelevant and prejudicial evidence, including baseless expert testimony ................................................ 57

A. Standard of review and governing law ............................................................ 57

B. The district court's exclusion of Litvak's expert evidence was not manifestly erroneous ............................................... 58

    1. Relevant facts ...................................... 58

    2. Discussion ........................................... 60

iv

a. Litvak does not argue that the district court's exclusion of expert evidence under Rules 702 or 403 was manifestly erroneous...................... 60

b. Willner's expert testimony was irrelevant ......................................... 60

c. Menchel's expert testimony was irrelevant ......................................... 62

d. Litvak's arguments do not establish the district court's manifest error ... 63

C. The district court's exclusion of the defendant's other evidence was not an abuse of discretion .............................................. 64

1. Relevant facts...................................... 64

2. Discussion........................................... 65

Conclusion ...................................................... 67

Certification per Fed. R. App. P. 32(a)(7)(C)

Addendum

v

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

## Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
   303 F.3d 256 (2d Cir. 2002)............................ 57

*Basic, Inc. v. Levinson,*
   485 U.S. 224 (1988) ........................................ 28

*Cantor Fitzgerald, Inc. v. Lutnick,*
   313 F.3d 704 (2d Cir. 2002)...................... 60, 65

*Cheek v. United States,*
   498 U.S. 192 (1991) ........................................ 65

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993) .................................. 58, 63

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185........................................ 37, 40, 51

*Feinman v. Dean Witter Reynolds, Inc.,*
   84 F.3d 539 (2d Cir. 1996)......................*passim*

*Ganino v. Citizens Utils. Co.,*
   228 F.3d 154 (2d Cir. 2000)............................ 29

*Herman & MacLean v. Huddleston,*
   459 U.S. 375 (1983) ........................................ 35

vi

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 416 (S.D.N.Y. 2003) ............ 41

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ......................................... 40

*Neder v. United States*,
   527 U.S. 1 (1999) ........................................... 42

*Press v. Chemical Inv. Servs. Corp.*,
   166 F.3d 529 (2d Cir. 1999) ........................... 27

*SEC v. Holschuh*,
   694 F.2d 130 (7th Cir. 1982) ........................ 40

*SEC v. Mayhew*,
   121 F.3d 44 (2d Cir. 1997) ...................... 28, 35

*SEC v. Zandford*,
   535 U.S. 813 (2002) ................................. 29, 32

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ............... 27, 28, 29, 31, 35

*United States v. Abu-Jihaad*,
   630 F.3d 102 (2d Cir. 2010) ........................... 57

*United States v. Adekanbi*,
   675 F.3d 178 (2d Cir. 2012) ..................... 42, 53

*United States v. Agrawal*,
   726 F.3d 235(2d Cir. 2013), *cert. denied*,
   134 S. Ct. 1527 (2014) ................................... 56

vii

*United States v. Almonte*,
   956 F.2d 27 (2d Cir. 1992)............................. 57

*United States v. Ballistrea*,
   101 F.3d 827 (2d Cir. 1996)..................... 53, 54

*United States v. Bastian*,
   770 F.3d 212 (2d Cir. 2014)........................... 54

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991)........ 27, 46, 47, 60

*United States v. Brandt,*
   196 F.2d 653 (2d Cir. 1952)...................... 65-66

*United States v. Candella*,
   487 F.2d 1223 (2d Cir. 1973).................. 47, 48

*United States v. Carlo*,
   507 F.3d 799 (2d Cir. 2007)..................... 55, 56

*United States v. Chiarella*,
   588 F.2d 1358(2d Cir. 1978), *rev'd on other
   grounds*, 445 U.S. 222 (1980) ........................ 40

*United States v. Chong Lam*,
   677 F.3d 190 (4th Cir. 2012) ......................... 25

*United States v. Coppola*,
   671 F.3d 220 (2d Cir. 2012)..................... 58, 63

*United States v. Davis*,
   8 F.3d 923 (2d Cir. 1993)............................... 48

viii

*United States v. Dinome,*
    86 F.3d 277 (2d Cir. 1996) ............................. 55

*United States v. Dixon,*
    536 F.2d 1388 (2d Cir. 1976) ......................... 40

*United States v. Ferguson,*
    676 F.3d 260 (2d Cir. 2011) ..................... 48, 49

*United States v. Gaudin,*
    515 U.S. 506 (1995) ........................... 42, 53, 54

*United States v. Gonzalez,*
    764 F.3d 159 (2d Cir. 2014), *cert. denied,*
    135 S. Ct. 492 (2014). .................................... 57

*United States v. Huezo,*
    546 F.3d 174 (2d Cir. 2008) ........................... 25

*United States v. Jones,*
    30 F.3d 276 (2d Cir. 1994) ............................. 49

*United States v. Kaiser,*
    609 F.3d 556 (2d Cir. 2010) ..................... 37, 40

*United States v. Lincecum,*
    2000 WL 1015927 (2d Cir. July 20, 2000) ..... 40

*United States v. Litvak,*
    30 F. Supp. 3d 143 (D. Conn. 2014) ................. 3

*United States v. MacPherson,*
    424 F.3d 183 (2d Cir. 2005) ........................... 25

*United States v. Marcus,*
  560 U.S. 258 (2010) .................................. 25, 26

*United States v. Mi Sun Cho,*
  713 F.3d 716 (2d Cir. 2013)...................... 24, 25

*United States v. Mitchell,*
  328 F.3d 77 (2d Cir. 2003).............................. 54

*United States v. Newman,*
  773 F.3d 438 (2d Cir. 2014)............... 37, 40, 50

*United States v. Novak,*
  443 F.3d 150 (2d Cir. 2006)...................... 41, 42

*United States v. O'Hagan,*
  521 U.S. 642 (1997) ....................................... 39

*United States v. Oluwanisola,*
  605 F.3d 124 (2d Cir. 2010)...................... 61, 66

*United States v. Onumonu,*
  967 F.2d 782 (2d Cir. 1992)............................ 58

*United States v. Regent Office Supply Co.,*
  421 F.2d 1174 (2d Cir. 1970)......................... 41

*United States v. Rigas,*
  490 F.3d 208 (2d Cir. 2007)................. 42, 45-46

*United States v. Rivera,*
  388 F.2d 545 (2d Cir. 1968)............................ 25

x

*United States v. Rodgers,*
    466 U.S. 475 (1984) .................................. 46, 47

*United States v. Rossomando,*
    144 F.3d 197 (2d Cir. 1998)........................... 51

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987)............................. 41

*United States v. Vilar,*
    729 F.3d 62 (2d Cir. 2013), *cert. denied,*
    134 S.Ct. 2684 (2014) ........................ 40, 56, 57

*United States v. Whitman,*
    904 F. Supp. 2d 363 (S.D.N.Y. 2012), *aff'd,*
    555 F. App'x 98 (2d Cir. 2014), *cert. denied,*
    135 S. Ct. 352 (Nov. 10, 2014)....................... 41

*United States v. Weintraub,*
    273 F.3d 139 (2d Cir. 2001)..................... 49, 54

*United States v. Wilkerson,*
    361 F.3d 717 (2d Cir. 2004)........................... 48

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007)........................... 58

## Statutes

12 U.S.C. § 5201.................................................... 7

12 U.S.C. § 5202.................................................... 7

12 U.S.C. § 5211.................................. 7, 8, 10, 43

xi

12 U.S.C. § 5214............................................ 43, 45

2 U.S.C. § 5231................................................ 10

12 U.S.C. § 5231a.................................... 7, 10, 43

18 U.S.C. § 1001............................................... 46

18 U.S.C. § 3231.............................................. xiii

28 U.S.C. § 1291.............................................. xiii

## Rules

Fed. R. App. P. 4 ............................................. xiii

Fed. R. Crim. P. 30........................................... 49

Fed. R. Crim. P. 52........................................... 49

Fed. R. Evid. 401.............................................. 58

Fed. R. Evid. 403.............................................. 58

Fed. R. Evid. 702.............................................. 60

## Statement of Jurisdiction

The United States District Court for the District of Connecticut (Janet C. Hall, C.J.) had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. Judgment entered on July 25, 2014. Joint Appendix ("JA__") 27. On August 5, 2014, the defendant filed a timely notice of appeal pursuant to Fed. R. App. P. 4(b). JA27; JA1084. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

**Statement of Issues
Presented for Review**

I.  At the defendant's trial on charges of securities fraud, fraud against the Department of the Treasury's Troubled Asset Relief Program ("TARP"), and making false statements in a matter within Treasury's jurisdiction, the Government introduced documentary evidence of the defendant's lies in multiple bond trades—including those with investment funds created, funded, and supervised by Treasury—and victim testimony that the defendant admitted to lying, that his lies mattered, and that they affected purchase decisions.

A.  Whether a rational jury could find that the defendant's misrepresentations were material?

B.  Whether a rational jury could find that the defendant acted with the intent to deceive his customers?

C.  Whether a rational jury could find that the defendant's misrepresentations were capable of influencing Treasury?

D.  Whether a rational jury could find that the defendant lied in a matter within Treasury's jurisdiction?

II.  Whether the jury instructions on the intent element of securities fraud, the requi-

xiv

site materiality for TARP fraud and making false statements, and the meaning of "a scheme and artifice to obtain...property" were erroneous?

III. Whether the district court abused its discretion by excluding:

    A. Expert testimony about the materiality of the defendant's misstatements and his criminal intent?

    B. "State of mind" evidence regarding events that the defendant did not know about?

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 14-2902

_____

### UNITED STATES OF AMERICA,

*Appellee,*

-vs-

### JESSE C. LITVAK,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES OF AMERICA

### Preliminary Statement

Defendant-appellant Jesse C. Litvak lied in multiple bond trades about important aspects of the transactions, causing victims to pay millions of extra dollars in undisclosed commissions to his firm.

Litvak was a securities broker who traded bonds known as residential mortgage-backed securities ("RMBS"). Litvak lied about the terms of

RMBS bond purchases and sales to customers who had no way to verify his statements: Litvak told buyers—falsely—that sellers were demanding higher prices and told sellers—falsely—that buyers would only pay lower prices, then kept the difference for his firm. In addition, when selling bonds from Jefferies' inventory, Litvak told buyers that he was negotiating with a non-existent seller to justify charging an unearned match-making commission.

By misrepresenting the true terms of trades, Litvak manipulated victims' prices and made trades less profitable for them, but more profitable for Jefferies. When one victim discovered that Litvak had lied, Litvak denied neither his conduct nor its significance; instead, he apologized and admitted his financial motive. Following an investigation, Litvak's scheme was exposed as a multi-year, multi-victim, multi-million dollar fraud on RMBS bond investors. Litvak was ultimately convicted on fifteen counts related to this scheme.

On appeal, Litvak argues principally that his lies were immaterial, that the jury instructions were flawed and that the district court erred by excluding certain evidence. For the reasons set forth below, those claims are meritless. The district court's judgment should be affirmed.

2

**Statement of the Case**

On January 25, 2013, a grand jury indicted Litvak on sixteen counts of securities fraud, major fraud against the United States, and making false statements in a matter within the jurisdiction of Treasury. JA1; JA33. The district court (Janet C. Hall, C.J.) denied Litvak's motion to dismiss the indictment. Government Appendix ("GA__") 1.

On March 7, 2014, after a ten-day trial, a federal jury convicted Litvak of ten counts of securities fraud under 15 U.S.C. § 78j(b) & 78ff, one count of major fraud against the United States under 18 U.S.C. § 1031, and four counts of making false statements in a matter within the jurisdiction of the Department of the Treasury in violation of 18 U.S.C. § 1001.[1] JA920-21. On July 2, 2014, the district court denied Litvak's motion for judgment of acquittal and for a new trial. JA1010 (*United States v. Litvak*, 30 F. Supp. 3d 143 (D. Conn. 2014)). On July 23, 2014, the district court sentenced him to 24 months' imprisonment and a $1.75 million fine. JA1080.

Litvak is on release pending appeal.

## I. The RMBS bond market

From April 2008 to December 2011, Jesse C. Litvak worked as a licensed securities broker at

---

[1] One count was dismissed before trial. JA20-21.

3

Jefferies & Co., Inc. ("Jefferies"), where he traded RMBS bonds. JA333; JA362.

Litvak's customers were investment funds and hedge funds that owed their investors a fiduciary duty of best execution, which included seeking to "execute trades at the best possible prices." JA316 (Miller: "the [PPIF] managers had a fiduciary responsibility to Treasury"); JA410 (Canter: "as a fund manager with fiduciary duty to [his] clients [he is] trying to pay less for a bond"); JA469 (Vlajinac: "we aim to seek best price and best execution"); JA509 (Norris: as a buyer, "[m]y job is to buy it as cheaply as I can"); JA579 (Corso: as a seller, "I define best execution as the highest price possible").

Sophisticated professional investors like Litvak's customers perform their own market research, including attempting to figure out the price at which a broker-dealer purchased a bond. JA498-99. This analysis results in a range of prices at which a bond is an attractive investment. JA378-79; JA508-09; JA488-89. From the buyer's perspective, the lower a bond's purchase price, the higher its yield and the more profitable the investment will be. JA364; JA410; JA426; JA442 (Canter: "The lower the price, the higher yield and higher profit potential."); JA500; JA510; JA511; JA517; JA554-55. By contrast, from the seller's perspective, the higher a bond's sale price, the greater the profit. JA579.

4

In this market, bond investors negotiate prices in tiny increments known as "ticks," where one tick is equal to 1/32 of a percentage point (or 1/32 of a penny on the dollar).[2] JA369; JA515. As one portfolio manager put it, "every tick counts. It's important to us as bond investors." JA495. *See also* JA426 (Canter: walked away from trades "over 1 or 2 ticks").

The role of a licensed broker in the RMBS market, such as Litvak, is to match and act as an intermediary for buyers and sellers. JA363-64; JA517-18. The RMBS bond market is structured very differently from the stock market. JA362-63. There is no public source of information about when a bond last traded or its price. JA363. Buyers and sellers cannot negotiate directly, and rarely even know one another's identities. JA363; JA518. Instead, they must communicate indirectly through an intermediary broker. JA363. Thus, customers must rely on the information about deal terms provided by their broker. JA363; JA514.

A broker-dealer profits by selling an RMBS bond for a higher price than it paid, a difference known as the "markup" or "spread." JA402; JA519 (Wollman: contrasting to the stock mar-

---

[2] Bond prices can be expressed in various ways. For example, a price of 58.25% (*i.e.*, 58.25 cents on the dollar) is often written as "58-8" or "58 8/32s." JA369; JA493.

5

ket, "where there's a price that trades on the exchange and then you separately indicate a commission"). The information that a broker-dealer provides his customers can cause "the negotiation [to be] formed very differently." JA561. Although buying customers can ask, it is "very common" for broker-dealers to refuse "to divulge the price they bought a bond at." JA382. That refusal "factor[s] into the price that [the purchaser] buy[s] the bond at," because the purchaser would then have to "rely that much more on [its] own analysis and perhaps seek out other market information about that bond." JA382. As one RMBS bond buyer testified, "when the dealer gives us a price, we put that into our calculus for—what price we're going to pay for the bond." JA382.

There are three basic types of RMBS trades. JA370; JA375-76. First, a "bid list" or "BWIC" (an acronym of "Bids Wanted In Competition") is an auction in which potential buyers submit bids to the seller through brokers, like Litvak. JA370. A customer depends on his broker to transmit its bid and report back the result. JA370; JA491-92. If a broker submits a bid lower than the customer's bid (known as "backing up a bid"), the customer wants to know and would expect to receive the benefit of that lower bid if it were to win the auction. JA493; JA441. The second kind of bond trade is an "order," where a customer asks a broker to locate a counter-party willing to either

6

buy or sell a particular bond. JA376. The third type of trade is an "inventory trade," where a broker-dealer is the seller of a bond that it previously purchased. JA376. In inventory trades, buyers never pay an additional commission, because the broker-dealer is acting as a seller, rather than as an intermediary. *See, e.g.*, JA543-44; JA473; JA509.

## II. The Legacy Securities Public-Private Investment Program ("PPIP")

Litvak specialized in trading a specific type of RMBS bond that was eligible to be traded in a federal assistance program known as the Legacy Securities Public-Private Investment Program ("PPIP"). JA310-11. PPIP was created in 2009 to address the financial crisis and was a component of the federal bailout plan known as the Troubled Asset Relief Program ("TARP"). JA310-12. *See* Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201, *et seq*.; Public-Private Investment Program Improvement and Oversight Act of 2009, 12 U.S.C. § 5231a.

The Department of the Treasury was mandated by statute to use PPIP to address the problem of "troubled assets" in such a way as to "maximize[] overall returns to the taxpayers of the United States," 12 U.S.C. § 5201(2)(C), and "to minimize cost to the taxpayers," 12 U.S.C. § 5211(c)(4). By statute, "troubled assets" included the RMBS bonds traded by Litvak. JA312-14; 12 U.S.C. § 5202(9)(A). Specifically, Congress

7

contemplated that Treasury would "manage troubled assets...[by] establishing vehicles that are authorized, subject to supervision by the Secretary [of the Treasury], to purchase, hold, and sell troubled assets and issue obligations." 12 U.S.C. § 5211(c)(4). *See also* JA311-12.

Accordingly, Treasury oversaw the creation of nine Public-Private Investment Funds ("PPIFs"), investment vehicles which "were established in order to ultimately buy troubled assets," including RMBS bonds. JA311-13. Over one hundred firms applied to be PPIF managers, and Treasury selected nine, including AllianceBernstein, Invesco, and Wellington Management. JA312; JA314; JA326; JA365; JA468; JA490. These PPIFs were funded with public money from Treasury and private money from investors such as state and teacher pension funds, university endowments, sovereign wealth funds, investment funds, and banks. JA314; JA365. For every dollar of private investment a PPIF raised, Treasury matched it with three dollars of TARP money in equity and debt. JA314; JA365. Eventually, Treasury invested approximately $24 billion in the PPIFs. JA314. Given Congress's mandate to protect taxpayer funds, Treasury hoped to make (or at least not to lose) money through the PPIFs. JA317; JA368.

Treasury determined what securities the PPIFs could trade, but left day-to-day operations to the PPIF managers. JA312-13; JA326. How-

8

ever, it was important to Treasury that the
PPIFs execute trades at the best possible prices.
JA316; JA365. In addition, Treasury created a
system for supervising the PPIFs to "stay in
close contact" and ensure "there was no fraud,
waste and abuse." JA315-16; JA326. Under its
rules, Treasury regularly received information
from PPIF managers, whether informally, in
monthly reports and update calls, or in quarterly
reports containing "more robust data." JA315-16.
The PPIFs reported transaction data, including
the prices they paid for bonds, to Treasury.
JA324-25. As compared to private investors,
Treasury had "more in the way of rights given
its position and some of its mandates under the
law," including the ability "to audit and spot
check" a PPIF, to obtain information at "a very
extensive down to trade level data" level, to con-
duct "on-site visits," and to demand "any discus-
sion with the [PPIF] managers when [Treasury]
needed it." JA316. Treasury had the power to
terminate a PPIF that violated Treasury's rules
or failed to respond to its inquiries. JA365.

Congress also created within Treasury the
Office of the Special Inspector General for the
Troubled Asset Relief Program ("SIGTARP"). 12
U.S.C. § 5231; JA326. SIGTARP's duties were
broadly defined to include "conduct[ing], super-
vis[ing], and coordinat[ing] audits and investiga-
tions of the purchase, management, and sale of
assets by the Secretary of the Treasury" through

9

PPIP. 12 U.S.C. §§ 5231(c)(1), 5211. SIGTARP regularly prepared reports to Congress with "a detailed statement of all purchases, obligations, expenditures, and revenues associated with any [TARP] program established by the Secretary of the Treasury," including PPIP. 12 U.S.C. § 5231(i)(1).

Litvak tracked Treasury's progress establishing the PPIFs and knew which of his customers were PPIF managers. JA365-67; JA373; JA607-09.

## II. The evidence at trial

### A. Litvak's motive

Litvak was dissatisfied with the amount of money he was making. JA613; GA24 (chat: "Litvak: 'just sux that i cant even win when i win.... dont have to tell you how hard it is to buy bonds right...fml[.]' Rahbar: 'sorry buddy[.] just think about how much $$$$$$$$$ u have in the bank[.]' Litvak: 'but i want more $$$$'").[3] Litvak was particularly unhappy with the profitability of his bid list trades. JA608; GA25 ("im sick of letting this bwic sht keep me from making $$").

The profitability of Litvak's trades was "an important factor" in determining his annual bonus. JA760-61; JA765. Traders generally expect their annual bonus to be at least 5-12% of the

---

[3] All quoted electronic communications appear as in the original, unless otherwise noted.

10

profits that they earned for the firm. JA760-61. Litvak's misrepresentations increased Jefferies' profitability on the trades raised in the Government's case by $2,256,086.13. JA515; JA614-19; JA621; JA623; JA626-29; JA632-34.

## B. Discovery of Litvak's scheme

Michael Canter ran AllianceBernstein's PPIF (the "AB-PPIF"), which traded with Litvak. JA362; JA365.

On November 10, 2011, Canter received an email from Jefferies which inadvertently attached a spreadsheet with trade information that Canter would not normally see. JA367-69; JA397. That spreadsheet revealed Litvak had been lying to the AB-PPIF about price in certain trades, causing the AB-PPIF to unknowingly pay more than the agreed-upon 4-tick commission. JA370-74; JA621. For instance, in an April 2011 bid list trade, Litvak falsely claimed that the AB-PPIF's winning bid was too low. JA370-72. The AB-PPIF therefore increased its bid, and Litvak kept the difference between the first and second bids for Jefferies, increasing its commission from the agreed-upon 4 ticks to 20 ticks, five times what the AB-PPIF had agreed to pay. JA370-72. Canter testified that, after reading Jefferies' spreadsheet, "it was clear to me that [Litvak] had lied to us by asking us to improve our bid for this bond and others in this spread-

11

sheet, that he had lied to us about needing to improve our bid." JA372-73.

Canter confronted Litvak with this conclusion and Litvak admitted that "yes, he was sorry, that it was a hard year and guys were doing whatever they needed to make money." JA372-73. Canter testified about his reaction:

> So I started yelling. I said, I can't believe that you would do this to me. This feels very personal. I said that I can't believe you would do this to AllianceBernstein. We're one of the largest bond holders of Jefferies' debt. I said, are you freaking crazy doing this to the United States Treasury Department. Because of this, I'm going to have to report this. And, you know, I continued to yell. I was, like, we're—and I yelled out to the rest of the traders that sit around me that we are done doing business with Jefferies, they are in the box, the penalty box.

JA373.

## C. The offense conduct

Litvak was charged with making criminal misrepresentations in 11 RMBS bond trades. *See* JA594-95; GA27.

12

### 1. Litvak's misrepresentations

The documentary evidence included Litvak's verbatim misrepresentations to customers in connection with each charged trade, made via electronic communications including "chats." JA327; JA1011; JA1018. *See, e.g.*, JA380-81 (Counts 1-2, 12-14); JA375 (Counts 3, 12); JA492-93 (Counts 4, 12); JA470-72 (Count 5, 12, 15); JA630-31 (Count 6); JA575-76 (Count 8); JA511-14 (Counts 9-10); JA494-95 (Count 16). The evidence also included trade tickets and other records reflecting the prices at which Jefferies actually bought and sold bonds. JA594-95.

Litvak's misrepresentations fell into three categories. *First*, Litvak misrepresented to buyers the price that Jefferies was paying the seller for a bond. *See, e.g.*, JA40-45 (Indictment ¶¶ 33(a), 36-46). For example, on March 31, 2010, the AB-PPIF purchased two bonds from the same seller through Litvak. JA378-82; JA625-27; JA48-52 (Counts 1, 2, 12-14). Litvak falsely told Michael Canter of the AB-PPIF that Jefferies was paying the seller 58 and 58-8 for the two bonds, when the seller had agreed to accept 57-16 and 56-16. JA380-81; JA625-26. Canter agreed with Litvak that the AB-PPIF would pay Jefferies' purchase price, plus a small negotiated commission; Litvak agreed to "wash" or take no commission on the first bond and take a 5-tick commission on the second bond. JA381; JA432. By lying to Canter about the terms of the

13

trade, Litvak secretly increased the AB-PPIF's purchase price to take a 16-tick commission (worth $60,143.18) on the first bond and a 56-tick commission (worth an extra $602,396.91) on the second bond. JA381-82; JA626-27.

A mirror image of these transactions was the *second* category of Litvak's misrepresentations: when Litvak was negotiating with bond sellers, he misrepresented the price Jefferies was charging to buyers. *See, e.g.*, JA40-41 (Indictment ¶ 33(b)). An example of this type is Count 8, a January 7, 2010 sale by York Capital Management ("York"). JA48-49. After Litvak told Katherine Corso, York's portfolio manager, the price the buyer was bidding for York's bond, Corso asked Litvak, "how much do you work for?" to which he responded, "i think 8/32s is great." JA575-76. Litvak proposed that he deduct an 8-tick commission from the buyer's price, and asked whether the buyer should pay 61 or 61-8, saying "wanna get you the highest i can." JA576. Corso answered, "well i want best execution obv[iously] so try and get him to 61-8!" JA576. Litvak then falsely stated, "im selling him bonds at 61-8......will buy em from you at 61 [o]k?" JA576. In truth, the buyer paid Jefferies 62-12. JA632. By lying to Corso about the terms of the deal, Litvak secretly decreased York's sale price to take a 44-tick commission, worth an extra $228,561.45. JA632.

14

*Third*, in bonds Litvak sold from Jefferies' inventory, Litvak misrepresented to buyers that there was a third-party seller. JA41; JA46-48 (Indictment ¶¶ 34, 47-54). An example of this type of inventory sale was Count 11, a November 22, 2010 bond sale to the hedge fund Magnetar Capital ("Magnetar"). JA48-49 (Indictment ¶ 55). Jefferies purchased the bond on November 18, 2010 for 51-8. JA551. Four days later, Litvak misrepresented to Vladimir Lemin, a Magnetar portfolio manager, that he was negotiating with the bond's seller. JA542-43 (chat: "told him to give me an offer[...]he is offering me bonds at 55[....]he came off one point to 54"). When Lemin offered to pay 52-16, Litvak responded, "ok....let me go beat him up and see what I can do," then reported back, "he is at 53-16 bro....i beat him up pretty good to get that....and think we are getting to the end of the rope with him (ie i may be able to get 4-8/32s out of him)[.]" JA543. Lemin asked Litvak "see if you can buy them at 53 for me, pls[.]" JA543. Litvak replied "alright dude....he sold me bonds at 53....but it was painful getting him to do it! he literally was talking about bwic'ing them....and i was like dude...u cant.....so whatever the case.....i bot bonds at 53[.]" JA543. One minute later, Litvak wrote to a co-worker at Jefferies, "i bot em at 52-24," (itself a lie) and continued "lets see what the russian pays us." JA633. Falsely believing that Litvak had intermediated a deal between Magnetar and the seller, Vladimir Lemin agreed to pay an 8-

15

tick commission "on top" of Jefferies' purported purchase price, worth an extra $13,880.27. JA543-44; JA633. Lemin testified at trial that Magnetar does "not pay commission on inventory trades," because a commission is meant to compensate a broker-dealer who "buys from a seller and sells to a buyer." JA543-44. *See also* JA473 (Vlajinac: never "paid compensation on top in an inventory trade"); JA509 (Norris: "if you know it is [an] inventory trade, [you] do [not] ever pay commission to the broker/dealer").

The jury also saw a number of uncharged transactions in which Litvak made misrepresentations. *See, e.g.,* JA383-87; JA544-48; JA594-95; JA616. For instance, in a February 17, 2009, purchase by Soros Fund, Litvak misrepresented his negotiations with the bond's seller, writing "told him not to get too cute....believe me...im working for u bro [...] 28-16 and they are yours....and that is with me makin 8 ticks....full disclosure....thats how I roll[.]" JA616. Soros agreed to Litvak's proposal and paid a price of 28-16. In truth, Jefferies paid only 27-16, meaning that instead of "makin 8 ticks," Litvak's commission was 32 ticks, a difference of $398,026.21. JA616.

The Government also introduced Litvak's discussion with a co-worker. JA613-14. Before misrepresenting the winning bid in a bid list auction, Litvak's co-worker asked, "NO WAY FOR THEM TO KNOW WHERE WE BID, RIGHT[?]"

16

Litvak reassured him, "no shot what-so-ever that they will know where we bot." JA614. The customer ended up paying a commission 31 ticks greater that it had agreed to, worth an extra $71,461.11. JA614-15.

By the conclusion of the trial, the defense conceded that Litvak had made misrepresentations to his customers in RMBS bond trades. JA886; JA889; *see also* Def.'s Br. at 2.

## 2. Effect of misrepresentations

In each trade, Litvak and his customer negotiated Jefferies' commission as a term of the deal, which buyers then added to the seller's sale price or sellers then deducted from the buyer's purchase price. *See, e.g.*, JA370-71; JA380-81; JA384; JA410 (Canter: "our bid is based on that information, and we're paying on top of that"); JA434; JA509 (Norris: "We had a contract. We had negotiated, you know, transaction fee that was agreed upon by both parties for each of those transactions."); JA583 (Corso: deal was that "Litvak was making eight ticks in the spread between the buy and sell as an explicit arrangement with [her]," not that he "could keep whatever he wanted"); JA520 (Wollman: "[W]e're talking about the price that the seller ultimately wants to sell, where [Litvak] is going to buy it, and then the commission is a separate component to that trade."); JA519 (Wollman: Litvak had "an agreement with me whereby [he] will

17

facilitate the transfer of a security at a price where that price reflects the cost that [he had] paid to acquire it plus a fair market spread in so doing the service").

Litvak's victims testified that his misrepresentations affected the terms of their deal:

- Michael Canter of the AB-PPIF testified that "of course" knowing the truth that Litvak was misrepresenting the sellers' sale prices "would have mattered to [him]." JA381-83. This information would have "been important" because, had he known Jefferies actually paid a lower price, "[Canter's] investors would have gotten a better price." JA377. *See also* JA381-82 (lies "mattered...[b]ecause if we had been told [the truth], we would have been able to buy it at a lower price, I believe"). At the very least, Canter would have had reason to bid differently. JA410 ("Our bid...may be constructed based on the information we received about where the seller is willing to sell the bond.... [O]ur bid is based on that information, and we're paying on top of that.").

- It would have mattered to Alan Vlajinac of the Wellington PPIF that Litvak misrepresented an inventory bond to be an order because he has never "paid compensation on top in an inventory trade." JA473.

18

- Brian Norris of the Invesco PPIF "absolutely" would have wanted to know that Litvak lied to conceal that he had secretly "backed up" Invesco's bid in a bid list auction and "would have demanded that extra money for [his] investors." JA493-95 (fact that "Litvak wasn't telling [him] the truth about that bid, in fact, had sen[t him] an altered document to deceive [him]" was "important to [him]" because "it means that my clients are paying more for the bond than we thought we were paying"); JA506 ("we should have been able to buy the bond cheaper"); JA508 (what Litvak told him "affected how much [his] clients paid for that bond...to the tune of $75,000"); JA509 ("There's a transaction cost that is added to our investment analysis and that transaction cost is what we were deceived on."). Where "Litvak didn't give [Norris] truthful information on what he bought the bond at on the bid list, [Norris was not] able to do the job for the taxpayers and for [his] clients." JA509.

- Joel Wollman of QVT testified the information that Litvak purchased a bond for less than he stated "was important," and, if Wollman had known the seller's true price, he "would have offered to pay a lower price." JA514-15. *See also* JA517 ("important" to know "Litvak wasn't making...4 ticks, but was making 16 ticks" because "[Wollman]

19

wouldn't want to pay such a large commission. [He] would have wanted to pay less.").

- It would have mattered to Katherine Corso of York that Litvak sold her bond "for a lot higher that what he had told me," and if she had known she "would have either tried to rip up the trade or try to get compensation for the difference or it would have affected our relationship with Jefferies." JA576-77. *See also* JA583 ("attempt to get best execution for [her] clients or investors was hindered by Litvak's representation that [']I'm selling the him bonds at 61-8['] if in fact the bonds were sold for 62-12").

- Vladimir Lemin of Magnetar testified that if he had known the seller's true sale price, he would not have agreed to pay an inflated purchase price that included a 20-tick commission for Jefferies. JA548.

Litvak's misrepresentations were sufficiently serious to put Jefferies' continued business relationship with his customers in jeopardy. JA381 (Canter: "[I]f I knew that he was being untruthful..., then it would've affected us doing future business with him."); JA489 (Vlajinac: "I would not want to be" "doing business with a broker/dealer who [I] knew had been lying to [me]"); JA576 (Corso: "would have affected our relationship with Jefferies").

20

Litvak's misrepresentations also had an economic effect on his victims. By lying to buying customers about the seller's price, Litvak convinced his customers to pay more for bonds. *See* JA385 (Canter: "that's money that could have gone to my investors instead of to Jefferies"); JA446 (Canter: "I felt like he was taking money from clients...meaning firms like mine."); JA381 (Canter: "[J]ust in terms of the numbers,...if we could have bought the bond at a lower price, that would have been more profitable for my clients."); JA495 (Norris: "my clients are paying more for the bond that what we thought we were paying"); JA508 (Norris: lie "affected how much [his] clients paid for that bond...to the tune of $75,000"). By lying to selling customers about the buyer's price, Litvak convinced his customers to sell bonds for less. JA576-77 (Litvak "sold them for a lot higher than what he had told me."); JA583 (Corso: "attempt to get best execution for [her] clients or investors was hindered by Litvak's representation that [']I'm selling him bonds at 61-8['] if in fact the bonds were sold for 62-12"). By lying about non-existent sellers when bonds were in Jefferies' inventory, Litvak caused his customers to pay a match-making commission which they would never knowingly pay. JA473; JA489; JA509; JA543-44.

## Summary of Argument

I. The evidence presented at trial was sufficient for the jury to convict Litvak of securities

21

fraud under § 78j(b), TARP fraud under § 1031, and making false statements under § 1001.

*First*, a rational jury could find that Litvak's lies were material for purposes of securities fraud. The victim testimony and documentary evidence established that Litvak's misrepresentations affected victims' transaction prices and made their RMBS bond investments less profitable, demonstrating a substantial likelihood that a reasonable investor would have deemed Litvak's lies significantly altered the total mix of information. Litvak does not deny that he lied to victims; instead he claims that those lies were immaterial as a matter of law under *Feinman v. Dean Witter Reynolds*. However, Litvak did not raise this argument below and, in any event, *Feinman* is distinguishable on its facts.

*Second*, the evidence established Litvak's intent to commit securities fraud. Based on victim testimony and documentary evidence of Litvak's deceptive conduct, a rational juror could have found that Litvak had the intent to deceive, manipulate, and defraud his victims. Litvak ignores the controlling case law to argue that the Court should apply the mail or wire fraud "intent to harm" standard.

*Third*, the Government presented overwhelming evidence that Litvak's lies were material to Treasury for purposes of TARP fraud and making false statements. Treasury is statutorily obligated to protect taxpayer funds by managing

22

RMBS bonds in a manner that maximizes profit and minimizes cost to the taxpayers. Litvak's lies to the investment managers delegated by Treasury to invest Treasury funds according to Treasury's rules affected the information reported to Treasury and resulted in diminished returns to taxpayers Treasury was mandated to financially protect.

*Fourth*, that same evidence was sufficient to prove that Litvak's lies occurred in a matter within Treasury's jurisdiction.

II. The district court properly instructed the jury.

*First*, the district court's instruction on the intent element of securities fraud was proper. The district court followed controlling case law and required "a specific intent to deceive." Litvak's argument that the district court should have used the "intent to harm" standard from mail and wire fraud ignores that precedent.

*Second*, the district court's materiality instructions on TARP fraud and making false statements were proper. Read as a whole, the jury instructions required the jury to find that Litvak's lies materially affected Treasury.

*Third*, the jury instructions did not constructively amend the Indictment's TARP fraud charge. The district court's instructions and the Indictment's allegations substantially corre-

23

sponded because this Court's prior decisions have held that "a scheme and artifice to obtain...property" encompasses a scheme to deprive victims of information necessary to make a discretionary economic decision.

III. The district court did not abuse its discretion by excluding certain defense evidence.

*First*, the district court's rulings that Litvak's expert testimony was unreliable, irrelevant, and prejudicial were not manifestly erroneous.

*Second*, it was not an abuse of discretion to find that evidence concerning bad acts of Litvak's co-workers—which he was not aware of—was irrelevant to his state of mind and unfairly prejudicial.

## Argument

## I. The evidence was sufficient for the jury to convict Litvak of securities fraud, TARP fraud, and making false statements.

### A. Standard of review

A defendant challenging the sufficiency of the evidence "faces an uphill battle, and bears a very heavy burden." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (citation omitted). The Court reviews such challenges *de novo*, but—viewing the evidence "in the light most favorable to the government, with all reasonable

24

inferences drawn in its favor"—will affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citations omitted). "Under this stern standard, a court...may not usurp the role of the jury by substituting its own determination of...the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005) (citations and quotations omitted).

"[J]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008). Because there is rarely direct evidence of a person's state of mind, "the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *MacPherson*, 424 F.3d at 189.

Where an argument is not raised to the district court, this Court reviews only for plain error. *See United States v. Marcus*, 560 U.S. 258, 262 (2010). Like a majority of circuits, this Court has held that when a defendant raises specific grounds in a Rule 29 motion below, arguments that are not specifically raised are waived on appeal. *United States v. Rivera*, 388 F.2d 545, 548 (2d Cir. 1968); *United States v. Chong Lam*, 677 F.3d 190, 200 (4th Cir. 2012) (collecting cases).

Under the plain error standard, "an appellate court may, in its discretion, correct an error not

25

raised at trial only where the appellant demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Marcus*, 560 U.S. at 262 (citations and quotations omitted).

## B. The evidence established that Litvak's lies were material for purposes of securities fraud.

### 1. Relevant facts

Prior to trial, Litvak sought dismissal of the Indictment under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure. GA28. In that motion, Litvak argued that the Indictment failed to sufficiently allege that his misstatements were material. GA56-66. Litvak did not argue that his misstatements were immaterial as a matter of law or cite *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996).

The district court denied Litvak's motion to dismiss, finding, *inter alia*, that "[c]hallenges to the government's evidence for supporting an element of a charged crime are not appropriate for Rule 12(b) motions to dismiss" because "whether a statutory element has been satisfied is a matter for trial." GA9.

26

After the jury convicted Litvak on ten counts of securities fraud, JA920-21, Litvak moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure. GA70. In that motion, Litvak argued that "[n]o reasonable professional investment manager would (or actually did) consider [Litvak's] [mis]statements so important as to significantly alter the total mix of information available in making their investment decisions." GA82. Although Litvak cited *Feinman*, he did so only to argue that this Court "has found that misrepresentations concerning broker fees are certainly not necessarily material." GA85. Again, Litvak did not argue that his misstatements were immaterial as a matter of law. GA80-87. The district court denied Litvak's Rule 29 motion, finding, *inter alia*, that the "trial evidence sufficiently supported a finding of materiality." JA1015.

## 2. Governing law

"Determination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination." *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) ("The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts...and these assessments are peculiarly ones for the trier of fact.")). *See also Press v. Chemical In-*

27

*vestment Services Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("[M]ateriality is a mixed question of law and fact that generally should be presented to a jury."). "The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (citation omitted). "The factual component requires an inference as to whether the information would likely be given weight by a person considering that question." *Id.* (citation omitted).

For purposes of securities fraud, to be considered material "there must be substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449; *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (applying standard to actions under Rule 10b-5). Therefore, "[t]he question of materiality...is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus.*, 426 U.S. at 445.

Only where misrepresentations are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance, [may] a court...find the misstatements immaterial as a matter of law." *Feinman* 84 F.3d at 540-41 (quotation and citation omitted). In other words, a misrepresenta-

28

tion "may be immaterial if the information is trivial, or is so basic that any investor could be expected to know it." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quotations and citations omitted). But the Supreme Court has refused to restrict materiality to only those misstatements that affect the value of a security. *SEC v. Zandford*, 535 U.S. 813, 820 (2002).

### 3. Discussion

#### a. The evidence presented was sufficient to support a finding of materiality under Rule 10b-5.

The overwhelming evidence showed that Litvak's lies "significantly altered the 'total mix' of information made available" and that they "assumed actual significance in the deliberations" of reasonable investors. *TSC Indus.*, 426 U.S. at 449.

First, the most straightforward evidence of materiality was the trial testimony of Litvak's victims from which a rational jury could have found that Litvak's misrepresentations were material to a reasonable professional investment manager's decision about the price at which it would purchase or sell a RMBS bond. Several fund manager victims testified that Litvak's lies unquestionably mattered to them and affected their purchase decisions. *See, e.g.*, JA381-82 (Canter: lies "mattered...[b]ecause if we had been told [the truth], we would have been able to buy

29

it at a lower price, I believe"); JA493-94 (Norris: "absolutely" would have wanted to know truth and "would have demanded that extra money for [his] investors."); JA495 (Norris: misrepresented fact was "important to [him]" because "it means that my clients are paying more for the bond than we thought we were paying"); JA576-77 (Corso: "would have either tried to rip up the trade or try to get compensation for the difference or it would have affected our relationship with Jefferies"); JA514-15 (Wollman: "that information was important" and "would have offered to pay a lower price"); JA473 (Vlajinac: would have mattered to know bond was in Jefferies' inventory); JA548 (Lemin: would not have paid final price).

Second, the jury heard undisputed testimony that Litvak apologized to a victim and explained that he had a financial motive to lie. JA372. That evidence could give rise to a rational inference that even Litvak recognized the materiality of his misrepresentations.

Third, the jury heard that when AllianceBernstein learned Litvak had lied about prices in its transactions, it refused to do business with Jefferies for months. JA362; JA373. Several victims testified that Jefferies would have faced similar business consequences had they learned of Litvak's fraud. JA381; JA489; JA576-77. This strong reaction makes sense in light of the fiduciary duty that fund managers owe their inves-

30

tors to achieve best execution, which includes transacting at the best possible price. Because Litvak's lies affected the final price, they were necessarily material. JA509 (Norris: not "able to do the job for the taxpayers and my client"); JA583 (Corso: "attempt to get best execution for [her] clients or investors was hindered"); JA383-84.

Fourth, the jury heard that Litvak's lies made the trades charged as securities fraud $1,397,005.75 less profitable for victims and more profitable for Jefferies. JA626-29; JA632-34; JA1034.

### b. Litvak's Rule 10b-5 materiality arguments are unavailing.

Litvak, appealing the district court's denial of his Rule 29 motion, now argues for the first time that his misstatements were immaterial as a matter of law. Def.'s Br. at 23-25. Because Litvak forfeited this argument by failing to raise it below, it is reviewed for plain error. But, regardless of the standard of review, the materiality of Litvak's lies was properly put to the jury. *TSC Indus.*, 426 U.S. at 450.

Litvak's materiality argument rests principally on *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996). In *Feinman*, this Court affirmed an order granting summary judgment, holding that the plaintiffs' class action complaint failed to plead materiality as a matter of law. *Id.*

31

at 540-41. Defendant stock broker firms were alleged to have charged a "transaction fee" ranging from $2.35 to $4.85 for each purchase or sale of stock processed. The plaintiffs conceded that they received trade slips that accurately reported these transaction fees. Yet the complaint alleged fraud on the grounds that the transaction fees exceeded the defendants' actual costs for processing and handling, and instead represented hidden commissions. *Id.*

In considering civil securities fraud cases, the Court referenced the elements of reliance and materiality, noting that "[c]ases in which we have refused to find that representations were not material as a matter of law have involved misstatements or omissions that did, or at least had the potential to, cause the plaintiff financial harm."[4] *Id.* at 541. The Court contrasted that standard to the facts before it, and found that "reasonable minds could not find that an individual investing in the stock market would be affected in a decision to purchase or sell a security by knowledge that the broker was pocketing a dollar or two of the fee charged for the transaction." *Id.* The allegedly fraudulent fees were nominal and the plaintiffs were never misled as

---

[4] Although Litvak claims that misrepresentations that "did not affect the value of the securities" are immaterial as a matter of law, Def.'s Br. at 24-25, the Supreme Court has expressly rejected that argument. *Zandford*, 535 U.S. at 820.

32

to how much they were paying for the brokerage firms' services. *Id.* Moreover, the transaction fees were added after the fact, and were not alleged to have affected the price of the securities. *Id.* at 540-41.

The facts of this criminal case are very different. Unlike *Feinman*, Litvak's misrepresentations regarding the terms of the deal directly affected the price of securities. Rather than lying about the allocation of dollars within a known fee, Litvak lied to secretly boost commissions by increasing purchase prices and decreasing sale prices.

Unlike *Feinman*, Litvak's misrepresentations occurred in an opaque market. Other than Litvak's word, his victims lacked any information about what prices counter-parties were actually trading at, which Litvak exploited.

Unlike *Feinman*, Litvak's victims explicitly negotiated the components of their transaction prices, including Jefferies' acquisition cost and the size of Jefferies' commission. *See, e.g.*, JA410 (Canter: "our bid is based on that information, and we're paying on top of that"); JA509 (Norris: "We had negotiated, you know, [a] transaction fee that was agreed upon by both parties for each of those transactions."); JA583 (Corso: "Litvak was making eight ticks in the spread between the buy and sell as an explicit arrangement with [her]"); JA520 (Wollman: price "was derived as a price that [']you go and source it[']

33

and then a commission on top"). While some victims may have taken Litvak's statements "with a grain of salt," JA473, it defies common sense to suppose that profit-oriented investment professionals would waste time negotiating something immaterial.

Unlike *Feinman*, Litvak's misrepresentations were not "unrelated to value." Def.'s Br. at 25. To the contrary, Litvak's lies caused "financial harm" by making victims' investments less profitable. *Feinman,* 84 F.3d at 541. Litvak's victims testified that knowing the truth about a fact that affected price would have mattered to them and caused them to pay less, demand compensation from Jefferies, cancel the trade, or offer to pay a lower price. *See supra* at pages 17-21.

Unlike *Feinman*, the amounts at issue here are not so insignificant that they could not have mattered to *any* reasonable person. The RMBS market was so competitive that "every tick counts," JA495, and trades were known to fall apart "over 1 or 2 ticks," JA426. It was in that context that Litvak's lies caused victims' to miss out on $602,396.91 of profit on a single trade. JA627.

Putting aside *Feinman*, Litvak also cites aged common law authority to argue that a misrepresentation is material only if it goes to "the very ground on which the transaction has taken place." Def.'s Br. at 26. The Court should not use common law cases that predate the federal secu-

34

rities fraud statutes to interpret Rule 10b-5. As the Supreme Court has cautioned, such "[r]eference to common-law practices can be misleading" because "an important purpose of the federal securities statutes was to rectify perceived deficiencies in the available common law protections by establishing higher standards of conduct in the securities industry." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 388–89 (1983). Thus, Rule 10b-5 purposely expanded on the cramped definition of materiality found in Litvak's common law cases to require only a "substantial likelihood that the [misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449. *See Mayhew*, 121 F.3d at 52 ("[T]he information need not be such that a reasonable investor would necessarily change his investment decision based on the information[.]").

Finally, Litvak argues that his conviction "raise[s] the specter of criminal liability for commonplace conduct in negotiations." Def.'s Br. at 28. To make this claim, Litvak inaccurately frames his conduct as misleading victims about Jefferies' "true reservation price." But, in fact, the evidence showed that Litvak lied to victims about a crucial term of the deal. When acting as a conduit between buyers and sellers in exchange for a commission, Litvak lied about Jef-

35

feries' acquisition or sale price in order to convince his victims to agree to trade at a less favorable price and secretly increase Jefferies' commission. In inventory trades, Litvak lied about the existence of a third-party to convince victims to pay an inapplicable match-making commission.

Litvak's conviction does not blur the line between ordinary negotiations and criminal securities fraud because his misrepresentations directly impacted a term of the deal, namely price. Consider the July 1, 2010 transaction in which Brian Norris, portfolio manager for the Invesco PPIF, asked Litvak to submit a bid of 79-24 for a bond being sold in an auction. JA492. Litvak falsely told Norris that he was "using" Invesco's bid, then five minutes later reported "winner bro[...]i bid your level . . .so will work for whatever you want big man." JA492-93. Norris offered to pay a commission of 6 ticks, which Litvak accepted by saying "6/32s is great," resulting in a total price of 79-30 to the Invesco PPIF. JA493. But Litvak was lying to Norris to conceal that he had secretly "backed up" Invesco's bid (or underbid his customer) by bidding 79-16, which won the auction. JA492-93. By lying, Litvak increased Jefferies' commission on this five-minute, risk-free trade from 6 ticks to 14 ticks, a difference worth $73,018.53. JA493-94; JA629. *See also supra* at pages 13-17.

36

In this example, as in all of the charged trades, Litvak's lies pertained to a deal term of significance to a reasonable investor, evidenced here by Norris's testimony that he would have demanded that Jefferies return the commission to his investors. JA493-94. Thus, affirmatively misrepresenting a term of the deal that is actually negotiated is qualitatively different from bluffing about the lowest price one would be willing to accept.

In sum, *Feinman* does not apply to Litvak's conduct, his common law fraud cases do not apply to the charged crime, and his concern for typical negotiators is a red herring. Accordingly, there is no basis to find that Litvak's misrepresentations were immaterial as a matter of law.

## C. The evidence established Litvak's intent to commit securities fraud.

### 1. Governing law

Securities fraud requires an "intent to defraud," which in this context means to act with the specific intent to deceive. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976) (for § 10(b) and Rule 10b-5, "'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud"); *United States v. Newman*, 773 F.3d 438, 447 (2d Cir. 2014); *United States v. Kaiser*, 609 F.3d 556, 567-68 (2d Cir. 2010) (approving of the following securities fraud instruction: "In order to convict the defendant, you

37

must find that he knew that false statements were being made,...and that he did this with intent to cause a deception, a falsification.").

## 2. Discussion

There was sufficient evidence for a rational jury to find that Litvak had the required intent to deceive his customers.

First, when confronted by Canter, Litvak apologized and said "it was a hard year and guys were doing whatever they needed to make money." JA372. The jury was entitled to conclude from this evidence that Litvak felt remorse that economic pressure had motivated him to intentionally deceive customers in order to increase profits.

Second, the jury saw extensive documentary evidence of Litvak's deceptive conduct. The evidence included electronic chats showing that Litvak planned to deceive victims, actually lied to victims, and celebrated his success in deceiving victims. *See, e.g.*, JA614-15; JA626; JA742; JA375; JA380-81; JA383-87; JA470-72; JA492-95; JA511-14; JA544-48; JA575-76; JA616; JA630-31; JA633. This and other evidence established that Litvak knew his statements were false when he made them, and were not the product of confusion or ignorance. *See, e.g.,* JA594-95.

38

Third, the jury heard uncontested testimony about Litvak's financial motive to deceive his victims. JA625-29; JA632-33. By lying, Litvak secretly increased Jefferies' commission by as much as $602,396.91 on a single trade, although he was willing to do so to boost profits by just $276.38. JA626-27; JA634; JA495.

Fourth, the jury heard the testimony of victims about how Litvak's lies increased Jefferies' profitability at their expense. *See, e.g.*, JA583; JA508-09; JA514; JA517. This was strong circumstantial proof that Litvak intended to deceive his customers.

Litvak seeks to avoid the evidence against him by arguing that securities fraud requires an "intent to harm," citing the intent standard for mail and wire fraud. Def.'s Br. at 31-35. Litvak incorrectly claims that *United States v. O'Hagan*, 521 U.S. 642, 654 (1997), "suggested" that mail and wire fraud cases "are a 'particularly apt source of guidance' in interpreting the requirements of securities fraud." Def.'s Br. at 31-32. Not only is *O'Hagan* factually distinguishable—limited as it is to insider trading under a misappropriation theory, 521 U.S. at 654, rather than fraudulent misrepresentations like Litvak's—but also it does nothing to "suggest" an equivalence between the intent elements of mail fraud and securities fraud.

More significantly, Litvak's intent argument is contrary to controlling case law. He ignores

39

the "intent to deceive, manipulate, or defraud" standard announced by the Supreme Court more than 30 years ago in *Hochfelder*, 425 U.S. at 193 & n.12. He also ignores the numerous decisions applying *Hochfelder*. *See, e.g.*, *Newman*, 773 F.3d at 447; *Kaiser*, 609 F.3d at 567-68; *United States v. Vilar*, 729 F.3d 62, 93 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2684 (2014); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175-76 (2d Cir. 1993).

Litvak also does not acknowledge that this Court has expressly recognized that securities fraud has a different intent element than mail or wire fraud. *See United States v. Chiarella*, 588 F.2d 1358, 1371 (2d Cir. 1978) (specific intent to defraud is not an element of securities fraud), *rev'd on other grounds*, 445 U.S. 222 (1980); *United States v. Dixon*, 536 F.2d 1388, 1398 (2d Cir. 1976) (Friendly, J.: "[T]he Government's burden with respect to criminal intent on the Securities Exchange Act counts was less than under the mail fraud counts."); *United States v. Lincecum*, 2000 WL 1015927, at *1 (2d Cir. July 20, 2000) (summary order) (distinguishing securities fraud from wire fraud on the basis that the government "need not prove that the defendant intended to cause harm to the victim of the fraud").

Litvak is incorrect when he points to two district court cases as having "required contemplated harm in construing the fraudulent-intent el-

40

ement of securities fraud." Def.'s Br. at 33 (citing *United States v. Whitman*, 904 F. Supp. 2d 363, 373-74 (S.D.N.Y. 2012), *aff'd*, 555 Fed. Appx. 98 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 352 (2014), and *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 427 (S.D.N.Y. 2003)). Neither of those factually inapposite cases changed *Hochfelder's* intent standard.

In any event, even if this Court were now to require intent to harm, the evidence met that standard, further distinguishing this case from the mail and wire fraud cases relied on by Litvak. *See* Def.'s Br. at 32-37 (citing *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006); *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970)). In each of those cases, the charged fraud had no potential adverse effect on its supposed victims. In contrast, here, Litvak lied about a term of the deal, leading to an inference that "the intent of the schemer [was] to injure another to his own advantage by withholding or misrepresenting material facts." *Regent Office*, 421 F.2d at 1182. Thus, this case is distinguishable from Litvak's mail and wire fraud cases because his misrepresentations were directed to the "price of goods...or otherwise to the nature of the bargain." *Id.* at 1179. *See also Starr*, 816 F.2d at 98 ("[T]he harm con-

41

templated must affect the very nature of the bargain itself."); *Novak*, 443 F.3d at 159 (same).

### D. The evidence established that Litvak's lies were material for purposes of TARP fraud and § 1001.

#### 1. Governing law

This Court has not addressed materiality under 18 U.S.C. § 1031, but the parties agree that because that statute is based on the mail, wire and bank fraud statutes, materiality under § 1031 should follow the well-established definition of materiality from those fraud crimes. Def.'s Br. at 51. Accordingly, for purposes of § 1031, "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (citation, internal quotation, and alteration omitted); *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007).

This materiality standard also applies under § 1001. *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012).

#### 2. Discussion

The Government presented overwhelming evidence that Litvak's misrepresentations were material to Treasury for the purposes of TARP fraud and making false statements.

42

Treasury had a statutory obligation to protect taxpayer funds by "manag[ing] troubled assets in a manner designed to minimize cost to the taxpayers" and reporting "suspected fraud, misrepresentations, or malfeasance…." 12 U.S.C. §§ 5211(c)(4) and 5214(a)(3). Anything that prevented Treasury from carrying out this directive—such as reaping diminished investment returns as a result of Litvak's misrepresentations—would have a natural tendency to influence its decisionmaking.

Although Treasury did not tell the fund managers what to pay for specific RMBS bonds, Treasury required PPIFs to obtain bonds "at the best possible prices" because "the [PPIF] managers had a fiduciary responsibility to Treasury…[involving] billions of dollars." JA316; *see also* 12 U.S.C. § 5231a (program must ensure that "fiduciary duties to public and private investors…are not violated"). As such, Treasury required that each manager, as a fiduciary, adhere to a specific best execution policy, orally communicate with Treasury, and submit monthly trade reports giving Treasury access to "pretty detailed information" including "which bonds were being bought" and the "price paid" for a specific bond because "Treasury…wanted to know what was going on with respect to its investments" so it could "ensure that [the PPIF's] were doing what they say they are doing." JA314; JA317; JA323. *See also* JA365 (Canter:

43

"quarterly I would have to certify...that I was complying with all these rules the Treasury had put in place for the program").

Treasury undeniably knew and was concerned about the prices PPIFs were paying for RMBS bonds, which were improperly inflated as a result of Litvak's misrepresentations. Broker-dealers' profits, including those earned by Litvak on charged transactions, were reflected in the "all-in" price in the monthly reports PPIF managers were required to provide to Treasury. *See* JA324. Commissions paid to Litvak had an impact on returns because commissions were "imbedded into the price" and "[w]e knew that it was 4 ticks every time." JA428. As one PPIF manager put it, "The lower the price, the higher yield and higher profit potential," which results in a "more profitable investment for [PPIF investors] potentially." The purpose of negotiating price, including commissions, is "to get the best price for the investors." JA442-43; JA374. Similarly, another PPIF manager testified that his "job is to buy [the bond] as cheaply as [he] can," and "[i]f Mr. Litvak didn't give [him] truthful information on what he [Litvak] bought the bond at on the bid list," the fund manager could not "do the job for the taxpayers and for [his] client." JA509.

Furthermore, the evidence showed that if any PPIF manager failed to follow the rules, Treasury had the authority to terminate that manag-

44

er. JA365. Treasury instituted these extensive monitoring procedures, "to make sure...there was no fraud, waste and abuse." JA316.

The response to AllianceBernstein's complaint highlights the significance of Litvak's misrepresentations to Treasury. AllianceBernstein was required to report Litvak's conduct to Treasury's Office of Financial Stability. JA373. Indeed, when Litvak admitted that he had lied, Canter reacted by asking, "are you freaking crazy doing this to the United States Treasury Department[?] Because of this, I'm going to have to report this." JA373. Treasury was required to refer reports of fraud in PPIP to SIGTARP because "it was part of the law." JA315-16. *See also* 12 U.S.C § 5214(a)(3). The fact that Treasury actually referred the matter to SIGTARP for investigation, JA607, demonstrates that Treasury regarded Litvak's conduct as significant.

Litvak argues that his misrepresentations could not have been material to Treasury because it "lacked the authority to make the only decision that Litvak's statements allegedly affected: the decision by the PPIP fund managers to negotiate harder to obtain a better price." Def.'s Br. at 52.[5] But it is undisputed that the

---

[5] Litvak cites *Rigas*, where this Court concluded that there was no evidence that the lies could have influenced the bank's decision on rates which was "cabined by the ranges set in the [governing]

45

information the PPIFs reported to Treasury was affected by Litvak's conduct and had a negative effect on the profitability of the PPIFs.

In light of the evidence, any reasonable jury could have found that Litvak's false statements were material to Treasury because they were not only capable of, but did in fact, influence Treasury.

### E. The evidence established Litvak's lies occurred "in [a] matter within the jurisdiction" of Treasury, satisfying the jurisdictional element of § 1001.

#### 1. Governing law

Section 1001 prohibits false statements "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001.

The statutory term "jurisdiction" is broadly defined and "covers all matters confided to the authority of an agency or department." *United States v. Rodgers*, 466 U.S. 475, 479 (1984); *Bilzerian*, 926 F.2d at 1300. It "differentiates the official, authorized functions of an agency or de-

---

[a]greement[]." 490 F.3d at 235-36. Here, by contrast, the jury heard overwhelming evidence that Treasury's primary concern was profitability, and that Litvak's lies prevented PPIF managers' from executing at the best price. JA315-16; JA381-82; JA473; JA509.

46

partment from matters peripheral to the business of that body." *Rodgers*, 466 U.S. at 479.

A federal agency has "jurisdiction" when it has "authority to act upon the information," *Bilzerian*, 926 F.2d at 1300, or "power to exercise authority in a particular situation," *Rodgers*, 466 U.S. at 479. Importantly, the question of "jurisdiction" does not turn on whether the federal agency has the authority or power to make "final or binding determinations." *Id.* at 482. Nor does § 1001 require "the false statement must actually have been submitted to a department or agency of the United States, but rather that it was contemplated that the statement was to be utilized in a matter which was within the jurisdiction of such department or agency." *United States v. Candella*, 487 F.2d 1223, 1227 (2d Cir. 1973).

## 2. Discussion

There was sufficient evidence for a rational jury to find that Litvak made his misrepresentations in a matter within Treasury's jurisdiction.

The uncontested evidence was that PPIFs were established by Treasury, with managers selected by Treasury, as a part of Treasury's TARP bailout plan, for the purpose of purchasing troubled assets specified by Treasury, with funds supplied by Treasury, operating under Treasury's supervision and according to Treasury's rules. Moreover, PPIFs submitted reports

47

to Treasury that actually reflected bond trade and price information affected by Litvak's fraudulent statements.

Contrary to Litvak's argument, under these circumstances, Treasury's lack of a direct role in executing individual trades is not dispositive of its jurisdiction. This Court has held that, where a federal agency delegates day-to-day control over or responsibility for a program to private entities "subject to explicit regulation, supervision and audit," the federal agency retains jurisdiction over matters in the program. *Candella*, 487 F.2d at 1226. *See also United States v. Davis*, 8 F.3d 923, 929 (2d Cir. 1993) ("Merely because the Bureau of Prisons chose to delegate part of this responsibility [for care of federal inmates] to a state facility does not remove these matters from its jurisdiction.").

## II. The district court properly instructed the jury on the elements of securities fraud, TARP fraud, and making false statements.

### A. Standard of review

This Court reviews jury instructions to which a defendant objected *de novo*. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). If there is error, this Court will vacate a criminal conviction only if the error prejudiced the defendant by misstating the law. *United States v. Ferguson*, 676 F.3d 260, 275 (2d Cir. 2011). In-

48

structions are reviewed in their entirety to determine "whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United States v. Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001). Even if a particular instruction or portion thereof is deficient, this Court reviews "the entire charge to see if the instructions as a whole correctly comported with the law." *United States v. Jones*, 30 F.3d 276, 283 (2d Cir. 1994).

Where a defendant fails to object, this Court reviews only for plain error. *See* Fed. R. Crim. P. 30(d); Fed. R. Crim. P. 52(b); *Ferguson*, 676 F.3d at 276. "A reviewing court typically will not find such error where the operative legal question is unsettled." *Weintraub*, 273 F.3d at 152.

## B. The district court properly instructed the jury on intent to commit securities fraud.

### 1. Relevant facts

The district court's three-page instruction to the jury on intent to commit securities fraud explained "[t]o act with 'intent to defraud' here means to act willfully and with the specific intent to deceive." JA978. At Litvak's request, the district court also instructed the jury that "[t]he misrepresentation or omission must have had the purpose of inducing the victim of the fraud to undertake some action." JA978; JA785; JA1018.

49

In cross-examining victims and in closing argument, the defense raised the issue of whether victims ultimately lost money on their investments with Litvak. JA432; JA436; JA481-82; JA580; JA890. The district court noted that it had been prompted by this line of argument to include the following "no ultimate harm" instruction:

> [I]n considering whether or not Mr. Litvak acted in good faith, I instruct you that if you were to find that Mr. Litvak honestly believed that ultimately no one would lose money, or even that everyone would make a profit in the end, such an honest belief will not excuse fraudulent actions or false representations. No amount of honest belief on Mr. Litvak's part that the scheme would ultimately make a profit for everyone, or that no one would be harmed, will excuse fraudulent actions or false representations by him.

JA980. *See* JA458-59; JA786.

## 2. Discussion

The district court's securities fraud instruction requiring "the specific intent to deceive," JA978, comported with this Court's decisions, which require "a mental state embracing intent to deceive." *Newman*, 773 F.3d at 447. Indeed, the intent instruction was even more exacting than what this Court typically requires because,

50

at Litvak's urging, JA785, the district court also instructed that "[t]he misrepresentation or omission must have had the purpose of inducing the victim of the fraud to undertake some action," JA978.

Litvak argues, however, that the district court should have instructed the jury using the "intent to harm" standard from mail and wire fraud cases. As discussed *supra* at pages 39-40, this argument ignores more than 30 years of controlling case law. *See Hochfelder*, 425 U.S. at 193 & n.12.

Litvak also argues that it was error for the district court to give a "no ultimate harm" instruction. But the district court felt it necessary to give that instruction because the defense repeatedly raised the issue of whether the victims had ultimately lost money on bonds they purchased through Litvak. *See* JA458-59; JA786; JA890 (defense closing: "[N]obody lost any money.... Nobody lost any money on any of these trades...."). Accordingly, Litvak's reliance on *United States v. Rossomando*, is misplaced, as that case expressly states that a "no ultimate harm" instruction is proper where, as here, "there is a sufficient predicate in the record." 144 F.3d 197, 202 (2d Cir. 1998).

51

### C. The district court properly instructed the jury on the materiality elements of § 1001 and § 1031.

#### 1. Relevant facts

Because there was no allegation or evidence that Litvak had made misrepresentations directly to Treasury, the district court modified the standard § 1001 instruction "to make this be a charge relevant to the record in the case and within the confines of the statute." JA854; JA851-52. The district court instructed the jury that a false statement is material under § 1001 if it has "a natural tendency to influence, or is capable of influencing, the decision of a reasonable decisionmaker in a matter within the jurisdiction of the United States government." JA998. Shortly thereafter, in its instruction on the jurisdictional element of § 1001, the district court explained that "where the deception at issue is made to a private party receiving Federal funds, such deception may be within the jurisdiction of the United States government if it affected a Federal department or agency because of that department or agency's responsibility to ensure that its funds are properly spent." JA1001-1002.

With respect to materiality under § 1031, the court instructed the jury that "[a] material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement to make an investment decision." JA986. Litvak

52

did not object to this instruction. JA850; JA1020-21 n.5.

## 2. Governing law

To be material for purposes of § 1001, a false statement must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Gaudin*, 515 U.S. at 509 (quotations omitted); *see also Adekanbi*, 675 F.3d at 182.

## 3. Discussion

The district court's instructions on materiality followed controlling precedent.

With respect to § 1001, although the district court did not specifically instruct that Litvak's false statements had to be material to Treasury in its materiality instruction, it did so moments later in its jurisdictional instruction. There, the district court instructed that the jurisdictional element of § 1001 required that Litvak's misstatements "affected a Federal department or agency." False statements that "affected" a federal department by definition must have had a "natural tendency to influence, or [be] capable of influencing" that federal department.[6] That the

---

[6] There is no meaningful distinction between "influencing" and "affecting." *See United States v. Ballistrea*, 101 F.3d 827, 835 n.5 (2d Cir. 1996) (using terms interchangeably).

district court informed the jury about this requirement in its jurisdictional instruction rather than its materiality instruction was not error. When read together as the jury heard them, these two instructions provided an accurate summary of controlling law. *See United States v. Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003).

Litvak argues that the district court's instructions allowed "the jury to convict...if it found a statement material to a PPIP manager's decision, even though it was irrelevant to Treasury." Def.'s Br. at 54. But that argument ignores the fact that the jury concluded beyond a reasonable doubt that Litvak's lies actually "affected a federal department," JA1001-02, which is a higher materiality standard than the law requires. *Gaudin*, 515 U.S. at 509.

Litvak also seems to argue, albeit not clearly, that the district court's § 1031 materiality instruction was erroneous. Def.'s Br. at 54. Because Litvak did not object to the district court's § 1031 instruction, that instruction is reviewed for plain error. Since neither the Supreme Court nor this Court have specifically defined materiality under § 1031, any error cannot have been plain. *See Weintraub*, 273 F.3d at 152; *see also United States v. Bastian*, 770 F.3d 212 (2d Cir. 2014) (holding that a purported error could not be plain error because the legal question was unsettled in the Second Circuit).

54

**D. The district court properly instructed the jury on the definition of a "scheme and artifice to obtain...money and property" under § 1031.**

### 1. Relevant facts

Paragraph 57 of the Indictment alleged that Litvak "devised a scheme and artifice to defraud the United States and to obtain money and property...." JA50.

In its § 1031 instructions, the district court explained that "a contemplated deprivation of money or property can include a deprivation of material information necessary to make discretionary economic decisions." JA987.

### 2. Governing law

This Court has held in the context of fraud statutes analogous to § 1031 that the term "property" includes the right to control one's assets and the information necessary to make discretionary economic decisions. *See United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007) (*per curiam*) ("The court properly described the harm to the victims' property interests as the deprivation of information necessary to make discretionary economic decisions."); *United States v. Dinome*, 86 F.3d 277, 283-84 (2d Cir. 1996) (approving instruction: "Under the mail fraud statute, the definition of property includes intangible property interests...[which are] injured when

55

a person is deprived of information he would consider valuable in deciding how to use his assets.").

### 3. Discussion

Litvak argues that because the Indictment "said nothing about the deprivation of information or the alleged victims' right to control such information," the district court instruction was a constructive amendment. Def.'s Br. at 57.

This Court has "proceeded cautiously" in finding constructive amendment. *United States v. Agrawal*, 726 F.3d 235, 259-60 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1527 (2014). "[W]here a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment." *Vilar*, 729 F.3d at 81 (quotations omitted).

Here, the Indictment generally framed "a scheme and artifice...to obtain money and property." JA50. Under controlling case law, that encompassed the specific legal theory of a "deprivation of information necessary to make discretionary economic decisions." *Carlo*, 507 F.3d at 802. Therefore, the district court's instruction was correct and there was no constructive amendment. *See Vilar*, 729 F.3d at 81.

56

## III. The district court acted well within its discretion in excluding irrelevant and prejudicial evidence, including baseless expert testimony.

### A. Standard of review and governing law

This Court gives a district court's evidentiary rulings great deference in recognition of its "superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010). This Court therefore "will reverse an evidentiary ruling only for abuse of discretion, which we will identify only if the ruling was arbitrary and irrational." *Id.* (quotations and citations omitted). "A decision to...exclude expert...testimony is not an abuse of discretion unless it is 'manifestly erroneous.'" *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citations omitted). And even if evidence was erroneously excluded, "[e]rrors are not grounds for reversal if they are harmless, *i.e.*, if there is 'fair assurance' that the 'judgment was not substantially swayed by the error.'" *United States v. Gonzalez*, 764 F.3d 159, 168 (2d Cir.) (citation omitted), *cert. denied*, 135 S. Ct. 492 (2014).

"The right to present a defense...does not give criminal defendants carte blanche to circumvent the rules of evidence." *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992) (per curiam).

57

"Evidence is 'relevant' if it has 'any tendency to make a fact more or less probable than it would be without the evidence' and if 'the fact is of consequence in determining the action.'" *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012) (quoting Fed. R. Evid. 401). Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of...unfair prejudice, confusing the issues, [or] misleading the jury...." Fed. R. Evid. 403.

Expert testimony is admissible only if it "'both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). Otherwise admissible expert testimony may still be excluded under Rule 403. *United States v. Onumonu*, 967 F.2d 782, 786 (2d Cir. 1992).

## B. The district court's exclusion of Litvak's expert evidence was not manifestly erroneous.

### 1. Relevant facts

Although the district court found that Litvak's second expert disclosure did not comport with Rule 16(b)(1)(C), JA252-53; JA651; JA710, the court still considered the reliability and admissibility of his experts' opinions, JA253.

58

Litvak's first expert, Ram Willner, proposed to testify on the immateriality of Litvak's misrepresentations to his victims, the fiduciary duties of Litvak's victims to their investors, whether the bonds in the charged transactions traded at a fair market value, whether victims later managed to sell the bonds in question at a profit, and the volatility of the RMBS bond market. JA208-14; JA252-53. The district court found these opinions irrelevant, and specifically held that testimony about bonds' fair market value and victims' post-fraud profits would be prejudicial and confusing to the jury. JA253-54.

Litvak's second expert, Mark Menchel proposed to testify that Litvak had no duty to disclose facts he misrepresented, on the definition of industry terms, and that victims would not consider certain facts misrepresented by Litvak important. JA218-22; JA253-54. The district court found that most of these opinions were irrelevant, and that Menchel lacked any basis to opine on certain industry terms or what was important to Litvak's victims. JA253-54. The district court permitted Menchel to testify on the definition of terms raised during trial. JA253-54; JA710-12; JA715-16.

Notwithstanding these rulings, the defense was able to introduce evidence and argue in its closing that victims' trades with Litvak were profitable. JA580; JA890.

59

### 2. Discussion

#### a. Litvak does not argue that the district court's exclusion of expert evidence under Rules 702 or 403 was manifestly erroneous.

Litvak ignores the district court's Rule 702 and 403 rulings. JA253-54; JA710-12; JA715-16. Those were prudent grounds to exclude Litvak's expert evidence and, by failing to challenge them in his brief, Litvak has waived the argument that the district court committed manifest error. *See Cantor Fitzgerald, Inc. v. Lutnick*, 313 F.3d 704, 711 n.3 (2d Cir. 2002) ("Because this claim was first raised in plaintiffs' reply brief we need not consider it.").

#### b. Willner's expert testimony was irrelevant.

First, Willner's testimony about whether Litvak's lies should have been material to victims was irrelevant. JA208-09; JA213. The materiality of Litvak's lies was for the jury to decide. *Bilzerian*, 926 F.2d at 1295 ("[T]estimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice.").

Second, Willner's testimony about the fair market value of bonds was irrelevant. JA208-12. There was no evidence that Litvak considered or

60

performed an analysis of fair market value. It also is not an element of any charged crime that the transactions occurred outside the range of potentially "fair" prices. Indeed, the evidence reflected that one victim specifically requested "best execution," reflecting the importance to investors of obtaining the best possible price to maximize returns for their clients. JA576.

Third, Willner's testimony about victims' net profitability was irrelevant. JA212-14. Whether a victim eventually made or lost money on its bond investment had no bearing on whether Litvak made material misrepresentations with criminal intent, and loss is not an element of any charged crime. Moreover, regardless of victims' net profit or loss, Litvak's misrepresentations made their investments relatively less profitable by driving up victims' purchase prices and driving down their sale prices. Finally, even if this testimony was relevant, excluding it was harmless error because the defense had other evidence on victim profitability and was able to argue the point to the jury. JA580; JA890 ("[Y]ou can see in here that they bought at one price...then later, they sold the bond at a higher price."). *See United States v. Oluwanisola*, 605 F.3d 124, 134 (2d Cir. 2010) (harmless error analysis factors include "whether the excluded material was cumulative" of other evidence and "the extent to which the defendant was otherwise permitted to advance the defense").

61

### c. Menchel's expert testimony was irrelevant.

Litvak does not contend that all of Menchel's testimony was relevant, just that it was error to exclude his opinions on "industry practices," specifically "the structure of a broker-dealer's compensation on a trade, explaining that these were arm's-length transactions in which Mr. Litvak owed no duty to the counterparties and in which the broker-dealer made profits not by charging commissions but by selling the securities at a higher price than it acquired them." Def.'s Br. at 42. But Menchel was permitted to offer testimony on "industry practices," including "the structure of a broker-dealer's compensation on a trade," the "arm's-length" nature of certain transactions, a broker-dealer's "duty to the counterparties," how a "broker-dealer made profits," and the meaning of "commissions." JA817-19.

Litvak elicited this expert testimony in response to evidence that Litvak's misrepresentations created the misimpression that he was negotiating on behalf of his victims. *See, e.g.*, JA616 (Litvak: "believe me…im working for u bro[…]full disclosure….thats how I roll"); JA512 (Wollman: "in effect…[Litvak]'s acting as agent"); JA514-15; JA517; JA518 (Wollman: "I feel that in the transaction they are acting as agent to me"). But Menchel was ignorant of that factual evidence; he reviewed only a small number of Litvak's communications and did not

62

speak to victims. JA224; JA819-20. Moreover, as Menchel admitted, the relationship between a broker-dealer and its customer depends on the deal that they strike. JA820. Thus, it is no surprise that the jury simply found Menchel's opinions unconvincing.

### d. Litvak's arguments do not establish manifest error.

Litvak criticizes the district court for comparing the proffered expert evidence to "what this case is about." Def.'s Br. at 42-43, 45. But controlling case law instructs a trial court to tether relevance rulings to the facts of the case. *Daubert*, 509 U.S. at 591 (explaining that court must decide whether expert evidence is relevant to any issues in the case before it); *Coppola*, 671 F.3d at 244 (evidence is relevant if "the fact is of consequence in determining the action").

As the district court found, this case was about whether Litvak's misrepresentations were made with fraudulent intent and were material to victims' decisions to transact at prices that made investments less profitable. *See* JA254. None of the crimes charged required the Government to prove that the victims relied on Litvak's lies, breached their fiduciary duties, or even had clean hands. These civil concepts that Litvak attempted to introduce through his experts have no relevance to the elements of crim-

63

inal securities fraud, TARP fraud, and false statements.

## C. The district court's exclusion of the defendant's other evidence was not an abuse of discretion.

### 1. Relevant facts

It is undisputed that Litvak's supervisors encouraged or permitted him to lie to customers. JA43; JA431; JA742-43; JA823.

The district court excluded evidence regarding lies by other Jefferies employees. JA642-45. The defense argued the excluded evidence went to Litvak's state of mind, insofar as it "has to do with supervisory approval of the tactics that are the subject of this trial." JA642-43. The district court ruled that such evidence was irrelevant because Litvak was unaware of the transactions and further that the evidence was unfairly prejudicial. *See* JA645.

Despite these rulings, the defense managed to introduce evidence that other Jefferies' employees made misrepresentations to customers, in some instances with the knowledge or approval of supervisors. JA700; JA726-31: JA742-43; JA764-65; JA769-70. Further, the defense argued in closing that supervisors' knowledge of misrepresentations by other Jefferies employees went to Litvak's state of mind. JA891 ("[T]he supervisory stamp of approval is important to Jes-

se's state of mind. And there's a lot more evidence of this because other supervisors approved these tactics and other traders and sales reps used them, too."); JA889-90; JA892-93.

## 2. Discussion

The district court correctly excluded evidence of lies by other Jefferies employees as irrelevant and unfairly prejudicial. Litvak did not claim that he knew about other Jefferies employees' misrepresentations. JA645. By definition, facts unknown to Litvak could not have had any impact on his state of mind.

Litvak incorrectly argues that the excluded evidence "would have tended to show that Mr. Litvak was unaware that his actions were unlawful." Def.'s Br. at 46. First, Litvak ignores the district court's decision to exclude this evidence under Rule 403, JA645, and thus has waived any argument challenging that ruling. *See Cantor Fitzgerald*, 313 F.3d at 711 n.3. Second, the Government was not required to prove that Litvak knew his actions were illegal. *Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense...is deeply rooted in the American legal system."). Third, Litvak's reliance on *United States v. Brandt* is misplaced because that case considered the relevance of facts known to the defendants and explicitly contem-

65

plated excluding state of mind evidence under Rule 403. 196 F.2d 653, 656-57 (2d Cir. 1952).

Finally, because the district court's ruling did not deprive the defense of its state of mind arguments, JA889-93, any error was harmless. *See Oluwanisola*, 605 F.3d at 134 (harmless error analysis factors include "the extent to which the defendant was otherwise permitted to advance the defense").

66

## Conclusion

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: February 17, 2015

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

JONATHAN N. FRANCIS
ASSISTANT U.S. ATTORNEY

HEATHER CHERRY
ASSISTANT U.S. ATTORNEY

Sandra S. Glover
Assistant United States Attorney (of counsel)

67

**Federal Rule of Appellate Procedure
32(a)(7)(C) Certification**

This is to certify that the foregoing brief complies with the 14,000 word limitation of Fed. R. App. P. 32(a)(7)(B), in that the brief is calculated by the word processing program to contain approximately 13,896 words, exclusive of the Table of Contents, Table of Authorities, Addendum, and this Certification.

JONATHAN N. FRANCIS
ASSISTANT U.S. ATTORNEY

**Addendum**

## 15 U.S.C. § 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \*

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

\* \* \*

### § 1001. Statements or entries generally

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

    **(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

    **(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

    **(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

\* \* \*

### § 1031. Major fraud against the United States

**(a)** Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

  **(1)** to defraud the United States; or

  **(2)** to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, including through the Troubled Asset Relief Program, an economic stimulus, recovery or rescue plan provided by the Government, or the Government's purchase of any troubled asset as defined in the Emergency Economic Stabilization Act of 2008, or in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, or any constituent part thereof, is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

\* \* \*